**UNITED STATES COURT OF INTERNATIONAL TRADE**

MEXICHEM FLUOR INC., AND E.I. DUPONT DE NEMOURS & CO.

*Plaintiffs,*

*v.*

UNITED STATES,

*Defendant,*

SINOCHEM ENVIRONMENTAL PROTECTION CHEMICALS (TAICANG) CO., LTD., ZHEJIANG QUHUA FLUOR-CHEMISTRY CO., LTD., AND ZHEJIANG SANMEI CHEMICAL INDUSTRY CO.,

*Defendant-Intervenors.*

Consol. Court No. 15-00004
Before: Hon. Leo M Gordon, Judge

**ORDER**

Upon consideration of plaintiffs' motions for judgment on the agency record, all responses and replies thereto, and all other relevant papers and proceedings herein, it is hereby

ORDERED, that plaintiffs' motion is granted; and it is further

ORDERED, that the decision by the U.S. International Trade Commission ("ITC") in the final determination in the investigations of *1,1,1,2 Tetrafluoroethane from China*, 79 Fed. Reg. 73102 (December 9, 2014), is not supported by substantial evidence is and otherwise not in accordance with law; and it is further

ORDERED that the *Final Determination* is hereby remanded to the ITC for reconsideration in accordance with the Court's opinion in this matter.

SO ORDERED.

____________________________________
Honorable Leo M Gordon, Judge

Dated: ____________________
New York, NY

**UNITED STATES COURT OF INTERNATIONAL TRADE**

MEXICHEM FLUOR INC., AND E.I. DUPONT DE NEMOURS & CO.

*Plaintiffs,*

*v.*

UNITED STATES,

*Defendant,*

SINOCHEM ENVIRONMENTAL PROTECTION CHEMICALS (TAICANG) CO., LTD., ZHEJIANG QUHUA FLUOR-CHEMISTRY CO., LTD., AND ZHEJIANG SANMEI CHEMICAL INDUSTRY CO.,

*Defendant-Intervenors.*

Consol. Court No. 15-00004
Before: Hon. Leo M Gordon, Judge

**MOTION OF PLAINTIFF MEXICHEM FLUOR INC. FOR JUDGEMENT ON THE RECORD PURSUANT TO RULE 56.2**

Pursuant to Rule 56.2 of the Rules of the United States Court of International Trade, Plaintiff Mexichem Fluor Inc. hereby moves for judgment on the agency record with regard to the International Trade Commission's final negative determination in the investigations of *1,1,1,2 Tetrafluoroethane from China*, published in the Federal Register on December 9, 2014 (79 Fed. Reg. 73102).

Plaintiff maintains that the International Trade Commission's final determination was contrary to law and unsupported by substantial evidence in the record. Plaintiff details its request and explains its reasons in the attached memorandum. Plaintiff asks the Court to remand the matter to the International Trade Commission for redetermination of these issues.

Respectfully submitted,

_/s/ Paul W. Jameson/
Roger B. Schagrin
Paul W. Jameson
Schagrin Associates
900 7th St. NW Suite 500
Washington, DC 20001
(202) 223-1700

*Counsel for Plaintiff Mexichem Fluor Inc.*

July 31, 2015

PUBLIC VERSION

**UNITED STATES COURT OF INTERNATIONAL TRADE**

MEXICHEM FLUOR INC., AND E.I. DUPONT DE NEMOURS & CO.

*Plaintiffs,*

*v.*

UNITED STATES,

*Defendant,*

SINOCHEM ENVIRONMENTAL PROTECTION CHEMICALS (TAICANG) CO., LTD., ZHEJIANG QUHUA FLUOR-CHEMISTRY CO., LTD., AND ZHEJIANG SANMEI CHEMICAL INDUSTRY CO.,

*Defendant-Intervenors.*

Consol. Court No. 15-00004
Before: Hon. Leo M Gordon, Judge

**PLAINTIFF MEXICHEM FLUOR INC.'S MEMORANDUM IN SUPPORT OF MOTION FOR JUDGEMENT ON THE RECORD PURSUANT TO RULE 56.2**

Roger B. Schagrin
Paul W. Jameson
SCHAGRIN ASSOCIATES
900 7th St. NW Suite 500
Washington, DC 20001
(202) 223-1700

*Counsel for Plaintiff Mexichem Fluor Inc.*

July 31, 2015

Table of Contents

I. Statement Pursuant to Rule 56.2(c)(1) .......... 1

A. Administrative Determination Sought to be Reviewed .......... 1

B. Issues of Law Presented .......... 1

II. Statement of Facts .......... 2

III. Summary of Argument .......... 10

IV. Standard of Review and Legal Standards .......... 12

V. The Commission's finding that "the decline in prices during the POI is associated with the cessation of the supply shortage that temporarily inflated prices" was not supported by substantial evidence .......... 18

VI. The Commission's finding that the market "stabilized in 2012 and 2013" was not supported by substantial evidence .......... 26

VII. The Commission's finding that the increase in market share by imports of R-134a from China between 2011 and 2012 "was a function of purchasers' response to the supply shortages that persisted through at least the end of 2011" was not supported by substantial evidence .......... 28

VIII. The Commission's finding that "that the increase in the COGS/net sales ratio is a function of the high price levels that existed at the beginning of the POI due to supply shortages -- and the subsequent alleviation of those shortages -- rather than the presence of subject imports" was not supported by substantial evidence .......... 36

IX. The Commission's failure to take into account as a condition of competition that, because of high fixed costs and safety issues involved in handling hazardous chemicals, the U.S. industry was forced to lower prices in 2012 and 2013 in response to the increase of low-priced imports in order to maintain high capacity utilization, was not in accordance with law .......... 38

X. Conclusion and Relief Sought .......... 39

TABLE OF AUTHORITIES

**Cases**

*Angus Chemical Co. v. United States*, 140 F.3d 1478 (Fed. Cir. 1998) ..................................... 14

*Asociacion de Productores de Salmon y Trucha de Chile AG v. United States*, 180 F. Supp. 2d 1360 (Ct. Int'l Trade 2002)........................................................................................ 15

*Gallant Ocean (Thailand) Co., Ltd. v. United States*, 602 F.3d 1319, 1323 (Fed. Cir. 2010)...... 12

*Gerald Metals, Inc. v. United States*, 132 F.3d 716 (Fed. Cir. 1997).................................... 14, 15

*Kenda Rubber Industrial Co., Ltd. v. United States*, 10 C.I.T. 120, 630 F. Supp. 354 (1986)..... 37

*Mittal Steel Point Lisas Ltd. v. United States*, 542 F.3d 867 (Fed. Cir. 2008) ...................... passim

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 103 S. Ct. 2856, 77 L. Ed. 2d 443 (1983)............................................................................................... 22

*Nippon Steel Corp. v. United States*, 458 F.3d 1345 (Fed. Cir. 2006)............................. 12, 14, 17

*Nippon Steel Corp. v. USITC*, 345 F.3d 1379 (Fed. Cir. 2003)................................. 14, 16, 20, 29

*Nucor Corp. v. United States*, 414 F.3d 1331 (Fed. Cir. 2005) .................................................. 17

*Swiff-Train Co. v. United States*, 904 F. Supp. 2d 1336 (Ct. Int'l Trade 2013) .......................... 22

*Taiwan Semiconductor Industry Ass'n v. USITC*, 266 F.3d 1339 (Fed. Cir. 2001) ............... 14, 15

*United States Steel Group v. United States*, 96 F.3d 1352 (Fed. Cir. 1996).......................... 16, 17

*Usinor v. United States*, 26 C.I.T. 767 (2002) ........................................................................ 34

**Statutes**

19 U.S.C. § 1516a(b)(1)(B) ........................................................................................... 12

19 U.S.C. § 1677(7)(A)................................................................................................... 13

19 U.S.C. § 1677(7)(B)................................................................................................... 13

19 U.S.C. § 1677(7)(C)(iii)....................................................................................... 13, 39

19 U.S.C. §§ 1671d(b), 1673d(b) ...................................................................................... 13

**Federal Register Notices**

*1,1,1,2 Tetrafluoroethane from China*, 78 Fed. Reg. 73832 and 73839 (December 9, 2013)........ 3

*1,1,1,2 Tetrafluoroethane from China*, 79 Fed. Reg. 62594 (October 20, 2014) .......................... 3

*1,1,1,2 Tetrafluoroethane from China*, 79 Fed. Reg. 62597 (October 20, 2014) .......................... 3

**ITC Publications**

*Certain Oil Country Tubular Goods From India, Korea, The Philippines, Taiwan, Thailand, Turkey, Ukraine, and Vietnam*, Investigation Nos. 701-TA-499-500 and 731-TA-1215-1217 and 1219-1223 (Final), USITC Publication 4489 (September 2014) ...................................... 12

*Softwood Lumber from Canada*, Inv. Nos. 701-TA-414 and 731-TA-928 (Remand), USITC Pub. 3658 (Dec. 2003) ........................................................................................................ 15

**Other Authorities**

H.R. Rep. 96-317 ........................................................................................................ 16

S. Rep. 96-249........................................................................................................ 16, 17

Statement of Administrative Action accompanying the Uruguay Round Agreements Act, H.R. Doc. No. 103-316, vol. 1, (1994), reprinted in 1994 U.S.C.C.A.N. 4040 ................................ 15

## I. Statement Pursuant to Rule 56.2(c)(1)

### A. Administrative Determination Sought to be Reviewed

The administrative determination sought to be reviewed is the final negative determination of the U.S. International Trade Commission ("ITC") in the investigation of 1,1,1,2 Tetrafluoroethane ("R-134a") from China. Notice of the final negative determination was published in the Federal Register on December 9, 2014 (79 Fed. Reg. 73102).

### B. Issues of Law Presented

The issues of law presented are:

1. Whether the Commission's finding that "the decline in prices during the POI is associated with the cessation of the supply shortage that temporarily inflated prices" was supported by substantial evidence. The finding is not supported by substantial evidence because the price declines continued years after the cessation of the shortage.
2. Whether the Commission's finding that the market "stabilized in 2012 and 2013" was supported by substantial evidence. The finding is not supported by substantial evidence because the market did not stabilize in 2012 and 2013, but rather imports continued to increase and prices continued to fall.
3. Whether the Commission's finding that the increase in market share by imports of R-134a from China between 2011 and 2012 "was a function of purchasers' response to the supply shortages that persisted through at least the end of 2011" was not supported by substantial evidence. The finding is not supported by substantial evidence because the record shows that importers [

   ].
4. Whether the Commission's finding that "that the increase in the COGS/net sales ratio is a function of the high price levels that existed at the beginning of the POI due to supply

shortages -- and the subsequent alleviation of those shortages -- rather than the presence of subject imports" was supported by substantial evidence. The finding is not supported by substantial evidence because [

].

5. Whether the Commission's failure to take into account as a condition of competition that, because of high fixed costs and safety issues involved in handling hazardous chemicals, the U.S. industry was forced to lower prices in 2012 and 2013 in response to the increase of low-priced imports in order to maintain high capacity utilization, was in accordance with law. This failure was not in accordance with law because the statute directs the ITC to "evaluate all relevant economic factors … within the context of the business cycle and conditions of competition that are distinctive to the affected industry." The commissioners voting in the negative did not mention the high fixed costs and safety issues that are distinctive to the R-134a industry that explains why, as these commissioners found, there was "general stability of the domestic industry's output, sales quantities, and market share," and yet there was a "severe decline in operating performance from 2011 to 2013."

## II. Statement of Facts

On October 22, 2013, plaintiff filed a petition (Con Doc 1)[1] with the U.S. Commerce Department ("Commerce") and the ITC, alleging that sales of R-134a produced in China were being subsidized and being sold in the United States at less than fair value. The ITC instituted an

[1] Confidential documents, as listed in the Index of the Administrative Record and Documents Furnished Pursuant to USCIT Rule 73.2(b), filed by the ITC on March 23, 2015, are designated by "Con Doc" followed by the document number in that Index. Public documents are designated by "Pub Doc" followed by the document number.

investigation. Pub Doc 6. Commerce also initiated its investigations. 78 Fed. Reg. 73832 and 73839 (December 9, 2013).

In the ITC's preliminary determination, the Commissioners voted unanimously that there was a reasonable indication that an industry in the United States was materially injured by reason of imports of R-134a from China that were allegedly sold in the United States at less than fair value and that were allegedly subsidized by the government of China. Pub Doc 56, at 3.

In its preliminary investigation, the ITC gathered data covering the years 2010 through 2012, and the first half of 2013 (compared to the first half of 2012). The ITC found that the volume of subject imports, and the increase in that volume, was significant both in absolute terms and relative to consumption in the United States. Con Doc 105, at 23. It found that there was significant underselling and price depression. Con Doc 105, at 27. It concluded that subject imports had a significant adverse impact on the domestic industry. "Subject imports gained market share and sales directly at the expense of the domestic industry, and in 2012, as market conditions began to normalize, subject imports lowered their prices, which depressed U.S. producers' prices and had a significant negative impact on the domestic industry's profitability." Con Doc 105, at 30.

In its final determinations, published on October 20, 2014, Commerce found subsidies ranging from 1.87 to 22.75 percent, depending on the company. 79 Fed. Reg. 62594. It found a dumping margin of 280.67 percent for all exporter/producers in China. 79 Fed. Reg. 62597. It also found that critical circumstances exist with respect to Bluestar and the PRC-wide entity. *Id.*

In its final investigation, the ITC gathered data for the years 2011 through 2013, and the first half of 2014 (compared to the first half of 2013). The data gathered for the preliminary investigation, which included data for 2010, remained in the record.

PUBLIC VERSION

The record before the ITC showed that after more than doubling from 2010 to 2011,[2] imports of R-134a increased further from [ ] tons in 2011 to [ ] tons in 2012. This elevated level of imports was sustained through 2013, only falling in the first half of 2014 (compared to the first half of 2013) after the petition was filed and the preliminary dumping and subsidy determinations were imminent. Con Doc 297, at C-3.

The staff report for the preliminary determination showed that the U.S. market share of R-134a imports from China increased [ ] from [ ] percent of apparent consumption in 2010 to [ ] percent in 2011. Con Doc 106, at C-3. For the final determination, with more complete information from importers, the ITC found that imports from China had captured [ ] percent in 2011. Con Doc 297, at C-3.

Imports from China increased their share of the U.S. market in 2012 to [ ] percent of apparent consumption, as import volume increased from [ ] tons in 2011 to [ ] tons in 2012. This share remained steady in 2013. After the petitions were filed in late 2013, Chinese market share declined somewhat to [ ] percent in the first half of 2014 in anticipation of the imposition and antidumping and countervailing duties. *Id.*

Prices for R-134a [ ] between 2011 and the first half of 2014. The average unit values of domestically-produced R-134a fell [ ] percent between 2011 and January-June 2014.

**Average Unit Values ($/lb) of U.S. Commercial Shipments of U.S. Producers' R-134a**

| | 2011 | 2012 | 2013 | Jan-Jun 2013 | Jan-Jun 2014 | |
|---|---|---|---|---|---|---|
| [ | | | | | | ] |

Source: U.S. Producers Questionnaire Responses

[2] Based on official Commerce statistics for HTSUS 2903.39.2020 only, imports of R-134a from China increased from 4,369 short tons in 2010 to 11,465 tons in 2011. *See* Pub Doc 56, at IV-4.

Table from Con Doc 262, at 12.

This decline followed the decline in the average unit value of imports of R-134a from China, which fell [ ] percent over this same period.

| Average Unit Values ($/lb) of Imports of R-134a | | | | | | |
|---|---|---|---|---|---|---|
| | 2011 | 2012 | 2013 | Jan-Jun 2013 | Jan-Jun 2014 | |
| [ | | | | | | ] |
| | | | | | | |
| Source: Importers Questionnaire Responses | | | | | | |

Table from Con Doc 262, at 12.

Although 2011 [ ] for prices, from the 2010 data that was gathered during the preliminary investigation, by the first half of 2014 prices [

]




Chart from Con Doc 277, at 8.

The ITC typically evaluates the extent of underselling by imports by seeking pricing information on specific products on a quarterly basis, and by simply adding up the quarters for each product in which the imported product undersold the domestic product and the quarters in which the imported product "oversold" the domestic product. Equal weight is given to each product regardless of the relative quantities of each product that is imported. On that basis, for the 66 quarters in which there was a comparison possible (there were seven products and fourteen quarters), there were 31 instances of underselling and 35 instances of overselling. Con Doc 297 at 26.

However, because there were significantly different quantities of each product type imported, this method skewed the results. "The quantity of subject imports in instances of

underselling, [ ] pounds, exceeded the quantity of subject imports in instances of overselling, which was [ ] pounds." Doc 297 at 26.

However, when the prices that importers paid for the R-134a that they imported from China is compared to the reported prices at which the importers sold the R-134a in the United States, the prices that were the basis of the underselling margin calculations were suspect.

| Calculation of Implied Mark-Up (Difference Between AUV for Imports and AUV for Commercial Shipments) | | | | | | | |
|---|---|---|---|---|---|---|---|
| | | 2011 | 2012 | 2013 | Jan-Jun 2013 | Jan-Jun 2014 | |
| Import AUV | [ | | | | | | ] |
| U.S. Commercial Shipments AUV | [ | | | | | | ] |
| MarkUp | [ | | | | | | ] |
| % MarkUp | [ | | | | | | ] |
| | | | | | | | |
| Source: Importers Questionnaire Responses | | | | | | | |

Table from Con Doc 262, at 10.

The prices reported by the importers in their questionnaire responses are never verified by the ITC. An evaluation of whether there has been price underselling depends on these reported prices to an important degree, but the Purchasers Questionnaire Responses reported that 17 out of 29 responding purchasers reported that imports from China were "inferior" on price, which, by the way the question was phrased, means that imports from China were lower priced than domestically-produced R-134a. Eleven purchasers said they were comparable, and only one said that the domestic price was lower. Con Doc 297 at II-24 (Table II-8). <u>The purchasers would not have reported such lopsided results if the sales prices reported by importers were accurate.</u>

The nature of the facilities that produce R-134a is that they must be run continuously in order to be efficient. Shutdowns are rare, and when they occur, it takes some time to get production back up to an efficient level. In such instances, the most logical response to increased import competition at lower prices is not to lose market share, but to reduce prices to meet that competition. That is what happened in this market during the period of investigation.

Imports [ ]. The domestic industry at first tried to maintain prices, but starting around [ ] they decided they had to reduce prices in order to keep their plants running at the necessary efficiency levels. As a result of the severely eroding prices for R-134a, U.S. producers, in a remarkably short amount of time, [ ].

| Domestic Industry Operations as in Books of Domestic Industry | | | | | | | |
|---|---|---|---|---|---|---|---|
| | | 2011 | 2012 | 2013 | Jan-Jun 2013 | Jan-Jun 2014 | |
| Operating Income | [ | | | | | | ] |
| Net Income | [ | | | | | | ] |
| Operating Income as % Net Sales | [ | | | | | | ] |
| Net Income as % Net Sales | [ | | | | | | ] |
| Source: PSR Table D-1 | | | | | | | |

Table from Con Doc 262, at 20.

In their final determination four Commissioners voted in the negative and two Commissioners voted in the affirmative, resulting in a final negative determination. Con Doc 297. Notice of the final negative determination was published in the Federal Register on December 9, 2014. Pub Doc 191.

The commissioners voting in the negative found "the volume of subject imports to be significant in absolute terms and relative to consumption." Con Doc 297, at 24. They also found that the pendency of the investigations affected the import volume in the first half of 2014, so that they accorded less weight to the first half 2014 data. *Id.* at 21, note 90.

The commissioners voting in the negative found mixed "instances of underselling and overselling by subject imports. The record shows more instances of overselling than underselling by subject imports on a quarterly basis and more underselling than overselling by subject imports on a volume basis." Con Doc 297, at 26.

The commissioners voting in the negative acknowledged that the domestic industry's prices declined over the period of investigation ("POI"). They wrote, however, that the "record

shows that prices at the beginning of the POI were at high levels due to the supply squeeze that began in 2010. Prices peaked in 2011. As the supply situation normalized in 2012, prices declined." They therefore concluded that "the decline in prices during the POI is associated with the cessation of the supply shortage that temporarily inflated prices." Con Doc 297, at 28.

The record shows, and the two dissenting Commissioners pointed out, that prices continued to decline in 2013 and the first half of 2014, well after the cessation of supply shortage in 2011. Con Doc 297, Dissent at 13, note 49. The commissioners voting in the negative did not mention the continuation of the price declines past 2012. Rather, they stated that the market "stabilized in 2012 and 2013." Con Doc 297, at 36.

The commissioners voting in the negative noted that the subject imports gained market share from 2011 to 2012. They stated that "this increase in market share was a function of purchasers' response to the supply shortages that persisted through at least the end of 2011. Thus, the supply situation of the domestic industry, rather than underselling by subject imports, explains the shifts in market share." Con Doc 297, at 27. They did not explain why imports of R-134a increased their share of the U.S. market *after* the "supply situation of the domestic industry" had eased. The two dissenting Commissioners pointed out that "the parties agreed that supply tightness was no longer a real issue after 2011." Con Doc 297, Dissent at 5.

The commissioners voting in the negative noted that the ratio of cost of goods sold ("COGS") to net sales increased from 2011 to 2013, but found that "this increase in the COGS to net sales ratio is attributable primarily to changes in net sales value, which decreased from $[ ] in 2011 to $[ ] in 2012 and then to $[ ] in 2013." Con Doc 297, at 30. They concluded "that the increase in the COGS/net sales ratio is a function of the high price

levels that existed at the beginning of the POI due to supply shortages -- and the subsequent alleviation of those shortages -- rather than the presence of subject imports." *Id*.

The commissioners voting in the negative also found that there was no threat of material injury by reason of R-134a imports from China. Con Doc 297, at 36-42.

The two Commissioners voting in the affirmative found that there was present material injury, and therefore did not address any threat issue. Con Doc 297, Dissent at 1-18.

**III. Summary of Argument**

The finding of the commissioners voting in the negative that the price trends in 2012 through the first half of 2014 were entirely due to the shortage in 2011 was not supported by substantial evidence. Imports continued to increase and prices continued to fall well after the shortage ended.

The finding that the market "stabilized in 2012 and 2013" was not supported by substantial evidence. The price trends do not support the conclusion that "the market stabilized in 2012 and 2013." The domestic producers of R-134a saw their average prices fall throughout the period, long after any shortage had ended. The commissioners voting in the negative were correct in noting that "the domestic industry's severe decline in operating performance from 2011 to 2013 was attributable to the decline in prices that occurred during the POI." Their conclusion that none, or none but a trivial amount, of that price decline was due to the price effects of unfairly traded imports, is not supported by substantial evidence and is not in accordance with law.

The finding that the increase in market share by imports of R-134a from China between 2011 and 2012 "was a function of purchasers' response to the supply shortages that persisted through at least the end of 2011" was not supported by substantial evidence and was not in accordance with law. The commissioners voting in the negative acknowledged that the supply

shortage ended in 2011, but claimed that purchasers did not buy even more imported R-134a in 2012 than they had in 2011 because the imported price was lower. They simply bought more imported R-134a in 2012, these commissioners claimed, because there had been a supply shortage in 2011. But under the law, facts that merely "mitigate the significance" of observed underselling are not sufficient to support a negative determination. The commissioners voting in the negative ignored evidence that significantly undercut their conclusions.

The finding that "that the increase in the COGS/net sales ratio is a function of the high price levels that existed at the beginning of the POI due to supply shortages -- and the subsequent alleviation of those shortages -- rather than the presence of subject imports" was not supported by substantial evidence. The commissioners voting in the negative were in effect saying that declining prices in the face of steady costs means that there is no injury by reason of imports, because prices were relatively high in the beginning of the period of investigation. These commissioners are saying that the increasing volume of imports at ever-lower prices is not a cause *at all* (or at best at a trivial level) of the increase in the ratio of COGS to sales between 2011 and 2013. This also requires the commissioners to maintain that the price effects of a short-term shortage in 2011 persist through 2013 and the first half of 2014, a position that is not supported by substantial evidence. Furthermore, [

]

The Commission's failure to take into account as a condition of competition that, because of high fixed costs and safety issues involved in handling hazardous chemicals, the U.S. industry

was forced to lower prices in 2012 and 2013 in response to the increase of low-priced imports in order to maintain high capacity utilization, was not in accordance with law. The statute directs the ITC to "evaluate all relevant economic factors … within the context of the business cycle and conditions of competition that are distinctive to the affected industry." The commissioners voting in the negative did not mention the high fixed costs and safety issues that are distinctive to the R-134a industry that explains why, as these commissioners found, there was "general stability of the domestic industry's output, sales quantities, and market share," and yet there was a "severe decline in operating performance from 2011 to 2013."

## IV. Standard of Review and Legal Standards

In reviewing the Commission's determination, the court will remand the Commission's determination if it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law. . . ." 19 U.S.C. § 1516a(b)(1)(B). Substantial evidence review requires consideration of "the record as a whole, including any evidence that fairly detracts from the substantiality of the evidence," *Gallant Ocean (Thailand) Co., Ltd. v. United States*, 602 F.3d 1319, 1323 (Fed. Cir. 2010) (internal quotation and citation omitted), and asks, in light of that evidence, "is the determination unreasonable," *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1351 (Fed. Cir. 2006) (internal quotation and citation omitted).

In every final injury determination, the ITC includes the same section on "Legal Standards." Con Doc 297, at 10-15. *Cf. Certain Oil Country Tubular Goods From India, Korea, The Philippines, Taiwan, Thailand, Turkey, Ukraine, and Vietnam*, Investigation Nos. 701-TA-499-500 and 731-TA-1215-1217 and 1219-1223 (Final), USITC Publication 4489 (September 2014), at 23-27. It is worth repeating this language almost in its entirety,[3] both because Plaintiff

[3] We omit much of the discussion of the effects of non-subject imports, because there were virtually no non-subject imports in this case, and the discussion is not relevant.

believes it characterizes well the standards that the ITC is to follow when making its injury determination, and because it appears that the commissioners voting in the negative dropped this boilerplate into their view and then utterly failed to follow these standards.[4]

{Beginning of quote from Con Doc 297, at 10-15.} In the final phase of antidumping and countervailing duty investigations, the Commission determines whether an industry in the United States is materially injured or threatened with material injury by reason of the imports under investigation. 19 U.S.C. §§ 1671d(b), 1673d(b). In making this determination, the Commission must consider the volume of subject imports, their effect on prices for the domestic like product, and their impact on domestic producers of the domestic like product, but only in the context of U.S. production operations. 19 U.S.C. § 1677(7)(B). The Commission "may consider such other economic factors as are relevant to the determination" but shall "identify each {such} factor ... and explain in full its relevance to the determination." 19 U.S.C. § 1677(7)(B). The statute defines "material injury" as "harm which is not inconsequential, immaterial, or unimportant." 19 U.S.C. § 1677(7)(A). In assessing whether the domestic industry is materially injured by reason of subject imports, we consider all relevant economic factors that bear on the state of the industry in the United States. 19 U.S.C. § 1677(7)(C)(iii). No single factor is dispositive, and all relevant factors are considered "within the context of the business cycle and conditions of competition that are distinctive to the affected industry." 19 U.S.C. § 1677(7)(C)(iii).

Although the statute requires the Commission to determine whether the domestic industry is "materially injured or threatened with material injury by reason of" unfairly traded imports, 19

---

[4] The following is not an exact quote from the ITC's Final Determination, in that the footnote numbering continues the footnotes numbering in this brief, and that, following the Court's Chamber Procedures 2(C)(2), the citations for the text are contained in the text rather than in footnotes. Also, any emphasis added has been added by Plaintiff for this brief.

U.S.C. §§ 1671d(a), 1673d(a), it does not define the phrase "by reason of," indicating that this aspect of the injury analysis is left to the Commission's reasonable exercise of its discretion. *Angus Chemical Co. v. United States*, 140 F.3d 1478, 1484-85 (Fed. Cir. 1998) ("{T}he statute does not 'compel the commissioners' to employ {a particular methodology}."), *aff'g*, 944 F. Supp. 943, 951 (Ct. Int'l Trade 1996). In identifying a causal link, if any, between subject imports and material injury to the domestic industry, the Commission examines the facts of record that relate to the significance of the volume and price effects of the subject imports and any impact of those imports on the condition of the domestic industry. This evaluation under the "by reason of" standard must ensure that subject imports are more than a minimal or tangential cause of injury and that there is a sufficient causal, not merely a temporal, nexus between subject imports and material injury.

The Federal Circuit, in addressing the causation standard of the statute, observed that "*{a}s long as its effects are not merely incidental, tangential, or trivial, the foreign product sold at less than fair value meets the causation requirement.*" *Nippon Steel Corp. v. USITC*, 345 F.3d 1379, 1384 (Fed. Cir. 2003). This was further ratified in *Mittal Steel Point Lisas Ltd. v. United States*, 542 F.3d 867, 873 (Fed. Cir. 2008), where the Federal Circuit, quoting *Gerald Metals, Inc. v. United States*, 132 F.3d 716, 722 (Fed. Cir. 1997), stated that "this court requires evidence in the record 'to show that the harm occurred "by reason of" the LTFV imports, not by reason of a minimal or tangential contribution to material harm caused by LTFV goods.'" *See also Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1357 (Fed. Cir. 2006); *Taiwan Semiconductor Industry Ass'n v. USITC*, 266 F.3d 1339, 1345 (Fed. Cir. 2001).

In many investigations, there are other economic factors at work, some or all of which may also be having adverse effects on the domestic industry. Such economic factors might

include nonsubject imports; changes in technology, demand, or consumer tastes; competition among domestic producers; or management decisions by domestic producers. The legislative history explains that the Commission must examine factors other than subject imports to ensure that it is not attributing injury from other factors to the subject imports, thereby inflating an otherwise tangential cause of injury into one that satisfies the statutory material injury threshold.[5] In performing its examination, however, the Commission need not isolate the injury caused by other factors from injury caused by unfairly traded imports.[6] Nor does the "by reason of"

---

[5] Statement of Administrative Action accompanying the Uruguay Round Agreements Act, H.R. Doc. No. 103-316, vol. 1, at 851-52 (1994), reprinted in 1994 U.S.C.C.A.N. 4040, 4186 ("SAA") ("{T}he Commission must examine other factors to ensure that it is not attributing injury from other sources to the subject imports."); S. Rep. 96-249 at 75 (1979) (the Commission "will consider information which indicates that harm is caused by factors other than less-than-fair-value imports."); H.R. Rep. 96-317 at 47 (1979) ("in examining the overall injury being experienced by a domestic industry, the ITC will take into account evidence presented to it which demonstrates that the harm attributed by the petitioner to the subsidized or dumped imports is attributable to such other factors;" those factors include "the volume and prices of nonsubsidized imports or imports sold at fair value, contraction in demand or changes in patterns of consumption, trade restrictive practices of and competition between the foreign and domestic producers, developments in technology and the export performance and productivity of the domestic industry"); *accord Mittal Steel*, 542 F.3d at 877.

[6] SAA at 851-52 ("{T}he Commission need not isolate the injury caused by other factors from injury caused by unfair imports."); *Taiwan Semiconductor Industry Ass'n*, 266 F.3d at 1345 ("{T}he Commission need not isolate the injury caused by other factors from injury caused by unfair imports ... . Rather, the Commission must examine other factors to ensure that it is not attributing injury from other sources to the subject imports." (emphasis in original)); *Asociacion de Productores de Salmon y Trucha de Chile AG v. United States*, 180 F. Supp. 2d 1360, 1375 (Ct. Int'l Trade 2002) ("{t}he Commission is not required to isolate the effects of subject imports from other factors contributing to injury" or make "bright-line distinctions" between the effects of subject imports and other causes.); *see also Softwood Lumber from Canada*, Inv. Nos. 701-TA-414 and 731-TA-928 (Remand), USITC Pub. 3658 at 100-01 (Dec. 2003) (Commission recognized that "{i}f an alleged other factor is found not to have or threaten to have injurious effects to the domestic industry, i.e., it is not an 'other causal factor,' then there is nothing to further examine regarding attribution to injury"), *citing Gerald Metals*, 132 F.3d at 722 (the statute "does not suggest that an importer of LTFV goods can escape countervailing duties by finding some tangential or minor cause unrelated to the LTFV goods that contributed to the harmful effects on domestic market prices.").

standard require that unfairly traded imports be the "principal" cause of injury or contemplate that injury from unfairly traded imports be weighed against other factors, such as nonsubject imports, which may be contributing to overall injury to an industry. S. Rep. 96-249 at 74-75; H.R. Rep. 96-317 at 47. *It is clear that the existence of injury caused by other factors does not compel a negative determination. See Nippon Steel Corp.*, 345 F.3d at 1381 ("*an affirmative material-injury determination under the statute requires no more than a substantial-factor showing. That is, the 'dumping' need not be the sole or principal cause of injury.*").

Assessment of whether material injury to the domestic industry is "by reason of" subject imports "does not require the Commission to address the causation issue in any particular way" as long as "the injury to the domestic industry can reasonably be attributed to the subject imports" and the Commission "ensure{s} that it is not attributing injury from other sources to the subject imports." *Mittal Steel*, 542 F.3d at 877-78; *see also id.* at 873 ("While the Commission may not enter an affirmative determination unless it finds that a domestic industry is materially injured 'by reason of' subject imports, the Commission is not required to follow a single methodology for making that determination ... {and has} broad discretion with respect to its choice of methodology.") *citing United States Steel Group v. United States*, 96 F.3d 1352, 1362 (Fed. Cir. 1996) and S. Rep. 96-249 at 75.[7] Indeed, the Federal Circuit has examined and

[7] Vice Chairman Pinkert does not join this paragraph or the following three paragraphs. He points out that the Federal Circuit, in *Bratsk*, 444 F.3d 1369, and *Mittal Steel*, held that the Commission is required, in certain circumstances when considering present material injury, to undertake a particular kind of analysis of non-subject imports, albeit without reliance upon presumptions or rigid formulas. *Mittal Steel* explains as follows:

> What *Bratsk* held is that "where commodity products are at issue and fairly traded, price competitive, non-subject imports are in the market," the Commission would not fulfill its obligation to consider an important aspect of the problem if it failed to consider whether non-subject or non-LTFV imports would have replaced LTFV subject imports during the period of investigation without a continuing benefit to the domestic industry. 444 F.3d at

affirmed various Commission methodologies and has disavowed "rigid adherence to a specific formula." *Nucor Corp. v. United States*, 414 F.3d 1331, 1336, 1341 (Fed. Cir. 2005); *see also Mittal Steel*, 542 F.3d at 879 ("*Bratsk* did not read into the antidumping statute a Procrustean formula for determining whether a domestic injury was 'by reason' of subject imports.").

{Discussion of *Gerald Metals, Bratsk,* and *Mittal Steel* omitted.}

The question of whether the material injury threshold for subject imports is satisfied notwithstanding any injury from other factors is factual, subject to review under the substantial evidence standard.[8] Congress has delegated this factual finding to the Commission because of the agency's institutional expertise in resolving injury issues. *Mittal Steel*, 542 F.3d at 873; *Nippon Steel Corp.*, 458 F.3d at 1350, *citing U.S. Steel Group*, 96 F.3d at 1357; S. Rep. 96-249 at 75 ("The determination of the ITC with respect to causation is ... complex and difficult, and is a matter for the judgment of the ITC."). {End of quote from CR 297, at 10-15.}

To summarize this legal standard, this means that an industry can be materially injured by unfairly traded imports even if the industry was profitable during the period of investigation. The ITC, for example, cannot find that the domestic industry as a whole did not have operating losses, conclude that the industry has not experienced material injury, and leave its analysis at that. Instead, it must carefully examine import volumes and prices.

If unfairly traded imports captured a more than minimal or tangential share of the market that but for those imports would have gone at least in part to the domestic industry; if unfairly

---

> 1369. Under those circumstances, Bratsk requires the Commission to consider whether replacement of the LTFV subject imports might have occurred during the period of investigation, and it requires the Commission to provide an explanation of its conclusion with respect to that factor.

542 F.3d at 878.

[8] We provide in our respective discussions of volume, price effects, and impact a full analysis of other factors alleged to have caused any material injury experienced by the domestic industry.

traded imports undersold the domestic industry by more than a minimal or tangential amount that but for those prices would have resulted in higher profits for the domestic industry; and if any other potential cause of injury to the domestic industry cannot explain all but a minimal or tangential amount of the injury experienced by the domestic industry, the ITC must under the statute make an affirmative determination.

The commissioners who voted in the affirmative in the investigation below followed these legal standards well. The commissioners who voted in the negative failed to follow these standards.

**V. The Commission's finding that "the decline in prices during the POI is associated with the cessation of the supply shortage that temporarily inflated prices" was not supported by substantial evidence**

The commissioners voting in the negative wrote in their final determination (Con Doc 297 at 18-19:

> The parties agree that from mid-2010 through at least 2011, the U.S. market for R-134a experienced a supply shortage. Producers and importers attributed this supply shortage to a number of conditions such as raw material shortages, production problems, the phasing out of R-22 as a refrigerant and subsequent increased demand for R-134a in non-automotive applications, increased demand for R-134a as the United States emerged from a recession, low inventories, and new applications for R-134a. Respondents contend, and Petitioner does not dispute, that when supply was tight in 2010 and 2011, the domestic producers chose to fulfill their contractual obligations before selling R-134a to automotive aftermarket purchasers in the spot market. Although domestic producers testified that the supply shortage essentially ceased at the end of 2011, the record indicates that [ ], and [
>
> ] in early 2012.

Footnotes omitted. From this situation in 2010 to 2011, the commissioners voting in the negative spin out a story of causation (or lack thereof) that they carry over to the first half of 2014, two and a half years after the shortage ended.

A scenario in which prices spike due to a shortage, and then return to "normal" after the supply shortage ceases, would envision prices at 100 in 2010, at 125 in 2011, and then back to 100 in 2012. After 2012, price trends would reflect factors other than a shortage that occurred back in 2011.

In 2010, the record shows that the average unit value of U.S. shipments of R-134a produced by U.S. producers was $[ ] per ton.[9] Con Doc 101, at C-3. The unit value of U.S. shipments increased to $[ ] per ton in 2011. Con Doc 297, at C-3. The unit cost of goods sold ("COGS") also increased from $[ ] per ton in 2010 to $[ ] per ton in 2011.[10] Con Doc 101, at C-3.

By 2012, the shortage had ended, and unit values declined to $[ ] per ton. But COGS increased between 2011 and 2012, from $[ ] per ton in 2011 to $[ ] per ton in 2012. Con Doc 297, at D-4.[11] Between 2012 and 2013, costs eased a bit, falling to $[ ] per ton, but prices fell dramatically, falling to $[ ] per ton. Costs crept up in the first half of 2014, to $[ ] per ton, but prices continued to fall, to $[ ] per ton. *Id.*

The effect of the price declines in the face of continuing higher costs was devastating to the bottom lines of the domestic industry. In 2010, the domestic industry experienced operating profits equal to $[ ] per ton. Con Doc 101, at C-3. In 2012, operating profits equaled $[ ]

---

[9] R-134a actually tends to be priced on a per pound basis, but average unit values were calculated from quantities shipped in tons.

[10] These figures are from the preliminary investigation. For the final determination, the ITC accepted Mexichem's argument regarding the accounting treatment of inputs from affiliated parties (*see* Con Doc 297, at 34-35, note 147), resulting in a 2012 COGS of $[ ] per ton. Con Doc 297, at D-4.

[11] Again, the 2012 COGS from the final determination is not directly comparable to the 2010 COGS from the preliminary determination, but it is directly comparable to the 2011 COGS from the final determination. *See* Con Doc 297, at 34-35, note 147.

per ton (under the methodology by which profits were calculated in the preliminary investigation, *id.*) or $[ ] per ton (under the methodology by which profits were calculated in the final investigation, Con Doc 297, at D-4). In 2013, operating profits plunged to $[ ] per ton, [ ] percent decline in just one year. In the first half of 2014, the domestic industry experienced [ ] per ton. *Id.*

The commissioners voting in the negative contended that *all* (or all but a trivial amount) of the trends occurring in 2013 and the first half of 2014 were caused by the supply shortage of 2011. They in effect contended that *none* (or at most a trivial amount) of the trends occurring in 2012, 2013 and the first half of 2014 were caused by dumped and subsidized imports from China. As the Federal Circuit observed, "{a}s long as its effects are not merely incidental, tangential, or trivial, the foreign product sold at less than fair value meets the causation requirement." *Nippon Steel Corp. v. USITC*, 345 F.3d 1379, 1384 (Fed. Cir. 2003).

It must be kept in mind that imports of R-134a from China continued to increase well after the supply shortage ceased. When imports and prices are viewed on a quarterly basis, as plaintiff pointed out in its posthearing brief, it is clear that imports from China in 2012 were not simply filling in for a supply shortage that ended in 2011.




Chart from Con Doc 277, at 3.

A product used extensively in automotive air conditioning systems clearly has a degree of seasonality, as imports enter the United States in the first half of the year, so that distributors have supply on hand for the summer, when motorists discover that their air conditioning needs re-charging, and then imports usually tail off in the second half of the year. *See* Con Doc 297, at 16 and II-12. The "shortage" year of 2011 followed the typical trend, when the great majority of imports arrived in the first two quarters, and then dropped off significantly in the last two quarters. 2012, in the beginning, followed this trend, but then in the fourth quarter imports surged to 177 percent of what they were in the fourth quarter of 2011. Furthermore, the landed duty paid unit value of imports fell 32 percent between the fourth quarter of 2011 and the fourth quarter of 2012.

The commissioners voting in the negative ignored this pattern of imports. Instead, they wrote:

> Because the duration of the supply shortage was uncertain at the time it was occurring and because purchasers wanted to ensure a stable supply of R-134a, they turned to China as a reliable source of R-134a, both during the shortage and as the shortage began to dissipate. Purchasers testified at the hearing that they typically place orders in the fall and that these orders are delivered in the late fall and winter months. Therefore, orders placed in the fall of 2011, when purchasers were still responding to the 2011 supply tightness and continued inability to obtain R-134a from domestic producers, would have been delivered through early 2012.

Footnotes omitted. The commissioners voting in the negative have no explanation for the surge of imports in the fourth quarter of 2012, which continued unabated into 2013.

As the Federal Circuit noted in *Mittal Steel* (542 F.3d at 872-873): "While the Commission is correct that section 1677(7)(B)(ii) affords it discretion to consider factors other than the three factors set forth in section 1677(7)(B)(i), that discretion is not unbounded, but is subject to general principles of administrative law. In particular, the Commission would abuse its discretion if, by ignoring a relevant economic factor that it could consider under section 1677(7)(B)(ii), the Commission 'entirely failed to consider an important aspect of the problem.' *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S. Ct. 2856, 77 L. Ed. 2d 443 (1983)." *See also Swiff-Train Co. v. United States*, 904 F. Supp. 2d 1336, 1345 (Ct. Int'l Trade 2013).

Even if "some" of the "the decline in prices during the POI is associated with the cessation of the supply shortage that temporarily inflated prices," Con Doc 297, at 28, substantial evidence does not support the conclusion that "all" or "nearly all" of this price decline was caused by the cessation of the supply shortage, with no effect from dumped and subsidized imports.

PUBLIC VERSION

It is instructive to assess the price impact of imports of R-134a from China by examining the segments in which imported R-134a competed the most with the domestic product. Here are the reported sales volumes in each segment for the U.S. producers:

| US Producers Shipments by Segment | | | | | | | |
|---|---|---|---|---|---|---|---|
| AGGREGATE | | | | | | | |
| Quantity in short tons | | | | | | | |
| Item | | 2011 | 2012 | 2013 | Jan-Jun 2013 | Jan-Jun 2014 | |
| Automotive Refrigerant | | | | | | | |
| OEM | [ | | | | | | ] |
| Aftermarket | [ | | | | | | ] |
| Pharmaceutical | [ | | | | | | ] |
| Foam expansion agent | [ | | | | | | ] |
| Other Refrigerants | [ | | | | | | ] |
| Total | [ | | | | | | ] |

Table from Con Doc 262, at 13.

Here are the reported sales volumes by segment for R-134a imported from China:

| U.S. Shipments by Segment China | | | | | | | |
|---|---|---|---|---|---|---|---|
| AGGREGATE | | | | | | | |
| Quantity in short tons | | | | | | | |
| Item | | 2011 | 2012 | 2013 | Jan-Jun 2013 | Jan-Jun 2014 | |
| Automotive Refrigerant | | | | | | | |
| OEM | [ | | | | | | ] |
| Aftermarket | [ | | | | | | ] |
| Pharmaceutical | [ | | | | | | ] |
| Foam expansion agent | [ | | | | | | ] |
| Other Refrigerants | [ | | | | | | ] |
| Total | [ | | | | | | ] |
| Source: Final Staff Report, at IV-14 | | | | | | | |

Table from Con Doc 262, at 13, as revised by Con Doc 297, at IV-14.

As can be seen, by far the largest segment ([ ] percent in 2013, for example) for imports from China was the [ ]. Imports [

].

The following table shows that the [

] during the period of investigation, with apparent consumption in that segment

PUBLIC VERSION

[ ] from 2011 to 2012, [ ] from 2012 to 2013.

| Apparent Consumption By Segment | | | | | | | |
|---|---|---|---|---|---|---|---|
| Quantity in short tons | | | | | | | |
| **Item** | | **2011** | **2012** | **2013** | **Jan-Jun 2013** | **Jan-Jun 2014** | |
| **Automotive Refrigerant** | | | | | | | |
| OEM | [ | | | | | | ] |
| Aftermarket | [ | | | | | | ] |
| **Pharmaceutical** | [ | | | | | | ] |
| **Foam expansion agent** | [ | | | | | | ] |
| **Other Refrigerants** | [ | | | | | | ] |
| **Total** | [ | | | | | | ] |
| | | | | | | | |
| **Source: US Producers and Importers Questionnaire Responses** | | | | | | | |

Table from Con Doc 262, at 14, as revised by Con Doc 297, at IV-14.

Despite the [ ] percent increase in apparent consumption between 2011 and 2012, U.S. shipments to [ ] percent from 2011 to 2012, and declined [ ] percent from 2012 to 2013, while imports from China increased [ ] percent from 2011 to 2012, and increased [ ] percent from 2012 to 2013. The difference in the effects on average unit value of domestic shipments to these segments is stark:

| Domestic Producers' AUVs $/lb | | | | | | | |
|---|---|---|---|---|---|---|---|
| Item | | 2011 | 2012 | 2013 | Jan-Jun 2013 | Jan-Jun 2014 | |
| Automotive Refrigerant | | | | | | | |
| OEM | [ | | | | | | ] |
| Aftermarket | [ | | | | | | ] |
| Pharmaceutical | [ | | | | | | ] |
| Foam expansion agent | [ | | | | | | ] |
| Other Refrigerants | [ | | | | | | ] |
| Total | [ | | | | | | ] |
| | | | | | | | |
| Source: U.S. Producers Questionnaire Responses | | | | | | | |

Table from Con Doc 262, at 14.

The [ ] segment went from [ ]. Other segments, [ ] The only cause of the price depression in the [ ] segment is the direct underselling by imports of R-134a from China. The direct underselling in that segment had the effect of lowering prices in the other segments as well, as negotiators became aware of the price declines in that segment and demanded similar concessions.

The commissioners voting in the affirmative correctly found:

> The average unit value ("AUV") data for different market segments also support our finding of price depression by subject imports. Although the Commission usually relies on AUV data with caution because differences in product mix can affect the AUVs, we find these data to be probative of the pricing trends in each of the different market segments, as there is no indication of significant changes in product mix over time in the individual segments. As previously noted, the subject imports were focused primarily in the automotive aftermarket segment of the market (the largest market segment), with smaller volumes also present in the other refrigerants segment. The domestic industry's AUV in the automotive aftermarket declined by [ ] percent, or by $[ ] per short ton, between 2011 and 2013, while the AUVs in the other market segments declined by [ ] percent (with the absolute decline ranging between $[ ] and $[ ] per short ton). This again shows significantly larger price declines in the products facing direct competition with subject imports.
>
> The respondents tried to explain this decline by arguing that the automotive aftermarket was affected more than other segments by the tight supply at the beginning of the POI, which resulted in higher prices in 2011 and, thus, a larger price decline as prices normalized. Although it is true that the automotive aftermarket segment had the highest AUV in 2011, respondents' theory utterly fails to explain why the domestic industry's AUV for its aftermarket sales continued to plummet in 2013, falling well below the AUVs of the other market segments. From 2012 to 2013, the domestic producers' AUV in the automotive

> aftermarket fell by [ ] percent, similar to the [ ] percent decline from 2011 to 2012. However, the AUV declines in the other segments ranged between only [ ] percent from 2012 to 2013. The domestic industry's AUV for its aftermarket sales was $[ ] per short ton in 2013; the next lowest AUV was in the other refrigerants segment at $[ ] per short ton, followed by the AUV in the foam expansion agent segment of the market at $[ ] per short ton. Thus, in the portion of the market where U.S. producers faced significant competition from low-priced subject imports, the domestic industry experienced by far the largest price decline over the POI and its AUV in 2013 was substantially below its prices in other market segments.

Con Doc 297, Dissent at 6-8 (footnotes omitted).

The findings of the commissioners voting in the negative were not supported by substantial evidence.

**VI. The Commission's finding that the market "stabilized in 2012 and 2013" was not supported by substantial evidence**

The commissioners voting in the negative wrote (Con Doc 297, at 36):

> In light of the general stability of the domestic industry's output, sales quantities, and market share, the domestic industry's severe decline in operating performance from 2011 to 2013 was attributable to the decline in prices that occurred during the POI. As discussed above, these price declines occurred because prices were anomalously high at the beginning of the POI due to the supply shortages of 2010 and 2011 and began to return to their pre-shortage levels as the market stabilized in 2012 and 2013. By contrast, the subject imports did not have significant price depressing effects and did not significantly prevent price increases that otherwise would have occurred. Moreover, there is no correlation between declines in operating performance, which occurred throughout the POI, and changes in subject import volume and market share. In sum, the record does not support a conclusion that the domestic industry's declines in operating performance were caused by the subject imports.

Footnote omitted.

As discussed in Section V above, if 2012 represented, at least at the beginning, a return to "normal," the notion that 2013 represented a continuation of that "normal" is not supported by substantial evidence.

The commissioners voting in the negative were correct in noting that "the domestic industry's severe decline in operating performance from 2011 to 2013 was attributable to the

decline in prices that occurred during the POI." Con Doc 297, at 36. Their conclusion that none, or none but a trivial amount, of that price decline was due to the price effects of unfairly traded imports, is not supported by substantial evidence and is not in accordance with law.

Even though the POI during the final investigation was 2011 through the first half of 2014, the commissioners in the final views constantly referred to events in 2010, which was part of the POI during the preliminary investigation phase. *See, e.g.*, Con Doc 297, at 18, 19, 21, 22, 28, 36, 38, and 42. In such circumstances, the commissioners voting in the negative cannot refer to 2010 data only when convenient. The totality of the record from the preliminary phase of the investigation must be considered.

The inconvenient fact is that imports from China [ ] between 2010 and 2011, both in absolute terms and in terms of market share. *See* page 4 *supra*. The Commission could accept that the increase in imports in 2011 was in response to a shortage, but must then explain why it was not a cause of injury when there was no shortage in 2012 but imports not only did not return to "normal" but instead increased even more. Imports from China totaled [ ] tons in the "shortage year" of 2011 but totaled [ ] tons in 2012 when there was no shortage, and, as discussed above at page 21, the greatest surge in imports in 2012 came in the fourth quarter, traditionally a slow quarter.

Even more than the continued surge of imports following the cessation of the supply shortage, the price trends do not support the conclusion that "the market stabilized in 2012 and 2013." The domestic producers of R-134a saw their average prices fall throughout the period, long after any shortage had ended.




This is not a picture of a stable market. It is a picture of a fight over market share, being fought on the basis of price.

## VII. The Commission's finding that the increase in market share by imports of R-134a from China between 2011 and 2012 "was a function of purchasers' response to the supply shortages that persisted through at least the end of 2011" was not supported by substantial evidence

The commissioners voting in the negative wrote:

> We cannot find any correlation between the observed underselling and shifts in market shares for the subject imports. There were significant quantities of subject imports that undersold the domestic like product during each year of the POI, but the only gains in subject import market share occurred from 2011 to 2012, when subject imports increased their market share from [ ] percent to [ ] percent and U.S. producers' U.S. shipments fell from [ ] percent to [ ] percent of the U.S. market. As noted above, however, we earlier found that this increase in market share was a function of purchasers' response to the supply shortages that persisted through at least the end of 2011. Thus, the supply situation of the domestic industry, rather than underselling by subject imports, explains the shifts

> in market share. This, as well as the lack of correlation between underselling and price movements, discussed below, *mitigates the significance of the observed underselling*.

Footnotes omitted, emphasis added.

The commissioners therefore acknowledged that the supply shortage ended in 2011, but claimed that purchasers did not buy even more imported R-134a in 2012 than they had in 2011 because the imported price was lower. They simply bought more imported R-134a in 2012, these commissioners claimed, because there had been a supply shortage in 2011.

First of all, under the law, facts that merely "mitigate the significance" of observed underselling are not sufficient to support a negative determination. As the Federal Circuit observed, "{a}s long as its effects are not merely incidental, tangential, or trivial, the foreign product sold at less than fair value meets the causation requirement." *Nippon Steel Corp. v. USITC*, 345 F.3d 1379, 1384 (Fed. Cir. 2003). The facts would have to support a conclusion that the underselling was "incidental, tangential, or trivial." The facts here do not support such a conclusion.

A major purchaser/importer of R-134a was AutoZone. AutoZone appeared at the ITC hearing and provided testimony and answered questions. *See* Con Doc 297, at B-3. AutoZone submitted [ ]. Con Docs 163 and [ ]. The [ ].

In 2011, AutoZone [ ] (Con Doc 163, Question II-5). [ ] Calculated from data in Con Doc 163, Question II-5. At the same time (full year 2011), Mexichem's weighted-average selling price [

PUBLIC VERSION

] Calculated from data in Mexichem's Producers Response (Con Doc 159), Question IV-2. [

]

According to [

]. Con Doc 163, Question II-5. Meanwhile, Mexichem's weighted-average price in 2012 for sales of [

] Calculated from data in AutoZone Importers Response (Con Doc 163), Question II-5.

What AutoZone's [

]

Plaintiff wrote about this AutoZone experience in our posthearing brief (Con Doc 277, at 4-6), which is limited by regulation (19 C.F.R. § 207.25) to 15 pages, but other major importer/purchasers followed a similar pattern. [

]

In their Purchasers responses [

]

The commissioners voting in the negative invoked the underselling data to argue that "pricing data on the record demonstrate that price declines occurred whether subject imports oversold or undersold the domestic like product and regardless of whether subject imports were present in the market for a particular pricing product." CR 297, at 29. Plaintiff pointed out a number of problems with the underselling data, but the commissioners ignored them.

First, as noted on page 6, simply counting the number of products and quarters that have underselling or overselling skews the overall picture of relative prices, because the different product categories represent substantially varying quantities. The commissioners voting in the negative noted in passing that "The quantity of subject imports in instances of underselling, [ ] pounds, exceeded the quantity of subject imports in instances of overselling, which was [ ] pounds." Con Doc 297 at 26.[12] They did not, however, find it convenient to take this into account when explaining why they did not think that the underselling data could be correlated to price trends.

[12] The commissioners voting in the affirmative took special note of this, and found underselling to be significant. Con Doc 297, Dissent at 4.

Second, as noted on page 7, the markups implied by the difference between what importers paid for their merchandise and what they reported selling it for were implausibly high.

| Calculation of Implied Mark-Up (Difference Between AUV for Imports and AUV for Commercial Shipments) | | | | | | | |
|---|---|---|---|---|---|---|---|
| | | 2011 | 2012 | 2013 | Jan-Jun 2013 | Jan-Jun 2014 | |
| Import AUV | [ | | | | | | ] |
| U.S. Commercial Shipments AUV | [ | | | | | | ] |
| MarkUp | [ | | | | | | ] |
| % MarkUp | [ | | | | | | ] |
| | | | | | | | |
| Source: Importers Questionnaire Responses | | | | | | | |

Table from Con Doc 262, at 10.

To take a major example, [

]

[

]

PUBLIC VERSION

The ITC asked both the U.S. producers and the importers to report the quantity (in pounds) and the total value at which they sold six different product types in each quarter of the period of investigation. *See, e.g.*, Con Doc 159, Question IV-2; Con Docs [ ], Question III-2. Product 1 is a common type, "R-134a in bulk sold to distributors." The ITC calculates an average unit price from the quantity and value information submitted. The calculated prices from the information reported by Mexichem and [ ] are as follows:

**Comparison of Reported Prices for R-134a in bulk sold to distributors**
**Mexichem Inc. and [Airgas Refrigerants]**

| Period of shipment | | Price per Pound | | |
|---|---|---|---|---|
| | | **Mexichem** | **[ ]** | |
| **2011:** | | | | |
| Jan-March | [ | | | ] |
| April-June | [ | | | ] |
| July-Sept | [ | | | ] |
| Oct-Dec | [ | | | ] |
| **2012:** | | | | |
| Jan-March | [ | | | ] |
| April-June | [ | | | ] |
| July-Sept | [ | | | ] |
| Oct-Dec | [ | | | ] |
| **2013:** | | | | |
| Jan-March | [ | | | ] |
| April-June | [ | | | ] |
| July-Sept | [ | | | ] |
| Oct-Dec | [ | | | ] |
| **2014:** | | | | |
| Jan-March | [ | | | ] |
| April-June | [ | | | ] |

Sources: calculated from Con Docs 159 and [ ], Question IV-2 and III-2 for Product 1

The price reported by Mexichem is the price at which it sold bulk R-134a to distributors like [ ]. The price reported by [ ] is the price at which it turned around and sold the R-134a that it purchased to other customers. Remember that [

] is in effect selling at a completely different level of trade than what Mexichem reported. Under these circumstances, it is remarkable that the ITC found any underselling at all.

At yet, despite the problems with the data that plaintiff pointed out during the investigation below, the commissioners voting in the negative picked the data that they wanted to bolster their position without questioning it. This is an abuse of the ITC's discretion. *Mittal Steel* (542 F.3d at 872-873).

As the Court in *Usinor v. United States*, 26 C.I.T. 767, 783-785 (2002) explained:

> Regardless of any presumption in its favor, the Commission is in no way absolved under Dastech of its responsibility to explain or counter salient evidence that militates against its conclusions. The court is troubled by the repeated generic invocation of Dastech as a shield against examination of the Commission's failure to present required analysis of the record evidence. Dastech prefaces its entire discussion of this presumption with the requirement that the ITC present a "reviewable, reasoned basis" for its determinations and added that "explanation is necessary, of course, for this court to perform its statutory review function." *Dastech Int'l*, 21 C.I.T. at 475, 963 F. Supp. at 1226 (quoting *Bando Chem. Indus., Ltd. v. United States*, 17 C.I.T. 798, 799 (1993). Moreover, Dastech cites *Granges Metallverken AB*, 13 C.I.T. at 478, which states that "it is an abuse of discretion for an agency to fail to consider an issue properly raised by the record evidence" though there is no statutory requirement that the Commission respond to each piece of evidence presented by the parties. *Id*. (emphasis added) (citing *Timken Co. v. United States*, 10 C.I.T. 86, 97, 630 F. Supp. 1327, 1337-38 (1986), rev'd in part, *Koyo Seiko Co. v. United States*, 20 F.3d 1156 (Fed. Cir. 1994)). Dastech also cites *Roses, Inc. v. United States*, 13 C.I.T. 662, 720 F. Supp. 180 (1989), which indicates that the presumption the agency has considered all the evidence is rebuttable and that "the burden is on the plaintiff to make a contrary showing." *Id*. at 668 (citations omitted).
>
> Moreover, the Commission's responsibility to answer to evidence that undermines the Commission's findings and conclusions has recently been reiterated by the court in *ALTX, Inc. v. United States*, 167 F. Supp. 2d 1353 (CIT 2001). In that case, the Commission was made aware of certain key evidence, but declined to discuss it, instead including only superficial mention of that evidence in its final determination. This court ultimately found the determination unsupported by substantial evidence:
>
>> The Final Determination merely cites to record evidence containing data on subject import indicators throughout the POI.

> This off-handed reference to annual data cannot, by itself, constitute an acknowledgment of Plaintiffs' arguments, much less a reasoned explanation for discounting them, as the statute requires. Furthermore, whatever discretion the Commission may have to reject deliberately the conclusions found in the agency's Staff Report, it may not through its silence simply ignore a Staff Report analysis that contradicts the Commission's own conclusions where an interested party has specifically brought the possibly conflicting evidence to the agency's attention ....

*Id*. at 1359 (emphasis added).

> While the ITC need not address every argument and piece of evidence, it must address significant arguments and evidence which seriously undermines its reasoning and conclusions. When considered individually, every discrepancy discussed here might not rise to the level of requiring reconsideration of the overall disposition, but taken as a whole, the court finds that the ITC decision is not substantially supported and explained.

*Id*. at 1373 (emphasis added)(footnotes omitted).

> As in ALTX, the evidence here is not peripheral or ancillary to the Commission's determination. Rather, it has direct and material bearing on the proper resolution of the various issues presented to the Commission, and it calls the accuracy and legitimacy of the Commission's findings and conclusions squarely into question. As a result, unsupported assertions that this evidence was addressed and considered without greater discussion in the Review Determination is unsatisfactory and the Commission cannot rely on the presumption set forth in Dastech to avoid its obligations. While a foolish consistency may be the hobgoblin of little minds, every party before an agency of the United States has a right to expect a fair and logical determination containing as much analysis as is necessary to adequately demonstrate the basis for its conclusions.

The failure of the commissioners voting in the negative to even consider the disconnect between the pricing data reported by importers and all of the other pricing data in the record, which plaintiff went to great lengths to bring to the ITC's attention, was not in accordance with law.

**VIII. The Commission's finding that "that the increase in the COGS/net sales ratio is a function of the high price levels that existed at the beginning of the POI due to supply shortages -- and the subsequent alleviation of those shortages -- rather than the presence of subject imports" was not supported by substantial evidence**

The commissioners voting in the negative wrote:

> We have also examined whether the subject imports prevented the domestic industry from instituting price increases that otherwise would have occurred. The domestic industry's ratio of cost of goods sold ("COGS") to net sales increased from 2011 to 2013. We find, however, that this increase in the COGS to net sales ratio is attributable primarily to changes in net sales value, which decreased from $[ ] in 2011 to $[ ] in 2012 and then to $[ ] in 2013. By contrast, on a unit basis, raw material costs and COGS fluctuated within a fairly narrow range throughout the POI. Raw materials were $[ ] per short ton in 2011, $[ ] per short ton in 2012, and $[ ] per short ton in 2013. Similarly, COGS were $[ ] per short ton in 2011, $[ ] per short ton in 2012, and $[ ] per short ton in 2013. Demand over the POI was flat, and given that the market was emerging from a supply shortage, price increases were not likely. Consequently, we find that the increase in the COGS/net sales ratio is a function of the high price levels that existed at the beginning of the POI due to supply shortages -- and the subsequent alleviation of those shortages -- rather than the presence of subject imports.

Footnotes omitted.

These commissioners are in effect saying that declining prices in the face of steady costs means that there is no injury by reason of imports, because prices were relatively high in the beginning of the period of investigation. There are a number of problems with this finding. First, these commissioners are saying that the increasing volume of imports at ever-lower prices is not a cause *at all* (or at best at a trivial level) of the increase in the ratio of COGS to sales between 2011 and 2013. This also requires the commissioners to maintain that the price effects of a short-term shortage in 2011 persist through 2013 and the first half of 2014, a position that is not supported by substantial evidence.

Second, as noted on page 27, the commissioners voting in the negative constantly refer in their views to the situation in 2010, data for which was collected in the preliminary phase of the investigation. It is well-settled that since "the statute does not expressly command the

Commission to examine a particular period of time, … the Commission has discretion to examine a time period that most reasonably allows it to determine whether a domestic industry is injured by LTFV imports." *Kenda Rubber Industrial Co., Ltd. v. United States*, 10 C.I.T. 120, 126-127, 630 F. Supp. 354, 359 (1986). There is thus no legal impediment to the Commission taking 2010 data into consideration.

Once the Commission decides to consider data from 2010, however, it is an abuse of that discretion to select only parts of the data for 2010 and ignore the parts that are inconvenient. And as plaintiff pointed out in the investigation below, when the costs for 2010 are considered as well, it is clear that [ ]. The situation by the end of the period of investigation was *not* simply a return to equilibrium.




Chart from Con Doc 277, at 8.

This chart shows that [

]

Thus, the commissioners voting in the negative were wrong in finding that "the increase in the COGS/net sales ratio is a function of the high price levels that existed at the beginning of the POI due to supply shortages" alone, and that the dumped and subsidized imports of R-134a from China were not more than a trivial factor contributing to the increase in the COGS/nets sales ratio. The commissioners voting in the affirmative correctly found "that subject imports had a significant impact on the domestic industry, in particular on its financial condition." Con Doc 297, Dissent at 11.

**IX. The Commission's failure to take into account as a condition of competition that, because of high fixed costs and safety issues involved in handling hazardous chemicals, the U.S. industry was forced to lower prices in 2012 and 2013 in response to the increase of low-priced imports in order to maintain high capacity utilization, was not in accordance with law**

As was pointed out in plaintiff's Prehearing Brief (Con Doc 262, at 26), and at the hearing (Pub Doc 151, at 19 and 22-25), the nature of the facilities that produce R-134a is that they must be run continuously in order to be efficient. Shutdowns are rare, and when they occur, it takes some time to get production back up to an efficient level. The ITC staff learned this when they visited the Mexichem facilities in August 2014. *See* Pub Doc 99.

U.S. producers faced with competition with low-priced, unfairly traded imports, have two choices—they can hold steady on prices and give up market share, or they can fight to try to maintain market share by following the import prices down. The choice that U.S. producers make is strongly influenced by the nature of the industry in question. If the industry is one in which there are high fixed (as opposed to variable) costs, and there are otherwise reasons that it

is difficult to curtail production without incurring substantial costs, then the U.S. producers are more likely to respond by doing what it takes to keep capacity utilization as high as possible.

Imports [ ], as discussed on page 4. The domestic industry at first tried to maintain prices, but starting around [ ] they decided they had to reduce prices in order to keep their plants running at the necessary efficiency levels. As a result, profits plunged. The reduced profitability of the domestic industry noted on page 8 was directly caused by unfairly traded imports of R-134a from China.

The statute directs the ITC to "evaluate all relevant economic factors … within the context of the business cycle and conditions of competition that are distinctive to the affected industry." 19 U.S.C. § 1677(7)(C)(iii). The commissioners voting in the negative did not mention the high fixed costs and safety issues that are distinctive to the R-134a industry that explains why, as these commissioners found, there was "general stability of the domestic industry's output, sales quantities, and market share," and yet there was a "severe decline in operating performance from 2011 to 2013." Con Doc 297, at 36.

The domestic industry's output, sales quantities, and market share were "generally stable" because they had to be. But the domestic industry had to constantly lower its price in the face of unfair import competition in order to maintain this general stability. As a result, there was a "severe decline in operating performance from 2011 to 2013." Under the law, such facts should lead to an affirmative injury determination. The determination of the commissioners voting in the negative was not in accordance with law.

## X. Conclusion and Relief Sought

The commissioners voting in the negative used a shortage in 2011 to justify denying relief to the domestic R-134a industry in 2014. In reaching this conclusion, these commissioners

made findings that were unsupported by substantial evidence and were not in accordance with law.

Plaintiff respectfully requests that this Honorable Court remand this action to the ITC, with instructions that:

- The Commission's finding that "the decline in prices during the POI is associated with the cessation of the supply shortage that temporarily inflated prices" was not supported by substantial evidence;
- The Commission's finding that the market "stabilized in 2012 and 2013" was not supported by substantial evidence;
- The Commission's finding that the increase in market share by imports of R-134a from China between 2011 and 2012 "was a function of purchasers' response to the supply shortages that persisted through at least the end of 2011" was not supported by substantial evidence;
- The Commission's finding that "that the increase in the COGS/net sales ratio is a function of the high price levels that existed at the beginning of the POI due to supply shortages -- and the subsequent alleviation of those shortages -- rather than the presence of subject imports" was not supported by substantial evidence; and
- The Commission's failure to take into account as a condition of competition that, because of high fixed costs and safety issues involved in handling hazardous chemicals, the U.S. industry was forced to lower prices in 2012 and 2013 in response to the increase of low-priced imports in order to maintain high capacity utilization, was not in accordance with law.

Plaintiffs respectfully request that this Honorable Court instruct the ITC to reconsider its findings with respect to the issues listed above, and file remand results with the Court by a date certain.

Respectfully submitted,

/s/ Paul W. Jameson

Roger B. Schagrin
Paul W. Jameson
SCHAGRIN ASSOCIATES
900 7th St. NW Suite 500
Washington, DC 20001
(202) 223-1700

*Counsel for Plaintiff Mexichem Fluor Inc.*

July 31, 2015

**Certificate of Compliance**

The undersigned hereby certifies that the foregoing brief complies with the Standard Chambers Procedures of the U.S. Court of International Trade in that it contains 12,748 words, including accompanying motion, text, footnotes, headings, table of contents, table of authorities and counsel's signature block, according to the word count function of Microsoft Word 2013 used to prepare this brief. Word does not count the words that are in embedded tables and charts, but the tables and charts in this brief certainly contain fewer than 1,000 words.

**/s/ Paul W. Jameson**
Roger B. Schagrin
Paul W. Jameson
Schagrin Associates
900 7th St. NW Suite 500
Washington, DC 20001
(202) 223-1700

*Counsel for Plaintiff*