IN THE UNITED STATES COURT OF INTERNATIONAL TRADE


BEFORE:  THE HONORABLE LEO M. GORDON


| | |
|---|---|
| MEXICHEM FLUOR, INC. AND<br>E.I. DU PONT DE NEMOURS AND COMPANY<br><br>Consol. Plaintiffs,<br><br>v.<br><br>UNITED STATES,<br><br>Defendant.<br><br>and<br><br>SINOCHEM ENVIRONMENTAL PROTECTION<br>CHEMICALS (TAICANG) CO., LTD., ZHEJIANG<br>QUHUA FLOUR-CHEMISTRY CO., LTD. AND<br>ZHEJIANG SANMEI CHEMICAL INDUSTRY CO.<br><br>Defendant-Intervenors. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Consol. Court. No. 15-00004

**PUBLIC**


**PUBLIC APPENDIX ACCOMPANYING THE CHEMOURS COMPANY'S**
**(SUCCESSOR-IN-INTEREST TO E.I. DUPONT DE NEMOURS AND COMPANY)**
**RULE 56.2 MOTION**
**FOR JUDGEMENT ON THE AGENCY RECORD**

John D. Greenwald
Jonathan M. Zielinski
CASSIDY LEVY KENT (USA) LLP
2000 Pennsylvania Avenue N.W.
Suite 3000
Washington, D.C. 20006
(202) 567 2300

August 7, 2015

*Counsel to E.I. DuPont de Nemours and*
*the Chemours Company*

| Tab | Public Record Number | Document Description | Excerpts |
|---|---|---|---|
| 1 | P.R. 1 | Petition, October 22, 2013. | Page 1. |
| 2 | P.R. 71 | DuPont Comments on Draft Questionnaire, July 9, 2014. | Full document. |
| 3 | P.R. 128 | DuPont Pre-hearing Brief, October 6, 2014. | Exhibit 1. |
| 4 | P.R. 151 | *Cites supporting reference pages in C.R. 297*<br><br>Transcript of Commission Hearing, October 16, 2014. | Pages 9, 51, 54, 121, 156-7, 134, 208. |
| 5 | P.R. 198 | Inv. Nos. 701-TA-509 and 731-TA-1244 (Final), Pub. 4503, February 2, 2015. | Pages 6 (cited as 7), 13 (cited as 17), 15 (cited as 21), 16, 17 (cited as 25), 18, 19 (cited as 29 and 30), 20 (cited as 30), 21-22, 23 (cited as 34-35), 24-25,28-29.<br><br>Dissent at 31 (cited as 24 and 1), 33 (cited as 5), 34, 35 (cited as 7), 38 (cited as 11), 40 (cited as 15).<br><br>Tables I-3, III-6, IV-6-8, V-1-14, D-1. |
| 5a | P.R. 131 | *Cites supporting reference pages in P.R. 198.*<br><br>Mexichem Pre-hearing Brief, October 7, 2014. | Pages 14-15, 36. |

| Tab | Public Record Number | Document Description | Excerpts |
|---|---|---|---|
| 5b | P.R. 151 | *Cites supporting reference pages in P.R. 198.*<br><br>*See Tab 4.*<br><br>Transcript of Commission Hearing, October 16, 2014. | Pages 121, 156, 157, 208, 134. |
| 5c | P.R. 160 | *Cites supporting reference pages in P.R. 198.*<br><br>DuPont Post-hearing Brief, October 23, 2014. | Exhibit 2. |
| 6 | | 1,1,1,2—Tetrafluoroethane from the People's Republic of China, 79 Fed. Reg. 62, 597, Final Determination, October 20, 2014. | Full document. |

Tab 1

P.R. 1

Petition

October 22, 2013

# SCHAGRIN ASSOCIATES

900 SEVENTH STREET, N.W.
SUITE 500
WASHINGTON, D.C.  20001
(202) 223-1700

FAX (202) 429-2522

EMAIL: schagrin@erols.com

Inv. Nos. A-570-998 and C-570-999
Total No. of pages: 256
Investigation

Proprietary Information Deleted From:
Volume I, pages 2, 4-6, 8-11; Volume II,
page 4; and Exhibits I-5 and 8-10, and II-2
and 6-8,

## PUBLIC VERSION

October 22, 2013

The Honorable Penny Pritzker
Secretary of Commerce
Attention: Import Administration
Central Records Unit, Room 1870
U.S. Department of Commerce
14th Street and Constitution Avenue, N.W.
Washington, DC 20230

The Honorable Lisa R. Barton
Acting Secretary
U.S. International Trade Commission
500 E Street, S.W., Room 112
Washington, DC 20436

### Re: *1,1,1,2 – Tetrafluoroethane from the People's Republic of China*

Dear Secretary Pritzker and Secretary Barton:

On behalf of domestic producer of 1,1,1,2-Tetrafluoroethane, Mexichem Fluor, Inc.,

interested party as defined under 19 U.S.C. § 1677(9), we respectfully submit to the U.S.

Department of Commerce and the U.S. International Trade Commission the enclosed petitions

for the imposition of antidumping and countervailing duties on U.S. imports of 1,1,1,2-

Tetrafluoroethane ("R-134a") from the People's Republic of China.

Pursuant to sections 351.202(d) and 351.304 of the Department's regulations and section

201.6 of the Commission's rules, we request business proprietary treatment for the information

Tab 2


P.R. 71


DuPont Comments on Draft Questionnaire


July 9, 2014

CASSIDY LEVY KENT (USA) LLP

2000 Pennsylvania Avenue, N.W., Suite 3000
Washington, D.C. 20006

JOHN D. GREENWALD                                                        202.567.2306 (Direct)
jgreenwald@cassidylevy.com                                              202.567.2301 (Telecopy)

July 1, 2014

Inv. Nos. 701-TA-509 and 731-TA-1244 (Final)

**PUBLIC DOCUMENT**

**BY ELECTRONIC DELIVERY**
Lisa R. Barton, Secretary
U.S. International Trade Commission
Room 112A
500 E Street, S.W.
Washington, DC  20436

Re:   1,1,1,2-Tetrafluoroethane (R134a) from China;
      Comments on Draft Questionnaires

Dear Secretary Barton:

On behalf of E.I. DuPont de Nemours & Company ("DuPont"), a domestic producer of
R134a, we submit these comments on the Commission's draft questionnaires in the above-
captioned final phase investigation. These comments are informed by the data the Commission
collected in its preliminary investigation in this proceeding, which shed considerable light on the
nature of competition between domestic production and imports from China in the U.S. market
for R134a, and information developed since then. They relate to (1) the collection of "apples-to-
apples" data on the pricing of subject imports and the domestic like product, (2) identifying the
nature of the importer's operations, (3) the availability of domestic supply of packaged R134a,
(4) the timing of long term contracts, and (5) how transfer prices between related parties should
be analyzed in this investigation.

**Comment 1:  Apples-to-Apples Pricing Data**

R134a is purchased and sold for use in different applications and is purchased and sold at
different levels of trade. Because prices differ both by application and the level of trade at which
the purchase and sale occurs, "apples-to-apples" pricing comparisons must take account of such
differences:

- A "Big Box" retailer that imports R134a from China directly chooses between
  such imports, whether in bulk or packaged form, and domestic supply. Recall that
  at the Staff Conference, Autozone testified that "… we secured the gas in bulk
  quantities overseas, had them brought over and packaged in the United States.
  This new model for sourcing cans was pivotal for us as it allowed us to separately

CASSIDY LEVY KENT

Secretary Lisa R. Barton
July 1, 2014
Page 2.

negotiate gas and packing costs." In light of this sworn testimony, it is beyond dispute that bulk imports from China to retail companies like Autozone compete directly with a domestic producer's sales to a retail company like Pep Boys. Thus, a domestic producer's sale to Pep Boys is comparable to the price at which AutoZone *imports* from China, not the price at which AutoZone resells packaged R134a through its retail stores.

- Similarly, major repackagers are also direct importers of bulk R134a from China. For example, TCC, Inter-Dynamics, Airgas, Weitron, National Refrigerants, and other repackagers buy in bulk from China and from domestic manufacturers. These importer/purchasers then repackage in generic packages, under their own brand name or under private label or store brands. In this case, again, a domestic producer's sale to a repackager is comparable to the price at which the repackager directly *imports* R143a from China, not the price at which the repackager resells.

- Sales in the auto segment of the market to OEM accounts are different in both price and terms and conditions of sale than sales to aftermarket accounts.

- Sales of R134a for stationery air conditioning, chillers and refrigeration are made in different-sized containers and at different prices than sales for auto air-conditioning application.

- Sales of R134a to end-users for foam expansion are typically made in bulk containers, at different prices than sales for auto air-conditioning applications.

Given the significance of these differences on price comparability, the pricing products proposed in the draft questionnaires will, unless changed, produce data that could well be positively misleading. DuPont submits that the three broad pricing categories in the draft producer's and importer's questionnaires should be replaced by the following:

Product 1:   R134a in bulk for repackaging and resale into the auto aftermarket

Product 2:   R134a in 30-pound (13.62 kg) containers for sale into the auto aftermarket.

Product 3:   R134a in 12-ounce containers for resale into the auto aftermarket.

Product 4:   R134a in bulk for repackaging and resale into the service market for chillers, refrigeration and stationary air conditioning applications.

Product 5:   R134a in bulk for sale to end-users for foam expansion, foam blowing, and aerosol applications.

CASSIDY LEVY KENT

Secretary Lisa R. Barton
July 1, 2014
Page 3.

Moreover, in the case of Products 1, 4 and 5, the importer questionnaire should instruct repackagers and retailers to report the quarterly volume and value of their *purchases* from China. As reviewed above, domestic producers compete directly with foreign producers for sales to retailers and repackagers that are direct importers. The first point at which competition takes place is not the resale transaction by these importers; it is the purchase of bulk R134a from domestic or foreign producers. The Commission in prior cases has addressed this situation by requiring direct importers to report the quantity and value of their purchases of subject merchandise.[1]

These product categories will capture virtually all instances of direct competition between subject imports and the domestic like product.

**Comment 2: The Nature of Importer Operations**

As just described, importers may fall into one or more categories: retailers that import directly and resell to consumers at retail; repackager/distributors that import in bulk and repackage R134a into containers for sale at retail; and distributors that purely import and resell the subject merchandise to retailers or industrial end users. It would be useful to add a question to the importers' questionnaire following Section I-6 or at the end of Section I, as follows:

> **Nature of Operations.**—Please indicate the nature of your firm's U.S. operations on R-134a. More than one answer may be applicable.

| | |
|---|---|
| ☐ | Distributor (i.e., imports R134a and resells typically at wholesale to retailers and end-users) |
| ☐ | Repackager (i.e., imports R134a and repackages into smaller containers for resale) |
| ☐ | Retailer (i.e., imports R134a and resells to consumers at retail) |
| ☐ | Other (please describe): _____ |

---

[1] For example, In *Certain Tissue Paper Products from China*, Inv. No. 731-TA-1070B (Final), USTIC Pub. 3758 at V-5 (March 2005), the Commission requested pricing data consisting of "Sales to retailers" and "Purchases by importer/retailers" precisely to address the situation where direct importers chose between domestic and import offerings. The Commission noted that "Importers that sell to consumers were asked to report the quantity and value of their purchases of the four products." *Id.* At V-4. *See also id.* at V-6, n.3 ("These data represent purchase prices paid by ***, a firm that imports product for resale to consumers (i.e. a direct importer).").

CASSIDY LEVY KENT

Secretary Lisa R. Barton
July 1, 2014
Page 4.

**Comment 3: The Availability of Domestic Supply of Packaged R134a**

At the Staff Conference, respondents suggested that domestic R134a is not available in smaller containers with their own brand labeling. The purchasers and domestic producer questionnaires should address this issue directly. DuPont proposes the following questions:

1. For the domestic producers' questionnaire:

   During the POI, was your firm capable of supplying, either directly or through a repackager, 12-ounce cans of R134a for retail customers with the retailer's label?

   ☐  Yes – Please explain
   ☐  No

2. For the purchasers' questionnaire:

   During the POI, was domestic R134a available, either directly from the domestic producer or from a repackager or distributor, for purchasers in 12-ounce cans with your label?

   ☐  Yes – Please explain
   ☐  No

**Comment 4: The Timing of Long Term Contracts**

The following questions should be added to the draft purchaser's, producer's and importer's questionnaires:

1. For supply contracts of a year or more, please indicate in the quarter where the most recent contracts for the supply and/or sale of R134a were entered into:

   _____
   _____

**Comment 5: Related Company Supply of Inputs**

Section III of the U.S. producers' questionnaire asks producers to to report inputs from a parent company or separate division at cost rather than transfer or market prices. Where the input is from another country, however, reporting it at cost may distort the data for the U.S. operations of the domestic producer at issue. To provide transparency and to permit all parties to address the impact of elimination of intercompany profits, the questionnaire should be modified to insert a

CASSIDY LEVY KENT

Secretary Lisa R. Barton
July 1, 2014
Page 5.

new row in the table found in Section III-8. The new row would appear following "Other factory costs" and would call for producers to report separately "Intercompany profits." This line item would then be deducted in arriving at Total COGS. Armed with this information, the Commission and the parties can better address whether it is appropriate to adjust costs for intercompany profits in the case of inputs transferred from foreign operations.

*   *   *

If the Commission has any questions on these comments, please feel free to contact either of the undersigned.

Respectfully submitted,

Deirdre Maloney
Senior Trade Advisor

John D. Greenwald
James R. Cannon Jr.
CASSIDY LEVY KENT (USA) LLP
*Counsel for E.I. DuPont de Nemours
& Company*

*1,1,1-Tetrafluoroethane from China,*
*Inv. Nos. 701-TA-509 and 731-TA-1244*

## PUBLIC CERTIFICATE OF SERVICE

I hereby certify that on July 1, 2014, a copy of the foregoing document was served via

hand delivery upon the following parties:

Roger B. Schagrin, Esq.
Schagrin Associates
900 Seventh Street, N.W.
Suite 500
Washington, DC 20001

Matthew J. McConkey, Esq.
Mayer Brown LLP
1999 K Street, NW
Washington, DC 20006-1101

Elizabeth Hein, Esq.
Alston & Bird LLP
950 F Street, NW
Washington, DC 20004-1404

James R. Cannon, Jr.

Tab 3

P.R. 128

Dupont Pre-hearing Brief

October 6, 2014

# CASSIDY LEVY KENT (USA) LLP

2000 Pennsylvania Avenue, N.W., Suite 3000
Washington, D.C. 20006

JOHN D. GREENWALD                                                                    202.567.2306 (Direct)
jgreenwald@cassidylevy.com                                                           202.567.2301 (Telecopy)

October 7, 2014

Inv. Nos. 701-TA-509 and
731-TA-1244 (Final)

**PUBLIC VERSION**
**Proprietary Information Deleted**

BY ELECTRONIC FILING AND HAND DELIVERY

Lisa R. Barton, Acting Secretary
U.S. International Trade Commission
Room 112A
500 E Street, S.W.
Washington, DC 20436

### Re:    1,1,1,2-Tetrafluoroethane (R134a) from the People's Republic
of China; Prehearing Brief

Dear Acting Secretary Barton:

On behalf of E.I. DuPont de Nemours & Company ("DuPont"), we hereby submit the
public version of DuPont's Prehearing Brief in the above-referenced investigations.

As indicated on the attached certificate of service, copies of this submission are being
served on the parties listed on the Commission's public service list in this proceeding.

Respectfully submitted,

/s/ John D. Greenwald

John D. Greenwald
James R. Cannon, Jr.
Deirdre Maloney
  Senior International Trade Advisor
CASSIDY LEVY KENT (USA) LLP
*Counsel for E.I. DuPont de Nemours*
  *& Company*

# EXHIBIT 1

# CASSIDY LEVY KENT (USA) LLP

2000 Pennsylvania Avenue, N.W., Suite 3000
Washington, D.C. 20006

JOHN D. GREENWALD
jgreenwald@cassidylevy.com

202.567.2306 (Direct)
202.567.2301 (Telecopy)

July 1, 2014

Inv. Nos. 701-TA-509 and 731-TA-1244 (Final)

## PUBLIC DOCUMENT

**BY ELECTRONIC DELIVERY**
Lisa R. Barton, Secretary
U.S. International Trade Commission
Room 112A
500 E Street, S.W.
Washington, DC 20436

> **Re:   1,1,1,2-Tetrafluoroethane (R134a) from China;
> Comments on Draft Questionnaires**

Dear Secretary Barton:

On behalf of E.I. DuPont de Nemours & Company ("DuPont"), a domestic producer of R134a, we submit these comments on the Commission's draft questionnaires in the above-captioned final phase investigation. These comments are informed by the data the Commission collected in its preliminary investigation in this proceeding, which shed considerable light on the nature of competition between domestic production and imports from China in the U.S. market for R134a, and information developed since then. They relate to (1) the collection of "apples-to-apples" data on the pricing of subject imports and the domestic like product, (2) identifying the nature of the importer's operations, (3) the availability of domestic supply of packaged R134a, (4) the timing of long term contracts, and (5) how transfer prices between related parties should be analyzed in this investigation.

**Comment 1: Apples-to-Apples Pricing Data**

R134a is purchased and sold for use in different applications and is purchased and sold at different levels of trade. Because prices differ both by application and the level of trade at which the purchase and sale occurs, "apples-to-apples" pricing comparisons must take account of such differences:

- A "Big Box" retailer that imports R134a from China directly chooses between such imports, whether in bulk or packaged form, and domestic supply. Recall that at the Staff Conference, Autozone testified that "… we secured the gas in bulk quantities overseas, had them brought over and packaged in the United States. This new model for sourcing cans was pivotal for us as it allowed us to separately

CASSIDY LEVY KENT

Secretary Lisa R. Barton
July 1, 2014
Page 2.

negotiate gas and packing costs." In light of this sworn testimony, it is beyond dispute that bulk imports from China to retail companies like Autozone compete directly with a domestic producer's sales to a retail company like Pep Boys. Thus, a domestic producer's sale to Pep Boys is comparable to the price at which AutoZone *imports* from China, not the price at which AutoZone resells packaged R134a through its retail stores.

- Similarly, major repackagers are also direct importers of bulk R134a from China. For example, TCC, Inter-Dynamics, Airgas, Weitron, National Refrigerants, and other repackagers buy in bulk from China and from domestic manufacturers. These importer/purchasers then repackage in generic packages, under their own brand name or under private label or store brands. In this case, again, a domestic producer's sale to a repackager is comparable to the price at which the repackager directly *imports* R143a from China, not the price at which the repackager resells.

- Sales in the auto segment of the market to OEM accounts are different in both price and terms and conditions of sale than sales to aftermarket accounts.

- Sales of R134a for stationery air conditioning, chillers and refrigeration are made in different-sized containers and at different prices than sales for auto air-conditioning application.

- Sales of R134a to end-users for foam expansion are typically made in bulk containers, at different prices than sales for auto air-conditioning applications.

Given the significance of these differences on price comparability, the pricing products proposed in the draft questionnaires will, unless changed, produce data that could well be positively misleading. DuPont submits that the three broad pricing categories in the draft producer's and importer's questionnaires should be replaced by the following:

Product 1:   R134a in bulk for repackaging and resale into the auto aftermarket

Product 2:   R134a in 30-pound (13.62 kg) containers for sale into the auto aftermarket.

Product 3:   R134a in 12-ounce containers for resale into the auto aftermarket.

Product 4:   R134a in bulk for repackaging and resale into the service market for chillers, refrigeration and stationary air conditioning applications.

Product 5:   R134a in bulk for sale to end-users for foam expansion, foam blowing, and aerosol applications.

CASSIDY LEVY KENT

Secretary Lisa R. Barton
July 1, 2014
Page 3.

Moreover, in the case of Products 1, 4 and 5, the importer questionnaire should instruct repackagers and retailers to report the quarterly volume and value of their *purchases* from China. As reviewed above, domestic producers compete directly with foreign producers for sales to retailers and repackagers that are direct importers. The first point at which competition takes place is not the resale transaction by these importers; it is the purchase of bulk R134a from domestic or foreign producers. The Commission in prior cases has addressed this situation by requiring direct importers to report the quantity and value of their purchases of subject merchandise.[1]

These product categories will capture virtually all instances of direct competition between subject imports and the domestic like product.

**Comment 2: The Nature of Importer Operations**

As just described, importers may fall into one or more categories: retailers that import directly and resell to consumers at retail; repackager/distributors that import in bulk and repackage R134a into containers for sale at retail; and distributors that purely import and resell the subject merchandise to retailers or industrial end users. It would be useful to add a question to the importers' questionnaire following Section I-6 or at the end of Section I, as follows:

**Nature of Operations.**—Please indicate the nature of your firm's U.S. operations on R-134a. More than one answer may be applicable.

| | |
|---|---|
| ☐ | Distributor (i.e., imports R134a and resells typically at wholesale to retailers and end-users) |
| ☐ | Repackager (i.e., imports R134a and repackages into smaller containers for resale) |
| ☐ | Retailer (i.e., imports R134a and resells to consumers at retail) |
| ☐ | Other (please describe): _____ |

---

[1] For example, in *Certain Tissue Paper Products from China*, Inv. No. 731-TA-1070B (Final), USTIC Pub. 3758 at V-5 (March 2005), the Commission requested pricing data consisting of "Sales to retailers" and "Purchases by importer/retailers" precisely to address the situation where direct importers chose between domestic and import offerings. The Commission noted that "Importers that sell to consumers were asked to report the quantity and value of their purchases of the four products." *Id.* At V-4. *See also id.* at V-6, n.3 ("These data represent purchase prices paid by ***, a firm that imports product for resale to consumers (i.e. a direct importer).").

CASSIDY LEVY KENT

Secretary Lisa R. Barton
July 1, 2014
Page 4.


**Comment 3: The Availability of Domestic Supply of Packaged R134a**

At the Staff Conference, respondents suggested that domestic R134a is not available in smaller containers with their own brand labeling. The purchasers and domestic producer questionnaires should address this issue directly. DuPont proposes the following questions:

1. For the domestic producers' questionnaire:

   During the POI, was your firm capable of supplying, either directly or through a repackager, 12-ounce cans of R134a for retail customers with the retailer's label?

   ☐ Yes – Please explain
   ☐ No

2. For the purchasers' questionnaire:

   During the POI, was domestic R134a available, either directly from the domestic producer or from a repackager or distributor, for purchasers in 12-ounce cans with your label?

   ☐ Yes – Please explain
   ☐ No


**Comment 4: The Timing of Long Term Contracts**

The following questions should be added to the draft purchaser's, producer's and importer's questionnaires:

1. For supply contracts of a year or more, please indicate in the quarter where the most recent contracts for the supply and/or sale of R134a were entered into:

   _____

   _____


**Comment 5: Related Company Supply of Inputs**

Section III of the U.S. producers' questionnaire asks producers to to report inputs from a parent company or separate division at cost rather than transfer or market prices. Where the input is from another country, however, reporting it at cost may distort the data for the U.S. operations of the domestic producer at issue. To provide transparency and to permit all parties to address the impact of elimination of intercompany profits, the questionnaire should be modified to insert a

CASSIDY LEVY KENT

Secretary Lisa R. Barton
July 1, 2014
Page 5.

new row in the table found in Section III-8. The new row would appear following "Other factory costs" and would call for producers to report separately "Intercompany profits." This line item would then be deducted in arriving at Total COGS. Armed with this information, the Commission and the parties can better address whether it is appropriate to adjust costs for intercompany profits in the case of inputs transferred from foreign operations.

\*           \*           \*

If the Commission has any questions on these comments, please feel free to contact either of the undersigned.

Respectfully submitted,

Deirdre Maloney
Senior Trade Advisor

John D. Greenwald
James R. Cannon Jr.
CASSIDY LEVY KENT (USA) LLP
*Counsel for E.I. DuPont de Nemours
& Company*

*1,1,1,2-Tetrafluoroethane from China,*
*Inv. Nos. 701-TA-509 and 731-TA-1244*

## PUBLIC CERTIFICATE OF SERVICE

I hereby certify that on July 1, 2014, a copy of the foregoing document was served via

hand delivery upon the following parties:

> Roger B. Schagrin, Esq.
> Schagrin Associates
> 900 Seventh Street, N.W.
> Suite 500
> Washington, DC 20001
>
> Matthew J. McConkey, Esq.
> Mayer Brown LLP
> 1999 K Street, NW
> Washington, DC 20006-1101
>
> Elizabeth Hein, Esq.
> Alston & Bird LLP
> 950 F Street, NW
> Washington, DC 20004-1404

James R. Cannon, Jr.

Tab 4


P.R. 151


Transcript of Commission Hearing

October 16, 2014

# UNITED STATES
# INTERNATIONAL TRADE COMMISSION

In the Matter of:                                    )  Investigation Nos.:
1,1,1,2-TETRAFLUOROETHANE FROM CHINA  )  701-TA-509 and 731-TA-1244 (FINAL)

**Pages:  1 - 221**
**Place:  Washington, D.C.**
**Date:   WEDNESDAY, OCTOBER 15, 2014**



**Ace-Federal Reporters, Inc.**
*Stenotype Reporters*
**1625 I Street, NW**
**Suite 790**
**Washington, D.C.  20006**
**202-347-3700**
**Nationwide Coverage**
**www.acefederal.com**

1             The record you have before you also demonstrates

2       that imports from China have been a principle cause of this

3       injury.   The economics of causation in this case are not

4       complicated.   Competition between imports from China and the

5       domestic-like product is as the Chinese themselves recognize

6       heavily concentrated in the auto aftermarket segment of

7       broader R134a market.

8             In that segment imports in the domestic-like

9       product are universally viewed as near perfect substitutes.

10            During the period of investigation these were the

11      only two sources of significant supply to the U.S. market.

12      The evidence on volume will show that imports into the auto

13      aftermarket segment, that is, measured by shipments, were

14      significant at the beginning of the period, that these

15      imports shipped increase significantly over the period and

16      that they did so even as shipments from the domestic

17      industry were falling.

18            The evidence on pricing will show that the great

19      majority of imports into the auto aftermarket undersold the

20      domestic-like product and that prices in the auto

21      aftermarket fell substantially over the period of

22      investigation.

23            In a nutshell, the impact of the imports on the

24      domestic industry's auto aftermarket business is crystal

25      clear from the data.   In the aftermarket domestic shipments

```
 1              COMMISSIONER SCHMIDTLEIN:  Right.

 2              MR. RUBIN:  And when supply goes tight that's

 3      when value goes up because typically the value a commodity

 4      delivers is much higher than the price you can extract

 5      because competitive forces constrain how much value you can

 6      extract.  That's the market forces.  But in the case of a

 7      tight supply, it becomes security of supply becomes much

 8      more important to a user because they're extracting

 9      significant value in the use of that product.

10              So, a longwinded answer to your question, but

11      yes, there's no question that the pricing dynamics in 2011

12      were driven predominantly by the tightness of supply in that

13      period.

14              COMMISSIONER SCHMIDTLEIN:  But domestic producers

15      are no longer experiences problems supplying, correct?  And

16      in fact, after 2011, that eased up.

17              MR. RUBIN:  That's correct for Dupont.

18              MR. GEOSITS:  And similarly for Metichem, the

19      supply issues have been eliminated.

20              COMMISSIONER SCHMIDTLEIN:  So, we would, as you

21      just explained, in a normal commodity market or near

22      commodity market you would expect that once -- if there was

23      a supply constraint would cause prices to go up.  Now,

24      supply has eased prices are going to come down, right?  So,

25      how should we -- what portion of the price decline do we
```

1    obligations first.  So, the other segments are going to have

2    less opportunity for penetration by the imported product.

3              The spot market, single product, packaged volume

4    predominance in the mobile aftermarket lends itself to being

5    the import market of choice and so that's where the imported

6    product was best able to fill the supply gap.  Does that

7    answer your question?

8              COMMISSIONER SCHMIDTLEIN:  I think so.  But I'm

9    trying to get at some of these other uses, the other

10   segments, right, for the aerosol foam, the pharmaceutical.

11   Are you saying that those purchasers didn't experience any

12   kind of shortages because you were able to -- because you

13   had contracts and so you had to fill those contracts first

14   and therefore that allowed the spot sales to be taken by the

15   imports?

16             MR. RUBIN:  There's a dynamic that exists there

17   where you're going to fulfill your contractual obligations

18   before you fulfill your spot obligations where you have a

19   spot market.  So, from the impact of supply I don't think

20   any of the stationary OEM customers, mobile OEM customers

21   had to shutdown a plant because of lack of supply and that's

22   because contractual obligations committed the manufacturers

23   of the 134-A to ensure that they would supply them first

24   from a prioritization standpoint.

25             So, again, it lends itself that the spot market

 1     based on the increase in the costs of raw materials.

 2     Beginning in 2012 as our global sources came online after

 3     our validation and factory auto process, the prices of R134a

 4     began to return to pre-shortage levels.

 5              The market is rationalizing and the prices we

 6     have seen from 2012 to 2014 are similar to what we saw prior

 7     to the shortages of 2010.  While the prices are returning to

 8     historical levels, we do not believe relying on U.S.

 9     packagers for 100% of supply is an option for AutoZone.

10              First, it would be irresponsible to our

11     shareholders and customers to put such an important product

12     line for AutoZone at risk of short supply which we feel is

13     likely to recur if the Petitioner is successful in this case

14     and thereby solidifies its already tight hold on the U.S.

15     market.

16              On the demand side, the need for R134a in the

17     U.S. will fluctuate, mainly due to weather but it is

18     unlikely to decrease significantly.   The pricing of the

19     product does not have significant impact on consumer's

20     purchasing decisions as consumers buy R134a when their air

21     conditioners are broken, even if they may not like the

22     price.

23              On the supply side, U.S. production of R134a is

24     dominated by only three domestic producers.   These three

25     companies really act like one company.   The Petitioner

1    low prices, but this is not so.  In its preliminary

2    determination the Commission did not find that there was

3    significant underselling and price depression in 2010 and

4    2011 when subject imports achieved their greatest gains in

5    market share.  And market share gains after the crisis

6    period of 2011 by subject imports have been modest, at most.

7            Mr. Jameson this morning presented a slide

8    showing a 40 percent increase in import volume, but this is

9    misleading because it relies on segment data from the staff

10   report that is incomplete.  It doesn't rely on the full U.S.

11   shipments of imports from the apparent consumption tables,

12   and those are the shipments that Mr. Schagrin referred to as

13   being appropriate for the analysis, that is, Census Bureau

14   data for the relevant HTS category added to the imports that

15   might have been classified under other HTS numbers.  So, we

16   agree that that's the appropriate way to measure apparent

17   consumption, but that is what this chart uses and the actual

18   increase in subject imports between 2011 and 2012 is far,

19   far less than what Mr. Jameson is claiming.

20           In addition, they said that there weren't any

21   supply shortages or any difficulties after the crisis

22   period, and that I think is largely true, but we note also

23   that in 2012 one of the U.S. producers shutdown its plant

24   for scheduled maintenance for part of the year.  Now, this

25   was anticipated and they probably informed their customers,

 1       my question is, and so when you look at that table, which is
 2       I-23.  It's Table I-3.  And you see what's happened to the
 3       U.S. producers' share in the aftermarket how does that fit
 4       into our volume analysis?  And this may be better for
 5       counsel.
 6            So, you don't refer to that in particular in your
 7       points that you make with regard to volume effects.  It
 8       seems to be a bit conspicuously absent.  Does that not show
 9       there's volume effect there?
10            MR. DOUGAN:  What it shows is what we know, which
11       is that imports from China played an increasingly important
12       role in this segment of the market, and that had to do with
13       that segment's experience during the shortage period.
14            COMMISSIONER SCHMIDTLEIN:  Well, but it continued
15       after the shortage period.  That's sort of the question
16       here.  Doesn't that continuation, and how does that affect
17       our volume analysis?
18            MR. DOUGAN:  Again, it goes back to --
19            COMMISSIONER SCHMIDTLEIN:  the upward trend.
20            MR. DOUGAN:  Well, again, I think it goes back to
21       the point of the domestic industry would argue, look, you
22       know we had this horrible shortage, but that's all better
23       now, so bring your business back to us.  And I think that
24       AutoZone and others are just not willing to do that anymore,
25       and I think that they've been willing to reconfigure their

1    supply chains on that basis.

2              It was, I think most would agree, a temporary

3    supply shock.  But there are things, and I think Ms. Dayton

4    even said she had received word from her -- she'd testified

5    that she'd received word from one of her domestic suppliers

6    that supply would be "tight" in the first half of 2014.

7    When you've gotten notices like that before, you are --

8    there are still folks who buy most of their stuff domestic,

9    but are you going to look to get more of it from someone

10   other than the domestic producers?  I think yes.

11             COMMISSIONER SCHMIDTLEIN:  I mean but I think

12   just in looking at the volume, right, like that's obviously

13   getting into causation and what's causing them to chose one

14   supplier over the other, but just in terms of -- because

15   that's what I was looking at.  This was the section dealing

16   with volume and is volume significant.  Would you agree that

17   volume's significant in t his case or no?  And if not, where

18   does this trend fit into that?

19             MR. DOUGAN:  I think domestic producers overall

20   volume indicators, and I'm careful about what I can say.

21   Their overall volume indicators improved over the POI, but

22   production capacity utilization and things of that nature.

23   I'll have to think more for post-hearing about direct

24   response to your question without --

25             COMMISSIONER SCHMIDTLEIN:  For subject imports.

1    the U.S. marketplace over this period is the introduction of

2    massive amounts of low priced, unfairly traded quantities

3    from China.   And at the time they entered the market, they

4    were not injurious and that's why no petitions were filed in

5    2010 or 2011.   It's perfectly fine to have product come

6    into the U.S. market and even now new volumes increasing

7    rapidly and if they are not underselling the U.S. industry,

8    they are not causing injury, they are perfectly fine.

9            You do have a big increase in imports.

10   Respondent criticized our use of table 4-7 in the staff

11   report by saying that not all importers reported their

12   shipments by product categories so use just total import

13   levels and it's like look, shipments are important you know

14   and things come in and they may be held in inventories,

15   particularly at the end of the year by importers.   It's

16   when they are shipped that they are competing with the U.S.

17   industry and I think that table 4-7 is reliable in the fact

18   that certain importers may not have filled out information

19   on shipments versus imports and that shouldn't be held

20   against the domestic industry.

21           Now let's talk about the competition between the

22   Chinese and the domestic and I don't think you have any

23   probably better evidence of that than the actual testimony

24   of the AutoZone witness.   You know his testimony was

25   basically, and same with the preliminary and final phase,

Tab 5


P.R. 198


Inv. Nos. 701-TA-509 and 731-TA-1244 (Final), Pub. 4503


February 2, 2015

# 1,1,1,2—TETRAFLUOROETHANE FROM CHINA

Investigation Nos. 701-TA-509 and 731-TA-1244 (Final)

**Publication 4503**                     **December 2014**



U.S. International Trade Commission

Washington, DC 20436

refrigerant used in automotive air conditioning systems and is also used in domestic and commercial refrigeration, as a propellant in aerosol cans, in foam-blowing of building insulation, and in pharmaceutical uses such as asthma inhalers.[16]  R-134a is produced by a number of methods which generally involve reacting hydrogen fluoride with a compound containing carbon and chlorine.[17]

### C.      Domestic Like Product Analysis

In the preliminary phase of these investigations, the Commission found that R-134a was used primarily as a refrigerant in air conditioning systems, and that, notwithstanding differences between producers in achieving the chemical reaction necessary to producing R-134a, they used similar general processes to produce R-134a.[18]  The Commission also found that domestically produced R-134a was sold to both distributors and end users and was interchangeable with other refrigerants only in some circumstances.[19]  Based on these findings and the lack of any contrary argument from any of the parties, the Commission identified a single domestic like product that is coextensive with the scope of Commerce's investigations.

In the final phase of these investigations, the record does not contain any new information concerning the domestic like product factors,[20] and no party has argued that the Commission should adopt a definition of the domestic like product that is different from the preliminary phase determinations.[21]  Therefore, for the reasons set forth in the preliminary phase of these investigations, we define a single domestic like product that is coextensive with the scope of Commerce's investigations.

### 3.      Domestic Industry

The domestic industry is defined as the domestic "producers as a whole of a domestic like product, or those producers whose collective output of a domestic like product constitutes a major proportion of the total domestic production of the product."[22]  In defining the domestic industry, the Commission's general practice has been to include in the industry producers of all domestic production of the like product, whether toll-produced, captively consumed, or sold in the domestic merchant market.

We must determine whether any producer of the domestic like product should be excluded from the domestic industry pursuant to section 771(4)(B) of the Tariff Act.  This provision allows the Commission, if appropriate circumstances exist, to exclude from the

---

[16] CR at I-19-22, PR at I-13-15.

[17] CR at I-11, PR at I-8.

[18] *1,1,1,2 – Tetrafluoroethane from China*, Inv. Nos. 701-TA-509 and 731-TA-1244 (Preliminary) ("Preliminary Opinion"), USITC Pub. 4444 at 6-7 (Jan. 2014).

[19] Preliminary Opinion, USITC Pub. 4444 at 7.

[20] *See generally* CR at I-10-25, PR at I-7-16.

[21] *See generally* Petitioner's Prehearing Brief; Respondents' Prehearing Brief at 4.

[22] 19 U.S.C. § 1677(4)(A).

Apparent U.S. consumption declined somewhat from 2011 to 2013. Apparent U.S. consumption declined from *** short tons in 2011 to *** short tons in 2012 and *** short tons in 2013.[65]

### B.      Supply Conditions

The domestic industry supplied the majority of R-134a to the U.S. market during the POI. Nonsubject imports had a minimal presence in the U.S. market throughout the POI.[66]

U.S. producers' U.S. shipments as a share of apparent consumption were *** percent in 2011, *** percent in 2012, and *** percent in 2013.[67] Domestically produced R-134a was sold for all applications over the POI.[68] Subject imports as a share of apparent U.S. consumption were *** percent in 2011, *** percent in 2012, and *** percent in 2013.[69] The overwhelming majority of subject imports were sold for use in the automotive refrigerant aftermarket, with some sold for use as other refrigerants.[70] R-134a for household and commercial refrigeration is supplied by the domestic producers, subject imports, and to some extent nonsubject imports.[71] Nonsubject imports' share of apparent U.S. consumption never exceeded *** percent during any calendar year or interim period.[72]

The parties agree that from mid-2010 through at least 2011, the U.S. market for R-134a experienced a supply shortage.[73] Producers and importers attributed this supply shortage to a number of conditions such as raw material shortages, production problems, the phasing out of R-22 as a refrigerant and subsequent increased demand for R-134a in non-automotive applications, increased demand for R-134a as the United States emerged from a recession, low inventories, and new applications for R-134a.[74] Respondents contend, and Petitioner does not dispute, that when supply was tight in 2010 and 2011, the domestic producers chose to fulfill their contractual obligations before selling R-134a to automotive aftermarket purchasers in the

---

[65] CR/PR at Table IV-6. Apparent U.S. consumption of R-134a was *** short tons in interim 2013 and *** short tons in interim 2014. *Id.*

[66] *Compare* CR/PR at Table IV-8 with Tables III-6 and IV-7.

[67] CR/PR at Table IV-6. U.S. producers' U.S. shipments as a share of apparent consumption were *** percent in interim 2013 and *** percent in interim 2014. *Id.*

[68] *See* CR/PR at Table III-6.

[69] CR/PR at Table IV-6. Subject imports as a share of apparent consumption were *** percent in interim 2013 and *** percent in interim 2014. *Id.*

[70] CR/PR at Table IV-7.

[71] CR/PR at Table I-3. Nonsubject imports ***. *Id.* Subject imports were not imported for use as foam expansion agents or pharmaceutical purposes at any point during the POI. Nonsubject imports ***. *Id.*

[72] CR/PR at Table IV-6.

[73] *See, e.g.* Respondents' Prehearing Brief at Ex. 2.

[74] Tr. at 13 (Shutzman); 58 (Geosits); 77 (Rubin). ***. CR/PR at Table III-4.

The principal raw materials used in the production of R-134a are hydrogen fluoride (which is made from fluorspar), and trichloroethylene.[85]  Raw material costs for U.S. producers increased by *** percent from 2011 to 2012, then decreased by *** percent from 2012 to 2013.[86]  Raw material costs increased (*** percent) between interim 2013 and interim 2014.[87] [88]

**6.      No Material Injury By Reason of Subject Imports**

### A.      Volume of Subject Imports

Section 771(7)(C)(i) of the Tariff Act provides that the "Commission shall consider whether the volume of imports of the merchandise, or any increase in that volume, either in absolute terms or relative to production or consumption in the United States, is significant."[89]

The volume of subject imports increased from *** short tons in 2011 to *** short tons in 2012 before decreasing slightly to *** short tons in 2013.[90]  The increase in subject import volume that occurred between 2011 and 2012 is attributable to the effects of a domestic supply shortage that began in 2010 and persisted at least through the end of 2011.[91]  Domestic producers responded to the supply shortage by fulfilling their contractual obligations first before offering R-134a on the spot market to purchasers for the automotive replacement aftermarket.[92]  Purchasers for the automotive replacement aftermarket reported that throughout 2010 and 2011, domestic producers informed them that supply was tight, forcing them to turn to imports from China in order to ensure a stable supply of R-134a.[93]  Petitioners

---

[85] CR/PR at V-1.

[86] CR/PR at Appendix D.

[87] CR/PR at Appendix D.

[88] Commissioners Williamson and Schmidtlein have reached affirmative determinations and do not join the remainder of this opinion.  *See* their dissenting views.

[89] 19 U.S.C. § 1677(7)(C)(i).

[90] CR/PR at Table IV-2.  Subject imports also decreased from *** short tons in interim 2013 to *** short tons in interim 2014.  The pendency of these investigations affected the subject import volume in interim 2014 because parties anticipated orders would be imposed and therefore purchasers felt it would be "advantageous to keep production in the United States."  Tr. at 190 (Dayton, Marshak). We therefore exercise our discretion to accord less weight to the interim 2014 data.  See 19 U.S.C. §1677(7)(I).

[91] Tr. at 208 (Schagrin) ("at the time they entered the market, {subject imports} were not injurious and that's why no petitions were filed in 2010 or 2011.").  *See also* Tr. at 134 (Dougan) (observing that the partial shutdown of one U.S. production plant was anticipated for 2012).

[92] Tr. at 54 (Rubin) ("There's a dynamic that exists there where you're going to fulfill your contractual obligations before you fulfill your spot obligations.").   The record also shows that domestic producers did not reduce their export volumes despite supply tightness in the U.S. market.  CR/PR at Table III-5.

[93] Respondents' Prehearing Brief at 10-11.  The record contains correspondence from *** in April 2010 (***), and *** in January 2011 ("***").  *Id*.  A DuPont representative acknowledged at the (Continued...)

agree that the supply shortage occurred through the end of 2011.[94]  As late as February 2012, purchasers for the automotive aftermarket were informed by at least one domestic supplier (***.”[95] ***.[96]  Furthermore, purchasers were aware that *** had scheduled a plant shutdown in 2012 for maintenance, further decreasing the available supply of domestically produced R-134a in 2012.[97]

Because the duration of the supply shortage was uncertain at the time it was occurring and because purchasers wanted to ensure a stable supply of R-134a, they turned to China as a reliable source of R-134a, both during the shortage and as the shortage began to dissipate.[98]  Purchasers testified at the hearing that they typically place orders in the fall and that these orders are delivered in the late fall and winter months.[99]  Therefore, orders placed in the fall of 2011, when purchasers were still responding to the 2011 supply tightness and continued inability to obtain R-134a from domestic producers, would have been delivered through early 2012.  Unsurprisingly, the bulk of subject import volume was sold in the automotive replacement aftermarket,[100] which was the market segment that domestic producers concede was left with the greatest shortages of R-134a.[101]  We observe that as the market stabilized in 2012, the pace of subject imports slowed.  Subject imports on both a relative and absolute basis dropped slightly in 2013.[102]

Subject imports as a share of the U.S. market increased from *** percent in 2011 to *** percent in 2012, and then declined to *** percent in 2013.[103]  U.S. producers’ U.S. shipments as

---

(…Continued)

preliminary phase conference that “during the period in question, 2010/2011 . . . if we were in a constrained supply situation, we fulfilled all of our contractual obligations, but those customers that buy from us on the spot market, if we were constrained, we would have communicated to them that, hey, we’re constrained.  You may want to find an alternative source.”  (Prelim. Tr. at 114).  *See also* CR at V-28-29, PR at V-8 (***).

[94] *E.g.*, DuPont Prehearing Brief at 4.  *See also* Tr. at 51 (Rubin) (“There’s no question that the pricing dynamics in 2011 were driven predominantly by the tightness of supply in that period.”).

[95] Respondents’ Prehearing Brief at 13 (quoting ***).  Respondents’ Prehearing Brief at Exh. 2.

[96] Respondents’ Prehearing Brief at Exh. 2.

[97] CR at III-4, PR at III-2. Tr. at 134-35 (Dougan).

[98] Tr. at 121 (Lammers), 156-57 (Dougan)

[99] Tr. at 127 (Dayton).

[100] CR/PR at Table IV-7.

[101] *E.g.* Tr. at 54 (Rubin) (“There’s a dynamic that exists there where you’re going to fulfill your contractual obligations before you fulfill your spot obligations.”).

[102] CR/PR at Table IV-2.  While reported shipments of subject imports increased from 2012 to 2013, we find that this increase was nominal (*** percent), particularly compared to the *** percent increase in reported subject import shipments from 2011 to 2012.  CR/PR at Table IV-7.

[103] CR/PR at Table IV-6.   Subject imports as a share of the U.S. market were *** percent in interim 2013 and *** percent in interim 2014.

a share of the market declined from *** percent in 2011 to *** percent in 2012 and then increased to *** percent in 2013.[104]

In view of the foregoing, we find the volume of subject imports to be significant in absolute terms and relative to consumption.  However, for the reasons we discuss below, we do not find that the subject imports had significant price effects or a significant impact on the domestic industry.

### B.        Price Effects of the Subject Imports

Section 771(7)(C)(ii) of the Tariff Act provides that evaluating the price effects of the subject imports, the Commission shall consider whether

> (I) there has been significant price underselling by the imported merchandise as compared with the price of domestic like products of the United States, and

> (II) the effect of imports of such merchandise otherwise depresses prices to a significant degree or prevents price increases, which otherwise would have occurred, to a significant degree.[105]

As previously discussed, price is an important factor in purchasing decisions.  There is a high degree of substitutability between the domestic like product and the subject imports.  Price was the most important factor cited by purchasers in their purchasing decisions, while quality and availability were the next most important factors.[106]

The Commission collected pricing data for seven products, and quarterly price comparisons between subject imports and the domestic like product are possible for five of these products.[107]  Subject imports were concentrated in three of the pricing products: Products 4, 5, and 6.  Reported pricing data accounted for approximately 60.5 percent of U.S. producers' U.S. commercial shipments and 65.9 percent of U.S. importers' U.S. commercial shipments of imports from China during the POI.[108]  Although there are no pricing products that specifically target the automotive aftermarket, the pricing products nevertheless capture

---

[104] CR/PR at Table IV-6. U.S. producers' U.S. shipments as a share of the market were *** percent in interim 2013 and *** percent in interim 2014.

[105] 19 U.S.C. § 1677(7)(C)(ii).

[106] CR at II-19, PR at II-12.

[107] Product 1 was R-134a sold in bulk to distributors; Product 2 was R-134a sold in bulk to retailers; Product 3 was R-134a sold in bulk to end users for foam expansion, foam blowing, and aerosol applications; Product 4 was R-134a sold in 30 pound containers to distributors; Product 5 was R-134a sold in 30 pound containers to retailers; Product 6 was R-134a sold in 12 ounce containers to distributors; and Product 7 was R-134a sold in 12 ounce containers to retailers.  Subject imports were not present in Product 3.  The domestic like product was not present in Product 2.  CR at V-5-6, PR at V-3-4.

[108] CR at V-5-6, PR at V-3-4.

competition between the domestic like product and subject imports, the majority of which is in the automotive aftermarket.  Product 3 is the only use-specific product definition, and there were no subject imports of Product 3.

We find that there are mixed instances of underselling and overselling by subject imports.  The record shows more instances of overselling than underselling by subject imports on a quarterly basis and more underselling than overselling by subject imports on a volume basis.[109]  Subject imports undersold the domestic like product in 31 of 66 quarterly comparisons, at margins ranging from 0.5 percent to 47.5 percent.[110]  In the 35 instances in which subject imports oversold the domestic like product, prices for subject imports were between 1.2 percent and 77.2 percent higher than prices for domestically produced R-134a.[111]  The quantity of subject imports in instances of underselling, *** pounds, exceeded the quantity of subject imports in instances of overselling, which was *** pounds.[112]

We cannot find any correlation between the observed underselling and shifts in market shares for the subject imports.  There were significant quantities of subject imports that undersold the domestic like product during each year of the POI,[113]  but the only gains in subject import market share occurred from 2011 to 2012, when subject imports increased their market share from *** percent to *** percent and U.S. producers' U.S. shipments fell from *** percent to *** percent of the U.S. market.[114]  As noted above, however, we earlier found that this increase in market share was a function of purchasers' response to the supply shortages that persisted through at least the end of 2011.[115]  Thus, the supply situation of the domestic industry, rather than underselling by subject imports, explains the shifts in market share.[116]  This, as well as the lack of correlation between underselling and price movements, discussed below, mitigates the significance of the observed underselling.

We acknowledge that the domestic industry's prices declined over the POI.  The record shows that prices at the beginning of the POI were at high levels due to the supply squeeze that

---

[109] *See generally*, CR/PR at Tables V-3-9, V-11-12.

[110] CR at V-22, PR at V-6-7.

[111] CR at V-22, PR at V-7.

[112] CR/PR at Table V-12.

[113] CR/PR at Tables V-6.

[114] CR/PR at Table IV-6.  From 2012 to 2013, the domestic industry lost market share to the subject imports in the automotive aftermarket but gained it in "other refrigerants," the other market segment with subject import competition in which the domestic industry has greater shipments.

[115] *See* CR/PR at Table IV-6.

[116] Petitioner asserts that AUVs in the automotive aftermarket fell from *** due to the presence of subject imports.  Petitioner's Prehearing Brief at 14-15.  Petitioner acknowledges that in 2011 prices were higher in the automotive aftermarket than in other markets because of the supply shortage.  Petitioner also acknowledges that prices in the automotive aftermarket are more responsive to supply and demand because such sales take place in the spot market, compared to other contract-based markets.  Petitioner's Prehearing Brief at 36.

began in 2010.[117]  Prices peaked in 2011.[118]  As the supply situation normalized in 2012, prices declined.[119]  Therefore, the decline in prices during the POI is associated with the cessation of the supply shortage that temporarily inflated prices.  Because the supply shortage was most acute in the automotive aftermarket, prices therein increased the most, and as a consequence, experienced greater declines over the POI as compared to prices of R-134a sold for other purposes.

Indeed, pricing data on the record demonstrate that price declines occurred whether subject imports oversold or undersold the domestic like product and regardless of whether subject imports were present in the market for a particular pricing product.[120]  Prices declined for five of the seven products (Products 1 and 4-7) at approximately the same rate, even in the presence of overselling by subject imports.  Subject import prices for Product 1 oversold the domestic like product in all but two quarterly comparisons,[121] [122] yet prices for the domestic like product peaked in the second quarter of 2011 and continued falling throughout the remainder of the POI.[123]  Products 5, 6, and 7 all had mixed instances of overselling and underselling, yet exhibited price declines over the POI.[124]  Prices for Product 4, which had the most underselling by subject imports, fell at approximately the same rate as prices for Products 1, 5, 6, and 7.[125]

We have also examined whether the subject imports prevented the domestic industry from instituting price increases that otherwise would have occurred.  The domestic industry's ratio of cost of goods sold ("COGS") to net sales increased from 2011 to 2013.[126]  We find, however, that this increase in the COGS to net sales ratio is attributable primarily to changes in net sales value, which decreased from $*** in 2011 to $*** in 2012 and then to $*** in

---

[117] Exhibits to Testimony of Jim Dougan (Oct. 15, 2014) at 1; Respondents' Prehearing Brief at Exhs. 1 (quoting an industry report "Starting mid-2010 and continuing through 2011, HFC-134a has experienced supply shortages and cost increases that seem to escalate month-by-month.") (May 5, 2011) and 2 (quoting letters from ***) (*** .

[118] CR/PR at Figures V-1-7.  *See also* Exhibits to Testimony of Jim Dougan (Oct. 15, 2014) at 1 (showing prices from Q1 2010 to Q2 2014); DuPont Prehearing Brief at 4.

[119] CR/PR at Figures V-1-7.

[120] CR/PR at Figures  V-1-7.

[121] CR/PR at Table V-3.

[122] DuPont provided an exhibit comparing certain repackagers' annual direct import AUVs to sales AUVs of *** to each of these repackagers.  DuPont Posthearing Brief at Exh. 2.  We note that these AUVs are not directly comparable to importers' sales prices, as they do not include any sales markup that would typically be made by an importer selling R-134a in the U.S. market.

[123] CR/PR at Figure V-1.

[124] CR/PR at Figures V-5-7.

[125] Given that the pricing data on the record provides relatively high coverage of both the domestic like product and subject imports, we have relied on such pricing data.  Our usual practice is not to rely heavily on AUV data because changes in AUV data over time can be a result of changes in product mix.

[126] This ratio increased from *** percent in 2011 to *** percent in 2012 and *** percent in 2013.  It was *** percent in interim 2013, and *** percent in interim 2014.  CR/PR at Appendix D.

2013.[127]  By contrast, on a unit basis, raw material costs and COGS fluctuated within a fairly narrow range throughout the POI.  Raw materials were $*** per short ton in 2011, $*** per short ton in 2012, and $*** per short ton in 2013.[128]  Similarly, COGS were $*** per short ton in 2011, $*** per short ton in 2012, and $*** per short ton in 2013.[129]  Demand over the POI was flat, and given that the market was emerging from a supply shortage, price increases were not likely.  Consequently, we find that the increase in the COGS/net sales ratio is a function of the high price levels that existed at the beginning of the POI due to supply shortages -- and the subsequent alleviation of those shortages -- rather than the presence of subject imports.[130] [131]

---

[127] CR/PR at Appendix D.  Net sales were $*** in interim 2013 and $*** in interim 2014.

[128] CR/PR at Appendix D.  Raw material costs were $*** per short ton in interim 2013 and $*** per short ton in interim 2014.

[129] CR/PR at Appendix D. Total COGS was $*** per short ton in interim 2013 and $*** in interim 2014.

[130] With respect to petitioner's argument that whether prices were returning to a "natural equilibrium" is irrelevant to the price effects inquiry, Petitioner's Posthearing Brief at 6, the statute does not refer to "equilibrium" prices and we have not purported to compute such prices.  Nonetheless, the statute does direct us to ascertain whether the effect of subject imports is to depress prices to a significant degree.  19 U.S.C. §1677(7)(C)(ii)(II).  In light of this provision, our responsibility is to determine whether price declines over the POI are due to subject imports or other causes.  Therefore, conditions of competition that may cause price levels to be higher or lower than they otherwise would have been are pertinent to our inquiry.  In these investigations, the fact that there was an acknowledged supply shortage early in the POI is a factor that caused prices to be higher than they otherwise would have been.  *E.g.*, Respondents' Prehearing Brief at Exh. 2, Letter from *** on April 1, 2011 (advising that "***").  The resumption of normal supply conditions is a factor that would tend independently to reduce prices.  We have properly considered these conditions of competition in fulfilling our statutory responsibility to ascertain whether subject imports had significant price depressing effects.

[131] During the hearing, various domestic industry witnesses expressed the view that the subject imports had "spillover" effects that caused prices to decline for domestically produced R-134a sold for uses other than the ones for which there was subject import competition.  Tr. at 91 (Rubin, Geosits).  While we do not question the testimony that purchasers may have used prices of subject imports in the automotive aftermarket in negotiating prices for the R-134a products that they purchased for other uses, neither DuPont nor petitioner provided specific examples of when domestic producers were forced to reduce prices because of "spillover effects."  *See* DuPont Posthearing Hearing Brief, Part II at 24-25; Petitioner's Posthearing Brief at 6-9.  The testimony does not outweigh the fact that purchasers had no credible alternative to purchasing R-134a for other non-automotive aftermarket uses from the domestic industry.  Consequently, we find that the alleviation of the supply shortage, not "spillover" effects from the subject imports, explains the decline in prices across different uses, including those in which there was limited or no subject import competition.

In light of the foregoing, we find that the subject imports did not have the effect of depressing prices or preventing price increases that would otherwise have occurred to a significant degree.[132]  Because we also find that the observed underselling did not lead to significant shifts in market share, we find that the subject imports did not have significant price effects.

C.      **Impact of the Subject Imports**[133]

Section 771(7)(C)(iii) of the Tariff Act provides that examining the impact of subject imports, the Commission "shall evaluate all relevant economic factors which have a bearing on the state of the industry."[134]  These factors include output, sales, inventories, capacity utilization, market share, employment, wages, productivity, profits, cash flow, return on investment, ability to raise capital, research and development, and factors affecting domestic prices.  No single factor is dispositive and all relevant factors are considered "within the context of the business cycle and conditions of competition that are distinctive to the affected industry."

In a market where apparent consumption was largely stable from 2011 to 2013, the domestic industry's output, shipments, market share, and employment indicators were also relatively stable, showing only minor fluctuations.  By contrast, the domestic industry's operating income steadily declined over the POI, both when subject import volume increased and when subject import volume flattened.

The domestic industry's average capacity showed little change over the POI, while production and capacity utilization both increased from 2011 to 2013.[135]  Average capacity was

---

[132] We acknowledge that there were some instances of confirmed lost sales and revenues. CR/PR at Table V-13-14.  These, however, do not outweigh the other data in the record which, taken as a whole, show the lack of significant price effects.

[133] The statute instructs the Commission to consider the "magnitude of the dumping margin" in an antidumping proceeding as part of its consideration of the impact of imports.  19 U.S.C. § 1677(7)(C)(iii)(V).  In its final determination of sales at less value, Commerce found antidumping duty margins of 280.67 percent for imports of R-134a from China for all exporters. *1,1,1,2 – Tetrafluoroethane from the People's Republic of China*, 79 Fed. Reg. 62597 (final determination of sales at less than fair value) ("Commerce Final AD Determination") (Oct. 20, 2014).  In its final countervailing duty investigation, Commerce found countervailable subsidies at the following rates:  1.87 to 22.75 percent for individually investigated parties, and 14.23 percent as the all others rate.  *1,1,1,2 – Tetrafluoroethane from the People's Republic of China*, 79 Fed. Reg. 62594 (final affirmative countervailing duty determination) ("Commerce Final CVD Determination") (Oct. 20, 2014).

[134] 19 U.S.C. § 1677(7)(C)(iii); *see also* SAA at 851 and 885 ("In material injury determinations, the Commission considers, in addition to imports, other factors that may be contributing to overall injury.  While these factors, in some cases, may account for the injury to the domestic industry, they also may demonstrate that an industry is facing difficulties from a variety of sources and is vulnerable to dumped or subsidized imports.").

[135] CR/PR at Table III-3.

*** short tons in 2011, *** short tons in 2012, and *** short tons in 2013.[136]  Production declined from *** short tons in 2011 to *** short tons in 2012, and then increased to *** short tons in 2013.[137]  Capacity utilization was *** percent in 2011, *** percent in 2012, and *** percent in 2013.[138]  The domestic industry's shipments showed minor fluctuations.  U.S. shipments were *** short tons in 2011, *** short tons in 2012, and *** short tons in 2013.[139]

As previously discussed, the domestic industry lost market share from 2011 to 2012 because of the supply shortage, but regained some of that loss in 2013.  The domestic industry's market share decreased slightly over the entire POI, from *** percent in 2011 to *** percent in 2012, and then increased to *** percent in 2013.[140]  We examined data collected concerning sales for different applications.  These data indicate that as the domestic industry lost market share in sales to the automotive aftermarket from 2011 to 2013, it gained market share in the "other refrigerants" application in which it faced competition from subject imports.[141]

The number of production workers, wages paid, productivity, and hours worked remained relatively stable from 2011 to 2013.  The number of production workers was *** in 2011, *** in 2012, and *** in 2013.[142]  Wages paid increased slightly from $*** in 2011 to $*** in 2012 and 2013.[143]  Productivity stayed at *** short tons per 1,000 hours throughout the POI.[144]  Hours worked were *** in 2011, *** in 2012, and *** in 2013.[145]  Hourly wages increased slightly over the POI, from $*** per hour in 2011 to $*** per hour in 2012, and then to $*** per hour in 2013.[146]

---

[136] CR/PR at Table III-3.  Capacity was *** short tons in both interim 2013 and interim 2014.

[137] CR/PR, Table III-3.  Production was *** short tons in interim 2013 and *** short tons in interim 2014.

[138] CR/PR at Table III-3.  Capacity utilization was *** percent in interim 2013 and *** percent in interim 2014.

[139] U.S. shipments were *** short tons in interim 2013 and *** short tons in interim 2014. CR/PR at Table C-1.  U.S. producers' end of period inventories were *** short tons in 2011, *** short tons in 2012, and *** short tons in 2013.  They were *** short tons in interim 2013 and *** short tons in interim 2014.  CR/PR at Table III-9.  Inventories as a ratio of U.S. production were *** percent in 2011, *** percent in 2012, and *** percent in 2013.  They were *** percent in interim 2013 and *** percent in interim 2014. *Id.*

[140] CR/PR at Table IV-6.  Domestic producers' market share was *** percent in interim 2013 and *** percent in interim 2014.

[141] CR/PR at Tables III-6, IV-7.  *See* n.115.

[142] CR/PR at Table III-11.  There were *** production related workers in interim 2013 and *** in interim 2014.

[143] CR/PR at Table III-11.  Wages paid were $*** in interim 2013 and $*** in interim 2014.

[144] CR/PR at Table III-11.  It remained at *** short tons per hour in interim 2013 and increased marginally in interim 2014.

[145] CR/PR at Table III-11.  Hours worked were *** in interim 2013 and *** in interim 2014.

[146] CR/PR at Table III-11.  Hourly wages were $*** in interim 2013 and $*** in interim 2014.

The domestic industry's net sales quantities showed minor fluctuations during the POI. COGS declined both absolutely and on a per-unit basis.  Sales revenues, which in 2011 reflected the increased prices the domestic industry was able to receive that year because of the supply shortage, declined more rapidly than did COGS.  As a consequence, the domestic industry's operating income declined from $*** in 2011 to $*** in 2012 and $*** in 2013.[147] Consequently, operating income decreased severely, both from 2011 to 2012, when subject import volume and market share increased, and from 2012 to 2013, when subject import volume and market share declined.[148]  The domestic industry's reported capital expenditures

---

[147] CR/PR at Table D-1.  The domestic industry's operating income was $*** in interim 2013, and it posted an operating loss of $*** in interim 2014. *Id.*

Mexichem purchases its primary raw material input from a related supplier located in Mexico.  It contends that the purchase values it reports in its financial records are the ones that should be used in the Commission's financial analysis.  Petitioner's Prehearing Brief at 21-25. Respondents generally disagree.  Respondents' Posthearing Brief at Exh. 1, p. 7.  In cases where inputs are purchased from a related party (domestic or foreign), the Commission has followed the practice of requiring the elimination of related party profit or loss such that only the related supplier's cost is reflected in the financial results reported to the Commission.  Consistent with this approach, Part VI of the Commission Report presented the U.S. industry's financial results with the above-referenced input adjustment.  In order to consider this issue more fully, Appendix D also presented the U.S. industry's financial results without the input adjustment.  We considered both sets of financial results and arrived at the same general conclusion regarding the financial results and condition of the U.S. industry.

Having considered this issue further, in this case and in general, we believe that the financial results information reported in Appendix D (i.e., without the input adjustment for related party profit or loss) is more useful for purposes of our analysis because it more closely reflects the actual cost of goods sold which directly impacted the U.S. producer's decisions related to revenue, *i.e.* pricing.  Based on this conclusion, in future questionnaires the Commission no longer intends, as a standard practice, to require a separate adjustment to eliminate relevant profit or loss on inputs purchased from related parties.  Instead, the Commission will require that relevant costs included in reported financial results be consistent with and based on the accounting books and records of the firm responding to the U.S. producer questionnaire.

While this reflects a change in practice with respect to how financial results are to be reported, the Commission will continue to gather relevant information regarding input purchases from related suppliers for its analysis and will examine anomalous patterns, to the extent present, related to such input purchases.

[148] Additionally, although the volume of subject imports was lower and the domestic industry's market share higher in interim 2014 than in interim 2013, this did not result in improvement in the domestic industry's operating performance.  The domestic industry's operating income as a ratio to net sales was *** percent in interim 2013 and *** in interim 2014.  CR/PR at Table D-1.  Petitioner argues that subject imports increased sharply in the beginning of 2014, resulting in abnormally high inventories, and asserts that importers "would have been desperate to unload those inventories before the end of the auto air conditioning season, and would have offered record low prices."  Petitioner's Prehearing Brief at 20-21.  However, petitioner provides no support for this assertion, and pricing data on the record shows that, with one exception, subject import prices increased during interim 2014.  CR/PR at Tables V-3-9.

and research and development ("R&D") expenses increased from 2011 to 2013.[149]   Total capital expenditures were $*** in 2011, $*** in 2012, and $*** in 2013.[150]  R&D expenses were $*** in 2011, $*** in 2012, and $*** in 2013.[151]

In light of the general stability of the domestic industry's output, sales quantities, and market share, the domestic industry's severe decline in operating performance from 2011 to 2013 was attributable to the decline in prices that occurred during the POI.  As discussed above, these price declines occurred because prices were anomalously high at the beginning of the POI due to the supply shortages of 2010 and 2011 and began to return to their pre-shortage levels as the market stabilized in 2012 and 2013.  By contrast, the subject imports did not have significant price depressing effects and did not significantly prevent price increases that otherwise would have occurred.  Moreover, there is no correlation between declines in operating performance, which occurred throughout the POI, and changes in subject import volume and market share.[152]  In sum, the record does not support a conclusion that the domestic industry's declines in operating performance were caused by the subject imports.

In view of the foregoing, we find that subject imports have not had significant adverse impact on the domestic industry.

## 7.    No Threat of Material Injury by Reason of Subject Imports

### A.    Legal Standard

Section 771(7)(F) of the Tariff Act directs the Commission to determine whether the U.S. industry is threatened with material injury by reason of the subject imports by analyzing whether "further dumped or subsidized imports are imminent and whether material injury by reason of imports would occur unless an order is issued or a suspension agreement is accepted."[153]  The Commission may not make such a determination "on the basis of mere conjecture or supposition," and considers the threat factors "as a whole" in making its determination whether dumped or subsidized imports are imminent and whether material injury by reason of subject imports would occur unless an order is issued.[154]  In making our determination, we consider all statutory threat factors that are relevant to these investigations.[155]

---

[149] CR/PR at Table VI-4.

[150] CR/PR at Table VI-4.  Capital expenditures were $*** in interim 2013 and $*** million in interim 2014.

[151] CR/PR at Table VI-4.  R&D expenses were $*** in interim 2013 and $*** in interim 2014.

[152] Petitioner's counsel appears to concede that subject imports were not injurious in 2011.  *See* Tr. at 208 (Schagrin) ("And at the time they entered the market, they were not injurious and that's why no petitions were filed in 2010 or 2011.").

[153] 19 U.S.C. § 1677(7)(F)(ii).

[154] 19 U.S.C. § 1677(7)(F)(ii).

[155] These factors are as follows:

(Continued...)

### B.        Analysis

### 1.        Likely Volume

As discussed above, we have found the volume of subject imports to be significant during the POI.  In particular, we found that subject import volume increased due to supply shortages that occurred in 2010 and 2011, and which forced purchasers for the automotive replacement aftermarket to turn to imported R-134a from China.  After the supply shortage was resolved, subject import volume ceased to increase.  Consequently, there is no evidence in the record that the U.S. market conditions that led to subject import volume increases from 2011 to 2012 will exist in the imminent future.

The record shows that capacity in China increased throughout the POI, yet subject import volume did not increase accordingly; instead it began to decrease midway through the POI.  Reported capacity in China increased from *** short tons in 2011 to *** short tons in

---

(…Continued)

(I) if a countervailable subsidy is involved, such information as may be presented to it by the administering authority as to the nature of the subsidy (particularly as to whether the countervailable subsidy is a subsidy described in Article 3 or 6.1 of the Subsidies Agreement) and whether imports of the subject merchandise are likely to increase,

(II) any existing unused production capacity or imminent, substantial increase in production capacity in the exporting country indicating the likelihood of substantially increased imports of the subject merchandise into the United States, taking into account the availability of other export markets to absorb any additional exports,

(III) a significant rate of increase of the volume or market penetration of imports of the subject merchandise indicating the likelihood of substantially increased imports,

(IV) whether imports of the subject merchandise are entering at prices that are likely to have a significant depressing or suppressing effect on domestic prices and are likely to increase demand for further imports,

(V) inventories of the subject merchandise,

(VI) the potential for product-shifting if production facilities in the foreign country, which can be used to produce the subject merchandise, are currently being used to produce other products,

…

(VIII) the actual and potential negative effects on the existing development and production efforts of the domestic industry, including efforts to develop a derivative or more advanced version of the domestic like product, and

(IX) any other demonstrable adverse trends that indicate the probability that there is likely to be material injury by reason of imports (or sale for importation) of the subject merchandise (whether or not it is actually being imported at the time).

19 U.S.C. § 1677(7)(F)(i).  To organize our analysis, we discuss the applicable statutory threat factors using the same volume/price/impact framework that applies to our material injury analysis.  Statutory threat factors (I), (II), (III), (V), and (VI) are discussed in the analysis of likely subject import volume.  Statutory threat factor (IV) is discussed in the analysis of likely subject import price effects.  Statutory factors (VIII) and (IX) are discussed in the analysis of likely impact.  Statutory factor (VII) concerning agricultural products is inapplicable to this investigation.

domestic supply shortage was resolved and we consequently find that there is not a likelihood of substantially increased subject imports in the imminent future.

### 2. Likely Price Effects

In our discussion above, we found mixed instances of overselling and underselling by the subject imports.  We also found that notwithstanding the instances of underselling by subject imports during the POI, the subject imports did not cause significant price effects.  Any increases in subject import market share were due to the domestic supply shortage rather than the pricing of the subject imports.  Because we do not believe that subject import volume in the imminent future is likely to change appreciably from the levels observed in 2012 and 2013, we believe that the absence of significant price effects that characterized the POI will likely persist in the imminent future.  We consequently find that imports of the subject merchandise are unlikely to enter the U.S. market at prices that are likely to have a significant depressing or suppressing effect on domestic prices and that are likely to stimulate demand for further imports.

### 3. Likely Impact

As we discussed above, during the POI the only indicator of domestic industry performance to show a substantial decline was its operating income, which was not caused by subject imports, but rather, by a decline in prices that occurred as the U.S. market began to stabilize after experiencing supply shortages in 2010 and 2011.  As stated above, we do not anticipate in the imminent future any significant change in subject import volumes from those that occurred during the latter portion of the POI or significant price effects.  Consequently, the subject imports are unlikely to have significant impact on the domestic industry.  The record does not provide evidence of any demonstrable adverse trends that indicate the probability that there is likely to be material injury by reason of subject imports.  We further find that subject imports have had no significant actual or potential negative effects on the existing development and production efforts of the domestic industry, including efforts to develop a derivative or more advanced version of the domestic like product.[169]

In view of the foregoing, we conclude that an industry in the United States is not threatened with material injury by reason of subject imports.

---

[169] The record indicates that the domestic industry's current research and development efforts are not  being devoted to developing advanced or improved versions of the domestic like product, R-134a.  Instead, domestic producers are focusing their R&D efforts on developing the next generation of refrigerants – in other words, new products that are intended to replace R-134a.  CR at VI-21 n. 37-38, PR at VI-6-7 nn. 37-38.

**8.**     **Conclusion**

For the reasons stated above, we determine that an industry in the United States is not materially injured or threatened with material injury by reason of subject imports of R-134a from China that are sold in the United States at less than fair value.

## Dissenting Views of Commissioners Irving A. Williamson and
## Rhonda K. Schmidtlein

**I.     Material Injury**

We join our colleagues in their findings regarding the domestic like product, the domestic industry, and conditions of competition.  As explained below, however, we find that a significant volume of subject imports has undersold the domestic like product, significantly depressed U.S. prices, and caused material injury to the domestic industry producing 1,1,1,2-Tetrafluoroethane ("R-134a") during the period of investigation ("POI").

**A.     Volume of Subject Imports**

Section 771(7)(C)(i) of the Tariff Act provides that the "Commission shall consider whether the volume of imports of the merchandise, or any increase in that volume, either in absolute terms or relative to production or consumption in the United States, is significant."[1]

The volume of subject imports increased from *** short tons in 2011 to *** short tons in 2012 and was *** short tons in 2013, for a total increase of *** percent.[2]  Total apparent U.S. consumption was *** short tons in 2011, *** short tons in 2012, and *** short tons in 2013.[3]  Subject imports accounted for *** percent of apparent U.S. consumption in 2011, *** percent in 2012, and *** percent in 2013.[4]  At the same time, the domestic industry's share of apparent U.S. consumption was *** percent in 2011, *** percent in 2012, and *** percent in 2013.[5]  Based on the foregoing, we find that the volume of subject imports is significant both in absolute terms and relative to consumption in the United States.

The subject imports were concentrated in the automotive aftermarket segment of the market during the POI, which is also the largest segment of the total R-134a market.[6]  Consequently, an examination of the trends in the automotive aftermarket is also relevant to

---

[1] 19 U.S.C. § 1677(7)(C)(i).

[2] Confidential Report ("CR")/Public Report ("PR") at Table C-1.  The volume of subject imports declined from *** short tons in January—June ("interim") 2013 to *** short tons in interim 2014.  We find that the smaller, though still substantial, volume of subject imports in interim 2014 was due at least in part to the filing of the petition in October 2013 and, thus, give reduced weight to the decline in subject import volume in interim 2014.

[3] CR/PR at Table IV-6.

[4] CR/PR at Table C-1.  Subject imports accounted for *** percent of apparent U.S. consumption in interim 2013 and *** percent in interim 2014.  *Id.*

[5] CR/PR at Table C-1.  The domestic industry's market share was *** percent in interim 2013 and *** percent in interim 2014.  *Id.*

[6] *See* CR/PR at Table I-3.  The automotive aftermarket segment's share of total reported U.S. shipments of R-134a rose from *** percent in 2011 to *** percent in 2012 and *** percent in 2013; the share in interim 2014 was *** percent, compared to *** percent in interim 2013.

majority of purchasers also reported that price is a very important purchasing factor and that they always or usually purchase the lowest-priced R-134a that is available.[13]

The Commission collected pricing data on seven different products.[14] On a quarterly comparison basis, the subject imports undersold the domestic like product in 31 quarters and oversold the U.S.-produced product in 35 quarters.[15] On a volume basis, however, the *** of subject imports undersold the domestic like product. The data show that *** percent of the total volume of subject imports reported for the pricing products undersold the domestic like product.[16] We therefore find the underselling by subject imports to be significant.

The significant volume of low-priced subject imports depressed U.S. prices to a significant degree. The domestic industry's prices for each of its pricing products declined between *** percent and *** percent from the first quarter of 2011 to the second quarter of 2014.[17] We recognize that there was some supply tightness at the beginning of the POI, which resulted in abnormally high prices in 2011.[18] Consequently, we also acknowledge that some aspect of the price declines is likely related to the alleviation of that tightness in the market. We, therefore, find the pricing data after 2011 to be particularly probative, as market conditions were returning to a more normal supply and demand balance. We note that U.S. prices declined consistently throughout the POI, despite the fact that the parties agreed that supply tightness was no longer a real issue after 2011.[19] As explained below, we find that the

_____

[13] CR/PR at Table II-6; CR at II-20, PR at II-12-13.

[14] The data for these pricing products covered approximately 60.5 percent of the domestic industry's U.S. commercial shipments and about 65.9 percent of U.S. importers' U.S. commercial shipments of R-134a during January 2011-June 2014. CR at V-5-6, PR at V-3-4. These data do not include, however, the substantial volume of sales by firms that directly imported R-134a during the POI. *See* CR at V-6 n.10, PR at V-4 n.10; *see also* DuPont Posthearing Brief at Exhibit 2 (showing that in 2012, 2013, and the first half of 2014, repackagers directly imported at least *** short tons of R-134a from China).

[15] CR/PR at Table V-11.

[16] *See* CR/PR at Tables V-3-9, V-12.

[17] CR/PR at Table V-10.

[18] *See, e.g.*, Respondents' Prehearing Brief at 9-10; Hearing Tr. at 51 (Rubin).

[19] *See* Hearing Tr. at 47 (Greenwald) (stating there has been ample domestic supply post-2011); Hearing Tr. at 51, 55 (Rubin) (stating that supply tightness ended in 2011 and DuPont has not had problems supplying demand after the 2010-2011 period); Hearing Tr. at 51, 55 (Geosits) (stating that Mexichem has not had problems supplying demand after 2011); Hearing Tr. at 133 (Dougan) (referring to supply shortages in 2010 and 2011); Hearing Tr. at 136 (Dougan) (stating that supply conditions returned to normal in 2012 and 2013). The respondents submitted information showing that *** reported some supply tightness persisted in early 2012, though questionnaire respondents primarily referred to tightness in 2010 and 2011. *See* Respondents Posthearing Brief at 8; CR at II-8-9, PR at II-5-6 (showing that only three of 35 responding purchasers reported any supply constraints after 2011). To the extent that any domestic supply tightness did exist beyond 2011, this only supports our finding that the U.S. price declines were caused by the subject imports' underselling. If supply was still tight in 2012,

subject imports put significant downward pressure on U.S. prices, exacerbating price declines in the market and contributing to the domestic industry's cost-price squeeze.

The pricing product data show significantly larger price declines in the products where U.S. producers face competition from subject imports.  For the five products where subject imports and the domestic like product competed head-to-head, the domestic industry's prices declined between *** percent and *** percent.[20]  For the one pricing product where U.S. producers did not face import competition (*i.e.*, Product 3), their price declined by *** percent.[21]  Thus, the domestic industry's prices declined far more sharply in the products facing direct subject import competition.[22]

The average unit value ("AUV") data for different market segments also support our finding of price depression by subject imports.  Although the Commission usually relies on AUV data with caution because differences in product mix can affect the AUVs, we find these data to be probative of the pricing trends in each of the different market segments, as there is no indication of significant changes in product mix over time in the individual segments.[23]  As previously noted, the subject imports were focused primarily in the automotive aftermarket segment of the market (the largest market segment), with smaller volumes also present in the

---

there is no explanation for the price declines between 2011 and 2012 other than the effect of subject imports.

[20] CR/PR at Table V-10.

[21] CR/PR at Table V-10.  This product was sold for use in foam expansion, foam blowing, and aerosol applications, which are separate end uses from the automotive aftermarket.  *See* CR at I-22, PR at I-15.

[22] For Product 1, we note that the pricing data show that the domestic industry's prices *** and the subject imports primarily *** in the quarterly comparisons.  However, these data do not include the substantial direct imports by some large repackagers because those imports are at a different level of trade (*i.e.*, the price of a direct import is a purchase price whereas the data in the pricing tables show the importers' and domestic producers' sales prices).  DuPont submitted information showing that the volume of such direct imports was substantial during the POI.  *See* DuPont Posthearing Brief at 8 and Exhibit 2.  This information compares *** substantial volumes of R-134a directly from Chinese suppliers.  *Id.* at Exhibit 2 (referencing importer questionnaire data from ***).  In 2012 and 2013, *** directly from Chinese suppliers at average unit values *** than the prices paid to ***.  *Id.*  Consequently, the pricing data reported for Product 1 does not fully reflect the level of competition, in terms of volume or pricing, between the subject imports and the domestic like product.

[23] We acknowledge that the domestic industry's AUVs of its shipments in the automotive aftermarket segment were lower than the AUVs of the importers' shipments of subject merchandise in the same segment.  *Compare* CR/PR at Table III-6 *with* CR/PR at Table IV-7.  As noted above, AUVs may reflect differences in product mix.  The differences in AUVs between the subject imports and domestically produced R-134a likely reflect the fact that two of the domestic producers *** while subject import shipments ***.  *See* CR at II-23, PR at II-14-15; CR/PR at Tables III-7 and IV-9; *see also* CR at V-6, PR at V-4 (showing a larger concentration of subject import sales in *** and a larger concentration of the domestic industry's sales in ***).

other refrigerants segment.[24]  The domestic industry's AUV in the automotive aftermarket declined by *** percent, or by $*** per short ton, between 2011 and 2013, while the AUVs in the other market segments declined by *** percent (with the absolute decline ranging between $*** and $*** per short ton).[25]  This again shows significantly larger price declines in the products facing direct competition with subject imports.

The respondents tried to explain this decline by arguing that the automotive aftermarket was affected more than other segments by the tight supply at the beginning of the POI, which resulted in higher prices in 2011 and, thus, a larger price decline as prices normalized.[26]  Although it is true that the automotive aftermarket segment had the highest AUV in 2011, respondents' theory utterly fails to explain why the domestic industry's AUV for its aftermarket sales continued to plummet in 2013, falling well below the AUVs of the other market segments.[27]  From 2012 to 2013, the domestic producers' AUV in the automotive aftermarket fell by *** percent, similar to the *** percent decline from 2011 to 2012.[28]  However, the AUV declines in the other segments ranged between only *** percent from 2012 to 2013.[29]  The domestic industry's AUV for its aftermarket sales was $*** per short ton in 2013; the next lowest AUV was in the other refrigerants segment at $*** per short ton, followed by the AUV in the foam expansion agent segment of the market at $*** per short ton.[30]  Thus, in the portion of the market where U.S. producers faced significant competition from low-priced subject imports, the domestic industry experienced by far the largest price decline over the POI and its AUV in 2013 was substantially below its prices in other market segments.[31]

_____

[24] *See* CR/PR at Table IV-7 (showing between *** percent of the quantity of subject imports was in the automotive aftermarket segment during the full years of the POI and the remaining *** percent was in the other refrigerants segment).

[25] CR/PR at Table III-6.  Domestic producers contend that subject import pricing affects the R-134a market beyond just the automotive aftermarket.  *See* Mexichem Posthearing Brief at A-5; DuPont Posthearing Brief, Answers to Questions at 24-25.  They point out that there are purchasers who operate in both the automotive aftermarket and other segments of the R-134a market, such as Technical Chemical Company and Weitron who have customers in the automotive aftermarket and the stationary service segment.  DuPont Posthearing Brief, Answers to Questions at 24.  Similarly, OEMs such as Ford and GM buy R-134a both for use in new vehicles (*i.e.*, the OEM segment) and for their dealers who provide aftermarket services.  *Id.*

[26] *See, e.g.*, Respondents' Prehearing Brief at 16.

[27] *See* CR/PR at Table III-6.

[28] *See id.*

[29] *See id.*

[30] CR/PR at Table III-6.  The domestic industry's remaining AUVs in 2013 were $*** per short ton in the OEM segment of the market and $*** per short ton in the pharmaceutical segment.  *Id.*

[31] We note that the segment of the market that experienced the second-largest price declines and the second-lowest AUV in 2013 was the other refrigerants segment, which was the only other

We find that subject imports had a significant impact on the domestic industry, in particular on its financial condition.  As discussed above, subject import volume was significant throughout the POI, both absolutely and relative to U.S. consumption.  The main effect of this volume on the domestic industry was through the underselling and price depression discussed above, as the domestic industry maintained most of its production and sales volume but only at sharply lower prices.  Consequently, while the industry's volume-based indicators did not show major changes, the industry's financial indicators declined sharply.[39]

Over the full years of the POI, some indicators of the domestic industry's condition, including capacity, production, and capacity utilization, remained constant or increased slightly.[40]  Over the same period other indicators, including U.S. shipment quantity, market share,[41] the number of production and related workers, and hours worked, declined somewhat, and the industry's inventories increased slightly.[42]  However, in line with the sharp drop in prices in the market, U.S. shipment value fell sharply, by *** percent.[43]

In stark contrast to the production-related indicators discussed above, the domestic industry's financial condition deteriorated in the face of subject imports and their price-depressing effects.[44] [45]  From 2011 to 2013, the industry's gross profit fell by *** percent, from $*** million to $*** million.[46]  The industry's operating income fell even more sharply, by *** percent, from $*** million to $*** million, and its operating income to net sales ratio fell from *** percent to *** percent.[47]  These declines were primarily due to the sharp decline in prices that we have found to be caused in significant part by subject imports.  The industry's costs

---

[39] We note that some of the industry's indicators, such as production and shipments, declined in 2012 due to ***.  See CR at III-4 n.4, PR at III-2 n.4.  Our analysis is based on the changes from 2011 to 2013; there is no evidence in the record that ***.

[40] Between 2011 and 2013, the industry's capacity was ***, its production rose by *** percent, and its capacity utilization rose by *** percentage points.  CR/PR at Table C-1

[41] We note that, as discussed above, the domestic industry lost substantial share in the auto aftermarket segment of the market, the segment in which subject imports were most heavily present.

[42] U.S. shipment quantity fell by *** percent, market share fell by *** percentage points, the number of production and related workers fell by *** percent, hours worked fell by *** percent, and inventories rose by *** percent.  CR/PR at Table C-1.

[43] Id.

[44] We note that the declining trends discussed below are also apparent in the industry data calculated with the adjustments to Mexichem's costs, as presented in Table VI-1 of the Staff Report.

[45] Respondents argued that certain of *** costs were aberrational, and should be given reduced weight in the Commission's analysis.  See Respondents' Prehearing Brief at 39-44.  However, *** explained how it reported *** costs; based on these explanations, staff declined to make adjustments to these costs.  See CR at VI-16 n.26, VI-20 n.34; PR at VI-5 n.26, VI-6 n.34.  We agree with our staff's analysis and assess *** costs as reported.

[46] CR/PR at Table D-1.

[47] Id.

from *** percent in 2011 to *** percent in 2013.[57]  Demand was effectively steady over the POI, with apparent consumption falling by only *** percent from 2011 to 2013 (it was *** percent higher in interim 2014 compared to interim 2013).[58]

Respondents argued that the domestic industry was either unable or unwilling to adequately supply the automotive aftermarket segment, and that therefore subject imports were necessary in that market segment.[59]  However, in interim 2014, as subject import volume declined and prices began to rise, the domestic industry's shipments to this market segment increased substantially, and domestic producers' share of this market segment rose to *** percent, compared to *** percent in interim 2013.[60]  Thus, the domestic industry demonstrated its ability to serve this market segment and its interest in doing so.  Moreover, if supply were indeed tight in the automotive aftermarket segment throughout the POI, we would not expect to see the significant underselling and price declines apparent in the record.

In sum, we find that the significant volume of subject imports, at prices that undersold the domestic like product and depressed domestic prices, adversely impacted the domestic industry, leading to significant declines in that industry's financial performance.  We consequently determine that the domestic industry is materially injured by reason of subject imports.

## II.    Critical Circumstances

In its final antidumping duty determination regarding subject imports from China, the Department of Commerce found that critical circumstances exist with respect to Bluestar, non-individually examined companies, and the PRC-wide entity.[61]  Because we have determined that the domestic industry is materially injured by reason of subject imports from China, we must also consider "whether the imports subject to the affirmative {Commerce critical circumstances} determination . . . are likely to undermine seriously the remedial effect of the antidumping {and/or countervailing duty} order{s} to be issued."[62]  The SAA provides that the Commission is to determine "whether, by massively increasing imports prior to the effective date of relief, the importers have seriously undermined the remedial effect of the order" and specifically "whether the surge in imports prior to the suspension of liquidation, rather than the

---

[57] CR/PR at Table C-1.  Nonsubject imports' market share was *** percent in interim 2013 and *** percent in interim 2014.
[58] CR/PR at Table C-1
[59] *See, e.g.*, Sinochem's Prehearing Brief at 1, 12-13.
[60] CR/PR at Table I-3.
[61] 79 Fed. Reg. 62597, 62598 (October 20, 2014).
[62] 19 U.S.C. §§ 1671d(b)(4)(A)(ii), 1673d(b)(4)(A)(ii).

**Table I-3**
**R-134a:  U.S. shipments by U.S. producers and U.S. importers by segment, 2011-13, January-June 2013 and January-June 2014**

\*        \*        \*        \*        \*        \*        \*

Table I-4 presents the major applications of fluorocarbons including R-134a and similar refrigerants.

**Table I-4**
**R-134a:  Major applications of fluorocarbons or refrigerants, by segment**

| Major applications | Major fluorocarbons or refrigerants |
|---|---|
| Refrigeration:<br><br>  Automobile A/C<br>  Home/commercial A/C<br>  Industrial plant cooling and processing<br>  Retail store chilled and frozen foods<br>  Home refrigerators and freezers<br>  Refrigerated transport | **HFC-134a (R-134a)**[1]<br>Recycled HCFC-22<br>HFC-32<br>HFC-125<br>HFC-143a<br>Recycled CFCs<br>Refrigerant Blends (e.g., R-410A, R-404A)<br>HFO-1234yf[1]<br>Ammonia<br>Carbon dioxide (R-744) |
| Foam blowing:<br><br>  Insulation for appliances and buildings<br>  Packaging foams, thermal containers | **HFC-134a (R-134a)**<br>HFC-245fa<br>HFC-365mfc<br>HFO-1234ze |
| Electronics:<br><br>  Gases, etching, solvent cleaning | HFC-116<br>HFC-14<br>HFC-23<br>Carbon dioxide (R-744) |
| Chemical inputs:<br><br>  For fluoropolymers/fluoroelastomers | HCFC-22<br>HCFC-142b<br>HFC-152a |
| Propellants:<br><br>  Personal care and commercial products<br>  Metered-dose inhalers | HFC-227ea<br>HFC-152a<br>**HFC-134a (R-134a)**<br>Carbon dioxide (R-744) |
| Fire extinguishing | HFC-227ea<br>HFC-23<br>HFC-236fa |

[1] Used in automobile A/C applications.
*Source*: Ray K. Will, "CEH Marketing Research Report: Fluorocarbons," 543.7000 A, September 2011.

decreased from \*\*\* per short ton, or by \*\*\* percent.  The automotive aftermarket and other refrigerants are the only market segments in which subject imports appear to substantively compete with U.S. producers.[15]

**Table III-6**
**R-134a: U.S. producers' U.S. shipments by industry segment, 2011-13, January-June 2013, and January-June 2014**

\*        \*        \*        \*        \*        \*        \*

Table III-7 presents U.S. producers' U.S. shipments to the automotive refrigerant aftermarket by package type in 2013.

**Table III-7**
**R-134a: U.S. producers' U.S. shipments to the automotive refrigerant aftermarket, by package type**

\*        \*        \*        \*        \*        \*        \*

Table III-8 presents U.S. producers' U.S. shipments to the other refrigerant market by type of shipment in 2013.

**Table III-8**
**R-134a: U.S. producers' U.S. shipments to other refrigerant markets, by type**

\*        \*        \*        \*        \*        \*        \*

## U.S. PRODUCERS' INVENTORIES

Table III-9 presents U.S. producers' end-of-period inventories and the ratio of these inventories to U.S. producers' production, U.S. shipments, and total shipments**.** The quantity of U.S. producers' inventories of R-134a increased by \*\*\* percent from 2011 to 2013 and were \*\*\* percent higher in January-June 2014 than in January-June 2013. The ratios of inventories to shipments and production also decreased in 2012 compared to 2011 but all measures increased in 2013 and January to June 2014 compared to January to June 2013.

**Table III-9**
**R-134a: U.S. producers' inventories, 2011-13, January-June 2013, and January-June 2014**

\*        \*        \*        \*        \*        \*        \*

---

[15] This is based on responses to importer questionnaires compiled in table IV-7 of this report.

nonsubject countries in January-June 2014 was \*\*\* percentage points higher than in January-June 2013 based on quantity and \*\*\* percentage points higher based on value.

**Table IV-6**
**R-134a: U.S. shipments of domestic R-134a, U.S. imports, and apparent U.S. consumption and market shares, 2011-13, January-June 2013, and January-June 2014**

\*      \*      \*      \*      \*      \*      \*

     U.S. shipments of imports from China by market segment are presented in table IV-7. The automotive refrigerant aftermarket is the primary segment for imports from China, accounting for no less than \*\*\* percent of total U.S shipment volume throughout the period of investigation. The "other refrigerants" segment accounts for all of the remaining U.S. shipments of imports from China during the same period. [19] U.S. shipments of imports from all other sources by segment are presented in table IV-8.[20]

**Table IV-7**
**R-134a: U.S. shipments of imports from <u>China</u> by segment, 2011-13, January-June 2013, and January-June 2014[1]**

\*      \*      \*      \*      \*      \*      \*

**Table IV-8**
**R-134a: U.S. shipments of imports from <u>all other sources</u> by segment, 2011-13, January-June 2013, and January-June 2014**

\*      \*      \*      \*      \*      \*      \*

     U.S. shipments of imports to the automotive aftermarket by packaging type in 2013 are presented in table IV-9.

**Table IV-9**
**R-134a: U.S. importers' shipments of automotive aftermarket sales from China by packaging type**

\*      \*      \*      \*      \*      \*      \*

     U.S. importer shipments to the automotive aftermarket by nature of operations and packaging type in 2013 are presented in table IV-10.

---

[19] The U.S. producers reported the following other refrigerants: \*\*\*. Compiled responses to U.S. producer questionnaires, question II-8.

[20] See table I-3 for comparison of import shipments versus domestically produced shipments.

**PRICING PRACTICES**

**Pricing methods**

Most firms reported using transaction-by-transaction sales. All three responding producers reported setting prices on both transaction-by-transaction and contract bases, one reported set price lists, and one reported setting price competitively. Most responding importers (23 of 35) reported setting prices on a transaction-by-transaction basis, nine reported using contracts, nine reported using set price lists, and seven reported using "other" methods including meeting competition and retail market prices (table V-1).

**Table V-1**
**R-134a: U.S. producers' and importers' reported price setting methods, by number of responding firms[1]**

| Method | U.S. producers | U.S. importers |
|--------|---------------:|---------------:|
| Transaction-by-transaction | 3 | 23 |
| Contract | 3 | 9 |
| Set price list | 1 | 9 |
| Other | 2 | 7 |

[1] The sum of responses down will not add up to the total number of responding firms as each firm was instructed to check all applicable price setting methods employed.
*Source*: Compiled from data submitted in response to Commission questionnaires.

Most import sales and the majority of U.S. producers' sales were on a spot basis (table V-2). All three U.S. producers also reported sales via short-term contracts with a typical duration of one year. *** producers *** reported long-term contract sales in 2013, with a typical duration of three years. Twelve of 34 purchasers reported entering into contracts for R-134a of one year or longer.[6] As noted in part II, automotive OEMs typically purchase R-134a via annual or multi-year contracts while aftermarket sales are typically on a spot basis.

**Table V-2**
**R-134a: U.S. producers' and importers' shares of U.S. commercial shipments by type of sale, 2013**

| Type of sale | U.S. producers | U.S. importers China |
|--------------|---------------:|---------------------:|
| Long-term contracts | 12.2 | 0.0 |
| Short-term contracts | 36.2 | 24.7 |
| Spot sales | 51.6 | 75.3 |

Note.--Because of rounding, figures may not add to the totals shown.
*Source*: Compiled from data submitted in response to Commission questionnaires.

---

[6] Purchasers were asked to report the year and quarter in which they most recently entered into contracts for R-134a. ***.

134a and 65.9 percent of U.S. importers' U.S. commercial shipments of imports from China during January 2011-June 2014.[10]

The following tabulation shows the distribution of quantities of pricing data reported by U.S. producers and by importers, by pricing product.

*      *      *      *      *      *      *

Price data for products 1-7 are presented in tables V-3 to V-9 and figures V-1 to V-7. Sales quantities of most products were much higher in the first half of each of the year than in the second half of the year, reflecting seasonality in sales of R-134a used in air conditioners. Sales of product 3, R-134a for certain non-refrigerant uses, did not show these seasonal trends.

**Table V-3**

**R-134a: Weighted-average f.o.b. prices and quantities of domestic and imported product 1[1] and margins of underselling/(overselling), by quarter, January 2011-June 2014**

*      *      *      *      *      *      *

**Table V-4**

**R-134a: Weighted-average f.o.b. prices and quantities of domestic and imported product 2[1] and margins of underselling/(overselling), by quarter, January 2011-June 2014**

*      *      *      *      *      *      *

**Table V-5**

**R-134a: Weighted-average f.o.b. prices and quantities of domestic and imported product 3[1] and margins of underselling/(overselling), by quarter, January 2011-June 2014**

*      *      *      *      *      *      *

**Table V-6**

**R-134a: Weighted-average f.o.b. prices and quantities of domestic and imported product 4[1] and margins of underselling/(overselling), by quarter, January 2011-June 2014**

*      *      *      *      *      *      *

---

(...*continued*)

[9] Importers reported pricing data for all products except product 3 (bulk sales to end users for foam expansion, foam blowing, and aerosol applications). Useable price data were received from importers ***.

[10] Price data for nonsubject countries were not collected since such imports account for a relatively small percentage of total imports. Subject import price data were not collected for sales of R-134a to automotive OEMs and other refrigerant OEMs and for sales to consumers by retailers that import R-134a. Import value data were also not collected for the pricing products; therefore retailers and other firms that import R-134a directly and either do not resell the product or sell directly to consumers did not provide pricing data.

**Table V-7**
**R-134a: Weighted-average f.o.b. prices and quantities of domestic and imported product 5[1] and margins of underselling/(overselling), by quarter, January 2011-June 2014**

     *  *  *  *  *  *  *

**Table V-8**
**R-134a: Weighted-average f.o.b. prices and quantities of domestic and imported product 6[1] and margins of underselling/(overselling), by quarter, January 2011-June 2014**

     *  *  *  *  *  *  *

**Table V-9**
**R-134a: Weighted-average f.o.b. prices and quantities of domestic and imported product 7[1] and margins of underselling/(overselling), by quarter, January 2011-June 2014**

     *  *  *  *  *  *  *

**Figure V-1**
**R-134a: Weighted-average prices and quantities of domestic and imported product 1, by quarter, January 2011-June 2014**

     *  *  *  *  *  *  *

**Figure V-2**
**R-134a: Weighted-average prices and quantities of imported product 2, by quarter, January 2011-June 2014**

     *  *  *  *  *  *  *

**Figure V-3**
**R-134a: Weighted-average prices and quantities of domestic product 3, by quarter, January 2011-June 2014**

     *  *  *  *  *  *  *

**Figure V-4**
**R-134a: Weighted-average prices and quantities of domestic and imported product 4, by quarter, January 2011-June 2014**

     *  *  *  *  *  *  *

**Figure V-5**
**R-134a: Weighted-average prices and quantities of domestic and imported product 5, by quarter, January 2011-June 2014**

     *  *  *  *  *  *  *

**Figure V-6**
**R-134a: Weighted-average prices and quantities of domestic and imported product 6, by quarter, January 2011-June 2014**

     *  *  *  *  *  *  *

**Table D-1**
**R-134a:  Results of operations of U.S. producers, 2011-13, January-June 2013, and January-June 2014**

                             \*         \*         \*         \*         \*         \*         \*


**Table D-2**
**R-134a:  Results of operations of U.S. producers, by firm, 2011-13, January-June 2013, and January-June 2014**

                             \*         \*         \*         \*         \*         \*         \*


**Table D-3**
**R-134a:  Variance analysis on the operations of U.S. producers, 2011-13, January-June 2013, and January-June 2014**

                             \*         \*         \*         \*         \*         \*         \*

Tab 5a

P.R. 131

Mexichem Pre-hearing Brief

October 7, 2014

# SCHAGRIN ASSOCIATES

900 SEVENTH STREET, N.W.
SUITE 500
WASHINGTON, D.C.  20001
(202) 223-1700

*Received by CLK*
*OCT 0 6 2014*

FAX (202) 429-2522

October 7, 2014

EMAIL: schagrin@erols.com

Inv. Nos. 701-TA-509 and 731-TA-1244
Total Pages: 49
Business proprietary information
deleted from pages i, 1-2, 4-28, 30-35, and 37-38

**PUBLIC VERSION**

**FILED BY EDIS AND BY HAND**

Acting Secretary Lisa Barton
U.S. International Trade Commission
500 E St. SW, Room 112
Washington, DC  20436

> **Re:**   *1,1,1,2-Tetrafluoroethane from China,*
> **Inv. Nos. 701-TA-509 and 731-TA-1244 - Submission of Pre-Hearing Brief**

Dear Secretary Barton:

On behalf of petitioner Mexichem Fluor Inc., we hereby submit our pre-hearing brief in the investigation described above. The confidential version of this brief contains business proprietary information which has been granted confidential treatment by the Commission. This information appears at pages i, 1-2, 4-28, 30-35, and 37-38. This information has been deleted from this public version.

Please contact the undersigned with any questions regarding this submission.

Respectfully Submitted,

Roger B. Schagrin
John W. Bohn
Paul W. Jameson
**Schagrin Associates**
*Counsel to Mexichem Fluor Inc.*

PUBLIC VERSION

The following table shows that the [

] during the period of investigation, with apparent consumption in that segment

[                           ] from 2011 to 2012, [                           ] from 2012 to

2013.

| Apparent Consumption By Segment | | | | | |
|---|---|---|---|---|---|
| Quantity in short tons | | | | | |
| Item | 2011 | 2012 | 2013 | Jan-Jun 2013 | Jan-Jun 2014 |
| Automotive Refrigerant | ▓▓▓▓▓ | ▓▓▓▓▓ | ▓▓▓▓▓ | ▓▓▓▓▓ | ▓▓▓▓▓ |
| OEM | [ | | | | ] |
| Aftermarket | [ | | | | ] |
| Pharmaceutical | [ | | | | ] |
| Foam expansion agent | [ | | | | ] |
| Other Refrigerants | [ | | | | ] |
| Total | [ | | | | ] |

Source: US Producers and Importers Questionnaire Responses

Despite the increase in apparent consumption between 2011 and 2012, U.S. shipments to

the automotive refrigerant segment declined [      ] percent from 2011 to 2012, and declined [

] percent from 2012 to 2013, while imports from China increased [      ] percent

from 2011 to 2012, and increased [                          ] percent from 2012 to 2013. The difference

in the effects on average unit value of domestic shipments to these segments is stark:

| Domestic Producers' AUVs $/lb | | | | | |
|---|---|---|---|---|---|
| Item | 2011 | 2012 | 2013 | Jan-Jun 2013 | Jan-Jun 2014 |
| Automotive Refrigerant | | | | | |
| OEM | [ | | | | ] |
| Aftermarket | [ | | | | ] |
| Pharmaceutical | [ | | | | ] |
| Foam expansion agent | [ | | | | ] |
| Other Refrigerants | [ | | | | ] |
| Total | [ | | | | ] |

Source: U.S. Producers Questionnaire Responses

The [                                    ] segment went from [

]. Other segments, [

] The only cause of the price depression in the automotive refrigerant aftermarket segment is the direct underselling by imports of R-134a from China. The direct underselling in that segment had the effect of lowering prices in the other segments as well, as negotiators became aware of the price declines in that segment and demanded similar concesssions.

This is another reason to be skeptical of the reported sales prices of imported R-134a:

| Sales of R-134a to the Automotive Refrigerant Aftermarket Segment | | | | | |
|---|---|---|---|---|---|
| | 2011 | 2012 | 2013 | Jan-Jun 2013 | Jan-Jun 2014 |
| Domestic Sales (tons) | [ | | | | ] |
| Imported Sales (tons) | [ | | | | ] |
| Domestic AUV ($/lb) | [ | | | | ] |
| Imported AUV ($/lb) | [ | | | | ] |

Sources: US Producers and Importers Questionnaire Responses

How likely is it, for example, that in 2013 [

]? The reported prices are [

].

When we look at the retail price of aftermarket R-134a, it becomes apparent that consumers have not benefited in the least from the price reductions. Attached as Exhibit 1 are screen shots from archived web pages of the retailer Advance Auto Parts, as they appeared on August 1, 2011, and screen shots from last month. As the tables above indicate, the AUVs of sales of R-134a to the automotive aftermarket segment have fallen [                    ]

15

8.     The expiration of OEM contracts will compound the impact of subject imports

Finally, as discussed in the conference, while most R134a is sold in the aftermarket,

original equipment manufacturers (OEMs) buy about 30 percent of U.S. output. Conf. Tr. 51

(Rubin). OEMs mainly purchase under requirements contracts, which can last for a year or

perhaps more. Conf. Tr. 123-25 (Rubin and Geosits). Some aftermarket buyers also use

contracts, generally of shorter duration. *Id.*

Contract purchasers well know spot market prices and base their bids upon them. Conf.

Tr. 26 (Geosits), 125 (Rubin). Thus, while contracts lock prices in temporarily, the existence of

such contracts merely allows a "delay of the inevitable." Conf. Tr. 124 (Rubin). Accordingly, the

price impact of increased Chinese import penetration has likely not fully struck the U.S. industry,

but will do so over the next year as contracts expire, absent relief from unfairly traded imports.

## VII.    Critical Circumstances

The Act requires that if Commerce makes an affirmative critical circumstances

determination, the Commission must consider whether the imports subject to it "are likely to

undermine seriously the remedial effect" of any order that is to be issued. 19 U.S.C.

§§ 1671d(b)(4), 1673d(b)(4). In making this determination, the Commission considers (i) the

timing and volume of imports, (ii) a rapid increase in inventories of the imports, and (iii) any

other circumstances indicating that the remedial effect of the order will be seriously undermined.

*Id.* If the Commission makes a negative present injury determination but an affirmative threat

determination, the Commission must make a finding as to whether it would have found present

injury but for the suspension of liquidation. *Id.*

Normally, to determine whether import volumes rapidly increased, the Commission

compares imports in the six-month period prior to the filing of the Petition to the six-month

Tab 5b


P.R. 151


Transcript of Commission Hearing


October 16, 2014


*For Supporting Pages from P.R. 151, See Tab 4*

Tab 5c


P.R. 160


DuPont Post-hearing Brief


October 23, 2014

# CASSIDY LEVY KENT (USA) LLP

2000 Pennsylvania Avenue, N.W., Suite 3000
Washington, D.C. 20006

JAMES R. CANNON, JR.
jcannon@cassidylevy.com

202.567.2318 (Direct)
202.567.2301 (Telecopy)

October 23, 2014

Inv. Nos. 701-TA-509 and
731-TA-1244 (Final)

**PUBLIC VERSION**

BY ELECTRONIC FILING AND HAND DELIVERY

Lisa R. Barton, Acting Secretary
U.S. International Trade Commission
Room 112A
500 E Street, S.W.
Washington, DC 20436

Re:     **1,1,1,2-Tetrafluoroethane (R134a) from People's Republic of China;
Post-Hearing Brief and Answers to Commission Questions**

Dear Acting Secretary Barton:

On behalf of E.I. DuPont de Nemours & Company ("DuPont"), we hereby submit
DuPont's Post-Hearing Brief and Answers to Commission Questions in the above-referenced
investigations.

Bracketing changes have been incorporated in the public version filed today.
Accordingly and pursuant to the Commission's regulations, we are also filing and serving these
revised pages under separate cover.

Pursuant to section 777(b)(1) of the Tariff Act of 1930, 19 U.S.C. § 1677f(b)(1), and
section 201.6 of the Commission's regulations, 19 C.F.R. § 201.6, DuPont requests that
confidential treatment be granted to the business proprietary information of DuPont and the
confidential information released to us under administrative protective order, which have been
identified by brackets ("[]") in the enclosure. We agree on behalf of DuPont to permit disclosure
of the above-described information pursuant to an adequately drawn administrative protective
order.

As indicated on the attached certificate of service, copies of this submission are being
served on the parties listed on the Commission's administrative protective order service list in
this proceeding.

Please do not hesitate to contact the undersigned if you have any questions.

Exhibit 2

Public Version
Proprietary Information Deleted

**EXHIBIT 2**

| Average Unit Value of Bulk Sales by [          ] to Large Repackagers Compared to Average Unit Values of Repackager's Imports from China | | | |
|---|---|---|---|
| | **2012** | **2013** | **1H 2014** |
| Sales to [        ] | | | |
| Import Vol. (ST) | [ | | ] |
| Import UV ($/lb.) | [ | | ] |
| [     ] Vol. (ST) | [ | | ] |
| [     ] AUV ($/lb.) | [ | | ] |
| Import Underselling ($/lb.) | [ | | ] |
| % Imports Undersold U.S. | [ | | ] |
| Sales to [    ] | | | |
| Import Vol. (ST) | [ | | ] |
| Import UV ($/lb.) | [ | | ] |
| [     ] Vol. (ST) | [ | | ] |
| [     ] AUV ($/lb.) | [ | | ] |
| Import Underselling ($/lb.) | [ | | ] |
| % Imports Undersold U.S. | [ | | ] |
| Sales to [    ] | | | |
| Import Vol. (ST) | [ | | ] |
| Import UV ($/lb.) | [ | | ] |
| [     ] Vol. (ST) | [ | | ] |
| [     ] AUV ($/lb.) | [ | | ] |
| Import Underselling ($/lb.) | [ | | ] |
| % Imports Undersold U.S. | [ | | ] |
| Sales to [  ] | | | |
| Import Vol. (ST) | [ | | ] |
| Import UV ($/lb.) | [ | | ] |
| [     ] Vol. (ST) | [ | | ] |
| [     ] AUV ($/lb.) | [ | | ] |
| Import Underselling ($/lb.) | [ | | ] |
| % Imports Undersold U.S. | [ | | ] |

Sources: Importer QRs of [      ], [    ], [      ] and [   ]
at II-5; Data from [   ] and [   ].

*Public Version*

[               ] SALES TO KEY REPACKAGERS: 2012-2013, 1H 2014

| | | January | February | March | April | May | June | July | August | September | October | November | December | TOTAL/Avg PPU | IH 2014 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2012 | Sales Quantity | | | | | | | | | | | | | | |
| | Sales PPU | | | | | | | | | | | | | | |
| 2013 | Sales Quantity | | | | | | | | | | | | | | |
| | Sales PPU | | | | | | | | | | | | | | |
| 2014 | Sales Quantity | | | | | | | | | | | | | | |
| | Sales PPU | | | | | | | | | | | | | | |
| 2012 | Sales Quantity | | | | | | | | | | | | | | |
| | Sales PPU | | | | | | | | | | | | | | |
| 2013 | Sales Quantity | | | | | | | | | | | | | | |
| | Sales PPU | | | | | | | | | | | | | | |
| 2014 | Sales Quantity | | | | | | | | | | | | | | |
| | Sales PPU | | | | | | | | | | | | | | |
| 2012 | Sales Quantity | | | | | | | | | | | | | | |
| | Sales PPU | | | | | | | | | | | | | | |
| 2013 | Sales Quantity | | | | | | | | | | | | | | |
| | Sales PPU | | | | | | | | | | | | | | |
| 2014 | Sales Quantity | | | | | | | | | | | | | | |
| | Sales PPU | | | | | | | | | | | | | | |

**Public Version**

| Bulk Sales by [          ] to Large Repackagers | | | | |
|---|---|---|---|---|
| | | 2012 | 2013 | 1H 2014 |
| Sales to [          ] ($/Lb) | [ | | | ] |
| Total quantity (Lbs) | [ | | | ] |
| Total quantity (ST) | [ | | | ] |
| Total Value | [ | | | ] |
| Sales to [          ] ($/Lb) | [ | | | ] |
| Total quantity (Lbs) | [ | | | ] |
| Total quantity (ST) | [ | | | ] |
| Total Value | [ | | | ] |
| Sales to [          ] ($/Lb) | [ | | | ] |
| Total quantity (LBs) | [ | | | ] |
| Total quantity (ST) | [ | | | ] |
| Total Value | [ | | | ] |
| Sales to [          ] ($/Lb) | [ | | | ] |
| Total quantity (Lb) | [ | | | ] |
| Total quantity (ST) | [ | | | ] |
| Total Value | [ | | | ] |

Public Version

| [ ] SALES TO REPACKAGERS WEIGHT-AVERAGE AUV CALCULATIONS | | | |
|---|---|---|---|
| | 2012 | 2013 | 1H 2014 |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

Tab 6

1,1,1,2—Tetrafluoroethane from the People's Republic of China,
79 Fed. Reg. 62, 597, Final Determination

October 20, 2014

a request for a hearing is made, we will inform parties of the scheduled date for the hearing, which will be held at the U.S. Department of Commerce, 14th Street and Constitution Avenue NW., Washington, DC 20230, at a time and location to be determined.[16] Parties should confirm by telephone the date, time, and location of the hearing.

### Final Results of the Review

In accordance with 19 CFR 351.216(e), the Department intends to issue the final results of this changed circumstances review not later than 270 days after the date on which the review is initiated, or within 45 days if all parties agree to our preliminary finding.

### Notification to Interested Parties

This notice is issued and published in accordance with sections 751(b)(l) and 777(i)(l) of the Act.

Dated: October 14, 2014.

**Paul Piquado,**

*Assistant Secretary for Enforcement and Compliance.*

### Appendix—List of Topics Discussed in the Preliminary Decision Memorandum

I. Summary
II. Background
III. Scope of the Order
IV. Preliminary Results of Changed Circumstances Review
V. Recommendation

[FR Doc. 2014–24907 Filed 10–17–14; 8:45 am]

**BILLING CODE 3510–DS–P**

---

### DEPARTMENT OF COMMERCE

### International Trade Administration

**[A–570–998]**

### 1,1,1,2-Tetrafluroethane From the People's Republic of China: Final Determination of Sales at Less Than Fair Value

**AGENCY:** Enforcement and Compliance, International Trade Administration, Department of Commerce.

**SUMMARY:** We determine that 1,1,1,2-Tetrafluroethane ("tetrafluoroethane") from the People's Republic of China ("PRC") is being, or is likely to be, sold in the United States at less than fair value ("LTFV"), as provided in section 735 of the Tariff Act of 1930, as amended ("the Act"). This investigation's final dumping margins are in the "Final Determination Margins" section, *infra*.

**DATES:** *Effective Date:* October 20, 2014.

**FOR FURTHER INFORMATION CONTACT:** Frances Veith or Bob Palmer, AD/CVD

Operations, Office V, Enforcement and Compliance, International Trade Administration, U.S. Department of Commerce, 14th Street and Constitution Avenue NW., Washington, DC 20230; telephone: (202) 482–4295 or (202) 482–9068, respectively.

**SUPPLEMENTARY INFORMATION:**

### Background

On May 29, 2014, the Department of Commerce ("Department") published its *Preliminary Determination*[1] and postponement of the final determination in the LTFV investigation of tetrafluoroethane from the PRC and on July 1, 2014, we published an *Amended Preliminary Determination*.[2] We invited interested parties to comment on our *Preliminary Determination* of sales at LTFV and *Amended Preliminary Determination*. For a list of the parties that filed case and rebuttal briefs, *see* the Issues and Decision Memorandum.[3] On September 30, 2014, the Department held a public hearing limited to issues raised in case and rebuttal briefs.

### Period of Investigation

The period of investigation ("POI") is April 1, 2013, through September 30, 2013. This period corresponds to the two most recent fiscal quarters prior to the month of the filing of the petition, which was October 2013.[4]

### Scope of the Investigation

The product subject to this investigation is 1,1,1,2-Tetrafluoroethane, R–134a, or its chemical equivalent, regardless of form, type, or purity level. The chemical formula for 1,1,1,2-tetrafluoroethane is $CF_3\text{-}CH_2F$, and the Chemical Abstracts Service ("CAS") registry number is CAS 811–97–2.

1,1,1,2-Tetrafluoroethane is sold under a number of trade names including Klea 134a and Zephex 134a

(Mexichem Fluor); Genetron 134a (Honeywell); Suva 134a, Dymel 134a, and Dymel P134a (DuPont); Solkane 134a (Solvay); and Forane 134a (Arkema). Generically, 1,1,1,2-tetrafluoroethane has been sold as Fluorocarbon 134a, R–134a, HFC–134A, HF A–134a, Refrigerant 134a, and UN3159.

Merchandise covered by the scope of this investigation is currently classified in the Harmonized Tariff Schedule of the United States ("HTSUS") at subheading 2903.39.2020. Although the HTSUS subheading and CAS registry number are provided for convenience and customs purposes, the written description of the scope is dispositive.

### Verification

As provided in section 782(i) of the Act, between June 4 and June 20, 2014, the Department verified the information submitted by Weitron International Refrigeration Equipment (Kunshan) Co., Ltd. ("Weitron Kunshan") and Jiangsu Bluestar Green Technology Co., Ltd. ("Bluestar") for use in the final determination.[5] We issued our verification reports on July 21, 2014, and July 23, 2014.[6] The Department used standard verification procedures, including examination of relevant accounting and production records and original source documents provided by respondents.[7]

### Analysis of Comments Received

We addressed all issues raised by parties in case and rebuttal briefs in the Issues and Decision Memorandum.[8] The Appendix to this notice includes a list of the issues which the parties raised and to which the Department responded in the Issues and Decision Memorandum. The Issues and Decision Memorandum is a public document and is on file electronically via Enforcement

---

[1] *See 1,1,1,2-Tetrafluroethane from the People's Republic of China: Antidumping Duty Investigation, Preliminary Determination of Sales at Less Than Fair Value, Affirmative Preliminary Determination of Critical Circumstances, in Part, and Postponement of Final Determination,* 79 FR 30817 (May 29, 2014) (*Preliminary Determination*).

[2] *See 1,1,1,2-Tetrafluoroethane From the People's Republic of China: Antidumping Duty Investigation; Amended Affirmative Preliminary Determination of Critical Circumstances,* 79 FR 37287 (July 1, 2014) (*Amended Preliminary Determination*).

[3] *See* Memorandum from Christian Marsh, Deputy Assistant Secretary for Antidumping and Countervailing Duty Operations, to Paul Piquado, Assistant Secretary for Enforcement and Compliance, "Issues and Decision Memorandum for the Final Determination of the Antidumping Duty Investigation of 1,1,1,2-Tetrafluoroethane from the People's Republic of China," dated concurrently with this notice ("Issues and Decision Memorandum").

[4] *See* 19 CFR 351.204(b)(1).

[5] *See* the Department's four memoranda regarding: (1) "Verification of the Sales and Factors Responses of Jiangsu Bluestar Green Technology Co., Ltd., in the Investigation of 1,1,1,2-Tetrafluorethane from the People's Republic of China," dated July 21, 2014; (2) "Verification of the CEP Sales Response of Weitron International Refrigeration Equipment (Kunshan) Co. Ltd. and Weitron, Inc. in the Investigation of 1,1,1,2 Tetrafluoroethane from the People's Republic of China ("PRC")," dated July 23, 2014; (3) "Verification of the Response of Weitron International Refrigeration Equipment (Kunshan) Co., Ltd. in the Investigation of 1,1,1,2 Tetrafluoroethane from the People's Republic of China ("PRC")," dated July 23, 2014; and (4) "Verification of the Factors Responses of Zhejiang Juhua Co., Ltd. Organic Fluorine Plant ("JuhuaOP") in the Investigation of 1,1,1,2 Tetrafluoroethane from the People's Republic of China ("PRC")," dated July 23, 2014.

[6] *Id.*

[7] *Id.*

[8] *See* Issues and Decision Memorandum.

and Compliance's Antidumping and Countervailing Duty Centralized Electronic Service System ("IA ACCESS"). IA ACCESS is available to registered users at *http://iaaccess.trade.gov* and it is available to all parties in the Central Records Unit, room 7046 of the main Department of Commerce building. In addition, a complete version of the Issues and Decision Memorandum is available at *http://enforcement.trade.gov/frn/.* The signed and electronic versions of the Issues and Decision Memorandum are identical in content.

## Changes Since the Preliminary Determination

Based on the Department's analysis of the comments received and our findings at verification, we made certain changes to Bluestar's margin calculations. Additionally, we determined that Weitron Kunshan was not an exporter of subject merchandise during the POI. Accordingly, we have not calculated a dumping margin based on the data reported by Weitron Kushan. For a discussion of these changes, see the Issues and Decision Memorandum.

## Final Affirmative Determination of Critical Circumstances

We determine that critical circumstances exist with respect to

Bluestar, non-individually examined companies, and the PRC-wide entity.[9]

## Combination Rates

In the *Initiation Notice,*[10] the Department stated that it would calculate combination rates for the respondents that are eligible for a separate rate in this investigation. Policy Bulletin 05.1 describes this practice.[11]

## Final Determination

The final weighted-average antidumping duty ("AD") margin percentages are as follows:

| Exporter | Producer | Weighted-average margin (%) |
|---|---|---|
| Jiangsu Bluestar Green Technology Co., Ltd. ........................... | Jiangsu Bluestar Green Technology Co., Ltd. ........................... | [12] 280.67 |
| Shandong Dongyue Chemical Co., Ltd. ..................................... | Shandong Dongyue Chemical Co., Ltd. ..................................... | 280.67 |
| T.T. International Co., Ltd. ........................................................ | Sinochem Environmental Protection Chemicals (Taicang) Co., Ltd. | 280.67 |
| T.T. International Co., Ltd. ........................................................ | Zhejiang Quhua Fluor-Chemistry Co., Ltd. ............................... | 280.67 |
| T.T. International Co., Ltd. ........................................................ | Jiangsu Bluestar Green Technology Co., Ltd. ........................... | 280.67 |
| T.T. International Co., Ltd. ........................................................ | Zhejiang Sanmei Chemical Ind Co., Ltd. ................................. | 280.67 |
| T.T. International Co., Ltd. ........................................................ | Zhejiang Pujiang Bailian Chemical Co., Ltd. ............................ | 280.67 |
| T.T. International Co., Ltd. ........................................................ | Jiangsu Jinxue Group Co., Ltd. ................................................ | 280.67 |
| T.T. International Co., Ltd. ........................................................ | Zhejiang Quzhou Lianzhou Refrigerants Co., Ltd. ................... | 280.67 |
| Zhejiang Sanmei Chemical Industry Co., Ltd. ........................... | Zhejiang Sanmei Chemical Industry Co., Ltd. ........................... | 280.67 |
| Zhejiang Sanmei Chemical Industry Co., Ltd. ........................... | Jiangsu Sanmei Chemicals Co., Ltd.  ....................................... | 280.67 |
| PRC-Wide Entity [13]  ................................................................. | | 280.67 |

## Disclosure

We intend to disclose to parties the calculations performed in this proceeding within five days of the date of publication of this notice in accordance with 19 CFR 351.224(b).

## Continuation of Suspension of Liquidation

In accordance with section 735(c)(4)(A) of the Act, the Department will instruct U.S. Customs and Border Protection ("CBP") to continue to retroactively suspend liquidation of all appropriate entries of tetrafluoroethane from the PRC as described in the "Scope of the Investigation" section, which were entered, or withdrawn from warehouse, for consumption on or after the date which is 90 days before the

date on which the suspension of liquidation was first ordered (*i.e.,* May 29, 2014, the date of publication in the **Federal Register** of the notice of an affirmative preliminary determination that tetrafluoroethane is being, or is likely to be, sold in the United States at LTFV). Further, pursuant to 19 CFR 351.205(d), the Department will instruct CBP to require a cash deposit [14] equal to the weighted-average amount by which the normal value exceeds U.S. price, adjusted where appropriate for export subsidies and estimated domestic subsidy pass-through, as follows: (1) For the exporter/producer combination listed in the table above, the cash deposit rate will be equal to the dumping margin which the Department determined in this final determination;

(2) for all combinations of PRC exporters/producers of merchandise under consideration which have not received their own separate rate above, the cash deposit rate will be equal to the dumping margin established for the PRC-wide entity; and (3) for all non-PRC exporters of merchandise under consideration which have not received their own separate rate above, the cash deposit rate will be equal to the cash deposit rate applicable to the PRC exporter/producer combination that supplied that non-PRC exporter. These suspension-of-liquidation instructions will remain in effect until further notice.

We did not adjust the final determination AD margins for export subsidies because the Department found no evidence of export subsidies in the

---

[9] *See* the Issues and Decision Memorandum at Comment 6.

[10] *See 1,1,1,2-Tetrafluoroethane from the People's Republic of China: Initiation of Antidumping Duty Investigation,* 77 FR 73832, 73836 (December 9, 2013) ("*Initiation Notice*").

[11] *See* Enforcement and Compliance's Policy Bulletin No. 05.1, regarding, "Separate-Rates Practice and Application of Combination Rates in Antidumping Investigations involving Non-Market Economy Countries," (April 5, 2005) ("Policy Bulletin 05.1"), available on the Department's Web

site at *http://enforcement.trade.gov/policy/bull05-1.pdf.*

[12] Jiangsu Bluestar Green Technology Co., Ltd.'s margin is the only calculated margin. As the only calculated margin, it is the margin assigned to the separate rate companies. Addtionally, as it is the higher of the calculated margin or the petition rate, it is also the PRC-Wide Entity margin.

[13] This also includes Weitron International Refrigeration Equipment (Kunshan) Co., Ltd., Zhejiang Bailian Industry and Trade, Jiangsu Jin Xue Group Co., Ltd., SC Ningbo International Ltd,

Sinochem Environmental Protection Chemicals (Taichang) Co., Ltd., Sinochem Ningbo Ltd., Zhejiang Quhua Fluor-Chemistry Co., Ltd., Zhejiang Quzhou Lianzhou Refrigerants Co., Ltd. and Aerospace Communications Holdings, Co. Ltd.

[14] *See* Modification of Regulations Regarding the Practice of Accepting Bonds During the Provisional Measures Period in Antidumping and Countervailing Duty Investigations, 76 FR 61042 (October 3, 2011).

companion countervailing duty proceeding. Additionally, the Department did not adjust the final determination AD margins for estimated domestic subsidy pass-through because respondents provided no information to support an adjustment pursuant to section 777A(f) of the Act.

## ITC Notification

In accordance with section 735(d) of the Act, we notified the International Trade Commission (ITC) of the final affirmative determination of sales at LTFV. As the Department's final determination is affirmative, in accordance with section 735(b)(2) of the Act, the ITC will determine, within 45 days, whether the domestic industry in the United States is materially injured, or threatened with material injury, by reason of imports of tetrafluoroethane from the PRC, or sales (or the likelihood of sales) for importation, of tetrafluoroethane from the PRC. If the ITC determines that such injury does not exist, this proceeding with be terminated and all securities posted will be refunded or canceled. If the ITC determines that such injury does exist, the Department will issue an antidumping duty order directing CBP to assess, upon further instruction by the Department, antidumping duties on all imports of the subject merchandise entered, or withdrawn from warehouse, for consumption on or after the effective date of the suspension of liquidation.

## Return or Destruction of Proprietary Information

This notice also serves as a reminder to the parties subject to administrative protective order (APO) of their responsibility concerning the disposition of propriety information disclosed under APO in accordance with 19 CFR 351.305. Timely written notification of return or destruction of APO materials or conversion to judicial protective order is hereby requested. Failure to comply with the regulations and terms of an APO is a sanctionable violation.

This determination is issued and published in accordance with sections 735(d) and 777(i)(1) of the Act.

Dated: October 14, 2014.

**Paul Piquado,**

*Assistant Secretary for Enforcement and Compliance.*

## Appendix—Issues and Decision Memorandum

Summary
Background
Use of Adverse Facts Available
Weitron Kunshan
Critical Circumstances

Margin Calculations
Discussion of the Issues
Comment 1: Separate Rate Practice
Comment 2: Whether Weitron Kunshan Qualifies as a Respondent
Comment 3: Surrogate Country
Comment 4: By-products
Comment 5: Price Adjustments—ISO Tanks
Comment 6: Critical Circumstances
Comment 7: Whether to Continue to Rely on the Average-to-Average Margin Calculation Methodology
Comment 8: Whether to Add an Additional USHTS Code to the Scope
Comment 9: Whether The Department's Rejection of Minor Corrections Was Contrary to Law
Comment 10: Hydrogen Fluoride Surrogate Value
Comment 11: Color Salts Surrogate Value
Comment 12: Caustic Potash Surrogate Value
Comment 13: Dawson Gas Surrogate Value
Comment 14: Whether to Categorize Catalyst, Refrigerants and Compressed Air as Factory Overhead
Comment 15: Compressed Air Surrogate Value
Comment 16: Selection of Surrogate Financial Statements
Comment 17: Calculation of Thai-Japan Financial Ratios
Comment 18: Inland Freight and Brokerage & Handling
Comment 19: Bluestar R22 Supplier Distance
Comment 20: Packing Materials
Comment 21: Domestic Movement Expense Calculation
Comment 22: Whether to Correct the Unit Weight of Certain Packing Inputs
Comment 23: Whether to Delete Unknown Country of Origin Sales from Weitron's Reported Sales
Comment 24: Whether to Apply Subsidy Offset to Weitron's Margin Recommendation

[FR Doc. 2014–24903 Filed 10–17–14; 8:45 am]

**BILLING CODE 3510–DS–P**

---

# DEPARTMENT OF COMMERCE

## National Oceanic and Atmospheric Administration

### RIN 0648–XD564

### Caribbean Fishery Management Council (CFMC); Public Meeting

**AGENCY:** National Marine Fisheries Service (NMFS), National Oceanic and Atmospheric Administration (NOAA), Commerce.

**ACTION:** Notice of public meeting via webinar.

---

**SUMMARY:** The Caribbean Fishery Management Council's (Council) Scientific and Statistical Committee (SSC) will hold a meeting via webinar.

**DATES:** The SSC meeting via webinar will be held on November 12, 2014, from 9 a.m. to 5 p.m.

**ADDRESSES:** The address to access the SSC meeting via webinar is: *https:// global.gotomeeting.com/join/ 978083813*. Use your microphone and speakers (VOIP) for audio. You can also join through your smartphone by dialing 1 (408) 650–3131. Access code: 978–083–813, Audio Pin: Will be provided upon joining the session.

**SUPPLEMENTARY INFORMATION:** The SSC will discuss the items contained in the following agenda:

- FMUs ACL Overages—SERO Update
- Red Hind SEDAR 35 Assessment Review
   1. Peer Review and Discussion
   2. Recommendations to the CFMC
- National SSC V (February 23–25, 2015); Update and Discussion
- Discussion of 5-year Research Plan
- Selection Criteria for Exclusion/ Inclusion of Species in the Island-Based FMPs

A. Commercial Landings Data—SEFSC Update
   1. Overview of Recent Years Landings Data: Species List Ranked by Poundage and Value—Puerto Rico, St. Thomas/St. John, St. Croix
   2. Landings by Coast for Puerto Rico, as a Proxy to Differentiate Species that Might be Restricted to the State Waters
   3. SEFSC/DNER Revision of the 2005 East Coast Correction Factor Update

B. Recreational Landings Data—SEFSC Update
   1. Overview of Recent Years Landings Data: Species List Ranked by Poundage

C. Recommendations to the CFMC

The SSC meeting via webinar is open to the public, and will be conducted in English.

## Special Accommodations

This meeting via webinar is accessible to people with disabilities. For more information please contact Mr. Miguel A. Rolón, Executive Director, Caribbean Fishery Management Council, 270 Muñoz Rivera Avenue, Suite 401, San Juan, Puerto Rico, 00918, telephone: (787) 766–5926, at least 5 days prior to the meeting date.

Dated: October 15, 2014.

**Tracey L. Thompson,**

*Acting Deputy Director, Office of Sustainable Fisheries, National Marine Fisheries Service.*

[FR Doc. 2014–24855 Filed 10–17–14; 8:45 am]

**BILLING CODE 3510–22–P**