NONCONFIDENTIAL

**UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE: THE HONORABLE LEO M. GORDON, JUDGE**

———————————————

**Consol. Court No. 15-00004**

———————————————

**MEXICHEM FLUOR, INC. AND**
**E.I. DU PONT DE NEMOURS AND COMPANY,**

**Consol. Plaintiffs,**

v.

**UNITED STATES,**

**Defendant,**

and

**SINOCHEM ENVIRONMENTAL PROTECTION**
**CHEMICALS (TAICANG) CO., LTD., ZHEJIANG**
**QUHUA FLOUR-CHEMISTRY CO., LTD. AND**
**ZHEJIANG SANMEI CHEMICAL INDUSTRY CO.,**

**Defendant-Intervenors.**

**DEFENDANT INTERNATIONAL TRADE COMMISSION'S OPPOSITION TO**
**PLAINTIFFS' MOTIONS FOR JUDGMENT ON THE AGENCY RECORD**

**KARL S. VON SCHRILTZ**
**Attorney-Advisor**
**Telephone (202) 205-3096**

**NATALINE VIRAY-FUNG**
**Attorney for Defendant**
**Office of the General Counsel**
**U.S. International Trade Commission**
**500 E Street, SW, Suite 707**
**Washington, DC  20436**
**Telephone (202) 205-2657**

**DOMINIC L. BIANCHI**
**General Counsel**
**Telephone (202) 205-3061**

**ANDREA C. CASSON**
**Assistant General Counsel**
**for Litigation**
**Telephone (202) 205-3105**

**TABLE OF CONTENTS**

                                                                          **PAGE**

I.    STATEMENT PURSUANT TO RULE 56.2................................................................1

      A.    Administrative Determination Sought to be Reviewed .......................................1

      B.    Questions Presented and Summary of Argument.................................................1

            1.    Was the Commission's volume analysis reasonable and
                  in accordance with law? .......................................................................1

            2.    Was the Commission's price analysis reasonable and in
                  accordance with law?............................................................................3

            3.    Was the Commission's impact analysis supported by
                  substantial evidence and in accordance with law?...................................5

            4.    Was the Commission's threat analysis supported by
                  substantial evidence and in accordance with law? ..................................6

II.   STATEMENT OF FACTS......................................................................................7

      A.    Like Product, Domestic Industry, and Conditions of
            Competition ............................................................................................7

      B.    Volume ..................................................................................................7

      C.    Price......................................................................................................8

      D.    Impact ...................................................................................................9

      E.    Threat ....................................................................................................9

III.  STANDARD OF REVIEW ...................................................................................10

IV.   ARGUMENT .....................................................................................................12

      A.    The Commission's Volume Analysis was Supported by
            Substantial Evidence and in Accordance with Law..............................................12

**TABLE OF CONTENTS CONT'D**

PAGE

1.    The Commission's Volume Analysis Should Be Sustained ........................................................................12

2.    The Commission's Methodology for Analyzing Subject Import Volume and Market Share Was Reasonable and Should Therefore Be Sustained ..................................13

3.    The Commission Reasonably Found that the Increase in Subject Import Volume Between 2011 and 2012 Resulted from the Shortage......................................... 16

B.    The Commission's Price Analysis was Supported by Substantial Evidence and in Accordance with Law.............................................19

    1.    The Commission's Price Analysis Should Be Sustained ..........................19

    2.    The Commission's Price Comparison Methodology Was Reasonable and In Accordance With Law ................................................21

    3.    The Commission's Finding of No Correlation Between Underselling and Subject Import Market Share Trends Was Supported by Substantial Evidence and In Accordance With Law ...............................................................27

    4.    The Commission Reasonably Found that Domestic Prices Declined Due to Cessation of the Shortage ....................................32

C.    The Commission's Impact Analysis Was Reasonable ...........................................38

    1.    The Commission's Impact Analysis Should Be Sustained ......................38

    2.    The Commission Reasonably Found that the Domestic Industry's Declining Financial Performance Resulted from Cessation of the Shortage.....................................39

    3.    The Commission Reasonably Considered Subject Import Inventories......................................................43

D.    The Court Should Sustain the Commission's Threat Analysis ...........................45

V.    CONCLUSION ...............................................................46

# TABLE OF AUTHORITIES

**PAGES**

## Cases

*Altx, Inc. v. United States*,
26 CIT 709 (2002), 2002 WL 1560884 ........................................................................ 23, 29

*Aluminum Extrusions Fair Trade Comm. v. United States*,
2012 WL 5201218 ( 2012)........................................................................................ 14

*Am. Spring Wire Corp. v. United States*,
8 CIT 20, 590 F. Supp. 1273 (1984) aff'd 760 F.2d 249 (Fed. Cir. 1985) ........................... 19

*BIC Corp. v. United States*,
21 CIT 448, 964 F. Supp. 391 (1997) ............................................................................ 15

*Celanese Chemicals, Ltd. v. United States*,
31 CIT 279 (2007) .................................................................................................. 22, 30

*Cleo Inc. v. United States*,
501 F.3d 1291 (Fed. Cir. 2007)...................................................................................... 44

*Coal. for Pres. of Am. Brake Drum & Rotor Aftermkt. Mfrs. v. United States*,
22 CIT 520, 15 F. Supp. 2d 918 (1998) .......................................................................... 34

*Coal. of Gulf Shrimp Indus. v. United States*,
71 F. Supp. 3d 1356 (Ct. Int'l Trade 2015) ........................................................... 2, 11, 12

*Comm. for Fair Coke Trade v. United States*,
28 CIT 1140 (2004) ................................................................................................. 29

*Consolo v. Fed. Mar. Comm'n*,
383 U.S. 607 (1966)...................................................................................................... 10

*Diamond Sawblades Mfrs. Coal. v. United States*,
32 CIT 134 (2008) ...................................................................................................... 26

*GEO Specialty Chemicals, Inc. v. United States*,
33 CIT 125 (2009) ...................................................................................................... 37

*Goss Graphics Sys., Inc. v. United States*,
22 CIT 983, 33 F. Supp. 2d 1082 (1998),
*aff'd*, 216 F.3d 1357 (Fed. Cir. 2000)............................................................................ 11

*Grupo Indus. Camesa v. United States*,
85 F.3d 1577 (Fed. Cir. 1996)....................................................................................... 11

*Hynix Semiconductor, Inc. v. United States*,
30 CIT 1208, 431 F. Supp. 2d 1302 (2006)................................................................... 4, 12

*Int'l Imaging Materials, Inc. v. United States Int'l Trade Comm'n*,
30 CIT 1181 (2006) ..................................................................................................... 12

iii

# TABLE OF AUTHORITIES CONT'D

*JMC Steel Grp. v. United States*,
    24 F. Supp. 3d 1290 (2014) ........................................................................ passim

*JMC Steel Grp. v. United States*,
    70 F. Supp. 3d 1309 (Ct. Int'l Trade 2015) ................................................ 12

*LG Elecs., Inc. v. United States*,
    26 F. Supp. 3d 1338 (Ct. Int'l Trade 2014) ................................................ 22, 26

*Maverick Tube Corp. v. United States*,
    12 CIT 444, 687 F. Supp. 1569 (1988) ....................................................... 37

*Metallverken Nederland B.V. v. United States*,
    13 CIT 1013, 728 F. Supp. 730 (1989) ....................................................... 4, 33

*Nevinnomysskiy Azot v. United States*,
    32 CIT 642, 565 F. Supp. 2d 1357 (2008) .................................................. 11

Nippon Steel Corp. v. United States,
    345 F.3d 1379 (Fed. Cir. 2003) ................................................................... 4

*Nippon Steel Corp. v. United States*,
    25 CIT 1445, 182 F. Supp. 2d 1330 (2001) ................................................ 4, 33

*Nippon Steel Corp. v. United States*,
    458 F.3d 1345 (Fed. Cir. 2006) ................................................................... 10, 11

*Nitrogen Solutions Fair Trade Comm. v. United States*,
    29 CIT 86, 358 F. Supp. 2d 1314 (2005) .................................................... 39

*NSK Corp. v. United States*,
    32 CIT 966, 577 F. Supp. 2d 1322 (2008) .................................................. 5, 30

*Nucor Corp. v. United States*,
    28 CIT 188, 318 F. Supp. 2d 1207 (2004)
    *aff'd* 414 F.3d 1331 (Fed. Cir. 2005) ......................................................... 4, 33, 36, 43

*Roses, Inc. v. United States*,
    13 CIT 662, 720 F. Supp. 180 (1989) ......................................................... 32

*SCM Corp. v. United States*,
    4 CIT 7 544 F. Supp. 194 (1982) ................................................................. 19

*Shandong TTCA Biochemistry Co., Ltd. v. United States*,
    774 F. Supp. 2d 1317 (Ct. Int'l Trade 2011) ............................................. 4, 12, 21, 33

*Tropicana Prods., Inc. v. United States*,
    31 CIT 548, 484 F. Supp. 2d 1330 (2007) .................................................. 5, 30

## TABLE OF AUTHORITIES CONT'D

*U.S. Steel Grp. v. United States*,
  96 F.3d 1352 (Fed. Cir. 1996)................................................................ 10, 11, 12

*Universal Camera Corp. v. NLRB*,
  340 U.S. 474 (1951)................................................................................. 10, 11

*Usinor v. United States*,
  28 CIT 1107, 342 F. Supp. 2d 1267 (2004) ............................................ 2, 11

*USX Corp. v. United States*,
  11 CIT 82, 655 F. Supp. 487 (1987) ........................................................ 32

*USX Corp. v. United States,*
  12 CIT 844, 698 F. Supp. 234 (1988) ...................................................... 34

*Whirlpool v. United States*,
  2013 WL 6980820 (Ct. Int'l Trade Dec. 26, 2013) ............................. passim

**Statutes**

19 U.S.C. § 1516a(b)(1)(B)(i)....................................................................... 10

19 U.S.C. § 1671b(a)(2)................................................................................. 40

19 U.S.C. § 1671d(b)(1) ............................................................................... 30

19 U.S.C. § 1673b(a)(2)................................................................................. 40

19 U.S.C. § 1673d(b)(1) ............................................................................... 30

19 U.S.C. § 1677(4)(A)................................................................................. 30

19 U.S.C. § 1677(7)(B)(ii)............................................................................ 28

19 U.S.C. § 1677(7)(C)(ii)(I)........................................................................ 22

19 U.S.C. § 1677(7)(C)(ii)(II)....................................................................... 43

19 U.S.C. § 1677(7)(F)(i)(V)......................................................................... 43

19 U.S.C. § 1677(7)(I) .................................................................................. 40

28 U.S.C. § 2639(a)(1).............................................................................. 10, 45

**Legislative History**

H.R. Rep. No. 103-316, vol. I (1994) ........................................................... 35

**Federal Register Notice**

79 Fed. Reg. 73102 (Dec. 9, 2014) ....…………………………………………1

## TABLE OF AUTHORITIES CONT'D

**USITC Publications**

*1,1,1,2-Tetrafluoroethane from China*, Inv. Nos. 731-TA-1244 and 701-TA-509
(Final), USITC Pub. 4503 (Dec. 2014).......................................................................................... 1

*Certain Orange Juice from Brazil,* Investigation No. 731-TA-1089 (Final),
USITC Pub. 3838 (Mar. 2006) .................................................................................................... 45

*Certain Steel Grating from China*, Inv. Nos. 701-TA-465 and 731-TA-1161
(Final), USITC Pub. 4168 (July 2010).......................................................................................... 44

Defendant U.S. International Trade Commission ("Commission") hereby responds to the opening briefs filed by Chemours Company ("Chemours"), successor-in-interest to E.I. DuPont de Nemours and Company ("DuPont"), and Mexichem Fluor Inc. ("Mexichem"), which challenge certain aspects of the Commission's negative determinations in the investigations of R-134a from China.  Because the Commission's determinations are supported by substantial evidence and in accordance with law, we respectfully ask the Court to affirm them.

## I.      STATEMENT PURSUANT TO RULE 56.2

### A.      Administrative Determination Sought to be Reviewed

Plaintiffs seek review of the Commission's final determinations, by a 4-2 vote, that an industry in the United States was not materially injured or threatened with material injury by reason of R-134a imported from China.  *1,1,1,2-Tetrafluoroethane from China*, Inv. Nos. 731-TA-1244 and 701-TA-509 (Final), USITC Pub. 4503 (Dec. 2014) (1-198/2-297).[1]  The determinations were published at 79 Fed. Reg. 73102 (Dec. 9, 2014) (1-191).

### B.      Questions Presented and Summary of Argument

#### 1.      Was the Commission's volume analysis reasonable and in accordance with law?

Yes.  While recognizing that subject import volume and market share were significant during the period of investigation ("POI"),[2] the Commission explained that the only increase in subject import volume during the period, between 2011 and 2012, resulted from a domestic shortage of R-134a.  *See* Views at 21-23.  In so finding, the Commission observed that domestic

---

[1] Citations to record documents cite the list number, 1 for public and 2 for confidential, followed by the document number.  All citations to the Commission's confidential views ("Views") and the confidential staff report ("CR") are to record document 2-297.

[2] The POI for the investigations was 2011-2013 and an interim period consisting of January-June of 2013 and 2014.

CONFIDENTIAL BUSINESS
INFORMATION DELETED

producers' testimony suggesting that the shortage ended in 2011 conflicted other reliable

evidence indicating that the shortage continued into early 2012. *See id.* at 19, 22-23.  The

Commission also noted that subject import volume and market share declined slightly in 2013,

after the shortage ended.  *Id.* at 23.

In challenging these findings, plaintiffs argue that the Commission should have analyzed

subject import volume using methodologies they prefer.  Mexichem argues that the Commission

should have focused on quarterly volume trends, while Chemours claims that the Commission

should have calculated subject import market share using shipment data.  Mexichem's Br.

("MB") at 21-22; Chemours' Br. ("CB") at 22.  Notwithstanding these arguments, the

Commission followed its longstanding practice of assessing subject import volume and market

share, as well as domestic industry performance data, on an annual basis.  *See* CB at 21; CR at

IV-1, Table D-1.  Likewise, the Commission followed its practice of calculating subject import

market share using import volume data when shipment data are unreliable, as here.  While

plaintiffs may have preferred different methodologies, this Court has long held that it will not

upend the Commission's methodology where, as here, that methodology is reasonable and

consistent with Commission practice.  *Coal. of Gulf Shrimp Indus. v. United States*, 71 F. Supp.

3d 1356, 1361 (Ct. Int'l Trade 2015) (quoting *Usinor v. United States*, 28 CIT 1107, 1112, 342

F. Supp. 2d 1267, 1272 (2004)).

Plaintiffs also invite the Court to reweigh the evidence.  In particular, plaintiffs argue that

the shortage cannot explain increased subject import volume in 2012, and particularly in the

fourth quarter of 2012, because, in their view, the shortage ended in 2011.  MB at 22, 27; CB at

21.  Yet, the Commission reasonably found that the shortage continued into 2012, based on

letters from [                                          ] indicating as much and purchaser

awareness of the impending closure of [         ] major domestic production facility that year for

maintenance.  Views at 19, 22-23.  Coupled with other record evidence that domestic producer

shipments and subject imports occurred throughout the year, CR at Tables III-5, IV-2, there was

substantial evidence supporting the Commission's conclusion that purchaser uncertainty

surrounding the duration of the shortage accounted for the increase in subject import volume

between 2011 and 2012.

> **2.      Was the Commission's price analysis reasonable and in accordance
> with law?**

Yes.  The Commission's finding that subject imports did not have significant effects on

domestic prices was reasonable and lawful.  Based on quarterly pricing data covering nearly two-

thirds of domestic producer and subject import shipments, the Commission found mixed

instances of underselling and overselling by subject imports, and no correlation between subject

import underselling and market share.  Views at 26-27.  The Commission also explained that the

decline in domestic prices during the POI resulted from alleviation of the shortage, as prices

declined from levels inflated by the shortage, and not subject imports.  *Id.* at 28.   Indeed, the

Commission observed that domestic prices declined at a similar rate whether subject imports

under or oversold particular pricing products, or even competed with a product.  *Id.* at 29.  The

Commission found that alleviation of the shortage also accounted for the domestic industry's

increasing cost of goods sold ("COGS") to net sales ratio.  *Id.* at 30.  Based on these factors, the

Commission reasonably found no significant price effects.

In challenging these findings, plaintiffs again argue that the Commission should have

utilized their preferred methodologies.  It is well settled, however, that the Commission

possesses "'broad discretion' in selecting the appropriate methodology to review subject import

price effects, and may use the methodology of its choice as long as it is reasonable."  *Whirlpool*

*v. United States*, 2013 WL 6980820, at *11 (Ct. Int'l Trade Dec. 26, 2013) (citing *Shandong*

*TTCA Biochemistry Co., Ltd. v. United States*, 774 F. Supp. 2d 1317, 1327, 1329 (Ct. Int'l Trade

2011); *Hynix Semiconductor, Inc. v. United States*, 30 CIT 1208, 1215, 431 F. Supp. 2d 1302,

1310–11 (2006)).  Here, the Commission reasonably relied on its normal practice of comparing

quarterly prices on domestic producer and importer sales to unrelated U.S. customers, which are

necessarily at the same level of trade.  Contrary to Chemours' argument that the Commission

should have collected and relied on direct import prices instead, CB at 17-19, the Commission

explained that direct import prices are at a different level of trade than domestic producer sales

prices, and thus not a reliable basis for price comparisons.  Views at 29 n.122.

    The Commission also reasonably relied on the number of quarters in which subject

imports undersold the domestic like product, while recognizing that a greater volume of subject

imports undersold than oversold the domestic like product.  *See id.* at 26, 29.  Although plaintiffs

would have preferred the Commission to focus on the volume of underselling, MB at 31; CB at

30-31, this Court has repeatedly affirmed the Commission's reliance on quarters of underselling,

and has held that "the {ITC} is not obligated to conduct a price comparison analysis that

accounts for variations in sales volumes." *Nucor Corp. v. United States*, 28 CIT 188, 318 F.

Supp. 2d 1207, 1257 (2004) (citing *Nippon Steel Corp. v. United States*, 25 CIT 1445, 182 F.

Supp. 2d 1330, 1341 (2001) (citation omitted), vacated on different grounds after remand, 345

F.3d 1379 (Fed.Cir.2003)); *see also Shandong*, 774 F. Supp. 2d at 1327-29; *Metallverken*

*Nederland B.V. v. United States*, 13 CIT 1013, 1024, 728 F. Supp. 730, 739 (1989).

    Similarly unpersuasive is plaintiffs' claim that the Commission ignored the allegedly

clear correlation between subject import underselling and market share in the automotive

aftermarket segment.  *See* MB at 23-25, 29-31; CB at 24-27, 29.  As this Court has recognized,

4

"the ITC bears no obligation to perform a market segmentation analysis" and "d{oes} not err in basing its determination on data representing the experience of the domestic industry as a whole, rather than on the experience of {different segments of the industry} separately.'" *NSK Corp. v. United States*, 32 CIT 966, 577 F. Supp. 2d 1322, 1340 (2008) (quoting *Tropicana Prods., Inc. v. United States*, 31 CIT 548, 560, 484 F.Supp.2d 1330 (2007)) (brackets in original). Accordingly, the Commission considered the aftermarket segment, *see* Views at 23, 33, but reasonably based its analysis of subject import underselling and market share trends on the market as a whole. *Id.* at 27.

**3.      Was the Commission's impact analysis supported by substantial evidence and in accordance with law?**

Yes. The Commission observed that most measures of the domestic industry's performance remained stable during the POI, reflecting stable demand. *See id.* at 32-35. While acknowledging the "severe" decline in the industry's operating income during the period, the Commission explained that the decline occurred as prices inflated by the shortage at the beginning of the POI began to return to pre-shortage levels in 2012 and 2013. *Id.* at 36. By contrast, the Commission observed, subject imports had no significant price effects, and subject import volume and market share did not correlate to the industry's operating performance. *Id.*

In challenging these findings, plaintiffs once more invite the Court to reweigh the evidence. For example, Mexichem argues that the Commission should have compared the domestic industry's COGS to net sales ratio in 2010, from the preliminary investigations, to that in interim 2014 because such an analysis allegedly shows that subject imports suppressed domestic prices. MB at 18-20, 36-38. Yet, the Commission reasonably based its analysis of this and other factors on data collected for the POI in the more thorough final investigations, covering 2011-13 and January-June of 2013 and 2014. Nor is Mexichem correct that the

5

domestic industry should have been able to maintain the COGS to net sales ratio that prevailed during the shortage, in 2010, after the shortage had ended, in interim 2014.  On the contrary, the record showed that domestic prices were no less inflated by the shortage in 2010 than in 2011, which would have artificially reduced the domestic industry's COGS to net sales ratio in 2010. *See* Dougan Hearing Exhibits at 1 (1-150).

Chemours challenges what it characterizes as the Commission's finding that domestic prices had returned to "normal" towards the end of the POI, arguing that prices below cost could not be considered normal.  CB at 27.  Contrary to this argument, however, the Commission did not find that domestic prices had returned to "normal" but that domestic prices "had begun to return to their pre-shortage levels" – a finding supported by the record pricing data.  Views at 36; Dougan Hearing Exhibits at 1 (1-150).  Indeed, the Commission rejected plaintiffs' invitation to speculate as to whether domestic prices were returning to a "natural equilibrium," noting that the statute does not refer to such prices.  Views at 30 n.130.

### 4.      Was the Commission's threat analysis supported by substantial evidence and in accordance with law?

Yes.  The Commission reasonably found that because the record showed that subject imports were neither increasing in volume nor entering at prices likely to affect domestic prices, and had not adversely impacted the domestic industry, there was no threat to the domestic industry.  *Id.* at 38-41.  To the extent Chemours challenges the Commission's threat determination, the challenge is based entirely on its disagreement with the Commission's findings that subject imports increased due to the shortage and had no significant price effects. *See* CB at 33-34.  For the same reasons the Commission's present injury determination was supported by substantial evidence and in accordance with law, so too was its threat determination.

6

CONFIDENTIAL BUSINESS
INFORMATION DELETED

## II.     STATEMENT OF FACTS

### A.     Like Product, Domestic Industry, and Conditions of Competition

The Commission began by defining the domestic like product to include all R-134a and

the domestic industry to include all producers of R-134a.[3]  Views at 8-9.

In considering the pertinent conditions of competition, the Commission found that

approximately [    ] percent of R-134a sales were made to the automotive aftermarket segment on

a spot basis, while most other sales were made to original equipment manufacturers ("OEMs"),

supplied exclusively by domestic producers pursuant to yearly or multi-year contracts.  *Id.* at 16.

Additionally, apparent U.S. consumption of R-134a declined somewhat during the POI, although

petitioners characterized demand as "relatively static."  *Id.* at 17.

The Commission further found that the U.S. market for R-134a experienced a supply

shortage that all parties agreed had lasted from mid-2010 through at least 2011, due to raw

material shortages, production problems, and other factors.  *Id.* at 18-19.  Unable to supply both

the automotive aftermarket and OEM segments, domestic producers chose to fulfill their

contractual obligations to OEMs before serving aftermarket purchasers in the spot market.  *Id.* at

19.  The Commission also explained that the record conflicted with domestic producer testimony

that the shortage ended in 2011, with [

                                        ] indicating that the shortage was ongoing in early 2012.

*Id.*

### B.     Volume

Taking these conditions into account, the Commission found that although subject import

volume and market share was significant, the only increase in subject imports, between 2011 and

---

[3] Neither of these issues is on appeal.

CONFIDENTIAL BUSINESS
INFORMATION DELETED

2012, resulted from the shortage. *Id.* at 22-23. As domestic producers responded to the shortage by focusing on OEMs, purchasers in the automotive aftermarket segment turned to subject imports to ensure a reliable supply of R-134a through 2012. *Id.* at 23. Not only had purchasers been warned by [                          ] that the shortage was continuing in early 2012, the Commission explained, but purchasers were also aware that [          ] had scheduled a plant shutdown in 2012 for maintenance. *Id.* at 22. As the market stabilized during 2012, the pace of subject imports slowed and subject import volume and market share declined slightly in 2013. *Id.* at 23.

### C.    Price

Based on quarterly pricing data, the Commission found mixed instances of underselling and overselling by subject imports.[4] *Id.* at 25-26. Nevertheless, the Commission found no correlation between underselling and shifts in market share. *Id.* at 27. Although significant quantities of subject imports undersold the domestic like product throughout the POI, subject imports only gained market share between 2011 and 2012, due to the domestic supply shortage. *Id.*

The Commission also found that the decline in domestic prices over the POI resulted from cessation of the supply shortage, which had inflated domestic prices. *Id.* at 28. As further support, the Commission observed that domestic prices declined for all pricing products whether subject imports under or oversold a particular domestic product or even competed with it. *Id.* at 29.

---

[4] As discussed below, the Commission declined to use direct import pricing data because these data were not directly comparable to importers' sales prices. *Id.* at 29 n.122.

Finally, the Commission explained that alleviation of the shortage also accounted for the domestic industry's increased cost of goods sold ("COGS") to net sales ratio from 2011 to 2013. *Id.* at 30.  The Commission concluded that subject imports had no significant price effects.

### D.     Impact

The Commission found that generally stable demand during the POI was reflected in the domestic industry's stable performance according to most measures, including market share.  *Id.* at 32-33.  While acknowledging that the industry experienced a "severe" decline in operating income, *id.* at 34, the Commission explained that the decline occurred as prices that had been anomalously high due to the shortage during 2010-11 began to return to their pre-shortage levels as the market stabilized during 2012-13.  *Id.* at 36.  By contrast, the Commission observed that subject imports had no adverse price effects, and found no correlation between the industry's declining operating performance and subject import volume and market share.  *Id.* at 35-36 & n.148.  Accordingly, the Commission found no significant adverse impact.

### E.     Threat

The Commission also found no threat of material injury.  Specifically, the Commission found that subject imports had ceased to increase as the shortage ended, and were therefore unlikely to increase in the imminent future.  *Id.* at 38-39.  Although Chinese producers experienced increasing capacity and declining capacity utilization during the POI, the Commission found no correlation between these trends and subject import volume during the period.  *Id.*  Moreover, Chinese producers increased sales to home market customers and maintained substantial sales to third country customers, while inventories were stable relative to production.  *Id.* at 39-40.

The Commission further explained that the absence of significant price effects during the POI, coupled with the likely flat subject import volume, made significant price effects unlikely in the imminent future.  *Id.* at 41.

Finally, the Commission found that subject imports were unlikely to have a significant impact on the domestic industry, based on its findings that non-injurious subject import volumes and prices were unlikely to change from non-injurious levels in the imminent future.  *Id.* at 42. Based on these factors, among others, the Commission found no threat of material injury.

## III.    STANDARD OF REVIEW

Under the Tariff Act of 1930, this Court must review the Commission's final antidumping and countervailing duty determinations by assessing whether they are "unsupported by substantial evidence on the record, or otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B)(i).  The Commission's determinations are presumed to be correct and the burden is on the party challenging the determination to demonstrate otherwise.  28 U.S.C. § 2639(a)(1).

The Supreme Court has defined "substantial evidence" as being "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951).  Substantial evidence is "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence."  *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966).

Under the substantial evidence standard, the Courts defer to the Commission's reasoned fact-finding and analysis in injury investigations.  *See, e.g., Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1354-55 (Fed. Cir. 2006); *U.S. Steel Grp. v. United States*, 96 F.3d 1352, 1357 (Fed. Cir. 1996).  Under the substantial evidence standard, a Court may not, "even as to matters

not requiring expertise ... displace the {agency's} choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it *de novo*." *Universal Camera Corp.*, 340 U.S. at 488; *Grupo Indus. Camesa v. United States*, 85 F.3d 1577, 1582 (Fed. Cir. 1996).[5]  In other words, the Court may not "reweigh the evidence or substitute its own judgment for that of the agency." *Usinor*, 28 CIT at 1112, 342 F. Supp. 2d at 1272; *Coal. of Gulf Shrimp Indus.,* 71 F. Supp. 3d at 1361 (quoting *Usinor*, 28 CIT at 1112, 342 F. Supp. 2d at 1272).

Moreover, "{i}t is the Commission's task to evaluate the evidence it collects during its investigation" and "{c}ertain decisions, such as the weight to be assigned a particular piece of evidence, lie at the core of that evaluative process." *U.S. Steel Grp.*, 96 F.3d at 1357; *Nippon Steel*, 458 F.3d at 1350.  In its role as trier of fact in injury investigations, "{t}he Commission 'has the discretion to make reasonable interpretations of the evidence and to determine the overall significance of any particular factor in its analysis.'" *Nevinnomysskiy Azot v. United States*, 32 CIT 642, 655, 565 F. Supp. 2d 1357, 1367-68 (2008) (quoting *Goss Graphics Sys., Inc. v. United States*, 22 CIT 983, 1004, 33 F. Supp. 2d 1082, 1100 (1998), *aff'd*, 216 F.3d 1357 (Fed. Cir. 2000)).  As the Federal Circuit has stated, if "the totality of the evidence does not illuminate a black-and-white answer to a disputed issue, it is the role of the expert factfinder – here the majority of the Presidentially-appointed, Senate-approved Commissioners – to decide which side's evidence to believe." *Nippon Steel*, 458 F.3d at 1359.  "Congress has allocated to the Commission the task of making these complex determinations," the Federal Circuit has

---

[5] Even if one or more subsidiary findings of the Commission are unsupported by substantial evidence, the Court must still assess whether the remaining evidence cited by the Commission provides substantial evidence for the Commission's determinations.  *U.S. Steel Grp.*, 96 F.3d at 1367.

explained, and "{o}urs is only to review those decisions for reasonableness." *U.S. Steel Grp.*, 96 F.3d at 1357.

"When evaluating challenges to the ITC's choice of methodology," the Court has explained, "the court will affirm the chosen methodology as long as it is reasonable." *JMC Steel Grp. v. United States*, 70 F. Supp. 3d 1309, 1316 n.4 (Ct. Int'l Trade 2015) (citing *Shandong*, 774 F.Supp.2d at 1327; *accord Hynix,* 30 CIT at 1210, 1215, 431 F.Supp.2d at 1306, 1310–11); *Coal. of Gulf Shrimp Indus.*, 71 F. Supp. 3d at 1365 (citing *U.S. Steel Grp.*, 96 F.3d at 1361-62); *see also Whirlpool*, 2013 WL 6980820, at *8 ("As long as the agency's methodology and procedures are a reasonable means of effectuating the statutory purpose . . . the court will not . . . question the agency's methodology.") (citing *Int'l Imaging Materials, Inc. v. United States Int'l Trade Comm'n,* 30 CIT 1181, 1189 (2006)).  Thus, "{w}hen presented with a challenge to the Commission's methodology, the court examines 'not what methodology {plaintiffs} would prefer, but ... whether the methodology actually used by the Commission was reasonable.'" *JMC*, 70 F. Supp. 3d. at 1316 n.4 (quoting *Shandong,* 774 F.Supp.2d at 1329).

## IV.    ARGUMENT

### A.    The Commission's Volume Analysis was Supported by Substantial Evidence and in Accordance with Law

#### 1.    The Commission's Volume Analysis Should Be Sustained

The Commission recognized that subject import volume was significant, but reasonably found that the only increase in subject imports, between 2011 and 2012, resulted from the shortage.  As the Commission explained, domestic producers responded to the shortage by reducing their spot sales to purchasers in the automotive aftermarket segment in favor of fulfilling their contractual obligations to OEM customers, forcing aftermarket purchasers to turn to subject imports.  Views at 23.

CONFIDENTIAL BUSINESS
INFORMATION DELETED

The Commission also reasonably found that the shortage continued into 2012.  As the Commission explained, [


"]  *Id.* at 19 n.77.  Similarly, [


].  *Id.*  Purchasers were also aware that [          ] had scheduled a plant shutdown in 2012 for maintenance.  *Id.* at 23.

Due to the uncertain duration of the shortage, the Commission reasonably found that purchasers, who required stable supplies of R-134a, would have turned to subject imports both during the shortage and as the shortage eased.  *Id.*  Because purchasers typically place orders in the fall for delivery through the winter months, orders placed by purchasers in late 2011, during the shortage, would have been delivered through early 2012.  *Id.*  The Commission also observed that most subject import volume was sold in the automotive aftermarket segment, which experienced the greatest shortages.  *Id.*

Finally, the Commission found that as the market stabilized, subject import volume and market share dropped slightly, and domestic industry market share increased, between 2012 and 2013.  *Id.* at 23-24.  Because the Commission's volume analysis was supported by substantial evidence and in accordance with law, the Court should affirm it.

### 2.    The Commission's Methodology for Analyzing Subject Import Volume and Market Share Was Reasonable and Should Therefore Be Sustained

In these investigations, the Commission followed its longstanding practice of assessing subject import volume and market share on an annual basis.  The Commission's traditional reliance on annual data reflects the fact that trade and financial data is normally collected from domestic producers on an annual basis, as it was here.  *See* CR at Table D-1.  In order to

CONFIDENTIAL BUSINESS
INFORMATION DELETED

meaningfully evaluate the impact of subject imports on the domestic industry, the Commission must compare data for comparable periods.  Thus, having collected the domestic industry's U.S. shipments on an annual basis, the Commission reasonably considered subject import volume and market share on an annual basis as well.

Despite this, Plaintiffs challenge the Commission's reliance on annual data to evaluate subject import volume and market share, and propose alternative methodologies more to their liking.  Specifically, Mexichem argues that the Commission should have considered subject import volume on a quarterly basis because, in its view, increased subject import volume in the fourth quarter of 2012 could not have resulted from the shortage.  MB at 21-22.  Chemours contends that the Commission should have measured subject import market share using the U.S. shipments of subject imports reported by responding importers, instead of import data, because doing so allegedly shows a [        ] increase in subject import market share between 2012 and 2013.  CB at 22.

This Court has recognized, however, that "{t}he ITC has 'broad discretion' in choosing a methodology for measuring volume."  *Whirlpool,* 2013 WL 6980820, at *8 (citing *Aluminum Extrusions Fair Trade Comm. v. United States,* 2012 WL 5201218, at * 11 ( 2012)).  Accordingly, "{w}hen presented with a challenge to the Commission's methodology, the court examines 'not what methodology {plaintiff} would prefer, but ... whether the methodology actually used by the Commission was reasonable.'"  *JMC*, 24 F. Supp. 3d at 1300 (citation omitted); *see also Whirlpool,* 2013 WL 6980820, at *8 (citation omitted).  Because the Commission's volume methodology was reasonable in this case, the Court should affirm it.

Contrary to Mexichem's argument, quarterly trends in subject import volume would have been reflected in annual trends, and the Commission recognized that subject import volume

CONFIDENTIAL BUSINESS
INFORMATION DELETED

increased [     ] short tons between 2011 and 2012.  Views at 21.  Thus, Mexichem is incorrect

that the Commission somehow overlooked a relevant increase in subject import volume by

assessing annual instead of quarterly data.

The quarterly import data that Mexichem prefers is also unreliable because these data are

based entirely on official import statistics covering imports entered under HTSUS 2903.39.2020.

*See* MB at 21.  As noted by the Commission, official import statistics were likely incomplete due

to misclassified entries.  Views at 4 n.4; CR at IV-1 n.4.  To address this problem, importers

were asked to report their imports of R-134a under HTS numbers other than HTSUS

2903.39.2020 ("other HTS" imports) and these data were combined with imports under HTSUS

2903.39.2020 ("primary HTS" imports), according to official import statistics.  *Id.*  Mexichem's

preferred data do not account for "other HTS" imports, which were substantial, *see* CR at Table

IV-2, and therefore cannot provide an accurate basis for assessing quarterly subject import

trends.  Because the Commission reasonably analyzed subject import volume on an annual basis,

using data including "other HTS" imports, the Court should affirm the analysis.

Equally misplaced is Chemours' argument that the Commission should have measured

subject import market share using reported U.S. shipments of subject imports instead of subject

import volume.  The Commission typically relies on subject import volume to calculate subject

import market share when accurate data on U.S. shipments of subject imports are unavailable,

and this court has affirmed the practice.  *See BIC Corp. v. United States*, 21 CIT 448, 461, 964 F.

Supp. 391, 404 (1997).  Here, the Commission reasonably relied on subject import volume to

calculate subject import market share because the U.S. shipment data reported by importers were

not as reliable for this purpose.  Specifically, importers [

] reported that because they did not track shipments by supplier or country

15

CONFIDENTIAL BUSINESS
INFORMATION DELETED

of origin, they had to either estimate their U.S. shipments of subject imports or else report U.S.

shipments of subject imports that included some shipments of domestically-produced R-134a.

*See* Importers' Questionnaire Responses at questions II-5, II-10 ([

]).  As these importers accounted for [      ] percent of all subject imports, CR at Table

IV-1, the Commission reasonably relied on subject import data, combining "primary HTS"

official import statistics with "other HTS" imports reported by importers, to calculate subject

import market share.  *Id.* at Table IV-6.

### 3. The Commission Reasonably Found that the Increase in Subject Import Volume Between 2011 and 2012 Resulted from the Shortage

Plaintiffs challenge the Commission's finding that the only increase in subject import

volume during the POI, between 2011 and 2012, resulted from the shortage.  Specifically, they

claim that the shortage ended in 2011, and could therefore not explain increased subject imports

in 2012.  MB at 27; CB at 21.  Mexichem argues that the Commission's analysis conflicts with

increased subject imports in the fourth quarter of 2012, after the shortage had ended in its view.

MB at 22.  Chemours contends that the domestic industry's unused capacity during the 2011-13

period suggests that the industry's market share would have been higher "but for" subject

imports.  CB at 21-22.

Contrary to plaintiffs' argument, substantial record evidence supports the Commission's

finding that the shortage continued into 2012.  As the Commission found, the domestic

producers' testimony that the shortage ended in 2011 conflicted with correspondence from

[                                          ] indicating that the shortage continued into 2012.  Views at 19, 22.

Additionally, purchasers were aware that [             ] had scheduled a plant shutdown for

maintenance, *id.* at 22-23, which reduced the domestic industry's capacity by [      ] percent in

2012 relative to 2011.  CR at III-4.  Based on the uncertain duration of the shortage, the

CONFIDENTIAL BUSINESS
INFORMATION DELETED

Commission explained, purchasers turned to subject imports during the shortage and as the

shortage eased.  Views at 23.  In other words, the increase in subject import volume between

2011 and 2012 resulted not only from orders placed by purchasers during the shortage in late

2011 for delivery in early 2012 but also from orders placed by purchasers in early 2012, when

the shortage continued, for delivery later in the year.

 Equally unpersuasive is Mexichem's argument that increased subject import volume in

the fourth quarter of 2012 contradicts the Commission's finding that the shortage drove

increased subject imports during 2011-12.  MB at 22.  Mexichem's argument ignores that the

shortage continued into 2012.  Views at 22-23.  It also mistakenly assumes that subject imports

drawn into the U.S. market by the shortage would have been limited to the first half of 2012.

Although the Commission recognized that purchasers typically order R-134a in the fall for

delivery though the winter months, Views at 23, the record showed that domestic industry

shipments and subject imports occurred throughout the year.  In 2013, [      ] percent of domestic

producers' U.S. shipments to aftermarket purchasers and [      ] percent of subject imports, which

were concentrated in the aftermarket, occurred in the second half of the year.  CR at Tables III-6,

IV-2.  The quarterly data highlighted by Mexichem show that a similar proportion of subject

imports occurred in the second half of 2012.  MB at 21.  Given this, and continuation of the

shortage into early 2012, the increase in subject import volume in the fourth quarter of 2012 is

neither surprising nor inconsistent with the Commission's analysis.

 Finally, Chemours is mistaken that the domestic industry's unused capacity during the

2011-13 period mandated a finding that the industry's market share would have been higher "but

for" subject imports.  *See* CB at 21-22.  In so arguing, Chemours again invites the Court to

reweigh the evidence.  As already discussed, substantial evidence supported the Commission's

CONFIDENTIAL BUSINESS
INFORMATION DELETED

finding that subject import volume increased between 2011 and 2012 due to the shortage,

thereby reducing the domestic industry's market share in those years.  *See* Views at 21-23, 33.

The Commission also explained that as the market stabilized, subject import volume and market

share declined slightly in 2013 and domestic industry market share increased to a level only

slightly lower than in 2011.  *Id.* at 23, 33.  As for the domestic industry's capacity utilization, the

Commission found that utilization increased from [      ] percent in 2011 and [      ] percent in

2012 to [      ] percent in 2013, supporting the finding that industry performance was stable

during the POI according to most measures.  *Id.* at 33.  Substantial evidence supports the

Commission's analysis, notwithstanding Chemours' suggested reweighing of the evidence.

     Chemours' argument that the domestic industry's unused capacity would have enabled

domestic producers to increase their market share "but for" subject imports is also unpersuasive.

As the Commission explained, the shortage of R-134a in 2011 through early 2012 resulted not

only from increased demand, but also from raw material shortages and production problems.  *Id.*

at 18.  For this reason, the domestic industry's unused capacity in 2011 and 2012 is not an

accurate indication of how much additional R-134a domestic producers could have supplied to

the U.S. market in those years.  Indeed, Mexichem concedes that short supplies of domestically-

produced R-134a drew subject imports into the U.S. market in 2011 (*see* MB at 27), even though

the domestic industry's unused capacity in 2011 was similar to that in 2012 and 2013.  *See* CR at

Table III-3.

     Similarly unpersuasive is Chemours' assertion (CB at 22) that the domestic industry's

spare capacity would necessarily have enabled the industry to increase its sales and revenues in

2012 and 2013 but for subject import volume.  As this court has recognized, "the ITC 'has the

discretion – indeed an obligation – to consider and weigh a number of pertinent economic and

CONFIDENTIAL BUSINESS
INFORMATION DELETED

factual criteria, and consider all the facts and circumstances, including the health of the domestic

industry,' when determining whether subject import volume injured the domestic industry."

*JMC*, 24 F. Supp. 3d at 1310 (citing *SCM Corp. v. United States,* 4 CIT 7, 13, 544 F. Supp. 194,

199 (1982); *accord Am. Spring Wire Corp. v. United States,* 8 CIT 20, 23, 590 F. Supp. 1273,

1277 (1984) ("'No factor, standing alone, triggers a *per se* rule of material injury.'") (citation

omitted), *aff'd* 760 F.2d 249 (Fed.Cir.1985)).   In this case, the Commission based its negative

injury determinations not only on its analysis of subject import volume and industry capacity

utilization, but also on the absence of significant subject import price effects.  *See* Views at 26-

31.   The Commission also found that the industry's performance was stable during the POI

according to every factor but operating income, which declined as prices came down from

anomalously high levels caused by the shortage in 2011.  *See id.* at 36.   These findings, discussed

below, as well as the Commission's volume analysis, support the Commission's negative injury

determinations.

## B.   The Commission's Price Analysis was Supported by Substantial Evidence and in Accordance with Law

### 1.   The Commission's Price Analysis Should Be Sustained

The Commission began its price analysis by finding a mixed pattern of underselling and

overselling based on quarterly pricing data covering nearly [          ] of domestic producer

and subject import shipments.  *Id.* at 25.  As the Commission explained, subject imports oversold

the domestic like product in a majority of quarterly comparisons, 35 of 66, although the volume

of undersold subject imports was [          ] larger than the volume of oversold subject imports.

*Id.* at 26.

The Commission also found no correlation between underselling and shifts in market

share.  *Id.* at 27.  Although significant quantities of subject imports undersold the domestic like

CONFIDENTIAL BUSINESS
INFORMATION DELETED

product throughout the POI, the Commission explained, the only market share gain made by

subject import occurred between 2011 and 2012, due to the shortage.  *Id.*

Finding no significant price depression, the Commission explained that domestic prices

declined during the POI due to cessation of the shortage, which had temporarily inflated prices.

*Id.* at 28.  Evidence of inflated prices included: pricing product data showing that R-134a prices

increased 127 percent between the first quarter of 2010 and the second quarter of 2011, when

prices peaked; an industry report stating that  "{s}tarting mid-2010 and continuing through 2011,

HFC-134a has experienced supply shortages and cost increases that seem to escalate month-by-

month"; and letters from [

                                                                ].  *Id.* at 28 n.117.  Because the shortage had been

most acute in the automotive aftermarket segment, the Commission observed, prices in that

segment were inflated the most and therefore declined more over the POI than prices in other

segments.  *Id.*  Additionally, the Commission observed that domestic prices declined on all

pricing products regardless of whether subject imports undersold or oversold a particular product

or even competed with it.  *Id.* at 29.

Finally, the Commission found no significant price suppression by subject imports, even

though the domestic industry's COGS to net sales ratio increased over the POI.  *Id.* at 30.  As the

Commission explained, the increase in this ratio resulted from cessation of the supply shortage,

which caused net sales values to decline.  *Id.*  The Commission also observed that the domestic

industry's COGS and raw material costs fluctuated within a narrow range over the POI, and that

price increases were not likely towards the end of the POI given flat demand and the market's

emergence from the shortage.  *Id.*

Because the Commission's price analysis was supported by substantial evidence and in accordance with law, the Court should affirm it.

**2.      The Commission's Price Comparison Methodology Was Reasonable and In Accordance With Law**

In challenging the Commission's adherence to its traditional underselling methodology, Mexichem argues that the Commission's analysis was mistakenly based on quarterly price comparisons at different levels of trade.  MB at 33-34.  Similarly, Chemours contends that the Commission should have collected a different set of data, specifically direct import pricing data, which in its mistaken view were at the same level of trade as the pricing data reported by domestic producers.  CB at 17-18.  Chemours also claims that the Commission erroneously rejected its analysis purporting to show that the average unit values ("AUV") of direct imports from China by four "large repackagers" (*i.e.*, firms that purchase and import R-134a in bulk for repackaging and resale in smaller containers) were generally lower than the AUVs of domestic producer sales to the same repackagers.  *Id.* at 18-19.

In these arguments, plaintiffs invite the Court to replace the Commission's normal underselling methodology with one they prefer and then to reweigh the evidence on price effects using this new methodology.  As the Court has held, however, "Plaintiffs' preference for their own {underselling} methodology is understandable" but "'the focal point on appeal is not what methodology {plaintiffs} would prefer, but on whether the methodology actually used by the Commission was reasonable.'"  *Shandong*, 774 F. Supp. 2d at 1329 (citation omitted); *see also JMC*, 24 F. Supp. 3d at 1300.  It is well settled that the Commission possesses "'broad discretion' in selecting the appropriate methodology to review subject import price effects, and may use the methodology of its choice as long as it is reasonable."  *Whirlpool*, 2013 WL 6980820, at *11 (citations omitted).  Moreover, "while the statute requires the Commission to

analyze underselling," the court has held, "the statute does not stipulate how the Commission is to calculate the price of the imported merchandise or the domestic like product," granting the Commission "broad discretion to choose the manner in which it calculates the prices, and how it compares them." *Celanese Chemicals, Ltd. v. United States*, 31 CIT 279, 294 (2007) (citations omitted). Because use of the Commission's traditional underselling methodology was reasonable, as discussed below, the Court should affirm it.

Applying its usual approach, the Commission reasonably assessed the significance of subject import underselling using quarterly pricing product data collected from domestic producers and importers. Under 19 U.S.C. § 1677(7)(C)(ii)(I), the Commission must "consider whether . . . there has been significant price underselling by the imported merchandise as compared with the price of domestic like product of the United States." The Commission insures that prices are compared at the same level of trade by requesting that domestic producers and importers report quarterly sales volume and f.o.b. value data on products "shipped to unrelated U.S. customers," as it did here. CR at V-5; *see also* Domestic Producers' Questionnaires at Question III-2; Importers' Questionnaires at Question III-2 (1-73). Such sales would be at the same level of trade because domestic producers and importers perform similar activities, and thus bear comparable expenses, in serving unrelated U.S. customers.[6] This Court has affirmed the Commission's reliance on such quarterly pricing product sales data to conduct its underselling analysis in past cases, *e.g., LG Elecs., Inc. v. United States*, 26 F. Supp. 3d 1338, 1348-50 (Ct. Int'l Trade 2014), and should do so here as well.

---

[6] Levels of trade are the different market stages at which goods are traded, such as sales from manufacturer or importer to wholesaler, from wholesaler to retailer, and from retailer to consumer.

The Commission's reliance on quarterly pricing data in this case was also reasonable because these data covered a substantial proportion of domestic producers' and importers' U.S. shipments.  Specifically, pricing data accounted for 60.5 percent of domestic producers' U.S. commercial shipments and 65.9 percent of U.S. importers' U.S. commercial shipments of subject imports.  Views at 25.  Given this, the Commission reasonably concluded that these data "capture competition between the domestic like product and subject imports" and properly relied on the data for its underselling analysis.[7]

The Commission also adequately explained why it did not collect or rely on direct import price data for its underselling analysis, contrary to Chemours' argument.  CB at 17-18.  As the Commission noted, direct import AUVs "are not directly comparable to importers' sales prices, as they do not include any sales markup that would typically be made by an importer selling R-134a in the U.S. market."  Views at 29 n.122.  Direct import prices are the landed, duty-paid prices that importers paid for imports of R-134a from China at their port of entry.  *See* Questionnaire Instructions (1-73).  Such prices are not at the same level of trade as domestic producer sales prices to unrelated U.S. customers because, as the Commission explained, they do not include the markup that importers include in their sales prices to unrelated U.S. customers, covering transportation from the port to their facility, warehousing costs, and profit margins, among other things.[8]  Because direct import prices exclude such items, they are generally lower than importer sales prices to unrelated U.S. customers.  Given this, and the high coverage

---

[7] This Court has held that the Commission may rely on pricing product data covering even far lower percentages as long as the data are "broadly representative."  *Altx, Inc. v. United States*, 26 CIT 709 (2002), 2002 WL 1560884 at *9-10. (upholding Commission's reliance on pricing data accounting for 1 to 7 percent of sales of subject imports).

[8] Other costs of direct importation that would not be reflected in direct import prices include offices and staff in foreign countries; inventory and management services; supply chain management, inspection, and product inspection; regulatory compliance and risk mitigation; and financial management.

CONFIDENTIAL BUSINESS
INFORMATION DELETED

afforded by pricing product data, the Commission reasonably declined to collect or to rely on

direct import price data.

That Mexichem deems the markups reported by importers in this case "implausibly high"

does not make direct import prices any more comparable to domestic producer sales prices to

unrelated U.S. customers.  *See* MB at 32-34.  Nor is there anything remarkable about these

markups, *see id.* at 32, which reflect not only the additional costs of direct importation discussed

above but also the importers' cost of repackaging the bulk R-134a that they directly import into

smaller containers for resale.  Pricing product data suggest that these costs were considerable, as

per pound sales prices were generally higher for R-134a packaged in smaller containers.  *See* CR

at Table V-10.  For example, in 2013, the weighted-average sales price of importer sales of R-

134a in 12 ounce container to distributors (product 6), at $[        ] per pound, was [        ] percent

higher than the weighted-average sales price of importer sales of R-134a in bulk to distributors

(product 1), at $[        ] per pound.  *See id.* at Tables V-3, 8.

Similarly misplaced is Mexichem's argument that [           ] reported sales of subject

imported product 1 are somehow at a different level of trade than Mexichem's sales of

domestically-produced product 1.  MB at 33-34.  Sales to unrelated U.S. customers are

necessarily at the same level of trade because they involve the same sales activities.  Mexichem

contends that [           ] sales prices must be at a different level of trade because they were

generally higher than Mexichem's sales prices, even though [        ] reported in its purchasers'

questionnaire response that subject import prices are generally lower than domestic prices.  *Id.*

As already discussed, however, direct import prices are lower than sales prices to unrelated U.S.

customers because they exclude the various costs associated with direct importation.

Repackagers like [        ] would consider such costs when choosing between direct imports and

24

CONFIDENTIAL BUSINESS
INFORMATION DELETED

purchases from domestic producers, and not just direct import prices. Indeed, despite reporting

that subject import prices are generally lower, [      ] reduced its imports of R-134a from China

from [    ] short tons in 2011 and [     ] short tons in 2012 to [     ] short tons in 2013 and [     ]

in interim 2014. Importers' Questionnaire of [       ] at Question II-5 ([       ]).

Because the Commission's price comparison methodology was reasonable, the Court

need not consider the relative merits of Chemours' preferred methodology. *JMC*, 24 F. Supp. 3d

at 1300. Nevertheless, it bears mentioning that Chemours' methodology is problematic.

Chemours argues that the Commission should have relied on exhibit 2 to DuPont's Posthearing

Brief, comparing the AUV of direct imports by four "large repackagers" with the AUV of sales

by [                          ] to the same repackagers. CB at 18-19; DuPont's Posthearing Br. at

Exhibit 2 (2-278). As already discussed, however, these price comparisons would not provide an

accurate picture of subject import underselling because direct import prices are at a different

level of trade than domestic producer sales prices. Domestic producers do not compete with

direct import prices for sales to repackagers, as Chemours claims (CB at 19), but with direct

import prices <u>plus</u> the costs associated with direct importation. Accordingly, a portion of the

price differential between direct import AUVs and domestic producer sales AUVs reflects the

additional costs associated with direct importation that are not included in direct import prices,

rather than underselling.

Further reducing the reliability of the price comparisons preferred by Chemours is their

limitation to four "large repackagers" – [

   ] – without explanation. *See* DuPont's Posthearing Br. at Exhibit 2 (2-278). Excluded

from these data are [       ] repackagers that accounted for [     ] percent of subject imports from

China during the POI. *See* Importers' Questionnaire Responses of [

CONFIDENTIAL BUSINESS
INFORMATION DELETED

] at Question I-6a ([

]); CR at Table IV-1.  Thus, Chemours' preferred

methodology would not provide a reliable basis for the Commission's underselling analysis.

Finally, Chemours mistakenly argues that the Commission unlawfully based its

underselling analysis on the "absence of information that the Commission chose not to pursue"

by failing to collect quarterly pricing data on R-134a directly imported in bulk by the four "large

repackagers."  CB at 18 (citing *Diamond Sawblades Mfrs. Coal. v. United States*, 32 CIT 134,

148 (2008).  Chemours overlooks that the court in *Diamond Sawblades* recognized that "'{t}his

court has noted on several occasions that the Commission has broad discretion to pursue an

investigation in a manner that will provide substantial evidence to support its determinations,'

and that '{t}here is no minimum standard set by Congress to measure the thoroughness of an

investigation by the Commission.'"  *Diamond Sawblades*, 32 CIT at 148 (citations omitted); *see

also LG*, 26 F. Supp. 3d at 1348-50.  In this case, the pricing data collected by the Commission,

covering nearly two-thirds of domestic producer and importer shipments during the POI,

unequivocally provided substantial evidence supporting the Commission's finding of mixed

underselling and overselling.  Given this, and the substantial evidence supporting all other

aspects of the Commission's determinations, it is not the case that the Commission's

"determination . . . relies solely on the absence of information that the Commission chose not to

pursue," which was the court's concern in *Diamond Sawblades*.  *Diamond Sawblades*, 32 CIT at

148 (emphasis added).

Furthermore, the Commission did not ignore the price effects of R-134a directly imported

in bulk by the four "large repackagers," as Chemours claims.  On the contrary, the Commission

CONFIDENTIAL BUSINESS
INFORMATION DELETED

considered the pricing data reported by these repackagers, covering sales of pricing products

derived from the R-134a that they directly imported from China and repackaged into smaller

containers.  The volume of pricing product sales reported by these repackagers in 2013, [      ]

short tons, was equivalent to [      ] percent of their direct imports that year.  *See* Importers'

Questionnaire Responses of [                                                                                    ] at

Questions II-5, III-2 ([                                                        ]).  Moreover, unlike direct

import price data, the pricing data reported by repackagers was at the same level of trade as

domestic producer sales, and hence yielded meaningful price comparisons.  Thus, the

Commission reasonably considered the price effects of direct imports by large repackagers.

> **3.     The Commission's Finding of No Correlation Between Underselling and
> Subject Import Market Share Trends Was Supported by Substantial
> Evidence and In Accordance With Law**

Plaintiffs challenge the Commission's finding of no correlation between subject import

underselling and market share on both legal and substantial evidence grounds.  Chemours argues

that the Commission was precluded, as a matter of law, from finding no adverse price effects

"simply because" there was no correlation between subject import underselling and market

share.  *See* CB at 15-17.  Both plaintiffs contend that the Commission ignored what they view as

a clear correlation between subject import underselling and market share in the automotive

aftermarket segment.  *See* MB at 23-25, 29-31; CB at 29.

In arguing that the Commission was legally prohibited from considering the correlation

between subject import underselling and market share, Chemours misunderstands the

Commission's price analysis and the law.  The Commission did not conclude that subject import

underselling had no significant price effects "simply because the Commission could not correlate

the underselling to market share shifts," as Chemours claims (CB at 16).  Rather, in addition to

27

finding no correlation between subject import underselling and market share, Views at 27, the

Commission also found a mixed pattern of subject import underselling and overselling, with

overselling in a majority of quarterly comparisons.  *Id.* at 26.  The Commission found that

cessation of the shortage explained the decline in domestic prices during the POI, as prices came

down from levels inflated by the shortage, and the industry's increasing COGS to net sales ratio.

*Id.* at 28, 30.  By contrast, the Commission found that domestic prices declined at a similar rate

whether subject imports undersold or oversold a particular product or even competed with it.  *Id.*

at 29.  Thus, the Commission's correlation finding was but one of several findings supporting its

conclusion that subject imports had no significant price effects.

Furthermore, the Commission lawfully relied on the absence of any correlation between

subject import underselling and market share during the POI as one of several factors supporting

its finding of no significant price effects.  Chemours is correct that the statute "does not require"

any link between subject import underselling and volume, and that subject imports may depress

or suppress domestic prices without increasing in volume or market share.  CB at 16.  But

nothing in the statute precludes the Commission from considering whether subject import

underselling correlates with increased subject import volume or market share, as would be

expected if underselling is driving increased purchases of subject imports.  On the contrary, the

statute provides that the Commission "may consider such other economic factors as are relevant

to the determination regarding whether there is material injury by reason of subject imports."  19

U.S.C. § 1677(7)(B)(ii).  Accordingly, this Court has affirmed the Commission's analysis of the

correlation between subject import trends and domestic industry performance, including the

correlation between subject import volume and price effects, in past cases.  *JMC*, 24 F. Supp. 3d

at 1300 ("A correlation analysis entails tracking subject import trends in relation to trends in the

CONFIDENTIAL BUSINESS
INFORMATION DELETED

domestic industry's performance and the court has approved its use to assess the price effects of

subject imports.") (citing *Comm. for Fair Coke Trade v. United States,* 28 CIT 1140, 1168

(2004); *Altx,* 26 CIT at 729), 1302 ("The ITC supported, with substantial evidence, its finding

that there was no correlation between the increase in volume of subject imports and any negative

price effects on the domestic like product.").  It should do so here as well.

      Equally unpersuasive is plaintiffs' argument that the Commission ignored what they view

as the correlation between subject import underselling and market share in the automotive

aftermarket segment.  *See* MB at 23-25, 29-31; CB at 29.  Yet again, plaintiffs invite the Court to

reweigh evidence that the Commission reasonably considered.  The Commission recognized that

most subject imports were sold in the automotive aftermarket because that was the segment that

experienced the greatest shortage of R-134a, Views at 23, and that the domestic industry lost

market share in the aftermarket segment between 2011 and 2013.  *Id.* at 33.  As the Commission

explained, however, the domestic industry "gained market share in the 'other refrigerants'

application in which it faced competition from subject imports" during the period so that its

overall market share in 2013 ([     ] percent) was only "slightly" lower than in 2011 ([     ]

percent).  *Id.*  Relying on market share data covering the entire market, the Commission found no

correlation between subject import underselling and market share because significant volumes of

subject imports undersold the domestic like product in each year of the POI, yet subject imports

only increased between 2011 and 2012, due to the shortage.  *Id.* at 27.  In so finding, the

Commission recognized that most subject import competition, and thus most underselling, would

have occurred in the automotive aftermarket segment because subject imports, and by extension

subject imported pricing product sales, were concentrated in the segment.  *Id.* at 18, 25; CR at

Table IV-7.  Thus, the Commission expressly considered the automotive aftermarket segment

and reasonably found no correlation between subject import underselling and market share during the POI.

Plaintiffs' argument that the Commission was required to predicate its analysis on the aftermarket segment is also contrary to this court's recognition that "the ITC bears no obligation to perform a market segmentation analysis" and "d{oes} not err in basing its determination on data representing the experience of the domestic industry as a whole, rather than on the experience of {different segments of the industry} separately.'" *NSK*, 32 CIT at 983, 577 F. Supp. 2d at 1340 (quoting *Tropicana*, 31 CIT at 559-60, 484 F.Supp.2d at 1341) (brackets in original). Indeed, under the statute, the Commission must consider "whether . . . an industry in the United States . . . is materially injured . . . by reason of imports," 19 U.S.C. §§ 1671d(b)(1), 1673d(b)(1), with the term "industry" defined as "producers as a {w}hole of a domestic like product . . . ." 19 U.S.C. § 1677(4)(A). Thus, as this court has recognized, "{t}he statute . . . requires that the Commission consider the domestic market as a whole." *Celanese*, 31 CIT at 295 (citation omitted).

In this case, the Commission defined a single domestic like product coextensive with the scope of the investigations, encompassing all R-134a, and thus a single domestic industry comprised of all producers of R-134a. *See* Views at 8-9. Accordingly, the Commission was required to base its injury analysis on the impact of subject imports on the domestic producers as a whole, rather than the aftermarket segment of the industry. Moreover, the Commission was incapable of conducting an injury analysis of the aftermarket segment because domestic industry performance data by segment was not on the record; plaintiffs advocated a single domestic like product and industry, and did not request the collection of segment-specific performance data. Thus, the Commission acted in accordance with the statute in focusing its correlation analysis on

30

CONFIDENTIAL BUSINESS
INFORMATION DELETED

the market as a whole, while considering the automotive aftermarket as an important condition of competition.

Furthermore, plaintiffs are incorrect that the increase in subject import market share in the automotive aftermarket segment, and the decline in the AUV of domestic industry shipments to the segment, compels the conclusion that subject import underselling correlated with increased subject import market share. *See* MB at 23-25; CB at 29. As the Commission pointed out, the domestic industry partly made up for its declining market share in the aftermarket segment with increased market share in the "other refrigerants" segment, resulting in little change to the industry's overall market share. *See* Views at 27 n.114, 33. Furthermore, the Commission explained that because the shortage was most acute in the aftermarket segment, the segment experienced the greatest increase in subject import volume and the greatest decline in domestic prices as the shortage eased. *Id.* at 23, 28. Plaintiffs' argument fails to account for this evidence, and conflicts with both the mixed pattern of subject import underselling and overselling during the POI, *id.* at 26, and the higher AUVs of subject import shipments as compared to domestic industry shipments in the automotive aftermarket segment. *Compare* CR at Table III-6 *with id.* at Table IV-7. The Court should therefore decline plaintiffs' invitation to reweigh the evidence and affirm the Commission's analysis of this issue.

Mexichem also argues, mistakenly, that the correlation between subject import underselling and market share was clear from the purchasing patterns of importer/purchasers [                                                    ], which in Mexichem's view increased their purchases and imports of R-134a from China due to price. MB at 29-31. Mexichem would have the Commission predicate its correlation analysis on "'isolated tidbits of data which suggest a result contrary to the clear weight of the evidence,'" which is something the Commission may

CONFIDENTIAL BUSINESS
INFORMATION DELETED

not do.  *Roses, Inc. v. United States*, 13 CIT 662, 666, 720 F. Supp. 180, 184 (1989) (quoting

*USX Corp. v. United States*, 11 CIT 82, 84, 655 F. Supp. 487, 489 (1987)).  The Commission

reasonably analyzed the correlation between subject import underselling and market share using

pricing data reported by <u>all</u> responding importers, covering 65.9 percent of their U.S. commercial

shipments of subject imports, and market share data covering the market as a whole.  Views at

27 (citing CR at Tables IV-6, V-6).

By contrast, Mexichem's analysis focuses on only three of 40 responding importers,

accounting for [      ] percent of reported subject import volume during the POI.  CR at Table IV-

1.  Moreover, Mexichem compares the AUV of direct imports by these importers not to the AUV

of domestic producer sales of product 1, but to the AUV of Mexichem's sales of product 1.  *See*

MB at 29-31.  Comparing the AUV of direct imports by these importers to the AUV of all

domestic producer sales of product 1, direct import prices were higher than domestic prices in

[      ] of [      ] annual comparisons during 2011 and 2012.  CR at Table V-3 (the weight-averaged

domestic sales price for product 1 was $[      ] per pound in 2011 and $[      ] per pound in

2012).

In sum, the Commission reasonably predicated its analysis of the correlation between

subject import underselling and market share on the market as a whole.  The Court should

therefore affirm the analysis.

**4.      The Commission Reasonably Found that Domestic Prices Declined Due
            to Cessation of the Shortage**

Plaintiffs raise several unavailing arguments challenging the Commission's finding that

domestic prices declined from levels inflated by the shortage "{a}s the supply situation

normalized in 2012."  Views at 28.  Contesting the Commission's finding that domestic prices

declined whether subject imports undersold or oversold particular products, Mexichem argues

CONFIDENTIAL BUSINESS
INFORMATION DELETED

that the Commission overlooked that [     ] percent of the sales volume of subject imported pricing

product undersold the domestic like product during the POI.  MB at 31.  Chemours charges that

the Commission's finding that subject imports did not significantly depress domestic prices

violates "basic principles of economics."  CB at 24-25.

In arguing that the Commission should have measured the degree of subject import

underselling based on volume rather than quarters of underselling, Mexichem essentially

challenges the Commission's methodology for finding that the prices of domestically-produced

pricing products declined at a similar rate regardless of the degree of subject import underselling.

MB at 31.  Because the Commission methodology was reasonable, however, Mexichem's

argument fails.  *See Whirlpool*, 2013 WL 6980820, at *11.  The Commission has historically

measured the degree of subject import underselling by comparing the number of quarterly price

comparisons in which subject import underselling occurred to the number of quarterly

comparisons in which subject import overselling occurred.  This Court has repeatedly affirmed

this approach, and held that "the {ITC} is not obligated to conduct a price comparison analysis

that accounts for variations in sales volumes."  *Nucor*, 28 CIT at 246, 318 F. Supp. 2d at 1257

(quoting *Nippon Steel*, 182 F. Supp. 2d at 1341); *see also Shandong*, 774 F. Supp. 2d at 1327-29;

*Metallverken Nederland*, 13 CIT at 1024, 728 F. Supp. at 739.  The Court should do so here as

well.

Mexichem's argument is also unpersuasive because the Commission's analysis holds true

whether underselling is measured using quarterly comparisons or sales volume.  Relying on

quarterly comparisons, the Commission found that domestic prices declined at a similar rate for

product 1, which subject import oversold in most comparisons; product 4, which subject imports

undersold in most comparisons; and products 5, 6, and 7, which had mixed patterns of quarterly

CONFIDENTIAL BUSINESS
INFORMATION DELETED

underselling and overselling.  Views at 29.  Subject import underselling was similar in terms of

sales volume: most subject import sales of product 1 oversold the domestic like product ([     ]

percent), most subject import sales of product 4 undersold the domestic like product ([     ]

percent), a majority of sales of subject imports of products 5 and 7 oversold the domestic like

product ([     ] percent and [     ] percent, respectively), and a majority of sales of subject

imports of product 6 undersold the domestic like product ([     ] percent).  CR at Tables V-3, 6-

9.  Thus, whether underselling is measured in terms of quarters or volume, substantial evidence

supported the Commission's finding that domestic prices declined at a similar rate whether

subject imports undersold or oversold particular products.

    Similarly unavailing is Chemours' argument that the Commission somehow violated

economic principles in finding no correlation between subject imports and declining prices.  CB

at 24-25.  Under the guise of "elementary economics," Chemours essentially argues for a *per se*

rule that a significant volume of subject import underselling in the market for a substitutable

good requires the Commission to make an affirmative determination.  *See id.* at 25.  Rejecting

plaintiffs' argument for a similar *per se* rule in *JMC*, the court reasoned that "{t}he court has

repeatedly held that 'underselling combined with increasing import volumes does not

'necessarily indicate{} injury due to pricing in cases involving fungible products.'"  *JMC*, 24 F.

Supp. 3d at 1303 (citing *Coal. for Pres. of Am. Brake Drum & Rotor Aftermkt. Mfrs. v. United

States,* 22 CIT 520, 527–28, 15 F.Supp.2d 918, 925 (1998) (brackets in original) (quoting *USX

Corp. v. United States,* 12 CIT 844, 849, 698 F.Supp. 234, 239 (1988)).  In this case, the

Commission recognized that subject imports were highly substitutable for the domestic like

product and that price was an important factor in purchasing decisions, Views at 19-20, but

reasonably explained that cessation of the shortage rather than subject imports accounted for the

34

decline in domestic prices during the POI.  *Id.* at 28-29.  The Court should reject Chemours'
request that a *per se* rule be substituted for the Commission's reasoned analysis.

 Chemours is also incorrect that the Commission somehow "affirm{ed} the link between
domestic price levels and the rising supply of R-134a . . . including Chinese imports" by
attributing "the decline in prices during the POI" to "cessation of the supply shortages."  CB at
26.  Although the Commission found that subject imports were pulled into the U.S. market by
the shortage, and that resolution of the shortage resulted in declining domestic prices, it does not
follow that subject imports depressed domestic prices to a significant degree, as Chemours
claims.  As the Commission explained, the shortage, not subject import underselling, accounted
for the increase in subject import volume between 2011 and 2012, and cessation of the shortage,
not subject import underselling, accounted for the decline in domestic prices.  *See* Views at 21-
24, 28-29.  Having found that these trends resulted from the shortage rather than from subject
import underselling, the Commission reasonably concluded that subject imports did not depress
domestic prices to a significant degree, consistent with its obligation to "ensure that it is not
attributing injury from other sources to the subject imports."  Statement of Administrative Action
for the Uruguay Round Agreements Act, H.R. Rep. No. 103-316, vol. I at 851-52 (1994).  The
Court should therefore reject Chemours' effort to attribute the effects of the shortage and its
alleviation to subject import underselling.

 Chemours further argues that the Commission ignored certain evidence that in its view
established a link between subject import underselling and declining domestic prices.  CB at 30-
31.  Here again, Chemours invites the Court to reweigh evidence that the Commission
reasonably considered.  Chemours argues that the Commission attached insufficient weight to
evidence that domestic producer prices declined more for pricing products facing subject import

CONFIDENTIAL BUSINESS
INFORMATION DELETED

competition than for the one product with no subject import competition.  *Id.* at 30.  As the

Commission explained, however, domestic prices declined whether subject imports undersold or

oversold a particular product and "whether subject imports were present in the market for a

particular product."  Views at 29.  Thus, the Commission considered the decline in the domestic

price of the product for which there was no subject import competition and reasonably explained

how the decline supported its conclusion that subject imports did not depress domestic prices to a

significant degree.

Chemours also claims that, in finding a mixed pattern of underselling and overselling by

subject imports, the Commission attached insufficient weight to evidence that [    ] percent of

reported subject import sales volume undersold the domestic like product.  CB at 30-31.[9]  As

already discussed, however, the Commission reasonably relied on its traditional methodology,

counting quarters of underselling and overselling, and "{was} not obligated to conduct a price

comparison analysis that accounts for variations in sales volumes."  *Nucor*, 28 CIT at 246, 318 F.

Supp. 2d at 1257 (citation omitted).  Furthermore, the Commission expressly recognized that the

quantity of undersold subject imports was [          ] larger than the quantity of oversold

subject imports, Views at 26, but reasonably found that the "significant quantities of subject

imports that undersold the domestic like product during each year of the POI" did not correlate to

subject import market share shifts.  *Id.* at 27.  Notwithstanding these significant quantities of

undersold subject imports, the Commission explained, the only gain in subject import market

share occurred between 2011 and 2012, due to the shortage.  *Id.*

---

[9] Chemours also argues that the Commission's finding of mixed underselling and overselling
was erroneously based on its refusal to collect direct import pricing data on product 1.  CB at 30.
As already discussed, however, the Commission reasonably and lawfully chose not to collect or
rely on direct import pricing data because these data were at a different level of trade than
domestic producer sales to unrelated U.S. customers.

CONFIDENTIAL BUSINESS
INFORMATION DELETED

Finally, Chemours mistakenly argues that the Commission attached insufficient weight to confirmed lost sales and revenue allegations, given that the dollar amount of the allegations amounted to [  ] percent of industry sales in 2013 and [                                              ] that year.  CB at 31.  This Court has recognized that "'lost sales alone do not mandate an affirmative finding of injury; rather the Commission must determine whether lost sales, together with other factors, indicate a causal nexus between the imports at less than fair value and material injury to the domestic industry.'"  *GEO Specialty Chemicals, Inc. v. United States*, 33 CIT 125, 132-22 (2009) (quoting *Maverick Tube Corp. v. United States*, 12 CIT 444,449, 687 F.Supp. 1569, 1575 (1988)).  In this case, the Commission expressly considered confirmed lost sales and revenues, as Chemours concedes, and found that they did "not outweigh the other data in the record which, taken as a whole, show the lack of significant price effects."  Views at 31 n.132.  As the Commission explained, subject import underselling was mixed and did not correlate with subject import market share shifts; domestic prices declined due to cessation of the shortage, and regardless of whether subject imports undersold or oversold particular products; and declining prices from cessation of the shortage caused the industry's COGS to net sales ratio to increase, notwithstanding the industry's stable COGS.  *See id.* at 25-30.  The Commission's finding that confirmed lost sales and revenue allegations were outweighed by other evidence was therefore reasonable and should be affirmed.

Chemours' effort to inflate the importance of confirmed lost sales and revenues by comparing them to industry sales and operating income in 2013 is also misinformed.  Confirmed lost sales and revenues allegations were not concentrated in 2013, as Chemours suggests, but spread across the POI.  *See* CR at Tables V-13-14.  Such allegations ($[          ]) amounted to only [    ] percent of domestic industry sales during the POI ($[              ]) and were

37

substantially lower than the industry's operating income in 2011 ($[          ]) and 2012

($[          ]).  *Id.* at Table D-1.  Moreover, [     ] percent of confirmed lost sales and [     ]

percent of confirmed lost revenues occurred in 2011 and 2012, *see id.* at Tables V-13-14, when

the industry's operating income margins were [     ] percent and [     ] percent, respectively.  *Id.*

at Table D-1.  Thus, Chemours' argument overstates the magnitude of confirmed lost sales and

revenues and their relationship with the domestic industry's financial performance.

### C.      The Commission's Impact Analysis Was Reasonable

#### 1.      The Commission's Impact Analysis Should Be Sustained

In analyzing impact, the Commission found that largely stable demand during the POI

was reflected in the relatively stable performance of the domestic industry according to most

measures, including capacity, capacity utilization, production, U.S. shipments, market share,

employment, wages paid, hours worked, productivity, and net sales quantity.  Views at 32-34.

The industry's market share was only slightly lower in 2013 than in 2011, the Commission

explained, because the industry offset market share lost in the aftermarket segment with market

share gains in the "other refrigerants" application, despite subject import competition.  *Id.* at 33.

The Commission recognized that the domestic industry suffered a severe decline in

operating income during the POI, as the domestic industry's net sales revenues declined more

rapidly than the industry's COGS.  *Id.* at 34-35.  As the Commission explained, however, the

industry's financial performance declined during the POI as prices that had been anomalously

high due to the shortage in 2010 and 2011 began to return to pre-shortage levels as the market

stabilized in 2012 and 2013.  *Id.* at 36.  By contrast, the Commission observed that subject

imports had no significant price effects, and found no correlation between the domestic

industry's declining financial performance and subject import volume and market share.  *Id.*  The

CONFIDENTIAL BUSINESS
INFORMATION DELETED

Commission also noted that the industry's operating income margin declined from [     ] percent

in interim 2013 to [               ] percent in interim 2014, even though the domestic industry

gained market share from subject imports and subject import prices increased during the period.

*Id.* at 35 n.148.  Because the Commission's impact analysis was reasonable, the Court should

affirm it.

> **2.     The Commission Reasonably Found that the Domestic Industry's
> Declining Financial Performance Resulted from Cessation of the
> Shortage**

In challenging the Commission's impact analysis, Mexichem argues that the Commission

erred by ignoring the increase in the domestic industry's COGS to net sales ratio between 2010

and interim 2014, which in its view showed injury by reason of subject imports.  *See* MB at 18-

20, 36-38.   Similarly, Chemours argues that the Commission erred in allegedly finding that

domestic prices returned "to normal" in 2013 because, in its view, the decline in domestic prices

to below cost by interim 2014 could not be considered normal.  CB at 27.

Contrary to Mexichem's argument, the Commission reasonably defined the POI for the

final phase of the investigations as 2011-13 and the first halves of 2013 and 2014, consistent

with its normal practice.  *See Nitrogen Solutions Fair Trade Comm. v. United States*, 29 CIT 86,

97, 358 F. Supp. 2d 1314, 1325 (2005) ("the ITC's broad discretion in choosing the time frame

for its investigation and analysis has consistently been upheld").  It was for this period that the

Commission's questionnaires collected extensive data on subject imports, pricing product sales

data, and domestic industry performance.[10]  Thus, the Commission reasonably relied on POI data

---

[10] In its comments on the draft questionnaires, Mexichem did not request that the Commission
expand the POI to include 2010 and collect data covering 2010.  *See* Mexichem's Comments (1-
69).

to conduct its injury analysis, while considering the shortage that began in 2010 as an important

condition of competition.

Additionally, the Commission reasonably focused on 2011-13 data for its analysis of

trends in the domestic industry's COGS to net sales ratio.  Views at 30, 34.  As an initial matter,

the Commission found that the pendency of the investigations affected subject import volume in

interim 2014, and therefore exercised its discretion under 19 U.S.C. § 1677(7)(I) to accord less

weight to interim 2014 data.  Views at 21 n.90.  Plaintiffs do not challenge the Commission's

decision to do so.

Furthermore, the Commission had no reliable means of comparing the domestic

industry's COGS to net sales ratio in 2010 with that in interim 2014 because domestic producers

reported markedly different net sales, COGS, and operating income in the preliminary

investigations than in the final investigations.  *Compare* PCR at Table VI-1 (2-106) *with* CR at

Tables VI-1 and D-1.  These disparities presumably resulted from the much shorter deadlines for

completing questionnaire responses in preliminary investigations, which are limited by statute to

45 days.  19 U.S.C. §§ 1671b(a)(2), 1673b(a)(2).  Regardless of the reason, however, the

Commission was not in a position to reliably compare the domestic industry's COGS to net sales

ratios in 2010 and interim 2014, having not collected industry data for 2010 in the final

investigations.

Even if it were appropriate for the Commission to compare interim 2014 data with 2010

data from the record of the preliminary investigations, which is not the case, Mexichem's

argument that these data establish material injury by reason of subject imports is yet another

invitation for the Court to reweigh the evidence.  Mexichem claims that subject imports had to

have contributed to the domestic industry's declining operating income during the POI because

40

CONFIDENTIAL BUSINESS
INFORMATION DELETED

[

                                                              ].  MB at 5-6, 37-38.  As the Commission

explained, however, domestic prices were inflated by the supply shortage in both 2010 and 2011,

meaning that the AUV of the domestic industry's net sales in 2010 was much higher, and the

industry's COGS to net sales ratio much lower, than it would have been in the absence of the

shortage.  Views at 18, 28 & n.117, 36.  Indeed, the weight-averaged AUV of domestic producer

sales of the pricing products increased [      ] percent between the first and second quarters of

2010 and [      ] percent between the second and third quarters of 2010, ending the year [      ]

percent higher than when the year began.  *See* Dougan Hearing Exhibits at 1 (1-150), cited in

Views at 28 n.117.  Thus, the record contradicts Mexichem's suggestion that the AUV of the

domestic industry's net sales declined from normal levels in 2010 to suppressed levels in interim

2014 due to subject import competition.  Indeed, the Commission's finding that the domestic

industry's COGS to net sales ratio increased during the 2011-13 period as domestic prices

declined from the inflated levels that prevailed during the shortage, Views at 30, would also

explain the increase in the industry's COGS to net sales ratio between 2010 and interim 2014.

     Mexichem's argument also conflicts with the Commission's finding – supported by

substantial evidence – of no correlation between the domestic industry's operating performance

and subject import volume and market share during the POI.  *Id.* at 36.  The record showed that

the only increase in subject import volume and market share occurred between 2011 and 2012,

CR at Table IV-6, yet the domestic industry's operating income margin was a not inconsiderable

[      ] percent in 2012.  *Id.* at Table D-1.  Although subject import volume and market share

were slightly lower in 2013 than in 2012, *id.* at Table IV-6, the domestic industry's operating

income margin declined [      ] to [      ] percent that year.  *Id.* at Table D-1.  As the

CONFIDENTIAL BUSINESS
INFORMATION DELETED

Commission also noted, the domestic industry's operating performance continued to worsen during the interim period even though subject import volume and market share was lower in interim 2014 than in interim 2013, and subject import prices higher.  Views at 35 n.148.  Indeed, subject import market share was little higher in interim 2014 ([     ] percent) than in 2011 ([     ] percent), when the domestic industry's operating income margin was [     ] percent.  CR at Table D-1.  The same absence of correlation was evident during the 2010-11 period, when the domestic industry's operating income margin increased from [     ] percent to [     ] percent even as subject import market share [          ] from [    ] percent to [     ] percent.  *See* PCR at Tables IV-4 and VI-1 (2-106).  Given this, the absence of any correlation between subject import underselling and either market share shifts or domestic price declines, Views at 27-29, and the inflated domestic prices that resulted from the shortage during 2010-11, *id.* at 28 & nn.117-18, the Commission reasonably concluded that the domestic industry's declining operating income during the POI resulted from resolution of the shortage rather than subject imports.  *Id.* at 36.

Similarly unavailing is Chemours' challenge to what it characterizes as the Commission's finding that "falling prices in 2013 represented a return to 'normal,'" on grounds that "a fall in market prices to below cost levels" is not a "return to 'normal.'"  CB at 27.  In actuality, the Commission did not find that domestic prices "returned to normal" in 2013, but only that domestic "price declines occurred because prices were anomalously high at the beginning of the POI . . . and began to return to their pre-shortage levels as the market stabilized in 2012 and 2013."  Views at 36.  Consistent with this finding, the record showed that the weight-averaged AUV of domestic producer pricing product sales declined from a period high in the second quarter of 2011 to around the level that prevailed in the first quarter of 2010, before

CONFIDENTIAL BUSINESS
INFORMATION DELETED

the shortage began, in interim 2014.  *See* Dougan Hearing Exhibits at 1 (1-150), cited in Views at 28 n.117.

Furthermore, the Commission expressly declined plaintiffs' invitation to speculate as to whether prices were returning to their "natural equilibrium."  Views at 30 n.130.  As the Commission explained, "we have not purported to compute such prices" because "the statute does not refer to 'equilibrium' prices" but rather "directs {the Commission} to ascertain whether the effect of subject imports is to depress prices to a significant degree."  *Id.* at 30 n.130 (citing 19 U.S.C. § 1677(7)(C)(ii)(II).  Because substantial evidence supported the Commission's finding that cessation of the shortage rather than subject imports explained the industry's financial trends, the Court should affirm it.

### 3.    The Commission Reasonably Considered Subject Import Inventories

Chemours also claims, incorrectly, that the Commission "did not even begin" to analyze subject import inventories, which in its view caused an "inventory overhang" that adversely affected domestic prices.  *See* CB at 23-24.  On the contrary, the Commission expressly considered such inventories and reasonably concluded that "any inventory buildup did not persist after the end of 2013."  Views at 40.  Consistent with this finding, the record showed that importers' inventories of subject imports as a share of their U.S. shipments increased from [      ] percent in 2011 to [      ] percent in 2013 before declining to [      ] percent in interim 2014.  CR at Table VII-3.  That the Commission considered subject import inventories as part of its threat analysis, as required under 19 U.S.C. § 1677(7)(F)(i)(V), rather than as part of its material injury analysis, is immaterial.  The Commission is presumed to have considered all evidence relevant to its determination, *Nucor Corp. v. United States*, 28 CIT 188, 233-34, 318 F. Supp. 2d 1207, 1247 (2004), *aff'd* 414 F.3d 1331 (Fed. Cir. 2005), and it is clear from the Commission's analysis of

43

CONFIDENTIAL BUSINESS
INFORMATION DELETED

subject import inventories in the threat context why the Commission did not deem it necessary to address this factor explicitly in its material injury analysis.

The Commission also considered Mexichem's argument that "abnormally high inventories" in interim 2014 resulted in "record low" subject import prices – an argument similar to the one advanced by Chemours on appeal – and reasonably rejected the argument. *See* Views at 35 n.148. As the Commission explained, Mexichem provided no evidence to support its assertion that importers "desperate to unload those inventories . . . would have offered record low prices" during interim 2014 and the record contradicted the assertion, showing that subject import prices generally increased during the period. *Id.* Indeed, the record showed that the highest level of subject import inventories during the POI, at the end of 2013, was followed by an increase in subject import sales prices for five of six pricing products between the first and second quarters of 2014 (products 1, 4, 5, 6, and 7). CR at Tables V-3-9, VII-3. Because the Commission's analysis of this issue was reasonable, the Court should affirm it.

That Chemours can cite two previous determinations in which the Commission found a deleterious "inventory overhang" proves nothing, Chemours Br. at 23-24, because each Commission determination is *sui generis*. *See*, *e.g.*, *Cleo Inc. v. United States*, 501 F.3d 1291, 1299 (Fed. Cir. 2007). Moreover, these determinations are readily distinguishable. In *Certain Steel Grating from China*, Inv. Nos. 701-TA-465 and 731-TA-1161 (Final), USITC Pub. 4168 (July 2010) at 18, the Commission found that large subject import inventories "were worked off in 2009, severely limiting the domestic industry's ability to gain sales in the market place," causing the industry's U.S. shipments to decline 26.1 percent between 2008 and 2009. *Id.* at Table IV-3. In this case, by contrast, the domestic industry's U.S. shipments were stable between 2012 and 2013 and [     ] percent higher in interim 2014 than in interim 2013,

CONFIDENTIAL BUSINESS
INFORMATION DELETED

notwithstanding subject import inventories.  CR at Table IV-6.  Thus, there was no evidence that

subject import inventories prevented the domestic industry from gaining sales, as they had in

*Steel Grating*.

In *Certain Orange Juice from Brazil*, the Commission found that the "inherent volatility"

of round orange supplies prompted domestic producers of orange juice to maintain "relatively

large bulk juice inventories," representing "approximately one-half of domestic production in

any given crop year."  Investigation No. 731-TA-1089 (Final), USITC Pub. 3838 (Mar. 2006) at

15.  The Commission also found that the near doubling of subject import inventories between

crop years 2003/04 and 2004/05, the last year of the POI, suppressed prices for the domestic like

product.  *Id.* at 20-21, 24.  In this case, by contrast, domestic producer inventories ranged from

[     ] to [     ] percent of domestic production during the POI, CR at Table III-9, and subject

import inventories increased only [     ] percent between 2012 and 2013 and were [     ] percent

lower in interim 2014 than in interim 2013.  *Id.* at Table VII-3.  Inventories were simply not as

significant a condition of competition in this case as they were in *Orange Juice*, contrary to

Chemours' argument.

### D.     The Court Should Sustain the Commission's Threat Analysis

Chemours argues that the Court should remand the Commission's threat analysis because

the analysis is based on what Chemours views as the Commission's erroneous material injury

analysis, including the Commission's findings that subject imports increased due to the shortage

and had no significant price effects.  *See* CB at 33-34.  As discussed above, however, the

Commission's injury analysis was supported by substantial evidence and in accordance with law,

and should therefore be affirmed.  Given this, and plaintiffs' failure to allege any flaws in the

Commission's actual threat analysis, the Court should affirm that analysis as well.  28 U.S.C. §

2639(a)(1) (the Commission's determinations are presumed to be correct and the burden is on the party challenging the determination to demonstrate otherwise).

**V.     CONCLUSION**

For the foregoing reasons, the Court should affirm the Commission's negative determinations for R-134a from China.

Respectfully submitted,

\s\ Dominic L. Bianchi
Dominic L. Bianchi
General Counsel

\s\ Andrea C. Casson
Andrea C. Casson
Assistant General Counsel for
Litigation

\s\ Karl S. von Schriltz
Karl S. von Schriltz
Attorney-Advisor

\s\ Nataline Viray-Fung
Nataline Viray-Fung
Attorney-Advisor
Office of General Counsel
U.S. International Trade Commission
500 E Street, S.W.
Washington, D.C. 20436
(202) 205-2657
*Counsel for Defendant*
*U.S. International Trade Commission*

November 13, 2015

**CERTIFICATE OF SERVICE**

I, Karl S. von Schriltz, hereby certify under penalty of perjury that on this 13th day of

November 2015, I am electronically filing the attached **DEFENDANT INTERNATIONAL**

**TRADE COMMISSION'S OPPOSITION TO PLAINTIFFS' MOTIONS FOR**

**JUDGMENT ON THE AGENCY RECORD**.  I understand that notice of this filing will be

sent to all parties by operation of the Court's electronic filing system.  Parties may access this

filing through the Court's system.

/s/ Karl S. von Schriltz
Karl S. von Schriltz
Attorney-Advisor
Office of the General Counsel
U.S. International Trade Commission
500 E Street, SW
Washington, DC 20436
Telephone: (202) 205-3096
Facsimile: (202) 205-3111
Karl.vonschriltz@usitc.gov

## CERTIFICATE OF COMPLIANCE

Pursuant to Chambers Procedures 2(B)(1) and (2), I hereby certify that the attached brief contains 13,911 words, according to the word-count function of the word processing system used to prepare this brief (Microsoft Word 2010).

Dated: November 13, 2015                    /s/ Karl S. von Schriltz
                                            Karl S. von Schriltz