IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:  THE HONORABLE LEO M. GORDON

|  |  |
|---|---|
| MEXICHEM FLUOR, INC. AND<br>E.I. DU PONT DE NEMOURS AND COMPANY<br><br>                Consol. Plaintiffs,<br><br>           v.<br><br>UNITED STATES,<br><br>                Defendant.<br><br>       and<br><br>SINOCHEM ENVIRONMENTAL PROTECTION<br>CHEMICALS (TAICANG) CO., LTD., ZHEJIANG<br>QUHUA FLOUR-CHEMISTRY CO., LTD. AND<br>ZHEJIANG SANMEI CHEMICAL INDUSTRY CO.<br><br>             Defendant-Intervenors. | Consol. Court. No. 15-00004<br><br>**PUBLIC VERSION** |

**REPLY BRIEF OF THE CHEMOURS COMPANY**
**(SUCCESSOR-IN-INTEREST TO E.I. DUPONT DE NEMOURS AND COMPANY)**

James R. Cannon, Jr.
Jonathan M. Zielinski
Ulrika K. Swanson
CASSIDY LEVY KENT (USA) LLP
2000 Pennsylvania Avenue N.W., Suite 3000
Washington, D.C. 20006
(202) 567-2300

January 22, 2016

PUBLIC VERSION

## Table of Contents

Page

I.   The Commission and Sinochem Rely on Incomplete Analysis of the Record and Post Hoc Rationalization ...................................................................................1

II.  The Commission Offers No Reasonable Justification for Failing to Collect Pricing Data with Respect to Direct Imports by Repackagers ........................................4

   A.   The Direct Import Pricing Data Were Material to the Commission's Analysis .....................................................................................................4

   B.   The Record Contradicts the Claim that Direct Import Prices and Direct Prices from Domestic Producers Were Somehow at Different Levels of Trade .......................................................................................................6

   C.   Past Commission Precedent Required Collection of Pricing Data at the Point of Competition Between Domestic and Imported Products for Sales to Arms-Length Customers..................................................................8

   D.   The Commission's Failure to Explain its Decision to Not Collect Data Regarding the Price of Direct Shipments to Retailers Was Contrary to Law........10

III. The Statute Required the Commission to Consider Whether the Prices of Chinese Imports Had an Adverse Impact on the Domestic Industry Apart from any Change in Market Share Impacted by the Supply Shortage .........................................10

IV.  The Commission's Response Brief Rests on Incomplete and Inconsistent Analysis of the Record Evidence.................................................................................13

   A.   Having Found that Imports were Largely Confined to the Automotive Aftermarket, the Commission Cannot Rationally Ignore the Impact of Imports in that Segment...................................................................13

   B.   Having Relied so Heavily on the Trend in Import Market Share in 2013, the Commission Fails to Justify Its Refusal to Consider the Evidence Concerning Inventory Levels and Shipments of Imports from Inventory.............15

      1.   The Commission fails to justify its reliance on import data in lieu of other record evidence .........................................................15

      2.   The Commission likewise offers no basis for its treatment of [   ] import inventories in 2012......................................................16

PUBLIC VERSION

**3.** The Commission's arguments concerning domestic capacity are based on speculation, not record evidence...................................17

**C.** The Commission's Analysis of Import Prices Otherwise Ignored Record Evidence without Justification.............................................................18

**V.** Conclusion .........................................................................................................20

PUBLIC VERSION

## Table of Authorities

Page(s)

Statutes

19 U.S.C. § 1516a(b)(1)(B)(i) ................................................................................2, 3

19 U.S.C. § 1677(7)(C)(i) ................................................................................10

19 U.S.C. § 1677(7)(C)(ii) ...............................................................................10


Court Decisions

*Altx, Inc. v. United States*, 25 C.I.T. 1100; 167 F. Supp. 2d 1353 (2001) .............................2, 3, 4

*Am. Bearing Mfrs. Ass'n v. United States*, 28 CIT 1698, 1700, 350 F. Supp.
2d 1100 (2004).................................................................................................1

*BIC Corp v. United States*, 21 CIT 448, 461, 964 F. Supp 391(1997) ..........................................16

*Bowman Transportation, Inc. v. Arkansas-Best Freight Systems, Inc.*, 419
U.S. 281 (1974) ...............................................................................................3

*Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156 (1962) .............................................3

*Chung Ling Co., Ltd. v. United States*, 16 CIT 636, 640, 805 F. Supp. 45  (1992) .......................4

*CS Wind Vietnam Co. v. United States*, 971 F. Supp. 2d 1271 (Ct. Int'l
Trade 2014) ...................................................................................................14

*Diamond Sawblades Manufacturers Coalition v. United States*, 32 C.I.T.
134 (Ct. Int'l Trade, 2008) ............................................................................4, 10

*JMC Steel Group v. United States*, 24 F. Supp. 3d 1290 (Ct. Int'l Trade 2014) .........................13

*Matsushita Elec. Indus. v. United States*, 750 F.2d 927 (Fed. Cir. 1984)) .....................................1

*Nippon Steel Corp. v. United States*, 458 F.3d 1345 (Fed. Cir. 2006)  ............................................2

*NSK Corp. v United States*, 32 CIT 966, 983, 577 F. Supp. 2d 1322 (2008) ...............................14

*Sucocitrico Cutrale Ltda. v. United States*, 34 Int'l Trade Rep. (BNA) 1670
(Ct. Intl. Trade 2012) ....................................................................................2

*Swiff-Train Co., Metropolitan Hardwood Floors, Inc. v. United States,* 904
F. Supp. 2d 1336 (Ct. Int'l Trade 2013) .................................................11

*Timken Co. v. United States*, 20 CIT 1115, 937 F. Supp. 953 (1996) .............................................3

*USX Corp. f/k/a/ United States Steel Corp. v. United States*, 11 CIT 82; 655
F. Supp. 487(Ct. Int'l Trade 1987) ...................................................18


Administrative Determinations

*Boltless Steel Shelving Units Prepackaged for Sale from China*, Inv. Nos.
701-TA-523 and 731-TA-1259 (Final), USITC Pub. 4565 (Oct. 2015)....................................8, 9

*Grain-Oriented Electrical Steel from Germany, Japan, and Poland*, Inv.
Nos. 731-TA-1233, 1234, and 1236 (Final), USITC Pub. 4491 (Sept. 2014)................................9

*Certain Large Residential Washers from Korea and Mexico,* Inv. Nos. 701-
TA-488 and 731-TA-1199-1200 (Final), USITC Pub. 4378 ........................................6

*Certain Steel Grating from China,* Inv. Nos. 701-TA-465 and 731-TA-1161
(Final), USITC Pub. 4168 (July 2010) ..................................................11

*Certain Tow-Behind Lawn Groomers and Parts Thereof from China,* Inv.
Nos. 701-TA-457 and 731-TA-1153 (Final), USITC Pub. 4090 (July 2009) ..............................9

*Chlorinated Isocyanurates from China and Spain,* Inv. Nos. 731-TA-1082
and 1083 (Final) USITC Pub. 3782 (June 2005) ..................................................9

*Purified Carboxymethylcellulose from Finland, Mexico, Netherlands, and
Sweden*, Inv. Nos. 731-TA-1084-1087 (Final), USITC Pub. 3787 (June 2005) ..........................9

*Sugar from Mexico*, Inv. Nos. 704-TA-1 and 734-TA-1 (Review), USITC
Pub. 4523 (April 2015)..................................................8, 9

*Sulfur Dyes from China and the United Kingdom*, Inv. Nos. 731-TA-548
and 551 (Final), USITC Pub. 2602 (Feb. 1993) ..................................................6


Other

S. Rep. No. 249 (1979) ..................................................13

H.R. Rep. No. 96-347 (1979)..................................................11

iv.

PUBLIC VERSION

## REPLY BRIEF OF THE CHEMOURS COMPANY
## (SUCCESSOR-IN-INTEREST TO E.I. DUPONT DE NEMOURS AND COMPANY)

On behalf of The Chemours Company ("Chemours"), successor-in-interest to E.I. DuPont de Nemours and Company ("DuPont") and Consolidated Plaintiff in this action,[1] we hereby file the following reply to the arguments presented by the U.S. International Trade Commission ("Commission") and Sinochem Environmental Protection Chemicals (Taicang) Co., Ltd., *et al.* ("Sinochem"), in their respective response briefs dated November 13, 2015. Both Chemours and Mexichem Fluor, Inc. filed motions for judgment on the record pursuant to Rule 56.2. Although Chemours fully supports the motion filed by Mexichem, Chemours does not address in this brief arguments by the Commission that pertain only to points raised by Mexichem.

I.     THE COMMISSION AND SINOCHEM RELY ON INCOMPLETE ANALYSIS OF THE RECORD
       AND POST HOC RATIONALIZATION

First, there is no debate that the court should not "reweigh the evidence" or substitute its judgment for that of the Commission. *See Am. Bearing Mfrs. Ass'n v. United States*, 28 CIT 1698, 1700, 350 F. Supp. 2d 1100, 1104 (Ct. Int'l Trade 2004) (quoting *Matsushita Elec. Indus. v. United States*, 750 F.2d 927, 933 (Fed. Cir. 1984)) (the court's function "is not to reweigh the evidence but rather to ascertain 'whether there was evidence which could reasonably lead to the {agency's} conclusion'"). At the same time, however, the Court's analysis takes into account the whole record. "When reviewing agency determinations, findings, or conclusions for substantial

---

[1] As of July, 2015, the DuPont Performance Chemicals business was spun-off into a new company, *i.e.*, Chemours, which is now the real party in interest in this proceeding. *See* Amended Corporate Disclosure Statement, ECF No. 29.

PUBLIC VERSION

evidence, this Court determines whether the agency action is reasonable in light of the entire record." *Sucocitrico Cutrale Ltda. v. United States*, 34 Int'l Trade Rep. (BNA) 1670, Slip Op. 2012-71 (2012) (*citing Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1350-51 (Fed. Cir. 2006)). To be supported by "substantial evidence" means that the Commission's determination is a reasonable one based on the record as a whole and not on a portion of the record or facts analyzed out of context.

Second, the Commission's discretion is not unlimited. The core function of judicial review is to determine whether the Commission's decision is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). Specifically, in this case, the Commission has argued that it need not collect pricing data with respect to the product that accounts for the [            ] of the subject imports. Response Brief of the International Commission ("ITC Br."), ECF No. 38 at 21. Similarly, the Commission argues that it has discretion to disregard information submitted by the domestic industry showing that such direct imports [            ] domestic producer prices by [            ]. *Id*. at 23. (discussing AUV data). And, the Commission asserts that it has discretion to calculate "consumption" using import data that reflect imports still in inventory and not yet shipped for consumption. *Id*. at 14. Yet, the courts have held that the Commission's discretion does not excuse the failure to build an adequate record concerning major issues, timely raised, and material to the outcome of the case. In justifying its determination, the Commission "must address significant arguments and evidence which seriously undermines its reasoning and conclusions," *Altx, Inc. v. United States*, 25 CIT 1100, 1117-18, 167 F. Supp. 2d 1353, 1374 (Ct. Int'l Trade 2001), and must articulate a "rational connection between the facts found and the choice made." *Bowman*

PUBLIC VERSION

*Transportation, Inc. v. Arkansas-Best Freight Systems, Inc.,* 419 U.S. 281, 285 (1974) (quoting

*Burlington Truck Lines, Inc. v. United States,* 371 U.S. 156, 168 (1962)).

Third, a key corollary to the standard of review under Section 1516a(b)(1)(B)(i), is that the

Court reviews the Commission determination based on the reasons articulated by the Commission,

not post hoc arguments by counsel. "Where an explanation is lacking on the record, post hoc

rationalization for the {Commission's} action is insufficient." *Timken Co. v. United States*, 20

CIT 1115, 1118, 937 F. Supp. 953, 955 (Ct. Int'l Trade 1996); *see also Altx,* 25 CIT at 1103, 167

F. Supp. 2d at 1369 ("The court restricts its review to matters found in the Final Determination and

therefore does not consider such post hoc rationales for an agency's decision"). Here, for example,

the Commission majority found that Chinese imports had no impact on U.S. producer prices

because underselling by imports did not "correlate" with a change in market share due to the

supply shortage. Yet, the Commission's counsel now argues that this finding "was but one of

several findings supporting its conclusion…." ITC Br. at 18. Absent any reference to such

"findings" in the Commission's own opinion, counsel's argument is not sufficient to sustain the

determination.

Each of these principles is applied below to demonstrate that the Commission's response

brief rests on record evidence taken out of context, overbroad entreaties to agency discretion, and

arguments not made by the Commission itself.

PUBLIC VERSION

II.    THE COMMISSION OFFERS NO REASONABLE JUSTIFICATION FOR FAILING TO
       COLLECT PRICING DATA WITH RESPECT TO DIRECT IMPORTS BY REPACKAGERS

      A.    The Direct Import Pricing Data Were Material to the Commission's
             Analysis

The Commission's discretion to conduct an investigation is not unlimited. The agency has

the legal obligation to build a sufficient factual record. *See Chung Ling Co., Ltd. v. United States*,

16 CIT 636, 640, 805 F. Supp. 45, 49 (Ct. Int'l Trade 1992) (although the Commission is not

required to "amass every conceivable shred of evidence," it must collect relevant information

needed for a "thorough analysis"). This obligation exists when the issue is material to the final

determination and is timely raised. *See Altx,* 25 CIT at 1103; 167 F. Supp. 2d at 1359 (the ITC

must address possibly conflicting evidence brought to its attention by an interested party).

Although there is "no minimum standard set by Congress," "the Commission is not without

responsibility to procure relevant evidence." *Diamond Sawblades Manufacturers Coalition v.*

*United States,* 32 C.I.T. 134, 148 (Ct. Int'l Trade, 2008).

      Bulk pricing was critical in this investigation because it accounted for [    ] percent of

the dumped imports. Imports by the repackagers amounted to [    ] short tons, or [   ]

percent of total imports from China in 2013.[2] In response, the Commission obscures the facts.

Rather than address the fact that [    ] of the import prices were omitted from the analysis,

the Commission's response brief aggregated all domestic and all import prices and announced that

overall coverage "covered a substantial portion" of the transactions. ITC Br. at 23.

---

[2] [                             ] (showing total direct imports in bulk of [    ] in 2013).
C.R. 297 at IV-12 (showing total subject imports of [   ] in 2013). Note that there is math error
in Chemours Br. at 18. Double checking the source documents just cited indicates that direct
imports were [   ] short tons in 2013, not [   ] short tons. Appendix A includes a
worksheet that shows the calculations for the entire period of review.

PUBLIC VERSION

The pricing tables for product 1 plainly show the problem with the failure to collect direct import data. C.R. 297 at V-7, Table V-3.[3] As shown, the pricing data collected by the Commission, amounted to a total volume of only [      ] short tons[4] in 2013. By comparison, the 2013 imports by repackagers directly from China amounted to [      ] short tons.[5] Thus, the Commission found "mixed" underselling on the basis of a record in which [      ] percent of the imports of the most important product were not reported.

The table below compares the import pricing data actually collected by the Commission for product 1 with the imports reported by the major repackagers importing directly from China, [                              ]. The domestic prices and import prices (excluding direct imports) are given in the ITC staff report, Table V-3. C.R. 297 at V-7. The direct import data are taken from importers' questionnaire responses by the same repackagers.

| Quarterly Pricing Data for Product 1 as Collected by the Commission and Quantity and Value Data Reported by Direct Importers (for which quarterly data were not collected) | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | U.S. Producer | | China Pricing Data Collected by ITC | | | Direct Imports Reported by Purchasers | | |
| | Price ($/lb) | Quantity (lb) | Price ($/lb) | Quantity (lb) | Margin (%) | Price ($/lb) | Quantity (lb) | Margin (%) |
| 2011 | [ | | | | | | | ] |
| 2012 | [ | | | | | | | ] |
| 2013 | [ | | | | | | | ] |
| 6 mos. 2014 | [ | | | | | | | ] |

Source:  Appendix A.

---

[3] Citations are denoted by reference to the document numbers assigned to the Public Record ("P.R.") and Confidential Record ("C.R."), as identified in the Index of the Administrative Record, filed March 23, 2015, in the captioned action.

[4] Converted from pounds.

[5] Converted from pounds.

As shown, the quarterly pricing data for direct imports would be likely to [

] the percentage of total imports covered by the pricing data. At the same time, the

results of the analysis – i.e., the demonstration of underselling – would be [

]. The annual quantity and value data reported by imports suggests that the quarterly

pricing data, had it been collected, would have shown [

] "mixed" underselling as found by the Commission. Thus, this issue would materially

alter the Commission's key findings with respect to underselling.

Moreover, the majority finding that subject imports were "concentrated" in 30-lb. or 12-

ounce containers (Pricing product 4, 5, or 6) is erroneous because the Commission did not account

for R-134a in bulk that were imported by repackagers. P.R. 198 at 17. Ultimately, as a result of the

Commission's failure to collect these prices, the finding that underselling was "mixed" is based on

an inadequate record. Underselling only appears "mixed" because there are [      ] imports of

Pricing Product 1. *See* C.R. 297 at V-6 and V-7.

**B.**   The Record Contradicts the Claim that Direct Import Prices and Direct
        Prices from Domestic Producers Were Somehow at Different Levels of
        Trade

The Commission's own precedent teaches that price comparisons should be made at the

point of competition between subject imports and the domestic industry. *See, e.g., Sulfur Dyes*

*from China and the United Kingdom*, Inv. Nos. 731-TA-548 and 551 (Final), USITC Pub. 2602 at

42 (Feb. 1993) ("we find data regarding prices at the level of sales to end users, which is the

actual point of competition, to be more probative evidence than price comparisons between subject

exports and an artificial transfer price …which may bear limited relevance to the prices quoted in

the end user markets in which the merchandise is actually sold"). *See also, e.g., Certain Large*

PUBLIC VERSION

*Residential Washers from Korea and Mexico,* Inv. Nos. 701-TA-488 and 731-TA-1199-1200

(Final), USITC Pub. 4378 at 64, 92 (Feb. 2013).

Here, questionnaire responses filed by [



].[6] At the same time, [

].[7]

The Commission does not dispute that these importers purchased directly from Chinese

producers and directly from U.S. producers. Nor does the Commission dispute that Chemours

timely requested that the data be collected. Instead, without even having collected direct pricing

data, the Commission asserts that the prices were not at the same level of trade. ITC Br. at 23,

citing P.R. 198 at 29, n.122 (direct import prices "do not include any sales markup that would

typically be made by an importer selling R-134a in the U.S. market"). This argument misses the

point entirely. When domestic producers compete directly with foreign producers to supply bulk

containers to companies that repackage the R-134a into smaller containers, there is no middleman

"importer" involved in the transaction and no "markup" to add. That is, the "actual point of

competition" is found where the domestic producer and the foreign producer compete head to head

for the sales.

---

[6] [

                                                                        ].

[7] [          ] at II-1, 171 at II-1, 172 at II-1, 282 at II-1.

PUBLIC VERSION

Stated differently, the Commission's claim that "{d}omestic producers do not compete with direct import prices for sales to repackagers" is flatly contradicted by the record evidence. ITC Br. at 2. As just discussed, [          ] repackagers purchased directly from domestic producers and from Chinese producers. Moreover, in their lost sales allegations, domestic producers provided details concerning specific instances of head-to-head competition between the domestic industry and the Chinese imports. Domestic producers lost sales to Chinese imports at [

          ]. C.R. 297 at V-28-30. Indeed, [                                        ]. *Id.* at V-28. [

                              ] *Id.* at V-29-30. Given unrebutted evidence that domestic producers and Chinese imports were simultaneously supplying the identical repackagers, there is no basis in the record for the Commission's claim that "{d}omestic producers do not compete with direct import prices for sales to repackagers." ITC Br. at 25.[8]

    **C.**    <u>Past Commission Precedent Required Collection of Pricing Data at the Point of Competition Between Domestic and Imported Products for Sales to Arms-Length Customers</u>

The Commission argues that it merely followed its "normal underselling methodology," which compares resale prices by end-users (re-packagers) with domestic producers' prices for bulk product. ITC Br. at 21. However, the Commission has collected direct to importer prices in many cases when the facts warrant. *See, e.g.*, *Sugar from Mexico*, Inv. Nos. 701-TA-513 and 731-TA-1249 (Final), USITC Pub. 4577 (Nov. 2015) at 28, n. 162; *Boltless Steel Shelving Units Prepackaged for Sale from China*, Inv. Nos. 701-TA-523 and 731-TA-1259 (Final), USITC Pub.

---

[8] Notably, the Commission's response brief provided no record citations to support its level of trade claim.

PUBLIC VERSION

4565 at 18-19 (Oct. 2015); *id.* at 27-29 (separate views by Chairman Broadbent and Commissioner Johanson); *Grain-Oriented Electrical Steel from Germany, Japan, and Poland*, Inv. Nos. 731-TA-1233, 1234, and 1236 (Final), USITC Pub. 4491 at 26-27 & n.150 (Sept. 2014); *id.* at 38-40 (dissenting views of Commissioner Schmidtlein); *Certain Tow-Behind Lawn Groomers and Parts Thereof from China*, Inv. Nos. 701-TA-457 and 731-TA-1153 (Final), USITC Pub. 4090 (July 2009) at 24, n. 157; *Purified Carboxymethylcellulose from Finland, Mexico, Netherlands, and Sweden*, Inv. Nos. 731-TA-1084-1087 (Final), USITC Pub. 3787 (June 2005) at 19 (comparing purchase prices); *Chlorinated Isocyanurates From China and Spain*, Inv. Nos. 731-TA-1082 and 1083 (Final) USITC Pub. 3782 (June 2005) at 29 (same).

In several cases, the Commission has noted the concern that direct import prices might not be directly comparable with domestic prices because of potential differences in the level of trade. *See, e.g., Boltless Steel Shelving Units*, USITC Pub. 4565 at 29. Nevertheless, the Commission collected and analyzed the data because of the significance of the direct imports. For example, in *Sugar from Mexico*, the Commission explained "{w}e have collected data on direct import costs when direct imports are an important factor in the U.S. market, although the weight we accord to them will vary depending on the facts of a particular investigation and the quality of the data." *Sugar from Mexico*, USITC Pub. 4577 at 28, n. 162.

As shown above, the direct import prices were undoubtedly important to the analysis, if only because direct imports accounted for [        ] percent of total imports. Hence, whether or not the level of trade required additional analysis or adjustment, the data should have been collected.

PUBLIC VERSION

**D.**     The Commission's Failure to Explain its Decision to Not Collect Data
Regarding the Price of Direct Shipments to Retailers Was Contrary to Law

Given a material issue on a key statutory factor on which the Commission plainly relied in

its finding, there must at least be evidence collected on the issue. The Commission's insistence that

it "reasonably declined to collect or to rely on direct import price data" is a post-hoc rationalization

that attempts to expound on the footnote in its determination that merely state that direct importer

data does not contain a markup. ITC Br. at 23-24. The extensive explanation offered in its brief

does not appear in the determination, and as such no reasonable explanation was offered by the

Commission for its failure to collect the relevant direct importer data. *See Diamond Sawblades*

*Mfrs. Coalition v. United States*, 32 C.I.T. (Ct. Int'l Trade 2008) ("The court cannot find that this

single footnote, without further explanation, constitutes either "substantial evidence of record" or

"a reasoned explanation" for the ITC's determination").


**III.**     THE STATUTE REQUIRED THE COMMISSION TO CONSIDER WHETHER THE PRICES OF
CHINESE IMPORTS HAD AN ADVERSE IMPACT ON THE DOMESTIC INDUSTRY APART
FROM ANY CHANGE IN MARKET SHARE IMPACTED BY THE SUPPLY SHORTAGE

The Commission does not dispute the language or structure of the statute. ITC Br. at 27-31.

On its face, the statute instructs the Commission to evaluate in every case both the volume and the

price effects of subject imports. 19 U.S.C. §§ 1677(7)(C)(i) and (C)(ii). In considering volume

effects, the Commission must take account of the absolute level and market share held by the

subject imports and increases in either over the period of investigation. 19 U.S.C. § 1677(7)(C)(i).

In considering price effects, the Commission is to consider whether there is underselling and

whether the imports "otherwise" depress or suppress U.S. market prices. 19 U.S.C. §

1677(7)(C)(ii). The language and the structure of the statute call for separate inquiries, treating

volume and price separately. *See* ITC Br. at 28 ("Chemours is correct that the statue 'does not

PUBLIC VERSION

require' any link between subject import underselling and volume…."). This approach reflects that a domestic industry faced with dumped import competition can be materially injured either because it loses market share or because it cuts its price to maintain share.[9]

Notwithstanding the statute, the Commission majority narrowly rested its finding of "price effects" on the following: "We cannot find any correlation between observed underselling and shifts in market shares for the subject imports." P.R. 198 at 18. To be clear, the Commission may and should consider whether there is a correlation between underselling and gains in market share. The point is that the Commission may not stop there. It must also consider whether there were negative effects (price depression, price suppression, reduced profits) because of the underselling, even if the domestic industry did not lose any market share. Here, the Commission failed its statutory obligation to determine whether the pricing of subject imports placed downward pressure on U.S. producer prices apart from any market share shifts.

In its response brief, the Commission misstates the issue. No one claims that the Commission is "prohibited from considering the correlation between subject import underselling and market share." ITC Br. at 27. In fact, as discussed below, the record does show a strong correlation between falling import prices and the rising market share captured by imports.

---

[9] *See, e.g.,* H.R. Rep. No. 96-317, at 73 (1979) ("In evaluating the first factor, the ITC shall consider whether the volume of imports is or any increase in such volume, is significant. With regard to price, the ITC shall consider whether domestic prices are being significantly undercut or suppressed ..."). *See also, e.g. Swiff-Train Co., Metropolitan Hardwood Floors, Inc. v. United States,* 904 F. Supp. 2d 1336 (Ct. Int'l Trade 2013). Indeed, the Commission in many cases has found material injury where subject imports depressed domestic producers' prices even though the imports were not increasing in volume or market share over the period. *See, e.g., Certain Steel Grating from China,* Inv. Nos. 701-TA-465 and 731-TA-1161 (Final), USITC Pub. 4168 at 38-9 (July 2010).

PUBLIC VERSION

However, purely from the standpoint of the statute, the Commission cannot require such a correlation between market share and prices as the *sine qua non* to an affirmative determination.

The problem with the Commission majority's analysis is illustrated by the Commission's response brief. The Commission's brief argues that the correlation finding "was but one of several findings supporting its conclusion…." *Id*. Yet, read carefully, all of the "findings" repeat the same proposition: there is no correlation between underselling and a shift in market shares due to the supply shortage. P.R. 198 at 18 ("the supply situation of the domestic industry, rather than underselling by imports, explains the shifts in market share."). Thus, having observed that "the domestic industry's prices declined over the POI," the Commission did not analyze the impact of subject imports on those prices, but instead returned to the same mantra: "the decline in prices during the POI is associated with the cessation of the supply shortage…." P.R. 198 at 19. Or, having conceded that the domestic industry was suffering a declines in prices relative to costs – a cost/price squeeze[10] -- the Commission blamed the decline in prices on the supply shortage. P.R. 198 at 20 ("we find that the increase in the COGS/net sales ratio is a function of the high price levels that existed at the beginning of the POI due to supply shortages -- and the subsequent alleviation of those shortages -- rather than the presence of subject imports.").

In sum, the Commission's analysis was one-dimensional. It only considered that the decline in import prices was a function of the supply shortage. It failed independently to consider or even to address evidence that domestic prices were falling due to the presence of unfairly traded

---

[10] In the Commission's parlance, a cost/price squeeze, in which prices fall faster than costs and profits are depressed, is shown by the ratio of cost of goods sold (COGS) to net sales. P.R. 198 at 20.

PUBLIC VERSION

imports.[11] *See JMC Steel Group v. United States*, 24 F. Supp. 3d 1290 (Ct. Int'l Trade 2014) (without any express discussion, the court cannot assume that the Commission has evaluated all relevant factors). This is exactly the lack of precision that the Congress sought to avoid. S. Rep. No. 249 at 47 (1979) ("The law does not contemplate that injury from such imports be weighed against other factors … which may be contributing to overall injury to an industry.").[12]

IV.   THE COMMISSION'S RESPONSE BRIEF RESTS ON INCOMPLETE AND INCONSISTENT ANALYSIS OF THE RECORD EVIDENCE

   A.   Having Found that Imports were Largely Confined to the Automotive Aftermarket, the Commission Cannot Rationally Ignore the Impact of Imports in that Segment

The Commission acknowledged that the automotive aftermarket is the segment of the industry where "the overwhelming majority" of imports compete with the domestic like product. P.R. 198 at 13. The Commission also noted that import volumes [

]. C.R. 297 at 23-24, 28, 33. However, the Commission majority failed to rely upon this agreed-upon record evidence that the auto-aftermarket is the relevant segment of the industry, and instead it based its finding of a lack of correlation between low prices and market share on the whole market. ITC Br. at 29.

In response, the Commission argues that the Commission majority "expressly considered the automotive aftermarket segment," and that any attempt to analyze how the Commission

---

[11] As discussed below, the quarterly pricing data demonstrated that [

].

[12] Also, as discussed in Section IV.B, below, the Commission's analysis of market share was distorted by its refusal to consider the trend in import shipments and inventories.

PUBLIC VERSION

considered it is an invitation for the Court to reweigh the evidence. ITC Br. at 29. There is a

difference between acknowledging record evidence and considering that evidence when making a

determination. Here, there is no dispute that competition occurred primarily in the auto-aftermarket

and that import volumes [                    ] in that segment during the period of investigation

while domestic industry market share [                          ] during that same

period. C.R. 297 at I-23 and I-24, Table I-3. All the while, average U.S. producer prices [

                  ]. *Id*. at III-11, III-6. The problem is that the Commission then ignored this

abundant record evidence showing a correlation between subject imports, market share, and prices

and determined that no such correlation exists based upon "market share data covering the entire

market." *Id*.

    Although the Commission may not be obligated to perform a market segmentation analysis

(ITC Br. at 30, *citing NSK Corp. v United States*, 32 CIT 966, 983, 577 F. Supp. 2d 1322, 1340

(Ct. Int'l Trade 2008)), once it segments the market for purposes of analyzing the trend in import

prices and the supply shortage, it is unreasonable to then depart from the segmented analysis only

to supply its assertion that price and market share trends do not correlate. Indeed, the Commission

made several other findings based upon the auto-aftermarket segment of the industry. C.R. 297 at

25-26, 33, and 38. Yet, to support its conclusion that prices and market did not "correlate," the

Commission simply ignored the automotive aftermarket segment and compared import prices (in

the automotive aftermarket segment) with the trend in market share in the market as a whole.

    To paraphrase the court, the Commission "may not rely on {particular} data when they

support {it's} determination but then reject the data when they detract from that conclusion, at

least without a substantial reason." *CS Wind Vietnam Co. v. United States*, 971 F. Supp. 2d 1271

(Ct. Int'l Trade 2014). Indeed, had the Commission consistently analyzed the trend in import

14.

PUBLIC VERSION

prices and the trend in market share within the automotive aftermarket segment, it would have found the correlation between falling prices and rising import market penetration. Chemours Br. at 27-29.

**B.** Having Relied so Heavily on the Trend in Import Market Share in 2013, the Commission Fails to Justify Its Refusal to Consider the Evidence Concerning Inventory Levels and Shipments of Imports from Inventory

**1.** The Commission fails to justify its reliance on import data in lieu of other record evidence

As discussed above, a central element of the Commission majority's analysis is the finding that import market penetration declined in 2013 even though prices continued to fall. The Commission relied heavily on this lack of "correlation" to support the conclusion that the end of the supply shortage, not subject imports, caused prices to fall. Yet, the Commission does not dispute that its analysis of market shares is distorted by its methodology. Instead, the Commission defends its arithmetic without addressing the implications of its methodology.

The Commission calculated apparent consumption using "shipments" by domestic producers to U.S. customers, plus "imports" of the Chinese R-134a and other imports. C.R. 297 at IV-11-12. Ordinarily, the Commission relies on "shipments" to calculate apparent consumption and market share. Here, the Commission argues that it had to use imports rather than "shipments" of those imports because importers did not "track shipments by supplier or country of origin." ITC Br. at 15-16.

The fundamental problem, though, is that "imports" in December or November that go into inventory may not be sold until they leave the importers' inventory in the following year. *See* Chemours Br. at 27-29. As a result, using "imports" as a proxy for shipments of imports for consumption causes a timing issue. That is, imports that arrived late in 2012 and were held in

15.

PUBLIC VERSION

inventory until 2013 were not consumed until 2013. But, if those imports are used to calculate

market shares, they will inflate the market share in 2012 and reduce the market share in 2013.

Thus, reliance on imports rather than shipments is dangerous to the extent that the import market

share is overstated in 2012 and understated in 2013.

Yet, this is [                    ]. The data in Table I-3, presenting market share on a

"shipments" basis, show that the market share held by subject imports [                    ]

percent in 2011 to [        ] percent in 2012 as prices [                    ] percent in

2013 as prices [        ]. C.R. 297 at I-24 (Table I-3). [                    ], the data in Table IV-6 show

a [        ] in the import market share from 2012 to 2013. C.R. 297 at IV-12. Yet, in finding a

lack of correlation between falling imports prices and falling import market share, the Commission

cited Table IV-6 and ignored Table I-3. P.R. 198 at 27, n.115 (citing Table IV-6). The Commission

majority does not even acknowledge the timing issue [                    ] if

calculated using "shipments" rather than "imports."

The fact that the court affirmed a different approach in *BIC Corp v. United States*, 21 CIT

448, 461, 964 F.Supp 391, 404 (Ct. Int'l Trade 1997) (ITC Br. at 15) does not justify an exception

here. There is no indication that the record in *BIC Corp.* included [        ] in market share

depending on whether imports or shipments of imports were used to build the market share tables.

Given the record evidence here, the Commission failed to consider the whole record or to provide

an adequate explanation.

2.   The Commission likewise offers no basis for its treatment of [        
          ] import inventories in 2012

A related issue is the lack of any analysis of the [        ] in inventories of the imported

R-134a.  The Commission ignored the fact that imports of R134a are kept in inventory and

PUBLIC VERSION

delivered as demand dictates, *i.e.*, on a seasonal basis. As a result, these deliveries affect the market upon shipment, not while they are held in inventory. The import shipment data that the Commission chose to disregard are imperative for a complete analysis of the market, as domestic shipments alone do not provide an "apples-to-apples" comparison.

The record evidence clearly showed that inventories of subject imports were [

]. C.R. 297 at Table VII-3. Given the [                ] in end of year inventories in 2012, it is obvious from the data that these imports could not be sold until 2013. The argument that the inventory [          ] ended after 2013 proves our point. ITC Br. at 43. [      ] year-end inventories in 2012 entered the market in 2013 and depressed prices. [

] at the end of 2013 means that import market penetration in 2013 was [

] were still in inventory at the end of the year.

Perhaps more importantly though, the [                ] in year-end inventories in 2012 indicates that the supply shortage had ended. In this respect, the record shows that the [                ] in the fourth quarter 2012 was unrelated to a supply shortage and instead the result of dumped prices. By disregarding the inventory levels, the Commission again failed to account for any evidence that did not support its finding.

> **3.**    The Commission's arguments concerning domestic capacity are based on speculation, not record evidence

In response to the fact that domestic industry capacity was available in 2012, the Commission asserts that "the shortage of R-134a in 2011 through early 2012 results not only from increased demand, but also from raw material shortages and production problems." ITC Br. at 18, citing P.R. 198 at 18. However, there is nothing on the record that indicates raw materials were in short supply or domestic producers had production problems in 2012. The identified problems were confined to 2011.

17.

PUBLIC VERSION

*See* C.R. 297 at III-5-6, Table III-4. Even respondents' witnesses testified to raw material and other

supply issues in 2010 and 2011, but not 2012 or 2013. P.R. 151, Hearing Transcript at 119, 133, 135,

137, 192-94. And, the Commission's underlying decision did not argue that domestic industry capacity

figures were overstated or unreliable due to a shortage of raw materials or other issues in 2012 and

2013

Thus, the record showed that domestic capacity was underutilized. C.R. 297 at III-5, Table III-

3. It follows that the inability of the domestic industry to regain market share from dumped imports

was not the result of a supply shortage in 2012 or 2013. Without any evidence of a shortage of raw

materials in 2012 or any other constraint on domestic capacity, the Commission was not entitled to

ignore or discount that capacity. "ITC may not rely upon isolated tidbits of data which suggest a result

contrary to the clear weight of the evidence." *USX Corp. f/k/a/ United States Steel Corp. v. United*

*States*, 11 CIT 82, 84; 655 F. Supp. 487, 489 (Ct. Int'l Trade 1987)

**C.**     The Commission's Analysis of Import Prices Otherwise Ignored Record
          Evidence without Justification

The record showed (and the dissent emphasized) that there were [                               ] in

the products where U.S. producers faced competition from Chinese imports. The record likewise

established that (apart from the lack of direct import pricing data) there was more underselling than

overselling by subject imports on a volume basis. Chemours Br. at 30. Yet, the Commission

focused on the number of quarterly comparisons showing underselling, without regard to the

volume of China R-134a that undersold U.S. producers' prices. C.R. 297 at 26. In response to this

evidence, the Commission argues that the Commission has "historically" adopted this approach,

and it has been affirmed. ITC Br. at 33.

PUBLIC VERSION

As in the case of the market share figures, the pricing data yielded conflicting results – the data showing more overselling when measured by number of comparisons but more underselling when measured by volume. C.R. 297 at V-7-13 and V-23-24, Tables V-3-9, V-11-12. The Commission majority opinion recited the number-of-comparisons figures, noting that underselling appeared in "31 of 66" comparisons. P.R. 198 at 24. It then cited the underselling data by volume: "The quantity of subject imports in instances of underselling, [          ] pounds, exceeded the quantity of subject imports in instances of overselling, which was [          ] pounds. *Id.* Having simply recited the facts, the Commission then announced that the results were "mixed." *Id.* It did not otherwise explain why it was reasonable to [

          ]. Nor did the majority address the fact that underselling on a comparison basis was closer to 50/50. Hence, the court is asked to affirm the opinion on the basis of a post hoc argument by counsel asserting that the Commission must have decided the underselling data were "mixed" based on a "historical" but unexplained approach.

Moreover, the Commission failed even to address the fact that domestic prices [

          ]. *See* C.R. 297 at V-7-V-13, Tables V-3-V-9. Again, as discussed above, the Commission apparently sorted through the record evidence and cited any evidence that supported its conclusion. Such an approach is not based on the whole record or supported by a rational basis and reasoned explanation. For these reasons, the Commission's findings are not supported by substantial evidence.

PUBLIC VERSION

## V.   CONCLUSION

For the reasons explained above, the majority misapplied the law to the facts before it and reached conclusions of material fact that are unsupported by substantial evidence. Chemours respectfully requests the Court to remand to the Commission its final negative determination for reconsideration.

Respectfully submitted,

/s/ James R. Cannon, Jr.
James R. Cannon, Jr.
Jonathan M. Zielinski
Ulrika K. Swanson
CASSIDY LEVY KENT (USA) LLP
2000 Pennsylvania Avenue N.W.
Suite 3000
Washington, D.C. 20006
(202) 567-2300

Date:  January 22, 2016                          *Counsel for Chemours Company (successor-in-interest to E.I. DuPont de Nemours and Company)*

PUBLIC VERSION

## Certification of Compliance with Chambers Procedures 2(B)(1)

The undersigned hereby certifies that the foregoing brief contains 6,465 words according to the word count function of the word-processing system used to prepare this brief, exclusive of the corporate disclosure statement, table of contents, table of authorities, and certificates of counsel, and therefore complies with the maximum 7,000 word count limitation set forth in the Standard Chambers Procedures of the U.S. Court of International Trade.


BY:   /s/ James R. Cannon, Jr.

21.

**APPENDIX A**

PUBLIC VERSION

**Comparison of Quarterly Volume and Value Data Reported for Product 1**

| | U.S. Producer | | | China Pricing Data Collected by ITC | | | |
|---|---|---|---|---|---|---|---|
| | Price ($/lb) | Quantity (lb) | Value ($) | Price ($/lb) | Quantity (lb) | Value ($) | Under/(over) selling Margin (%) |
| Q1 | | | | | | | |
| Q2 | | | | | | | |
| Q3 | | | | | | | |
| Q4 | | | | | | | |
| Total 2011 | | | | | | | |
| Q1 | | | | | | | |
| Q2 | | | | | | | |
| Q3 | | | | | | | |
| Q4 | | | | | | | |
| Total 2012 | | | | | | | |
| Q1 | | | | | | | |
| Q2 | | | | | | | |
| Q3 | | | | | | | |
| Q4 | | | | | | | |
| Total 2013 | | | | | | | |
| Q1 | | | | | | | |
| Q2 | | | | | | | |
| Total 2014 | | | | | | | |

Source:  C.R. 297 at V-7, Table V-3.

PUBLIC VERSION

**Annual Volume and Value Data Reported by Importers of Product 1 (R-134a in bulk)**

| Importer | Price ($/lb) | Quantity (lb) | Quantity (short tons) | Value ($1,000) | Under-/(over) selling Margin (%) |
|---|---|---|---|---|---|
| | | | | | |

Source: [                    ]