IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE LEO M. GORDON

| | |
|---|---|
| MEXICHEM FLUOR, INC. AND<br>E.I. DU PONT DE NEMOURS AND COMPANY<br><br>      Consol. Plaintiffs,<br><br>    v.<br><br>UNITED STATES,<br><br>      Defendant.<br><br>    and<br><br>SINOCHEM ENVIRONMENTAL PROTECTION<br>CHEMICALS (TAICANG) CO., LTD., ZHEJIANG<br>QUHUA FLOUR-CHEMISTRY CO., LTD. AND<br>ZHEJIANG SANMEI CHEMICAL INDUSTRY CO.<br><br>      Defendant-Intervenors. | Consol. Court. No. 15-00004<br><br>**PUBLIC DOCUMENT** |

**PUBLIC APPENDIX TO REPLY BRIEF OF THE CHEMOURS COMPANY
(SUCCESSOR-IN-INTEREST TO E.I. DUPONT DE NEMOURS AND COMPANY)**

James R. Cannon, Jr.
Jonathan M. Zielinski
Ulrika K. Swanson
CASSIDY LEVY KENT (USA) LLP
2000 Pennsylvania Avenue N.W., Suite 3000
Washington, D.C. 20006
(202) 567-2300

January 29, 2016

| Tab | Public Record Number | Document Description | Excerpts |
|---|---|---|---|
| 1 | P.R. 151 | Commission Hearing Transcript, October 16, 2014 | 54, 91, 119, 133, 135, 137,192-94 |
| 2 | P.R. 198 | 1, 1, 1, 2-Tetrafluoroethane from China, Inv. Nos. 701-TA-509 and 731-TA-1244 (Final), Pub. 4503, December 2014, February 3, 2015 | 13, 17, 18 n. 115 (cited as 27), 19 n.122 (cited as 29),20, 24, Table IV-7, V-3-4 |
| 2a | P.R. 131 | Mexichem Prehearing Brief, October 7, 2014 | 14-15, 36 |
| 2b | P.R. 159 | Mexichem Posthearing Brief, October 23, 2014 | 6-9 |
| 2c | P.R. 160 | Dupont Posthearing Brief, October 23, 2014 | Part II at 24-25 |
| 2d | P.R. 130 | Sinochem Prehearing Brief, October 7, 2014 | Exh. 2 (Letter from April 1, 2011) |
| 2e | P.R. 151 | *For supporting pages from P.R., see Tab 1*<br><br>Commission Hearing Transcript, October 16, 2014 | 91 |
| 2f | P.R. 198 | *For supporting pages from P.R. 198, see Tab 2 of the Public Appendix*<br><br>1, 1, 1, 2-Tetrafluoroethane from China, Inv. Nos. 701-TA-509 and 731-TA-1244 (Final), Pub. 4503, December 2014, February 3, 2015<br><br>See Confidential Version in Tab 9 of Confidential Appendix | Table IV-7 |

Tab 1

P.R. 151

Commission Hearing Transcript

October 16, 2014

# UNITED STATES
# INTERNATIONAL TRADE COMMISSION

In the Matter of:                              ) Investigation Nos.:
1,1,1,2-TETRAFLUOROETHANE FROM CHINA  )   701-TA-509 and 731-TA-1244 (FINAL)

Pages: 1 - 221
Place: Washington, D.C.
Date: WEDNESDAY, OCTOBER 15, 2014



## Ace-Federal Reporters, Inc.

*Stenotype Reporters*
1625 I Street, NW
Suite 790
Washington, D.C. 20006
202-347-3700
Nationwide Coverage
www.acefederal.com

1     obligations first.  So, the other segments are going to have

2     less opportunity for penetration by the imported product.

3               The spot market, single product, packaged volume

4     predominance in the mobile aftermarket lends itself to being

5     the import market of choice and so that's where the imported

6     product was best able to fill the supply gap.  Does that

7     answer your question?

8               COMMISSIONER SCHMIDTLEIN:  I think so.  But I'm

9     trying to get at some of these other uses, the other

10    segments, right, for the aerosol foam, the pharmaceutical.

11    Are you saying that those purchasers didn't experience any

12    kind of shortages because you were able to -- because you

13    had contracts and so you had to fill those contracts first

14    and therefore that allowed the spot sales to be taken by the

15    imports?

16              MR. RUBIN:  There's a dynamic that exists there

17    where you're going to fulfill your contractual obligations

18    before you fulfill your spot obligations where you have a

19    spot market.  So, from the impact of supply I don't think

20    any of the stationary OEM customers, mobile OEM customers

21    had to shutdown a plant because of lack of supply and that's

22    because contractual obligations committed the manufacturers

23    of the 134-A to ensure that they would supply them first

24    from a prioritization standpoint.

25              So, again, it lends itself that the spot market

1    the Chinese are not --

2            MR. SCHUTZMAN:    Yes.

3            MR. RUBIN:   Yes, there's no question.   When we

4    sit down across the table from buyers in the other segments,

5    they will highlight the competitive pricing coming out of

6    China.   It's part of the negotiating strategy that they will

7    use in order to try and get as cost effective, buy as they

8    possibly can.   So they're going to use it as leverage.   And

9    our job is to try and articulate the other values that we

10   try to deliver in order to defend and not have to go to

11   those levels in those segments.   And how close you have to

12   go to those levels depends on how well you do at

13   articulating the values you deliver.   But there is no

14   question, we have a litany of examples of where the pricing

15   coming from China has been used in the negotiations.

16           MR. GEOSITS:   The same is true for Mexichem,

17   Commissioner.   We've had many, many different companies in

18   various market segments come to us and report low prices

19   available from China and that has had an effect, certainly.

20           COMMISSIONER SCHMIDTLEIN:   Okay.   Thank you.

21           I just had a couple questions about critical

22   circumstances before I wrap up.   And these may be best

23   answered by one of the counsel.

24           In terms of evaluating one of those critical

25   circumstances, what should we -- how should we factor in

Ace-Federal Reporters, Inc.
202-347-3700

1       U.S. produced R134a due to severe shortages on the market.

2               We understand that certain U.S. producers

3       significantly reduced their production of R134a following

4       the 2008 economic downturn.   In addition to decreased

5       production beginning in 2009 there was a worldwide shortage

6       of raw materials which resulted in high raw material cost.

7       Around the same time demand in the automotive aftermarket

8       had surged as a result of record-setting summer temperatures

9       that caused customers to increase their dependence on their

10      vehicle's air conditioning systems.

11              The usual convergence of all these factors

12      resulted in supply for R134a being down while demand for

13      this product was extremely high.  Unable to meet increased

14      demand, domestic producers of R134a either declined to

15      supply buyers or institute allocation systems and allocation

16      preferences.

17              In the preliminary phase of the proceeding, we

18      provided the Commission staff with substantial proof of the

19      domestic producer's inability to supply the U.S. market

20      including AutoZone.   Left with no other choice AutoZone

21      turned to Chinese R134a manufacturers and obtained the much

22      needed supply.  To adapt to this fundamental shift in its

23      R134a sourcing model, AutoZone was forced to develop a new

24      strategy in which we imported bulk ISO containers of R134a

25      from China and separately negotiated with re-packagers in

1          The truth is 2011 was an aberrational peak year

2     in virtually every respect, and wildly inconsistent with

3     historical trends.  Whatever the year the Commission chooses

4     to begin its official POI the supply shocks of 2010 and 2011

5     provide absolutely crucial context for the Commission's

6     analysis of injury and causation.  The supply shortages of

7     2010 and 2011 set the stage for the rest of the POI.

8          First of all, as you've heard, these shortages

9     were driven entirely by domestic producers who had their own

10    supply issues and who held an even more dominant market

11    share than they do now.

12         Mr. Lammers from AutoZone has spoken to the

13    actual market experienced during that period, but as also

14    well documented in Respondent's pre-hearing brief, the

15    shortages were most acute in the automotive aftermarket

16    segment.  In fact, as corroborated by the testimony of Mr.

17    Rubin and others this morning, domestic producers served

18    their contract customers and customers in other market

19    segments first and then essentially let everyone else get in

20    line for what remained of the shrinking available supply.

21    Given the lack of this available supply, purchasers in this

22    segment had no choice but to look to subject imports for

23    supply, even as Mr. Lammers said, at higher prices.

24         Petitioners claim that subject imports

25    established themselves in the U.S. market on the basis of

1   but in a market where they've just had a severe supply

2   shock, you know, purchasers would reasonably view this as

3   additional reason to diversify their supply chain.

4           The automotive aftermarket is, all parties agree,

5   the segment in which the shortages were most acute and where

6   the corresponding price increases from 2010 to 2011 were the

7   sharpest.  Petitioners also corroborated that point with

8   their testimony this morning.  It is, also, the only market

9   segment, effectively, in which there is significant

10  competition from subject imports.  These things are not

11  unrelated.

12          Subject imports from China were pulled into the

13  U.S. market by demand that domestic producers could not or

14  would not satisfy.  And Petitioners concede that imports

15  from China are a minor factor in segments in the R-134-A

16  market, other than the automotive aftermarket.

17          Why didn't subject imports penetrate other market

18  segments?  If Chinese producers were bent on dominating the

19  U.S. market, wouldn't they at least have tried in the four

20  years that they've been in the market?  And if it's true

21  that this is a commodity that sells solely on the basis of

22  price, and if subject imports and domestic merchandise are

23  fully interchangeable, and if subject import prices are

24  always and everywhere lower, regardless of what the

25  questionnaire data might say, why haven't subject imports

1    imports have the greatest penetration.  But this is not a

2    reflection of adverse price affects, but rather that subject

3    import penetration is greatest in the segment where the

4    shortages were most severe, i.e., the last to be served by

5    domestic producers.  And also, (B) the segment where the

6    most severe price increases, which they conceded this

7    morning, during the supply shock will have the most severe

8    decreases as supply and pricing returns to equilibrium.

9    When prices go up due to the supply shock rather than any

10   underlying demand fundamentals, prices must also come down.

11          Domestic producers have lamented their inability

12   to push through further price increases in 2012, but as you

13   can see from the chart, these prices were already at a

14   highly elevated level, about 30 percent higher than at the

15   beginning of 2010 when demand in the intervening years had

16   grown slightly, if at all.

17          As demand flattened out and decline from 2011 to

18   2012 to 2013, it was inevitable that U.S. market prices

19   would return to a long-term historical equilibrium level.

20   Imports from China remain in the U.S. market not because of

21   a desire to dominate the market, but because U.S. customers

22   like AutoZone understandably were frightened by the supply

23   shortages in 2010 and 2011, and are unwilling to return to

24   U.S. producers as their only source of supply.

25          In some cases, as with AutoZone, they have

1         COMMISSIONER JOHANSON:   All right, I guess the

2    reason I was assuming they were soft, I've looked at the

3    data but it's not under my nose right now, but following up

4    with Miss Dayton I think you insinuated that the market was

5    not quite as strong as you would hope for it to be given

6    your investments in the Chinese market?

7         MS. DAYTON:   I think there's no question that

8    the Chinese capacity has increased at a much more rapid pace

9    than overall demand in the Chinese domestic market and in

10   the U.S. market and I have you know -- I know maybe some of

11   my colleagues may not agree with me but I think that I would

12   have to say that a lot of the reason for the increase in

13   capacity was to penetrate the U.S. market.

14        COMMISSIONER JOHANSON:   All right, thanks.

15   Thanks for your response.  The Respondent's pre-hearing

16   brief discusses at some length, actually great length, a

17   supply shortage which Respondent's allege drove prices up

18   between 2010 and 2011 and during which domestic producers

19   allegedly instructed spot purchasers to seek other sources.

20    This is mentioned I believe at the very beginning of your

21   brief and throughout the brief as well.

22        However, Respondent's apparently do not discuss

23   what causes the alleged supply shortage can you maybe

24   describe what you think caused this shortage?

25        MR. LAMMERS:   The reason given by our suppliers

1   which I believe that they documented in some of the

2   pre-hearing briefs was a shortage of the raw materials used

3   to make R134a.

4           COMMISSIONER JOHANSON:   Okay and this would not

5   -- I believe Miss Dayton you addressed this as well is that

6   a fluorospar is that the product?

7           MR. LAMMERS:   That's one of the product

8   components.

9           MS. DAYTON:   I don't think that particular one

10  was the one that was in short supply in 2010.

11          MR. LAMMERS:   But there's one of them that was?

12          MS. DAYTON:  Yeah there was one maybe PC, I'm not

13  totally sure.

14          MR. LAMMERS:   That was the reason given that

15  there was a shortage and they could not -- they didn't have

16  all the raw materials they needed to turn it into the R134a.

17          MS. DAYTON:   And I think that there were a bunch

18  of them, the switching of the foaming as Greg Rubin of

19  DuPont said at the end of 2009 to 2010, foaming market

20  switching from 22 and that no longer being allowed because

21  of EPA regulations, all that market went over to R134a in

22  almost one fell swoop.   So you had switching the foaming,

23  you had recovery from the recession building up low

24  inventory levels that people had during the recession, the

25  shortage of supply and as DuPont also stated this morning

1    they had plant problems, their plant facility is quite old

2    and they had plant problems that particular year so it was a

3    whole variety of factors that just all came together for

4    that time period.

5            MR. DOUGAN:   Commissioner Johanson at page 2-7

6    of the public staff report footnote 15 it references the

7    Chinese Respondent's post-conference brief but I can -- it's

8    public -- Respondent cited letters from U.S. producers

9    reporting supply shortages and price increases.   They

10   described difficulty obtaining R134a imports carbons and

11   hydrogen fluoride, increased demand for R134a because of

12   phased out use of R22 and HCFC increased demand in China and

13   by OEM's and high demand for R125.

14           COMMISSIONER JOHANSON:   All right, thanks.   I

15   will look at that again.   And this was a question this was

16   similar to what I asked this morning of the Petitioners but

17   why is Chinese product not figured more heavily in the OEM

18   market?

19           MR. DOUGAN:   Maybe one of the industry witnesses

20   could respond to this but I believe it may have been Mr.

21   Rubin or someone else this morning who said that it largely

22   had to do with a couple of factors.   One just in time

23   delivery and the supply chain security is incredible

24   important for the OEM's.   I mean not that it's not

25   important for the aftermarket but maybe to a different

Tab 2

P.R. 198

1, 1, 1, 2-Tetrafluoroethane from China, Inv. Nos.

701-TA-509 and 731-TA-1244 (Final), Pub. 4503,

December 2014

February 3, 2015

# 1,1,1,2—TETRAFLUOROETHANE FROM CHINA

Investigation Nos. 701-TA-509 and 731-TA-1244 (Final)

Publication 4503      December 2014

## U.S. International Trade Commission



Washington, DC 20436

Apparent U.S. consumption declined somewhat from 2011 to 2013. Apparent U.S. consumption declined from *** short tons in 2011 to *** short tons in 2012 and *** short tons in 2013.[65]

### B.    Supply Conditions

The domestic industry supplied the majority of R-134a to the U.S. market during the POI. Nonsubject imports had a minimal presence in the U.S. market throughout the POI.[66]

U.S. producers' U.S. shipments as a share of apparent consumption were *** percent in 2011, *** percent in 2012, and *** percent in 2013.[67] Domestically produced R-134a was sold for all applications over the POI.[68] Subject imports as a share of apparent U.S. consumption were *** percent in 2011, *** percent in 2012, and *** percent in 2013.[69] The overwhelming majority of subject imports were sold for use in the automotive refrigerant aftermarket, with some sold for use as other refrigerants.[70] R-134a for household and commercial refrigeration is supplied by the domestic producers, subject imports, and to some extent nonsubject imports.[71] Nonsubject imports' share of apparent U.S. consumption never exceeded *** percent during any calendar year or interim period.[72]

The parties agree that from mid-2010 through at least 2011, the U.S. market for R-134a experienced a supply shortage.[73] Producers and importers attributed this supply shortage to a number of conditions such as raw material shortages, production problems, the phasing out of R-22 as a refrigerant and subsequent increased demand for R-134a in non-automotive applications, increased demand for R-134a as the United States emerged from a recession, low inventories, and new applications for R-134a.[74] Respondents contend, and Petitioner does not dispute, that when supply was tight in 2010 and 2011, the domestic producers chose to fulfill their contractual obligations before selling R-134a to automotive aftermarket purchasers in the

---

[65] CR/PR at Table IV-6. Apparent U.S. consumption of R-134a was *** short tons in interim 2013 and *** short tons in interim 2014. *Id.*

[66] *Compare* CR/PR at Table IV-8 with Tables III-6 and IV-7.

[67] CR/PR at Table IV-6. U.S. producers' U.S. shipments as a share of apparent consumption were *** percent in interim 2013 and *** percent in interim 2014. *Id.*

[68] *See* CR/PR at Table III-6.

[69] CR/PR at Table IV-6. Subject imports as a share of apparent consumption were *** percent in interim 2013 and *** percent in interim 2014. *Id.*

[70] CR/PR at Table IV-7.

[71] CR/PR at Table I-3. Nonsubject imports ***. *Id.* Subject imports were not imported for use as foam expansion agents or pharmaceutical purposes at any point during the POI. Nonsubject imports ***. *Id.*

[72] CR/PR at Table IV-6.

[73] *See, e.g.* Respondents' Prehearing Brief at Ex. 2.

[74] Tr. at 13 (Shutzman); 58 (Geosits); 77 (Rubin). ***. CR/PR at Table III-4.

a share of the market declined from *** percent in 2011 to *** percent in 2012 and then increased to *** percent in 2013.[104]

In view of the foregoing, we find the volume of subject imports to be significant in absolute terms and relative to consumption. However, for the reasons we discuss below, we do not find that the subject imports had significant price effects or a significant impact on the domestic industry.

**B.    Price Effects of the Subject Imports**

Section 771(7)(C)(ii) of the Tariff Act provides that evaluating the price effects of the subject imports, the Commission shall consider whether

> (I) there has been significant price underselling by the imported merchandise as compared with the price of domestic like products of the United States, and

> (II) the effect of imports of such merchandise otherwise depresses prices to a significant degree or prevents price increases, which otherwise would have occurred, to a significant degree.[105]

As previously discussed, price is an important factor in purchasing decisions. There is a high degree of substitutability between the domestic like product and the subject imports. Price was the most important factor cited by purchasers in their purchasing decisions, while quality and availability were the next most important factors.[106]

The Commission collected pricing data for seven products, and quarterly price comparisons between subject imports and the domestic like product are possible for five of these products.[107] Subject imports were concentrated in three of the pricing products: Products 4, 5, and 6. Reported pricing data accounted for approximately 60.5 percent of U.S. producers' U.S. commercial shipments and 65.9 percent of U.S. importers' U.S. commercial shipments of imports from China during the POI.[108] Although there are no pricing products that specifically target the automotive aftermarket, the pricing products nevertheless capture

---

[104] CR/PR at Table IV-6. U.S. producers' U.S. shipments as a share of the market were *** percent in interim 2013 and *** percent in interim 2014.

[105] 19 U.S.C. § 1677(7)(C)(ii).

[106] CR at II-19, PR at II-12.

[107] Product 1 was R-134a sold in bulk to distributors; Product 2 was R-134a sold in bulk to retailers; Product 3 was R-134a sold in bulk to end users for foam expansion, foam blowing, and aerosol applications; Product 4 was R-134a sold in 30 pound containers to distributors; Product 5 was R-134a sold in 30 pound containers to retailers; Product 6 was R-134a sold in 12 ounce containers to distributors; and Product 7 was R-134a sold in 12 ounce containers to retailers. Subject imports were not present in Product 3. The domestic like product was not present in Product 2. CR at V-5-6, PR at V-3-4.

[108] CR at V-5-6, PR at V-3-4.

competition between the domestic like product and subject imports, the majority of which is in the automotive aftermarket. Product 3 is the only use-specific product definition, and there were no subject imports of Product 3.

We find that there are mixed instances of underselling and overselling by subject imports. The record shows more instances of overselling than underselling by subject imports on a quarterly basis and more underselling than overselling by subject imports on a volume basis.[109] Subject imports undersold the domestic like product in 31 of 66 quarterly comparisons, at margins ranging from 0.5 percent to 47.5 percent.[110] In the 35 instances in which subject imports oversold the domestic like product, prices for subject imports were between 1.2 percent and 77.2 percent higher than prices for domestically produced R-134a.[111] The quantity of subject imports in instances of underselling, *** pounds, exceeded the quantity of subject imports in instances of overselling, which was *** pounds.[112]

We cannot find any correlation between the observed underselling and shifts in market shares for the subject imports. There were significant quantities of subject imports that undersold the domestic like product during each year of the POI,[113] but the only gains in subject import market share occurred from 2011 to 2012, when subject imports increased their market share from *** percent to *** percent and U.S. producers' U.S. shipments fell from *** percent to *** percent of the U.S. market.[114] As noted above, however, we earlier found that this increase in market share was a function of purchasers' response to the supply shortages that persisted through at least the end of 2011.[115] Thus, the supply situation of the domestic industry, rather than underselling by subject imports, explains the shifts in market share.[116] This, as well as the lack of correlation between underselling and price movements, discussed below, mitigates the significance of the observed underselling.

We acknowledge that the domestic industry's prices declined over the POI. The record shows that prices at the beginning of the POI were at high levels due to the supply squeeze that

---

[109] *See generally*, CR/PR at Tables V-3-9, V-11-12.

[110] CR at V-22, PR at V-6-7.

[111] CR at V-22, PR at V-7.

[112] CR/PR at Table V-12.

[113] CR/PR at Tables V-6.

[114] CR/PR at Table IV-6. From 2012 to 2013, the domestic industry lost market share to the subject imports in the automotive aftermarket but gained it in "other refrigerants," the other market segment with subject import competition in which the domestic industry has greater shipments.

[115] *See* CR/PR at Table IV-6.

[116] Petitioner asserts that AUVs in the automotive aftermarket fell from *** due to the presence of subject imports. Petitioner's Prehearing Brief at 14-15. Petitioner acknowledges that in 2011 prices were higher in the automotive aftermarket than in other markets because of the supply shortage. Petitioner also acknowledges that prices in the automotive aftermarket are more responsive to supply and demand because such sales take place in the spot market, compared to other contract-based markets. Petitioner's Prehearing Brief at 36.

began in 2010.[117]  Prices peaked in 2011.[118]  As the supply situation normalized in 2012, prices declined.[119]  Therefore, the decline in prices during the POI is associated with the cessation of the supply shortage that temporarily inflated prices.  Because the supply shortage was most acute in the automotive aftermarket, prices therein increased the most, and as a consequence, experienced greater declines over the POI as compared to prices of R-134a sold for other purposes.

Indeed, pricing data on the record demonstrate that price declines occurred whether subject imports oversold or undersold the domestic like product and regardless of whether subject imports were present in the market for a particular pricing product.[120]  Prices declined for five of the seven products (Products 1 and 4-7) at approximately the same rate, even in the presence of overselling by subject imports.  Subject import prices for Product 1 oversold the domestic like product in all but two quarterly comparisons,[121] [122] yet prices for the domestic like product peaked in the second quarter of 2011 and continued falling throughout the remainder of the POI.[123]  Products 5, 6, and 7 all had mixed instances of overselling and underselling, yet exhibited price declines over the POI.[124]  Prices for Product 4, which had the most underselling by subject imports, fell at approximately the same rate as prices for Products 1, 5, 6, and 7.[125]

We have also examined whether the subject imports prevented the domestic industry from instituting price increases that otherwise would have occurred.  The domestic industry's ratio of cost of goods sold ("COGS") to net sales increased from 2011 to 2013.[126]  We find, however, that this increase in the COGS to net sales ratio is attributable primarily to changes in net sales value, which decreased from $*** in 2011 to $*** in 2012 and then to $*** in

---

[117] Exhibits to Testimony of Jim Dougan (Oct. 15, 2014) at 1; Respondents' Prehearing Brief at Exhs. 1 (quoting an industry report "Starting mid-2010 and continuing through 2011, HFC-134a has experienced supply shortages and cost increases that seem to escalate month-by-month.") (May 5, 2011) and 2 (quoting letters from ***) (*** .

[118] CR/PR at Figures V-1-7.  *See also* Exhibits to Testimony of Jim Dougan (Oct. 15, 2014) at 1 (showing prices from Q1 2010 to Q2 2014); DuPont Prehearing Brief at 4.

[119] CR/PR at Figures V-1-7.

[120] CR/PR at Figures  V-1-7.

[121] CR/PR at Table V-3.

[122] DuPont provided an exhibit comparing certain repackagers' annual direct import AUVs to sales AUVs of *** to each of these repackagers.  DuPont Posthearing Brief at Exh. 2.  We note that these AUVs are not directly comparable to importers' sales prices, as they do not include any sales markup that would typically be made by an importer selling R-134a in the U.S. market.

[123] CR/PR at Figure V-1.

[124] CR/PR at Figures V-5-7.

[125] Given that the pricing data on the record provides relatively high coverage of both the domestic like product and subject imports, we have relied on such pricing data.  Our usual practice is not to rely heavily on AUV data because changes in AUV data over time can be a result of changes in product mix.

[126] This ratio increased from *** percent in 2011 to *** percent in 2012 and *** percent in 2013.  It was *** percent in interim 2013, and *** percent in interim 2014.  CR/PR at Appendix D.

2013.[127]  By contrast, on a unit basis, raw material costs and COGS fluctuated within a fairly narrow range throughout the POI.  Raw materials were $\*\*\* per short ton in 2011, $\*\*\* per short ton in 2012, and $\*\*\* per short ton in 2013.[128]  Similarly, COGS were $\*\*\* per short ton in 2011, $\*\*\* per short ton in 2012, and $\*\*\* per short ton in 2013.[129]  Demand over the POI was flat, and given that the market was emerging from a supply shortage, price increases were not likely.  Consequently, we find that the increase in the COGS/net sales ratio is a function of the high price levels that existed at the beginning of the POI due to supply shortages -- and the subsequent alleviation of those shortages -- rather than the presence of subject imports.[130] [131]

---

[127] CR/PR at Appendix D.  Net sales were $\*\*\* in interim 2013 and $\*\*\* in interim 2014.

[128] CR/PR at Appendix D.  Raw material costs were $\*\*\* per short ton in interim 2013 and $\*\*\* per short ton in interim 2014.

[129] CR/PR at Appendix D. Total COGS was $\*\*\* per short ton in interim 2013 and $\*\*\* in interim 2014.

[130] With respect to petitioner's argument that whether prices were returning to a "natural equilibrium" is irrelevant to the price effects inquiry, Petitioner's Posthearing Brief at 6, the statute does not refer to "equilibrium" prices and we have not purported to compute such prices.  Nonetheless, the statute does direct us to ascertain whether the effect of subject imports is to depress prices to a significant degree.  19 U.S.C. §1677(7)(C)(ii)(II).  In light of this provision, our responsibility is to determine whether price declines over the POI are due to subject imports or other causes.  Therefore, conditions of competition that may cause price levels to be higher or lower than they otherwise would have been are pertinent to our inquiry.  In these investigations, the fact that there was an acknowledged supply shortage early in the POI is a factor that caused prices to be higher than they otherwise would have been.  *E.g.*, Respondents' Prehearing Brief at Exh. 2, Letter from \*\*\* on April 1, 2011 (advising that "\*\*\*").  The resumption of normal supply conditions is a factor that would tend independently to reduce prices.  We have properly considered these conditions of competition in fulfilling our statutory responsibility to ascertain whether subject imports had significant price depressing effects.

[131] During the hearing, various domestic industry witnesses expressed the view that the subject imports had "spillover" effects that caused prices to decline for domestically produced R-134a sold for uses other than the ones for which there was subject import competition.  Tr. at 91 (Rubin, Geosits).  While we do not question the testimony that purchasers may have used prices of subject imports in the automotive aftermarket in negotiating prices for the R-134a products that they purchased for other uses, neither DuPont nor petitioner provided specific examples of when domestic producers were forced to reduce prices because of "spillover effects."  *See* DuPont Posthearing Hearing Brief, Part II at 24-25; Petitioner's Posthearing Brief at 6-9.  The testimony does not outweigh the fact that purchasers had no credible alternative to purchasing R-134a for other non-automotive aftermarket uses from the domestic industry.  Consequently, we find that the alleviation of the supply shortage, not "spillover" effects from the subject imports, explains the decline in prices across different uses, including those in which there was limited or no subject import competition.

and research and development ("R&D") expenses increased from 2011 to 2013.[149]   Total capital expenditures were $\*\*\* in 2011, $\*\*\* in 2012, and $\*\*\* in 2013.[150]  R&D expenses were $\*\*\* in 2011, $\*\*\* in 2012, and $\*\*\* in 2013.[151]

In light of the general stability of the domestic industry's output, sales quantities, and market share, the domestic industry's severe decline in operating performance from 2011 to 2013 was attributable to the decline in prices that occurred during the POI.  As discussed above, these price declines occurred because prices were anomalously high at the beginning of the POI due to the supply shortages of 2010 and 2011 and began to return to their pre-shortage levels as the market stabilized in 2012 and 2013.  By contrast, the subject imports did not have significant price depressing effects and did not significantly prevent price increases that otherwise would have occurred.  Moreover, there is no correlation between declines in operating performance, which occurred throughout the POI, and changes in subject import volume and market share.[152]  In sum, the record does not support a conclusion that the domestic industry's declines in operating performance were caused by the subject imports.

In view of the foregoing, we find that subject imports have not had significant adverse impact on the domestic industry.

## 7.      No Threat of Material Injury by Reason of Subject Imports

### A.      Legal Standard

Section 771(7)(F) of the Tariff Act directs the Commission to determine whether the U.S. industry is threatened with material injury by reason of the subject imports by analyzing whether "further dumped or subsidized imports are imminent and whether material injury by reason of imports would occur unless an order is issued or a suspension agreement is accepted."[153]  The Commission may not make such a determination "on the basis of mere conjecture or supposition," and considers the threat factors "as a whole" in making its determination whether dumped or subsidized imports are imminent and whether material injury by reason of subject imports would occur unless an order is issued.[154]  In making our determination, we consider all statutory threat factors that are relevant to these investigations.[155]

---

[149] CR/PR at Table VI-4.

[150] CR/PR at Table VI-4.  Capital expenditures were $\*\*\* in interim 2013 and $\*\*\* million in interim 2014.

[151] CR/PR at Table VI-4.  R&D expenses were $\*\*\* in interim 2013 and $\*\*\* in interim 2014.

[152] Petitioner's counsel appears to concede that subject imports were not injurious in 2011.  *See* Tr. at 208 (Schagrin) ("And at the time they entered the market, they were not injurious and that's why no petitions were filed in 2010 or 2011.").

[153] 19 U.S.C. § 1677(7)(F)(ii).

[154] 19 U.S.C. § 1677(7)(F)(ii).

[155] These factors are as follows:

(Continued...)

nonsubject countries in January-June 2014 was *** percentage points higher than in January-June 2013 based on quantity and *** percentage points higher based on value.

**Table IV-6**
**R-134a: U.S. shipments of domestic R-134a, U.S. imports, and apparent U.S. consumption and market shares, 2011-13, January-June 2013, and January-June 2014**

\*        \*        \*        \*        \*        \*        \*

U.S. shipments of imports from China by market segment are presented in table IV-7. The automotive refrigerant aftermarket is the primary segment for imports from China, accounting for no less than *** percent of total U.S shipment volume throughout the period of investigation. The "other refrigerants" segment accounts for all of the remaining U.S. shipments of imports from China during the same period. [19] U.S. shipments of imports from all other sources by segment are presented in table IV-8.[20]

**Table IV-7**
**R-134a: U.S. shipments of imports from <u>China</u> by segment, 2011-13, January-June 2013, and January-June 2014[1]**

\*        \*        \*        \*        \*        \*        \*

**Table IV-8**
**R-134a: U.S. shipments of imports from <u>all other sources</u> by segment, 2011-13, January-June 2013, and January-June 2014**

\*        \*        \*        \*        \*        \*        \*

U.S. shipments of imports to the automotive aftermarket by packaging type in 2013 are presented in table IV-9.

**Table IV-9**
**R-134a: U.S. importers' shipments of automotive aftermarket sales from China by packaging type**

\*        \*        \*        \*        \*        \*        \*

U.S. importer shipments to the automotive aftermarket by nature of operations and packaging type in 2013 are presented in table IV-10.

---

[19] The U.S. producers reported the following other refrigerants: ***. Compiled responses to U.S. producer questionnaires, question II-8.
[20] See table I-3 for comparison of import shipments versus domestically produced shipments.

**Sales terms and discounts**

All three U.S. producers and most responding importers (21 of 30) reported quoting prices on a delivered basis. One producer (***) reported no discounts while the other two producers reported rebate programs and/or early payment discounts.[7] The majority of responding importers (20 of 34) reported offering no discounts, although 12 reported quantity discounts and 6 reported total volume discounts. All U.S. producers and 18 of 30 responding importers reported sales terms of net 30 days, although producers and importers also offer other sales terms.

**Price leadership**

Purchasers reported that the following suppliers were price leaders in the R-134a market: DuPont (listed by 15 purchasers), Mexichem (8), Chinese suppliers (4), and Arkema (4). In addition, purchasers also named major manufacturers in general, and distributors including Honeywell, IDQ, National Refrigerant, and Technical Chemical. *** reported that while OEM bulk pricing is not published; Arkema, DuPont, Honeywell, and Mexichem periodically issue general market price letters regarding aftermarket refrigerants.

**PRICE DATA**

The Commission requested U.S. producers and importers to provide quarterly data for the total quantity and f.o.b. value of the following R-134a products shipped to unrelated U.S. customers during January 2011-June 2014:

**Product 1.**-- R-134a in bulk sold to distributors.
**Product 2.**-- R-134a in bulk sold to retailers.
**Product 3.**-- R-134a in bulk sold to end users for foam expansion, foam blowing, and aerosol applications.
**Product 4.**-- R-134a in 30-pound containers sold to distributors.
**Product 5.**-- R-134a in 30-pound containers sold to retailers.
**Product 6.**-- R-134a in 12-ounce containers sold to distributors.
**Product 7.**-- R-134a in 12-ounce containers sold to retailers.

Three U.S. producers[8] and 22 importers[9] provided usable pricing data, although not all firms reported pricing for all products for all quarters. Price data reported by these firms accounted for approximately 60.5 percent of U.S. producers' U.S. commercial shipments of R-

---

[7] ***.

[8] All three U.S. producers reported sales of products ***.; ***. also reported sales of products ***.; and no U.S. producer reported sales of product 2 (bulk sales to retailers).

134a and 65.9 percent of U.S. importers' U.S. commercial shipments of imports from China during January 2011-June 2014.[10]

The following tabulation shows the distribution of quantities of pricing data reported by U.S. producers and by importers, by pricing product.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

Price data for products 1-7 are presented in tables V-3 to V-9 and figures V-1 to V-7. Sales quantities of most products were much higher in the first half of each of the year than in the second half of the year, reflecting seasonality in sales of R-134a used in air conditioners. Sales of product 3, R-134a for certain non-refrigerant uses, did not show these seasonal trends.

**Table V-3**

**R-134a: Weighted-average f.o.b. prices and quantities of domestic and imported product 1[1] and margins of underselling/(overselling), by quarter, January 2011-June 2014**

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

**Table V-4**

**R-134a: Weighted-average f.o.b. prices and quantities of domestic and imported product 2[1] and margins of underselling/(overselling), by quarter, January 2011-June 2014**

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

**Table V-5**

**R-134a: Weighted-average f.o.b. prices and quantities of domestic and imported product 3[1] and margins of underselling/(overselling), by quarter, January 2011-June 2014**

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

**Table V-6**

**R-134a: Weighted-average f.o.b. prices and quantities of domestic and imported product 4[1] and margins of underselling/(overselling), by quarter, January 2011-June 2014**

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

---

(...*continued*)

[9] Importers reported pricing data for all products except product 3 (bulk sales to end users for foam expansion, foam blowing, and aerosol applications). Useable price data were received from importers \*\*\*.

[10] Price data for nonsubject countries were not collected since such imports account for a relatively small percentage of total imports. Subject import price data were not collected for sales of R-134a to automotive OEMs and other refrigerant OEMs and for sales to consumers by retailers that import R-134a. Import value data were also not collected for the pricing products; therefore retailers and other firms that import R-134a directly and either do not resell the product or sell directly to consumers did not provide pricing data.

Tab 2a

P.R. 131

Mexichem's Prehearing Brief

October 7, 2014

# SCHAGRIN ASSOCIATES

900 SEVENTH STREET, N.W.
SUITE 500
WASHINGTON, D.C. 20001
(202) 223-1700

FAX (202) 429-2522

EMAIL: schagrin@erols.com

Received by CLK
OCT 06 2014

October 7, 2014

Inv. Nos. 701-TA-509 and 731-TA-1244
Total Pages: 49
Business proprietary information
deleted from pages i, 1-2, 4-28, 30-35, and 37-38

**PUBLIC VERSION**

**FILED BY EDIS AND BY HAND**

Acting Secretary Lisa Barton
U.S. International Trade Commission
500 E St. SW, Room 112
Washington, DC 20436

> **Re:** *1,1,1,2-Tetrafluoroethane from China*,
> **Inv. Nos. 701-TA-509 and 731-TA-1244 - Submission of Pre-Hearing Brief**

Dear Secretary Barton:

On behalf of petitioner Mexichem Fluor Inc., we hereby submit our pre-hearing brief in the investigation described above. The confidential version of this brief contains business proprietary information which has been granted confidential treatment by the Commission. This information appears at pages i, 1-2, 4-28, 30-35, and 37-38. This information has been deleted from this public version.

Please contact the undersigned with any questions regarding this submission.

Respectfully Submitted,

Roger B. Schagrin
John W. Bohn
Paul W. Jameson
**Schagrin Associates**
*Counsel to Mexichem Fluor Inc.*

The following table shows that the [

] during the period of investigation, with apparent consumption in that segment

[                           ] from 2011 to 2012, [                           ] from 2012 to

2013.

### Apparent Consumption By Segment

| Item | 2011 | 2012 | 2013 | Jan-Jun 2013 | Jan-Jun 2014 |
|------|------|------|------|--------------|--------------|
| **Automotive Refrigerant** | ░░░░░ | ░░░░░ | ░░░░░ | ░░░░░ | ░░░░░ |
|   OEM | [ | | | | | ] |
|   Aftermarket | [ | | | | | ] |
| **Pharmaceutical** | [ | | | | | ] |
| **Foam expansion agent** | [ | | | | | ] |
| **Other Refrigerants** | [ | | | | | ] |
| **Total** | [ | | | | | ] |

Quantity in short tons

Source: US Producers and Importers Questionnaire Responses

Despite the increase in apparent consumption between 2011 and 2012, U.S. shipments to

the automotive refrigerant segment declined [     ] percent from 2011 to 2012, and declined [

] percent from 2012 to 2013, while imports from China increased [     ] percent

from 2011 to 2012, and increased [                    ] percent from 2012 to 2013. The difference

in the effects on average unit value of domestic shipments to these segments is stark:

### Domestic Producers' AUVs $/lb

| Item | 2011 | 2012 | 2013 | Jan-Jun 2013 | Jan-Jun 2014 |
|------|------|------|------|--------------|--------------|
| Automotive Refrigerant | | | | | |
|   OEM | [ | | | | | ] |
|   Aftermarket | [ | | | | | ] |
| Pharmaceutical | [ | | | | | ] |
| Foam expansion agent | [ | | | | | ] |
| Other Refrigerants | [ | | | | | ] |
| Total | [ | | | | | ] |

Source: U.S. Producers Questionnaire Responses

The [                              ] segment went from [

]. Other segments, [

] The only cause of the price depression in the automotive refrigerant aftermarket segment is the direct underselling by imports of R-134a from China. The direct underselling in that segment had the effect of lowering prices in the other segments as well, as negotiators became aware of the price declines in that segment and demanded similar concesssions.

This is another reason to be skeptical of the reported sales prices of imported R-134a:

**Sales of R-134a to the Automotive Refrigerant Aftermarket Segment**

|  | 2011 | 2012 | 2013 | Jan-Jun 2013 | Jan-Jun 2014 |
|---|---|---|---|---|---|
| Domestic Sales (tons) | [ |  |  |  | ] |
| Imported Sales (tons) | [ |  |  |  | ] |
| Domestic AUV ($/lb) | [ |  |  |  | ] |
| Imported AUV ($/lb) | [ |  |  |  | ] |

Sources: US Producers and Importers Questionnaire Responses

How likely is it, for example, that in 2013 [

]? The reported prices are [

].

When we look at the retail price of aftermarket R-134a, it becomes apparent that consumers have not benefited in the least from the price reductions. Attached as Exhibit 1 are screen shots from archived web pages of the retailer Advance Auto Parts, as they appeared on August 1, 2011, and screen shots from last month. As the tables above indicate, the AUVs of sales of R-134a to the automotive aftermarket segment have fallen [                    ]

8.     The expiration of OEM contracts will compound the impact of subject imports

Finally, as discussed in the conference, while most R134a is sold in the aftermarket, original equipment manufacturers (OEMs) buy about 30 percent of U.S. output. Conf. Tr. 51 (Rubin). OEMs mainly purchase under requirements contracts, which can last for a year or perhaps more. Conf. Tr. 123-25 (Rubin and Geosits). Some aftermarket buyers also use contracts, generally of shorter duration. *Id.*

Contract purchasers well know spot market prices and base their bids upon them. Conf. Tr. 26 (Geosits), 125 (Rubin). Thus, while contracts lock prices in temporarily, the existence of such contracts merely allows a "delay of the inevitable." Conf. Tr. 124 (Rubin). Accordingly, the price impact of increased Chinese import penetration has likely not fully struck the U.S. industry, but will do so over the next year as contracts expire, absent relief from unfairly traded imports.

## VII.    Critical Circumstances

The Act requires that if Commerce makes an affirmative critical circumstances determination, the Commission must consider whether the imports subject to it "are likely to undermine seriously the remedial effect" of any order that is to be issued. 19 U.S.C. §§ 1671d(b)(4), 1673d(b)(4). In making this determination, the Commission considers (i) the timing and volume of imports, (ii) a rapid increase in inventories of the imports, and (iii) any other circumstances indicating that the remedial effect of the order will be seriously undermined. *Id.* If the Commission makes a negative present injury determination but an affirmative threat determination, the Commission must make a finding as to whether it would have found present injury but for the suspension of liquidation. *Id.*

Normally, to determine whether import volumes rapidly increased, the Commission compares imports in the six-month period prior to the filing of the Petition to the six-month

Tab 2b

P.R. 159

Mexichem's Posthearing Brief

October 23, 2014

# SCHAGRIN ASSOCIATES

900 SEVENTH STREET, N.W.
SUITE 500
WASHINGTON, D.C. 20001
(202) 223-1700

FAX (202) 429-2522

October 23, 2014

EMAIL: schagrin@erols.com

Received by CLK
OCT 23 2014

**Inv. Nos. 701-TA-509 and 731-TA-1244**
Total Pages: 51
Business proprietary information
deleted from pages 1-6, 8-10, 12, and A-3
Proprietary treatment requested for information
deleted from A-1, A-4, A-5, A-11 and exhibits 4-6

**· PUBLIC VERSION**

**FILED BY EDIS AND BY HAND**

Acting Secretary Lisa Barton
U.S. International Trade Commission
500 E St. SW, Room 112
Washington, DC 20436

Re: *1,1,1,2-Tetrafluoroethane from China*,
**Inv. Nos. 701-TA-509 and 731-TA-1244 - Submission of Post-Hearing Brief**

Dear Secretary Barton:

On behalf of petitioner Mexichem Fluor Inc., we hereby submit the public version of our post-hearing brief in the investigation described above. The public version of this brief deletes business proprietary information which has been granted confidential treatment by the Commission at pages 1-6, 8-10, 12, and A-3, and proprietary treatment requested information on pages A-1, A-4, A-5, A-11 and Exhibits 4-6.

Please contact the undersigned with any questions regarding this submission.

Respectfully Submitted,

Roger B. Schagrin
John W. Bohn
Paul W. Jameson
**Schagrin Associates**
*Counsel to Mexichem Fluor Inc.*

manufacturer a refrigerator. You'd have to go through Home Depot or one of their chains of distribution.

This raises the legal question of whether the Commission can conclude that a domestic industry is not being injured by increasing volumes of imports at prices that undersell the domestic price simply because the domestic industry opts to retain its current distribution system rather than give in to the demand of a retailer that it be sold to directly. Petitioner submits that the statute does not permit the Commission to excuse increasing imports at depressing prices on the grounds that a retailer suddenly decides that it does not want to go through a middleman.[16] In other words, the statute does not permit the Commission to conclude, yes, import volume increased, and yes, imports undersold the domestic product and caused price depression, leading to increased losses by the domestic industry, but imports did not cause injury because a retailer claims another reason for buying increased imports at dumped and subsidized prices. This is especially the case here, when AutoZone [

].[17]

Benefitting from lower prices from fairly traded imports is one thing, benefitting from lower prices from unfairly traded imports is another thing.

## III.  Prices Were Being Driven Down by Unfairly Traded Imports Rather Than Simply Returning to a "Natural Equilibrium"

Respondents presented the novel argument that the significant price declines that occurred when unfairly traded imports surged, at ever lower prices, were simply a matter of

---

[16] *Cf.* question by Commissioner Kieff, Tr. at 181-182.

[17] In fact, as Mr. Geosits testified (Tr. at 32), Mexichem will sell to a retailer in bulk who can then have these bulk purchases toll packaged by a repackager. However, AutoZone chose to approach a company, DuPont, that it knew had a policy not to sell directly, instead of companies like Mexichem and Arkema that would. That seems like a litigation ploy.

prices seeking and finding their "natural equilibrium" "as the supply shortages ebbed over time and the economy adjusted to the changes wrought." Tr. at 14 (Schutzman). Mr. Dougan presented a chart at the hearing that indexed prices from the preliminary and final investigations, so that 2010 data could be presented as well. Mr. Dougan claimed: "As supply conditions returned to normal in 2012 and 2013, prices you can see returned to effectively their 2010 levels." Tr. at 136. In other words, respondents are arguing that the increasing volumes of imports at prices that undersold the U.S. prices had at most an insignificant effect on prices. The prices for R-134a in the United States, respondents are arguing, would have been almost exactly the same if imports from China had never entered the market.

There are at least two major problems with this argument. First, under the statute, the notion of whether a price represents a "natural equilibrium" price is irrelevant. The Commission is instructed to "consider whether … there has been significant price underselling by the imported merchandise as compared with the price of like products of the United States," and whether "the effect of imports of such merchandise otherwise depresses prices to a significant degree or prevents price increases, which otherwise would have occurred, to a significant degree." 19 U.S.C. § 1677(7)(C)(ii). As discussed in the Staff Report (PSR at Table V-12), the record shows substantial and significant price underselling by the imported merchandise as compared with the price of like products of the United States. As discussed above and in our prehearing brief (at 12-16), the record shows that imports of R-134a from China caused substantial price depression. It is not a matter of prices slowly ebbing over the course of 2013, for instance, because of shortages in 2011, by some "natural" process.[18]

---

[18] Regarding Commissioner Schmidtlein's question (Tr. at 51-52) about "what portion of the price decline do we attribute to the supply demand versus the fact that you have imports in the market that came into meet the demand that was there that couldn't be met by domestic producers," we note that, under the statute, even if the Commission were to conclude that *some* of the price decline was due to an easing of supply constraints, it must still make an

Second, any discussion of prices is incomplete without a discussion of costs. The following chart combines the data from the preliminary and final investigations, so that we can also consider 2010 prices and costs.[19]



Per Unit Costs and Revenues, 2010 - 1H 2014:

Sources: Postconference Staff Report (12-5-13), Table VI-1; Prehearing Report (9-29-14), Table VI-1
Total Net sales from Prelim Staff Report    Total Net sa es from Final Staff Report
Costs (COGS + SG&A) From Prelim Staff Report   Costs (COGS + SG&A) From Final Staff Report

---

affirmative determination as long as a non-trivial part of the price decline was due to the price effects of unfairly traded imports. *See* Mexichem's Prehearing Brief at 2-4. In this case, as noted in Mexichem's Prehearing Brief (at 12-15) and by Mr. Greenwald at the hearing (Tr. at 52-53), an analysis of which portions of the market Chinese imports had the most presence and which portions of the market had the most substantial price declines supports the conclusion that Chinese imports of R-134a had a far greater than non-trivial role in the price declines that indisputably occurred from 2011 to the first half of 2014.

[19] Regarding Commissioner Kieff's question (Tr. at 45-46) about whether information from before 2011 should be relevant, we note that the Commission gathered information about 2010 during the preliminary investigation. US Producer information was gathered from the same three companies in both the preliminary and final investigations. [                                                                                                                    ]. The data gathered from importers in the preliminary and final investigations do not show similar coverage overlaps. The Commission gathered no information pre-2010, and such information would not be relevant to the Commission's analysis.

The data gathered by the Commission show that the average unit revenue in the first half of 2014 was [          ] than it was in 2010. Costs, meanwhile, [          ] from 2010 to the first half of 2014.[20] In such a situation, having prices return to 2010 levels would be an indicator of substantial material injury. Price increases that "otherwise would have occurred" due to increased costs were prevented because of the low-priced, unfairly traded imports of R-134a from China.

Mexichem's Prehearing Brief (at 16-19) discussed other factors that may have caused the price of R-134a to decline, and found that there was no possible explanation other than the presence of unfairly traded R-134a from China at ever-lower prices. The reason proffered by respondents, that prices have simply returned to their "natural equilibrium," has been shown not to withstand scrutiny. Once again, the record leaves only one possible explanation for the dramatic decline in prices over the period of investigation—increasing volumes of unfairly traded imports that undersold the domestic product and caused price depression and suppression.

## IV. Even a Profitable Industry Can Be Materially Injured by Reason of Unfairly Traded Imports

The Commission recently voted unanimously that a domestic industry was materially injured by reason of unfairly traded imports, even though the industry never showed an operating loss during the period of investigation:

> Therefore, despite increased sales, the mills' operating income fell from $641 million in 2011 to $613 million in 2012 and $312 million in 2013. The mills'

---

[20] The domestic producers' costs were calculated from PSR Table VI-1, which, Petitioner believes, improperly valued Mexichem Fluor's purchases from its parent company at the parent company's costs rather than at the transfer price actually paid by Mexichem Fluor. The [          ] if the information in PSR Appendix D were used instead.

Tab 2c

P.R. 160

Dupont's Posthearing Brief

October 23, 2014

# CASSIDY LEVY KENT (USA) LLP

2000 Pennsylvania Avenue, N.W., Suite 3000
Washington, D.C. 20006

JAMES R. CANNON, JR.
jcannon@cassidylevy.com

202.567.2318 (Direct)
202.567.2301 (Telecopy)

October 23, 2014

Inv. Nos. 701-TA-509 and
731-TA-1244 (Final)

**PUBLIC VERSION**

BY ELECTRONIC FILING AND HAND DELIVERY

Lisa R. Barton, Acting Secretary
U.S. International Trade Commission
Room 112A
500 E Street, S.W.
Washington, DC 20436

Re:   **1,1,1,2-Tetrafluoroethane (R134a) from People's Republic of China;
      Post-Hearing Brief and Answers to Commission Questions**

Dear Acting Secretary Barton:

On behalf of E.I. DuPont de Nemours & Company ("DuPont"), we hereby submit DuPont's Post-Hearing Brief and Answers to Commission Questions in the above-referenced investigations.

Bracketing changes have been incorporated in the public version filed today. Accordingly and pursuant to the Commission's regulations, we are also filing and serving these revised pages under separate cover.

Pursuant to section 777(b)(1) of the Tariff Act of 1930, 19 U.S.C. § 1677f(b)(1), and section 201.6 of the Commission's regulations, 19 C.F.R. § 201.6, DuPont requests that confidential treatment be granted to the business proprietary information of DuPont and the confidential information released to us under administrative protective order, which have been identified by brackets ("[]") in the enclosure. We agree on behalf of DuPont to permit disclosure of the above-described information pursuant to an adequately drawn administrative protective order.

As indicated on the attached certificate of service, copies of this submission are being served on the parties listed on the Commission's administrative protective order service list in this proceeding.

Please do not hesitate to contact the undersigned if you have any questions.

] under the "Other Refrigerants" category.[132] It is fair to say, therefore, that "other refrigerants" includes a variety of smaller market segments, not only sales to the stationary air conditioning and refrigeration markets (either OEM or aftermarket).[133]

**C.     "Could you elaborate more on why the mechanisms by which prices in the auto aftermarket segment could affect prices in the other market segments? (Tr. at 69)**

First, some distributors in the automotive aftermarket also provide R134a to the stationary airconditioning and refrigeration aftermarkets. Table IV-1 in the prehearing staff report identifies U.S. importers, such as Airgas Refrigerants, Inc., Coolgas, Inc., National Refrigerants, Inc. that supply the stationary service segment of the market. Other importers, such as Technical Chemical Company and Weitron, Inc., repackage refrigerants for customers in the automotive aftermarket, as well as in the stationary service segment.[134]

Second, within the automotive market, OEMs such as Ford or General Motors purchase both for the production of new vehicles and for their dealers, who provide aftermarket service of vehicles already on the road. These OEMs are therefore well aware of spot market prices for R134a.[135]

---

[132] Arkema Prod. Resp. at II-8. [
                    ].

[133] Tr. at 68 (Schagrin).

[134] **Exhibit 7** includes background information concerning these importers and distributors. **Exhibit 8** tabulates the responses of purchasers identifying themselves by type.

[135] *E.g.*, Tr. at 29 (Geosits); *id.* at 70 (Rubin); *id.* at 70-71 (Greenwald); *id.* at 71 (Geosits).
[
                    ].

Third, buyers in all market segments will use price quotes obtained from subject imports in sales negotiations. As Mr. Rubin explained: "When we sit down across the table from buyers in the other segments, they will highlight the competitive pricing coming out of China. It's part of the negotiating strategy that they will use in order to try and get as cost effective, buy as {much} they possibly can. So they're going to use it as leverage."[136] As Mr. Pacillo explained, "The first process was to get 30-pounders into the aftermarket. That's the easy step. Take over that market. next, we're moving into bulk containers into aerosol. And {the} final step will be auto OEMs."[137] The Commission has encountered a similar strategy in numerous cases.[138]

**D.** **"How easily can producers shift between export markets and the U.S. market and during the supply shortages in 2010 and 2011 did the producers reduce exports in order to serve the domestic customers?" (Tr. at 102)**

As shown by the prehearing staff report, the domestic industry had some ability to reduce exports to serve the U.S. market in 2010-2011. Table III-5 in the prehearing staff report shows that exports amounted to [                    ] percent of total domestic producer shipments. However, two points should be made. First, as explained by Mr. Rubin, DuPont honored existing contract commitments to export during 2010 and 2011 and could not shift that volume back to the U.S. market.[139] Second, the imbalance in demand and supply in 2010 and

---

[136] Tr. at 91 (Rubin).

[137] Tr. at 76 (Pacillo).

[138] *See, e.g., Sodium Hexametaphosphate from China*, 731-TA-1110 (Final), USITC Pub. 3984 at VII-2 – VII-4 (March, 2008) (technical grade SHMP from China first penetrated water treatment and clay mining markets, only later moving into food grade markets to supply more demanding customers).

[139] Tr. at 102-103 (Rubin). [                    ]

Tab 2d

P.R. 130

Sinochem Prehearing Brief

October 7, 2014



# GDLSK

GRUNFELD ; DESIDERIO ; LEBOWITZ
SILVERMAN ; KLESTADT LLP



Received by Clerk

OCT 07 2014

NEW YORK
WASHINGTON, DC
LOS ANGELES
HONG KONG

October 7, 2014

AD/CVD Investigation
Inv. Nos. 701-TA-509 and 731-TA-1244
(Final)

**Business Proprietary Information
Deleted From Pages 5-36, 38-52, 54 and
Exhibits 2-18**

**PUBLIC VERSION**

**VIA ELECTRONIC AND HAND DELIVERY**
The Honorable Lisa R. Barton
Secretary to the Commission
U.S. International Trade Commission
500 E Street, S.W., Room 112-A
Washington, DC 20436

    Re:    *Pre-hearing Case Brief,* 1,1,1,2 Tetrafluoroethane from China, Inv. No. 701-TA-509 and 731-TA-1244 (Final)

Dear Secretary Barton:

On behalf of our clients, Sinochem Environmental Protection Chemicals (Taicang) Co., Ltd., Zhejiang Quhua Fluor-Chemistry Co., Ltd., and Zhejiang Sanmei Chemical Industry Co., Ltd., foreign producer of the merchandise under consideration, we hereby file the public version of our pre-hearing brief in the above-captioned investigation.

Pursuant to 19 C.F.R. § 201.6, we have requested business proprietary treatment for the bracketed information contained in this brief. Proprietary treatment for the information contained in brackets is requested because this information was either released to us under

# EXHIBIT 2

PORTIONS REMOVED - BUSINESS
PROPRIETARY INFORMATION
NOT SUSCEPTIBLE TO PUBLIC
SUMMARY

Tab 2e

P.R. 151

Commission Hearing Transcript

October 16, 2014

*For supporting pages from P.R., see Tab 1*

Tab 2f

P.R. 198

1, 1, 1, 2-Tetrafluoroethane from China, Inv. Nos.

701-TA-509 and 731-TA-1244 (Final), Pub. 4503,

December 2014

February 3, 2015

*For supporting pages from P.R. 198, see Tab 2 of the Public Appendix*

*See Confidential Version in Tab 9 of Confidential Appendix*