UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| MEXICHEM FLUOR INC., & E.I. DUPONT DE NEMOURS & CO., <br><br>              Plaintiffs, <br><br>    v. <br><br> UNITED STATES, <br><br>              Defendant. | **PUBLIC VERSION** <br><br> Before: Leo M. Gordon, Judge <br><br> Consol. Court No. 15-00004 |

**OPINION**

[Final negative injury determination sustained.]

Dated: June 6, 2016

      <u>Paul W. Jameson</u>, Schagrin Associates of Washington, DC, argued for Plaintiff Mexichem Fluor Inc. With him on the brief was <u>Roger B. Schagrin</u>.

      <u>James R. Cannon, Jr.</u>, Cassidy Levy Kent (USA) LLP of Washington, DC, argued for Plaintiff-Intervenor E.I. DuPont de Nemours & Company. With him on the brief were <u>John D. Greenwald</u> and <u>Jonathan M. Zielinkski.</u>

      <u>Nataline Viray-Fung</u>, Attorney, and <u>Karl S. von Schriltz</u>, Attorney-Advisor, Office of the General Counsel, U.S. International Trade Commission, of Washington, DC, argued for Defendant. With them on the brief were <u>Dominic L. Bianchi</u>, General Counsel, and <u>Andrea C. Casson</u>, Assistant General Counsel.

      <u>Ned H. Marshak</u>, Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt LLP of New York, NY, argued for Defendant-Intervenors Sinochem Environmental Protection Chemicals (Taicang) Co., Ltd, Zhejiang Quhua Fluor-Chemistry Co., Ltd. and Zhejiang Sanmei Chemical Industry Co., Ltd. With him on the brief were <u>Max F. Schutzman</u> and <u>Kavita Mohan</u>.

      Gordon, Judge: This consolidated action involves the final determination of the

U.S. International Trade Commission ("Commission" or "ITC") that an industry in the

United States is not materially injured or threatened with material injury by reason of imports of 1,1,1,2– Tetrafluoroethane ("R-134a") from China. 1,1,1,2– Tetrafluoroethane from China, 79 Fed. Reg. 73,102 (Int'l Trade Comm'n Dec. 9, 2014) (final neg. determ.) ("Final Determination"); see also Views of the Commission, Inv. Nos. 701-TA-509 and 731-TA-1244 (Final), USITC Pub. 4503 (Dec. 2014) ("Views").[1] Before the court are the motions for judgment on the agency record of Plaintiff Mexichem Fluor Inc. and the Chemours Company, successor-in-interest to Consolidated Plaintiff E.I. DuPont de Nemours & Co. See Mot. of Pl. Mexichem Fluor Inc. for J. on the R. Pursuant to R. 56.2 (July 31, 2015), ECF No. 30 ("Mexichem Br."); The Chemours Co.'s (Successor-in-Interest to E.I. DuPont de Nemours & Co.) R. 56.2 Mot. for J. on the Agency R. (July 31, 2015), ECF No. 32 ("Chemours Br."); see also Def. Int'l Trade Comm'n's Opp'n to Pls.' Mots. for J. on the Agency R. (Nov. 13, 2015), ECF No. 38 ("Def.'s Resp."); Def.-Intervenors' Resp. to Pls.' R. 56.2 Mots. for J. upon the Agency R. (Nov. 13, 2015), ECF No. 40. The court has jurisdiction pursuant to Section 516A(a)(2)(A)(i)(I) and (B)(ii) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1516a(a)(2)(A)(i)(I), (B)(ii) (2012),[2] and 28 U.S.C. § 1581(c) (2012).

For the reasons set forth below, the court sustains the Final Determination on each of the issues raised.

---

[1] All citations to the Views and to the agency record are to their confidential versions.
[2] Further citations to the Tariff Act of 1930, as amended, are to the relevant provisions of Title 19 of the U.S. Code, 2012 edition.

## I. Standard of Review

The court sustains the Commission's "determinations, findings, or conclusions" unless they are "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). More specifically, when reviewing determinations, findings, or conclusions for substantial evidence, the court assesses whether the agency action is reasonable given the record as a whole. Nippon Steel Corp. v. United States, 458 F.3d 1345, 1350-51 (Fed. Cir. 2006). Substantial evidence has been described as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." DuPont Teijin Films USA v. United States, 407 F.3d 1211, 1215 (Fed. Cir. 2005) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). Substantial evidence has also been described as "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Consolo v. Fed. Mar. Comm'n, 383 U.S. 607, 620 (1966). Fundamentally, though, "substantial evidence" is best understood as a word formula connoting reasonableness review. 3 Charles H. Koch, Jr., Administrative Law and Practice § 9.24[1] (3d ed. 2015). Therefore, when addressing a substantial evidence issue raised by a party, the court analyzes whether the challenged agency action "was reasonable given the circumstances presented by the whole record." 8A West's Fed. Forms, National Courts § 3:6 (5th ed. 2015).

Separately, the two-step framework provided in Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 842-45 (1984), governs judicial review of the

Commission's interpretation of the Tariff Act. See United States v. Eurodif S.A., 555 U.S. 305, 316 (2009) (An agency's "interpretation governs in the absence of unambiguous statutory language to the contrary or unreasonable resolution of language that is ambiguous.").

## II. Discussion

Two separate, but parallel, provisions of the Tariff Act of 1930, as amended, provide for the Commission to determine whether a domestic industry is materially injured, or threatened with material injury, by reason of unfairly subsidized or dumped imports. See 19 U.S.C. §§ 1671d(b), 1673d(b). The Commission will issue an affirmative determination if it finds "present material injury or a threat thereof" and makes a "finding of causation." Hynix Semiconductor, Inc. v. United States, 30 CIT 1208, 1210, 431 F. Supp. 2d 1302, 1306 (2006) (citation and quotation marks omitted). In making a material injury determination, the Commission evaluates "(1) the volume of subject imports; (2) the price effects of subject imports on domestic like products; and (3) the impact of subject imports on the domestic producers of domestic like products." Id. (citing 19 U.S.C. § 1677(7)(B)(i)(I)-(III)). The Commission may also consider "'such other economic factors as are relevant in the determination.'" Id. at 1210, 431 F. Supp. 2d at 1306 (quoting 19 U.S.C. § 1677(7)(B)(ii)).

### A. Volume

In performing its volume analysis, the Commission must "'consider whether the volume of imports of the merchandise, or any increase in that volume, either in absolute terms or relative to production or consumption in the United States, is significant.'"

Shandong TTCA Biochemistry Co. v. United States, 35 CIT ___, ___, 774 F. Supp. 2d 1317, 1322 (2011) (quoting 19 U.S.C. § 1677(7)(C)(i)).

The Commission found that subject import volume and market share was "significant in absolute terms and relative to consumption." Views at 24. The Commission also noted an increase in subject imports between 2011 and 2012. Id. Nevertheless, the Commission determined that the volume of subject imports did not cause adverse effects to the domestic industry. The Commission reasoned that a domestic supply shortage beginning in 2010 and persisting "at least through the end of 2011" caused certain purchasers to turn to subject imports. Views at 21-23. As the shortage eased, "the market stabilized in 2012," and subject imports declined "on both a relative and absolute basis" in 2013. Id. at 23.

## 1. Subject Import Volume Data Source

### i. Contentions

Mexichem argues that the Commission should have evaluated subject import volume on a quarterly basis rather than an annual basis. Mexichem Br. at 21-22. Mexichem contends that the Commission "ignored" the increase in subject import volume in the fourth quarter of 2012, which in turn undermines the Commission's finding that the 2011 supply shortage caused the increase. Id. at 22. According to Mexichem, increased subject import volume in the fourth quarter of 2012 could not have resulted from the domestic shortage. Id. at 21-22.

Chemours argues that the Commission should have measured subject import market share using U.S. shipments of subject imports that importers reported rather than

official import statistics. Chemours Br. at 22. Chemours insists that imports of R-134a are kept in inventory and delivered as demand for air conditioning, which is weather dependent, dictates, and that imports held in inventories do not have market effects. Chemours also argues that shipment data are "essential" to calculate market share shifts on an "apples-to-apples basis." Id.

### ii. Analysis

The court does not agree with Mexichem that the Commission's evaluation of subject import volume on an annual rather than quarterly basis was unreasonable. The Commission followed its longstanding practice of assessing subject import volume and market share on an annual basis. As the Commission explained, the quarterly data that Mexichem prefers is less reliable than the annual data. Views at 4 n.4. Specifically, the quarterly data are limited to official import statistics covering imports entered under HTSUS subheading 2903.39.2020, see Mexichem Br. at 21, which cannot account for R-134a misclassified under other HTSUS provisions. Views at 4 n.4; 1,1,1,2–Tetrafluoroethane from China, Inv. Nos. 701-TA-509 and 731-TA-1244 (final), at IV-1 n.4 (Int'l Trade Comm'n Oct. 31, 2014) (final staff report) (confidential version) ("Conf. Rep."). To address this problem, the Commission combined the official import statistics for HTSUS subheading 2903.39.2020 with data for R-134a imported under other HTSUS provisions, which the Commission requested and obtained from importers directly. Views at 4 n.4. Because Mexichem's proposed methodology omits these misclassified imports, the Commission reasonably chose its traditional methodology to analyze subject import volume. Furthermore, the Commission does not appear to have overlooked increased

import volume due to its methodology selection: the Commission explicitly recognized that subject import volume increased between 2011 and 2012.[3] Views at 21.

The court also does not agree with Chemours that the Commission should have measured subject import market share using U.S. shipments. The Commission's typical practice is to use subject import volume to calculate subject import market share when accurate data on U.S. shipments of subject imports are unavailable. See BIC Corp. v. United States, 21 CIT 448, 461, 964 F. Supp. 391, 404 (1997) (sustaining the Commission's use of import data where questionnaires from importers were "incomplete"). Here, the Commission applied this practice because of reliability issues with the responding importers' U.S. shipment data. Specifically, certain importers,[4] accounting for a significant percentage of all subject imports,[5] reported that they did not track shipments by supplier or country of origin, meaning they had to either estimate their U.S. shipments of subject imports or else report U.S. shipments that included some amount of domestically-produced R-134a. See Conf. Rep. at Table IV-1; Importers' Questionnaire Responses at Questions II-5, II-10. The Commission therefore reasonably relied on official import data to measure subject import market share instead of U.S. shipment data. Conf. Rep. at Table IV-6.

---

[3] Subject import volume increased by **[[        ]]** short tons. Views at 21.
[4] **[[                                                                                ]]**.
[5] **[[        ]]**%. Conf. Rep. at Table IV-1.

## 2. Subject Import Volume Increase

### i. Contentions

Mexichem challenges the Commission's finding that the domestic supply shortage caused the increased volume of subject imports. Mexichem Br. at 18-26, 28-35. Mexichem asserts that the shortage ended in 2011, id. at 27, and contends that the Commission's finding is unreasonable because purchasers "bought even more imported R-134a in 2012 than they had in 2011." Id. at 29. Mexichem also challenges the Commission's conclusion that the market "stabilized" in 2012 because "imports continued to increase and prices continued to fall" in that year. Id. at 27-28. Mexichem points to quarterly and annual subject import volume data and purchasers' responses in support of its arguments.

Chemours argues that the Commission failed to consider market share gains by subject imports and domestic excess capacity in finding that the supply shortage caused the increased volume of subject imports. Chemours Br. at 20-22. Chemours insists that capacity utilization decreased and remained at that lowered level while subject imports increased. Id. at 21-22. Chemours asserts that domestic producers would have been able to increase sales volume and market share "but for" subject imports. Id. at 22.

### ii. Analysis

The court does not agree with Mexichem that subject import volumes in 2012 undermine the reasonableness of the Commission's finding that the domestic supply shortage caused the subject import volume increase. As the Commission reasonably

explained, confidential correspondence indicates that purchasers were warned that the supply shortage would continue <u>into</u> 2012.[6] <u>Views</u> at 2

2 & nn.93, 95. The Commission also explained that "purchasers were aware" that a domestic producer[7] "had scheduled a plant shutdown in 2012 for maintenance, further decreasing the available supply of domestically produced R-134a in 2012." <u>Id.</u> at 22-23. Moreover, the Commission explained that purchasers typically place orders in the fall for delivery through the winter months. <u>Id.</u> at 23. These facts support the Commission's reasonable finding that "the duration of the supply shortage was <u>uncertain</u> at the time it was occurring," which caused "purchasers [that] wanted to ensure a stable supply of R-134a" to "turn to China as a reliable source . . . both during the shortage <u>and as the shortage began to dissipate</u>." <u>Id.</u> (emphasis added). In the court's view, 2012 subject import volumes are consistent with the Commission's conclusion.

The court also does not agree with Mexichem that the Commission's finding that the market "stabilized" in 2012 was unreasonable. In terms of subject import volumes as a share of the U.S. market, the Commission noted the increase between 2011 and 2012, but a decline between 2012 and 2013.[8] <u>Id.</u> Likewise, the Commission observed a decline

---

[6] Specifically, in February 2012 **[[                                                                    ]]** warned of "**[[                                        ]]**." <u>Views</u> at 22 (emphasis added). Furthermore, **[[                                        ]]** notified its customers that **[[                                ]]**. <u>Id.</u>

[7] **[[          ]]**. <u>Views</u> at 22-23.

[8] Specifically, **[[    ]]**% in 2011, **[[    ]]**% in 2012, and **[[      ]]**% in 2013. <u>Views</u> at 23. Subject imports also constituted a **[[    ]]**% share in interim 2013, and a **[[    ]]**% share in interim 2014. <u>Views</u> at 23 n.103.

in U.S. producers' U.S. shipments as a share of the market between 2011 and 2012, but an increase from 2012 to 2013.[9] Id. at 23-24. Subject import volumes appear to have stabilized as the supply shortage eased, just as the Commission described. Id.

The court is also not persuaded by Chemours's argument regarding the domestic industry's unused capacity. Chemours believes domestic producers would have increased output "but for" subject imports, but fails to account for the numerous documents indicating that domestic producers were unable or unwilling to meet demand because of the shortage. See id. at 21-23 & nn.92-95 (quoting sources).

Consequently, the Commission reasonably found that the increase in the volume of subject imports between 2011 and 2012 was a result of the domestic supply shortage.

## B. Pricing

The Commission must evaluate whether:

(I) there has been significant price underselling by the imported merchandise as compared with the price of domestic like products of the United States, and

(II) the effect of imports of such merchandise otherwise depresses prices to a significant degree or prevents price increases, which otherwise would have occurred, to a significant degree.

19 U.S.C. § 1677(7)(C)(ii).

---

[9] Specifically, **[[        ]]**% in 2011, **[[        ]]**% in 2012, and **[[        ]]**% in 2013. Views at 23-24.

The Commission observed mixed instances of underselling and overselling.[10] Views at 25. As with its volume analysis, however, the Commission tied this pricing pattern back to the domestic supply shortage. The Commission explained that domestic prices declined during the period of investigation ("POI") due to cessation of the shortage, which had temporarily inflated prices. Id. at 28 & n.117. Because the shortage had been most acute in the automotive aftermarket segment, the Commission explained, prices in that segment were inflated the most and declined more than prices in other segments after the shortage ended. Id. at 28. Additionally, the Commission observed that domestic prices declined on all pricing products[11] after the shortage ended, regardless of whether subject imports undersold or oversold a particular pricing product. Id. at 29. The Commission also noted an increase in the domestic industry's cost of goods sold ("COGS") to net sales ratio over the POI, but explained that the increase resulted from the cessation of the supply shortage, which caused prices (and, consequently, net sales value) to decline. Id. at 30.

The Commission ultimately determined that subject imports "did not have significant price effects" because: (1) they "did not have the effect of depressing prices or preventing price increases that would otherwise have occurred to a significant degree";

---

[10] Subject imports oversold the domestic like product in 35 of 66 quarterly price comparisons, but the volume of undersold subject imports was **[[            ]]** larger than the volume of oversold subject imports. Views at 26.

[11] "Pricing products" refers to the seven different R-134a products for which the Commission sought pricing data. Conf. Rep. at V-5.

(2) "the observed underselling did not lead to significant shifts in market share;" and (3) instances of confirmed lost sales and revenues "do not outweigh the other data in the record which, taken as a whole, show the lack of significant price effects." Id. at 31.

### 1. Methodology Choice

### i. Contentions

Mexichem challenges the Commission's underselling methodology choice. According to Mexichem, the Commission's analysis compared U.S. and subject import prices at different levels of trade. Mexichem's Br. at 33-34. Mexichem asserts that the Commission's preferred import prices reflected differing levels of trade because they are generally higher than direct import prices. See id. at 32-34.

Similarly, Chemours contends that the Commission should have collected and used direct import pricing data. According to Chemours, the average unit values ("AUVs") of direct imports from China by four large repackagers[12] were generally lower than the AUVs of domestic producer sales to those same repackagers. Chemours Br. at 18-19. Chemours argues the Commission's methodology choice led it to ignore the price effects of bulk imports by these four large repackagers. Id. at 17-18.

---

[12] **[[                                                                    ]]**. Chemours Br. at 18-19.

**ii. Analysis**

Here, the Commission reasonably chose its typical underselling methodology. "[W]hile the statute requires the Commission to analyze underselling . . . the statute does not stipulate how the Commission is to calculate the price of the imported merchandise or the domestic like product," leaving it to the Commission "to choose the manner in which it calculates the prices, and how it compares them." Celanese Chems., Ltd. v. United States, 31 CIT 279, 294 (2007). Applying its usual approach here, the Commission based its price analysis on seven representative products, accounting "for approximately 60.5 percent of U.S. producers' U.S. commercial shipments and 65.9 percent of U.S. importers' U.S. commercial shipments of imports from China during the POI," Views at 25, and explained that the "pricing data on the record provides relatively high coverage of both the domestic like product and subject imports." Id. at 29, n.122. These two data sets have the added advantage of covering the same sales activities (shipments to unrelated U.S. customers), which enabled the Commission to make an apples-to-apples comparison between the price of imported merchandise and the price of domestic like products. See id. at 26-29. The Commission also reasonably explained that its "usual practice is not to rely heavily on AUV data because changes in AUV data over time can be a result of changes in product mix." Id. at 29 n.125.

Mexichem observes that prices of U.S. importers' U.S. shipments are higher than direct import prices. As the Commission reasonably explained, however, U.S. importers' U.S. shipments include "any sales markup that would typically be made by an importer selling R-134a in the U.S. market," such as transportation from the port to their facility,

warehousing costs, and profit margins, among other things. See Views at 29 n.122. That U.S. importers' U.S. shipments are priced higher than direct import prices is therefore neither surprising nor remarkable on this record.

The court also does not agree with Chemours's arguments. While Chemours would have preferred that the Commission collect and use direct import prices, "there is no minimum standard set by Congress to measure the thoroughness of an investigation by the Commission." Diamond Sawblades Mfrs. Coalition v. United States, 32 CIT 134, 148 (2008). As the Commission explained, direct import prices would not provide as accurate a picture of subject import underselling because domestic producers compete with direct import prices plus the costs associated with direct importation. See Views at 29 n.122. Likewise, the Commission considered the price data reported by the four large repackagers mentioned in Chemours's brief, which covered sales of pricing products derived from the R-134a they directly imported and repackaged into smaller containers.[13]

In the end, "Plaintiffs' preference for their own [underselling] methodology is understandable," but "'the focal point . . . is not what methodology [Plaintiffs] would prefer, but on whether the methodology actually used by the Commission was reasonable.'" Shandong, 35 CIT at ___, 774 F. Supp. 2d at 1329 (citation omitted); see also JMC Steel Group v. United States, 38 CIT ___, ___, 24 F. Supp. 3d 1290, 1300 (2014). Accordingly,

---

[13] See Importers' Questionnaire Responses of **[[                     ]]** at Questions II-5, III-2 (**[[

    ]]**).

the Commission in this case reasonably applied its usual methodology in analyzing subject import underselling.

## 2. Correlation Between Underselling and Market Share

### i. Contentions

Both Plaintiffs challenge the Commission's analysis of the relationship between underselling and changes in market share on legal grounds. Specifically, Chemours argues that the Commission was precluded as a matter of law from finding no adverse price effects "simply because" there was no correlation between subject import underselling and market share. See Chemours Br. at 15-17; see also 19 U.S.C. § 1677(7)(B)-(C) (describing "volume" separately from" price" as factors the Commission "shall consider" in each case). Mexichem argues that the Commission unlawfully failed to perform a market segmentation analysis when it found no correlation between underselling and market share changes. Mexichem insists that the Commission was required to perform a market segmentation analysis because the Commission considered the effects of the supply shortage on separate segments of the domestic market. Pl. Mexichem Fluor Inc. Reply's Br. at 16-18 (Jan. 21, 2016), ECF No. 49; see Mexichem Br. at 23-25, 29-31.

Plaintiffs also argue that the only reasonable conclusion on this record is that subject import underselling is in fact correlated with increased subject import market share. See id. at 23-25; Chemours Br. at 29. Plaintiffs contend that the Commission ignored what they view as a clear correlation between subject import underselling and market share in the automotive aftermarket segment. See Mexichem Br. at 23-25, 29-31;

Chemours Br. at 29. Mexichem in particular argues that the correlation between subject import underselling and market share was clear from the purchasing patterns of certain importer/purchasers,[14] which according to Mexichem increased their purchases and imports of R-134a from China due to lower prices. Mexichem Br. at 29-31.

### ii. Analysis

The court does not agree that the Commission violated 19 U.S.C. § 1677(7)(B)(ii) when it considered the connection between subject import underselling and volume. As Chemours correctly asserts, the statute "does not require" any link between subject import underselling and volume, and that subject imports may depress or suppress domestic prices without increasing in volume or market share. Chemours Br. at 16; see 19 U.S.C. § 1677(7)(B)(ii). The statute also does not, however, preclude the Commission from considering whether subject import underselling correlates with increased subject import volume or market share, as would be expected if underselling is driving increased purchases of subject imports. In fact, the statute provides that the Commission "may consider such other economic factors as are relevant to the determination regarding whether there is material injury by reason of subject imports." 19 U.S.C. § 1677(7)(B)(ii). The Commission therefore reasonably analyzed the correlation between subject import trends and domestic industry performance, including the correlation between subject import volume and price effects, as an economic factor relevant to the price effects of

---

[14] **[[                                                            ]]**. Mexichem Br. at 29-31.

subject imports. See JMC, 38 CIT at ___, 24 F. Supp. 3d at 1300 ("A correlation analysis entails tracking subject import trends in relation to trends in the domestic industry's performance and the court has approved its use to assess the price effects of subject imports.") (citing Comm. for Fair Coke Trade v. United States, 28 CIT 1140, 1168 (2004)).

The court also does not agree with Mexichem that the statute required the Commission to conduct a market segmentation analysis. "[T]he [Commission] bears no obligation to perform a market segmentation analysis" and "d[oes] not err in basing its determination on data representing the experience of the domestic industry as a whole, rather than on the experience of [different segments of the industry] separately.'" NSK Corp. v. United States, 32 CIT 966, 983, 577 F. Supp. 2d 1322, 1340 (2008) (quoting Tropicana Prods., Inc. v. United States, 31 CIT 548, 559-60, 484 F. Supp. 2d 1330, 1341 (2007)) (brackets in original); see also 19 U.S.C. § 1677(4)(A) ("The term 'industry' means the producers as a whole of a domestic like product, or those producers whose collective output of a domestic like product constitutes a major proportion of the total domestic production of the product."). During the investigation, Plaintiffs advocated a single domestic like product and industry, and did not request the collection of segment-specific performance data. The Commission defined a single domestic like product co-extensive with the scope of the investigations, encompassing all R-134a, and thus a single domestic industry comprised of all producers of R-134a. See Views at 8-9. The Commission therefore reasonably based its analysis of subject import underselling and market share trends on the market as a whole, while also considering the magnified effects of the supply shortage on the automotive sector as relevant to that analysis. Id. at 17-19, 27.

In any event, the Commission's correlation finding was but one of several findings supporting its conclusion that subject imports had no significant price effects. In addition to finding no correlation between subject import underselling and market share, Views at 27, the Commission also found a mixed pattern of subject import underselling and overselling, with overselling in a majority of quarterly comparisons. Id. at 26. The Commission found that cessation of the shortage explained the decline in domestic prices during the POI as well as the industry's increasing COGS to net sales ratio. Id. at 28, 30. The Commission found that domestic prices declined at a similar rate regardless of whether subject imports undersold or oversold a particular pricing product. Id. at 29. Taken as a whole, the Commission reasonably evaluated the relationship between subject import prices and other relevant economic factors and concluded that subject imports had no significant price effects.

The court is not persuaded that the Commission ignored subject import underselling in the automotive aftermarket segment. See Mexichem Br. at 23-25, 29-31; Chemours Br. at 29. The Commission found as a condition of competition that domestic producers maintained long term contracts with original equipment manufacturers but supplied the automotive aftermarket segment on a spot basis. The Commission explained that domestic producers chose to fulfill their long term contractual obligations before serving aftermarket purchasers in the spot market, which in turn concentrated the effects of the supply shortage on the automotive aftermarket segment. Views at 19. The Commission recognized that most subject imports were sold in the automotive aftermarket because that was the segment that experienced the greatest shortage of

R-134a, id. at 23, and that the domestic industry lost market share in the aftermarket segment between 2011 and 2013. Id. at 33. In so finding, the Commission recognized that most underselling would have occurred in the automotive aftermarket segment. Id. at 18, 25; Conf. Rep. at Table IV-7. As the Commission explained, however, the domestic industry "gained market share in the 'other refrigerants' application in which it faced competition from subject imports" during the period so that its overall market share in 2013 was only "slightly" lower than in 2011.[15] Views at 33.

The court also does not agree with Mexichem that the correlation between subject import underselling and market share was clear from the purchasing patterns of certain importer/purchasers. The Commission reasonably analyzed the relationship between subject import underselling and market share by using pricing data reported by all responding importers, covering 65.9 percent of their U.S. commercial shipments of subject imports, and market share data covering the market as a whole. Views at 27 (citing Conf. Rep. at Tables IV-6, V-6). By contrast, Mexichem's analysis focuses on only three of 40 responding importers, accounting for a smaller share[16] of reported subject import volume. Conf. Rep. at Table IV-1. Moreover, Mexichem compares the AUV of four of these importers' direct imports to the AUV of Mexichem's sales of product 1 alone. See Mexichem Br. at 29-31. When compared to the AUV of all domestic producer sales of

---

[15] **[[      ]]**% in 2013 as compared to **[[      ]]**% in 2011. Views at 33.

[16] **[[      ]]**%. Conf. Rep. at Table IV-1.

product 1, it turns out that direct import prices were <u>higher</u> than domestic prices in most[17] annual comparisons during 2011 and 2012. Conf. Rep. at Table V-3.

Finally, the court is not convinced that the only reasonable conclusion on this record is that subject import underselling is correlated with increased subject import market share. As the Commission pointed out, the domestic industry partly made up for its declining market share in the aftermarket segment with increased market share in the "other refrigerants" segment, resulting in little change to the industry's overall market share. <u>Views</u> at 27 n.114, 33. Plaintiffs rely heavily on the automotive aftermarket segment, which as the Commission explained experienced the greatest increase in subject import volume and the greatest decline in domestic prices as the shortage eased because the shortage impacted that segment most acutely. <u>Id.</u> at 23, 28. The Commission also explicitly found a "mixed" pattern of subject import underselling and overselling during the POI. <u>Id.</u> at 26. Plaintiffs' alternative interpretations of the same evidence do not, in the court's view, undermine the reasonableness of the Commission's findings here.

### 3. The Domestic Supply Shortage

### i. Contentions

Plaintiffs challenge the Commission's finding that domestic prices declined from levels inflated by the shortage as the domestic supply situation normalized in 2012. Mexichem argues that the Commission overlooked the quantity of subject imported

---

[17] Specifically, **[[          ]]** annual comparisons. Conf. Rep. at Table V-3.

pricing product that undersold domestic like product during the POI. Mexichem Br. at 31. Chemours asserts that the Commission's finding violates "basic principles of economics." Chemours Br. at 24-25. Chemours insists that the Commission actually "affirm[ed] the link" between domestic price levels and rising subject imports when it attributed the decline in prices during the POI to cessation of the supply shortage. Id. at 26. Chemours further argues that the Commission ignored evidence indicating that prices declined more for pricing products facing subject import competition than for the one product with no subject import competition. Id. at 30-31. Chemours insists that the share by volume of subject import underselling[18] "actually show[s]" that "underselling was pervasive." Id. Finally, Chemours contends that the Commission attached insufficient weight to confirmed lost sales and revenue allegations. Id. at 31.

### ii. Analysis

In arguing that the Commission should have measured the degree of subject import underselling based on volume rather than quarters of underselling, Mexichem essentially challenges the Commission's methodological choice. The Commission has historically measured the degree of subject import underselling by comparing the number of quarterly price comparisons in which subject import underselling occurred to the number of quarterly comparisons in which subject import overselling occurred. The court has sustained this approach in the past. Nucor Corp. v. United States, 28 CIT 188, 246,

---

[18] **[[    ]]**%. Chemours Br. at 30.

318 F. Supp. 2d 1207, 1257 ("[T]he [ITC] is not obligated to conduct a price comparison analysis that accounts for variations in sales volumes.") (quoting <u>Nippon Steel</u>, 182 F. Supp. 2d at 1341); <u>see also</u> <u>Shandong</u>, 35 CIT at ___, 774 F. Supp. 2d at 1327-29; <u>Coal. of Gulf Shrimp Indus.</u>, 39 CIT ___, ___, 71 F. Supp. 3d 1356, 1365-66 (2015).

Applying this methodology here, the Commission found that prices of domestically-produced pricing products declined at a similar rate regardless of the degree of subject import underselling. Specifically, domestic prices declined at a similar rate for product 1, which subject import oversold in most comparisons; product 4, which subject imports undersold in most comparisons; and products 5, 6, and 7, which had mixed patterns of quarterly underselling and overselling. <u>Views</u> at 29. Although Mexichem identifies an alternative methodology that supports its preferred outcome, the Commission here applied its traditional methodology for assessing underselling and found that domestic prices declined at a similar rate whether subject imports undersold or oversold particular products. <u>Id.</u> at 24-29. This finding, in turn, reasonably supports the Commission's conclusion that prices dropped in response to the improved domestic supply situation rather than subject import underselling. <u>Id.</u> at 31.

The court does not agree with Chemours that the Commission violated "elementary" economic principles in finding no correlation between subject imports and declining prices. CB at 24-25. "[U]nderselling combined with increasing import volumes does not 'necessarily indicate[] injury due to pricing in cases involving fungible products.'" <u>JMC</u>, 38 CIT at ___, 24 F. Supp. 3d at 1303 (quoting <u>Coal. for Pres. of Am. Brake Drum & Rotor Aftermkt. Mfrs. v. United States</u>, 22 CIT 520, 527-28, 15 F. Supp. 2d 918, 925

(1998)) (emphasis added). The Commission recognized that subject imports were highly substitutable for the domestic like product and that price was an important factor in purchasing decisions. Views at 19-20. Nevertheless, as the Commission explained, domestic prices for products 1, 4, 5, 6, and 7 dropped at similar rates regardless of whether (and how much) subject imports undersold, oversold, or even competed with those products. Id. at 29. The supply shortage, on the other hand, accounts for these widespread price reductions as well as many other market conditions outlined in the record. See id. at 17-19, 21-30. The Commission therefore reasonably concluded that the cessation of the shortage rather than subject import underselling accounted for the decline in domestic prices during the POI. Id. at 28-29; see also Statement of Administrative Action for the Uruguay Round Agreements Act, H.R. Doc. No. 103-316, vol. 1 at 851-52 (1994) (explaining that the Commission must "ensure that it is not attributing injury from other sources to the subject imports" (emphasis added)).

The court is also not convinced that the Commission ignored evidence that prices declined more for pricing products facing subject import competition than for the one product with no subject import competition. The Commission explicitly recognized that "price declines occurred whether subject imports oversold or undersold the domestic like product and regardless of whether subject imports were present in the market for a particular pricing product." Views at 29 (emphasis added). It appears that Chemours simply disagrees with the Commission's reasonable finding that the supply shortage, rather than subject import underselling, caused the decline in prices. See id. at 28-29.

The court also is not persuaded that the Commission attached insufficient weight to evidence that a certain percent[19] of reported subject import sales volume undersold the domestic like product. As discussed above, the Commission used its traditional methodology of assessing underselling on a quarterly basis and was "not obligated to conduct a price comparison analysis that accounts for variations in sales volumes." Nucor, 28 CIT at 246, 318 F. Supp. 2d at 1257 (citation omitted). The Commission expressly recognized that the quantity of undersold subject imports was larger than the quantity of oversold subject imports. Views at 26. The Commission explained, however, that the volume of subject imports that undersold the domestic like product did not correlate to subject import market share shifts. Id. at 27. Instead, the Commission found that the only gain in subject import market share occurred between 2011 and 2012 as a result of the domestic supply shortage. Id. In the court's view, the Commission reasonably weighed the evidence of underselling in concluding that subject imports did not cause the observed price declines.

Finally, the Court does not agree with Chemours's arguments about confirmed lost sales and lost revenue allegations. Chemours overstates confirmed lost sales and revenues by comparing them to industry sales and operating income in 2013 alone, even though lost sales and revenues allegations were spread across the POI. See Conf. Rep.

---

[19] **[[    ]]**%. Chemours Br. at 30.

at Tables V-13-14. Compared to the whole POI, lost sales and revenue allegations[20] amounted to a small percent of domestic industry sales[21] and were substantially lower than the industry's operating income in 2011 and 2012.[22] Id. at Table D-1. Most of the confirmed lost sales and lost revenues occurred during and immediately following the supply shortage in 2011 and 2012.[23] See id. at Tables V-13-14.

In any event, "the Commission must determine whether lost sales, <u>together with other factors</u>, indicate a causal nexus between the imports at less than fair value and material injury to the domestic industry.'" GEO Specialty Chems., Inc. v. United States, 33 CIT 125, 132-22 (2009) (quoting Maverick Tube Corp. v. United States, 12 CIT 444, 449, 687 F. Supp. 1569, 1575 (1988)) (emphasis added). Here, the Commission considered confirmed lost sales and revenues and found that they did "not outweigh the other data in the record which, taken as a whole, show the lack of significant price effects." Views at 31 n.132. As the Commission explained, subject import underselling was mixed and did not correlate with subject import market share shifts; domestic prices declined due to cessation of the shortage, and regardless of underselling, overselling, or even competition from subject imports; and declining prices from cessation of the shortage caused the industry's COGS to net sales ratio to increase, notwithstanding the industry's

---

[20] $[[          ]]. Conf. Rep. Table D-1.
[21] **[[    ]]**% of $[[              ]]. Conf. Rep. Table D-1.
[22] $[[              ]] and $[[            ]], respectively. Conf. Rep. Table D-1.
[23] Specifically, **[[    ]]**% of confirmed lost sales and **[[    ]]**% of confirmed lost revenues. Conf. Rep. at Tables V-13 to -14.

stable COGS. See id. at 25-30. The Commission therefore reasonably found that other evidence outweighed the confirmed lost sales and revenue allegations.

## C. Impact

In evaluating the impact of subject imports on the domestic industry, the Commission evaluates "all relevant economic factors which have a bearing on the state of the industry," including, but not limited to:

(I) actual and potential decline in output, sales, market share, profits, productivity, return on investments, and utilization of capacity,

(II) factors affecting domestic prices,

(III) actual and potential negative effects on cash flow, inventories, employment, wages, growth, ability to raise capital, and investment,

(IV) actual and potential negative effects on the existing development and production efforts of the domestic industry, including efforts to develop a derivative or more advanced version of the domestic like product, and

(V) in a proceeding [concerning the imposition of antidumping duties], the magnitude of the margin of dumping.

19 U.S.C. § 1677(7)(C)(iii). The Commission must analyze these factors "within the context of the business cycle and conditions of competition that are distinctive to the affected industry." Id.

The Commission found that largely stable demand during the POI was reflected in the relatively stable performance of the domestic industry according to most measures, including capacity, capacity utilization, production, U.S. shipments, market share, employment, wages paid, hours worked, productivity, and net sales quantity. Views at 32-34. The industry's market share was only slightly lower in 2013 than in 2011, the

Commission explained, because the industry offset market share lost in the aftermarket segment with market share gains in the "other refrigerants" application, despite subject import competition. Id. at 33.

The Commission recognized that the domestic industry suffered a severe decline in operating income during the POI, as the domestic industry's net sales revenues declined more rapidly than the industry's COGS. Id. at 34-35. The Commission explained, however, the industry's financial performance declined during the POI when prices that were anomalously high due to the shortage in 2010 and 2011 began to return to pre-shortage levels as the market stabilized in 2012 and 2013. Id. at 36. The Commission observed that subject imports had no significant price effects, and found no correlation between the domestic industry's declining financial performance and subject import volume and market share. Id.

## 1. The Domestic Supply Shortage

### i. Contentions

Mexichem argues that the Commission unlawfully ignored the increase in the domestic industry's COGS to net sales ratio between 2010 and interim 2014, which in its view showed injury by reason of subject imports. Mexichem Br. at 18-20, 36-38. Similarly, Chemours argues that the Commission erred in finding that domestic prices returned "to normal" in 2013 because, in its view, the decline in domestic prices to below cost by interim 2014 could not be considered normal. Chemours Br. at 27.

**ii. Analysis**

In the court's view, the Commission lawfully focused on 2011-13 data for its analysis of trends in the domestic industry's COGS to net sales ratio. Views at 30, 34. "The statute does not expressly command the Commission to examine a particular period of time." Kenda Rubber Indus. Co. v. United States, 10 CIT 120, 126-27, 630 F. Supp. 354, 359 (1986); see also Nitrogen Solutions Fair Trade Comm. v. United States, 29 CIT 86, 97, 358 F. Supp. 2d 1314, 1325 (2005) ("[T]he ITC's broad discretion in choosing the time frame for its investigation and analysis has consistently been upheld . . . ."). The Commission here applied its normal practice in defining the POI for the final phase of its investigations as 2011-13 and the first halves of 2013 and 2014. Mexichem did not challenge this decision below by requesting that the Commission expand the POI to include 2010 and to collect data covering 2010. See Mexichem's Comments (1-69). Just because Mexichem now identifies a different methodology that might support its own narrative does not mean that the Commission's normal practice is unlawful.

Here, the Commission reasonably analyzed trends in the domestic industry's COGS to net sales ratio. Views at 30, 40. The Commission explained that domestic prices were inflated by the supply shortage in both 2010 and 2011, meaning that the AUV of the domestic industry's net sales in 2010 was much higher, and the industry's COGS to net sales ratio much lower, than it would have been in the absence of the shortage. Views at 18, 28 & n.117, 36. More broadly, given the absence of any correlation between subject import underselling and either market share shifts or domestic price declines, id. at 27-29, and the inflated domestic prices that resulted from the shortage, id. at 28 & nn.117-

18, the Commission concluded that the domestic industry's declining operating income during the POI resulted from resolution of the shortage rather than subject imports. Id. at 36. Mexichem's argument that these data establish material injury by reason of subject imports is an invitation for the court to reweigh this same evidence. Usinor v. United States, 28 CIT 1107, 1111, 342 F. Supp. 2d 1267, 1272 (2004) (The CIT "may not reweigh the evidence or substitute its own judgment for that of the agency."). This the court will not do.

The court also does not agree with Chemours that the Commission unreasonably found that "falling prices in 2013 represented a return to 'normal.'" Chemours Br. at 27. The Commission expressly declined Plaintiffs' invitation to speculate as to whether prices were returning to their "natural equilibrium." Views at 30 n.130. As the Commission explained, "we have not purported to compute such prices" because "the statute does not refer to 'equilibrium' prices" but rather "directs [the Commission] to ascertain whether the effect of subject imports is to depress prices to a significant degree." Id. at 30 n.130 (citing 19 U.S.C. § 1677(7)(C)(ii)(II)). Chemours's argument is therefore not responsive to the Commission's finding that domestic "price declines occurred because prices were anomalously high at the beginning of the POI . . . and began to return to their pre-shortage levels as the market stabilized in 2012 and 2013." Id. at 36.

### 2. Fixed Costs

### i. Contentions

Mexichem argues that the Commission unlawfully failed "to mention the high fixed costs and safety issues that are distinctive to the R-134a market." Mexichem Br. at 39

## ii. Analysis

The court does not agree. The statute directs the Commission to "evaluate all underline relevant economic factors . . . within the context of the business cycle and conditions of competition that are distinctive to the affected industry." 19 U.S.C. § 1677(7)(C)(iii). Mexichem does not explain in its brief why "high fixed cost and safety issues" are relevant to the impact subject imports have on the state of the industry or how "mention[ing]" these factors would affect the Commission's impact analysis. <u>See</u> Mexichem Br. at 39. The court therefore deems this issue waived. <u>United States v. Great Am. Ins. Co.</u>, 738 F.3d 1320, 1328 (Fed. Cir. 2013); <u>see also</u> <u>Zhejiang Sanhua Co. v. United States</u>, 39 CIT ___, ___, 61 F. Supp. 3d 1350, 1357-58 (2015) (explaining waiver).

## 3. Subject Import Inventories

## i. Contentions

Chemours argues that the Commission failed to analyze subject import inventories, which in its view caused an "inventory overhang" that depressed domestic prices. <u>See</u> Chemours Br. at 23-24. Chemours identifies two previous determinations in which the Commission found that an "inventory overhang" adversely affected domestic prices. Chemours Br. at 23-24 (citing <u>Certain Steel Grating from China</u>, Inv. Nos. 701-TA-465 and 731-TA-1161 (Final), USITC Pub. 4168 (July 2010) ("<u>Steel Grating from China</u>"); <u>Certain Orange Juice from Brazil</u>, Inv. No. No. 731-TA-1089 (Final), USITC Pub. 3838 (Mar. 2006) ("<u>Orange Juice from Brazil</u>")).

### ii. Analysis

The court does not agree that the Commission failed to analyze the effects subject import inventories. The Commission expressly noted that "U.S. inventories of subject merchandise did increase" from 2011 to 2013, but explained that "[t]he available data indicate that any inventory buildup did not persist after the end of 2013." Views at 40. The Commission also considered whether "abnormally high inventories" in interim 2014 resulted in "record low" subject import prices. See id. at 35 n.148. As the Commission explained, pricing data on the record actually showed that, "with one exception, subject import prices increased during interim 2014." Id. (emphasis added).

The court is also not convinced that the "inventory overhang" issues discussed in Steel Grating from China or Orange Juice from Brazil compel a different outcome here. Each Commission determination is sui generis, "involving a unique combination and interaction of many variables, and therefore a prior administrative determination is not legally binding on other reviews before this court." U.S. Steel Corp. v. United States, 33 CIT 984, 1003, 637 F. Supp. 2d 1199, 1218 (2009) (citing Nucor Corp., 414 F.3d at 1340); see also Cleo Inc. v. United States, 501 F.3d 1291, 1299 (Fed. Cir. 2007) ("[P]rior determinations by the Commission with regard to one industry typically provide little guidance for later determinations with regard to different industries.").

### D. Threat

### i. Contentions

Chemours challenges the Commission's finding that there was "no link between the dumped imports and that falling price levels in the U.S. market" as unreasonable for

the same reasons Chemours challenged that finding in the material injury context. Chemours Br. at 33-34.

### ii. Analysis

Chemours does not identify any specific flaw in the Commission's threat analysis. See Chemours Br. at 33-34. The court therefore sustains the Commission's threat analysis as well. 28 U.S.C. § 2639(a)(1) (the Commission's determinations are presumed to be correct and the burden is on the party challenging the determination to demonstrate otherwise).

### III. Conclusion

For the foregoing reasons, the court sustains the Final Determination for each of the issues Mexichem and Chemours have challenged in their motions for judgment on the agency record. Judgment will be entered accordingly.

/s/ Leo M. Gordon
Judge Leo M. Gordon

Dated: June 6, 2016
        New York, New York